# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **OLLIE GREENE, Individually as the surviving parent of WYNDELL GREENE, SR., WILLIAM GREENE, as the Administrator of the Estate of WYNDELL GREENE, SR., and MARILYN BURDETTE HARDEMAN, Individually and as the surviving parent of LAKEYSHA GREENE,** | § § § § § § § | **CAUSE NUMBER: 3:11-cv-0207-N** |
| **Plaintiffs,** | § § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **TOYOTA MOTOR CORPORATION, TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., TOYOTA MOTOR SALES USA, INC., VOLVO GROUP NORTH AMERICA, LLC., VOLVO TRUCKS NORTH AMERICA, A DIVISION OF VOLVO GROUP NORTH AMERICA, LLC., STRICK TRAILERS, LLC, JOHN FAYARD MOVING & WAREHOUSE, LLC, and DOLPHIN LINE, INC.** | § § § § § § § § § § § § | |
| **Defendants.** | § | |

---

## JOINT SUBMISSION REGARDING PLAINTIFFS' EXPEDITED THIRD MOTION TO COMPEL AGAINST THE TOYOTA DEFENDANTS

TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. 1

PRELIMINARY STATEMENT ..................................................................................... 4

    A.    Plaintiffs' Contention: ............................................................................. 4

I.    NATURE OF THE EXPEDITED REQUEST ....................................................... 5

    A.    Plaintiffs' Contention: ............................................................................. 5

II.    TOYOTA'S DISCOVERY OBSTRUCTIONISM .................................................. 5

    A.    Plaintiffs' Contention: ............................................................................. 5

    B.    Toyota's Contention: .............................................................................. 8

III.    ARGUMENT AND AUTHORITIES ...................................................................... 14

    A.    The Discovery Standard ....................................................................... 14

        1.    Plaintiffs' Contention: ............................................................ 14

        2.    Toyota's Contention ............................................................... 14

    B.    The Discovery Relates Clearly to the Claims and Defenses of the Parties............ 15

        1.    Plaintiffs' Contention: ............................................................ 15

        2.    Toyota's Contention:.............................................................. 16

    C.    The Court Should Wholesale Overrule Toyota's Objections That Full Discovery Was Defined By a July 18, 2012, Order.................................... 17

        1.    Plaintiffs' Contention: ............................................................ 17

        2.    Toyota's Contention:.............................................................. 17

    D.    TMC Failed to Designate a Proper Witness under Fed.R.Civ.P. 30(b)(6) to Give Complete and Knowledgeable Answers Regarding the Matters Designated in the Notice. ...................................................................... 20

        1.    Plaintiffs' Contention: ............................................................ 20

            a.    Deponent did not provide complete information regarding TMC's use of and policies regarding using and preserving CAD, CAE and FEM. ................................. 21

            b.    Deponent did not provide complete information regarding TMC's fuel tank designs and fuel design alternatives used by Toyota. ...................................... 23

        2.    Toyota's Contention:.............................................................. 23

    E.    The Court Should Overrule Toyota's Boilerplate Objections to Plaintiffs' Discovery Requests........................................................................ 29

        1.    Plaintiffs' Contention: ............................................................ 29

        2.    Toyota's Contention:.............................................................. 29

F. The Court Should Order that Toyota Provide Full Responses to Interrogatories Where Toyota's Responses Simply Refer Plaintiffs to Other Documents or Sources: Interrogatory Nos. 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, and 12. ........................... 31

 1. Plaintiffs' Contention: ............................................................. 31

 2. Toyota's Contention: ............................................................... 33

G. Toyota's Other Objections to Plaintiffs' Discovery Requests. .............................. 37

 1. Plaintiffs' Contention: ............................................................. 37

  a. Information regarding Toyota's use of CAD and FEM and related information is relevant and discoverable. ........................ 37

   (1) The CAD, FE, CATIA information, as well as the related research and electronically stored information: Interrogatory Nos. 1, 2, and 3. ........................................... 38

   (2) The CAD, FE, CATIA information, as well as the related research and electronically stored information: Requests for Production – Nos. 1, 2, and 5...................... 40

  b. Plaintiffs are entitled to discovery regarding Toyota's alleged policy of destroying or discarding its CAD and FE.................... 42

   (1) Toyota's policy of destroying its clearly relevant CAD and FE information:  Interrogatory Nos. 7 and 8.................... 43

   (2) Toyota's policy of discarding its CAD and FE information: Request for Production No. 18......................................... 44

 2. Toyota's Contention: ............................................................... 44

 3. Toyota's Contention: ............................................................... 50

  c. Plaintiffs are entitled to discovery on Toyota's fuel tank designs, other alternative designs within Toyota's knowledge and cost information................................................................. 52

 1. Plaintiffs' Contention: ............................................................. 52

  a. The 4Runner fuel tank designs, alternative designs, and cost information:  Interrogatory Nos. 4, 5 and 6............... 53

  b. The 4Runner fuel tank designs, alternative designs, and cost information:  Requests for Production Nos. 12, 14, 15, 16, 23, and 24................................................................. 56

 2. Toyota's Contention: ............................................................... 57

  d. Plaintiffs are entitled to discovery regarding specific crash and simulated tests and the FMEA and DRBFM information related to relevant components: Interrogatory Nos. 9, 10, 11, and 12.......... 62

 1. Plaintiffs' Contention: ............................................................. 62

 2. Toyota's Contention: ............................................................... 64

e.  Plaintiffs are entitled to specific Electronically Stored Information and narrowly tailored email on clearly relevant materials: Request for Production Nos. 8, 9, 11, and 25. ........................................... 66

1.  Plaintiffs' Contention: ........................................................................ 66

2.  Toyota's Contention: ........................................................................... 67

f.  Plaintiffs are entitled to Toyota advertisements where it represents its safety features to the public: Request for Production No. 22. . 70

1.  Plaintiffs' Contention: ........................................................................ 70

2.  Toyota's Contention: ........................................................................... 70

H.  The Court Should Order That TMC Produce, at TMC's Cost, a Representative for a Deposition on the Information Sought in This Motion. .................................... 71

1.  Plaintiffs' Contention: ........................................................................ 71

2.  Toyota's Contention: ........................................................................... 72

IV.  CONCLUSION ............................................................................................................... 72

1.  Plaintiffs' Contention: ........................................................................ 72

2.  Toyota's Contention: ........................................................................... 72

CERTIFICATE OF CONFERENCE ............................................................................................. 74

## PRELIMINARY STATEMENT

### A.      Plaintiffs' Contention:

Defendants Toyota Motor Corporation ("TMC"), Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA"), Toyota Motor Sales USA, Inc. ("TMS") (collectively, "Toyota") continue their discovery abuse, the result of which deprives Plaintiffs of clearly discoverable matter.  Despite two previous motions to compel, a July 18, 2012, Court Order, and two sets of narrowed discovery requests after the deposition of the TMC corporate representative, Toyota once again interposes baseless objections in their continuing attempt to hide-the-ball from Plaintiffs.  The Toyota Defendants should be ordered to respond immediately to Plaintiffs' discovery requests.  The requests are clearly relevant to the issues in the lawsuit and are reasonably calculated to lead to the discovery of admissible evidence.

Additionally, on September 16, 2013 at 1:50 p.m. (just hours before the Joint Submission was due to be filed with the Court, and during the time Plaintiffs' counsel was in a hearing with the Honorable Judge Irma Ramirez), Toyota submitted over 45 pages of written contentions and over 1500 pages of documentary information allegedly in support of Toyota's contentions.  None of the legal authorities on which Toyota relies was provided to Plaintiffs prior to or during the face-to-face conference that took place on September 12, 2013.  Furthermore, many of the alleged factual contentions were not discussed during the face-to-face conference.  Accordingly, Plaintiffs have not had the opportunity to review these contentions in detail, nor to provide a rebuttal to these contentions.  By Toyota providing these last-minute contentions, Plaintiffs have been prejudiced to the extent they have not had the opportunity to fully review or address the contentions.

## I.      NATURE OF THE EXPEDITED REQUEST

**A.      Plaintiffs' Contention:**

Pursuant to the Scheduling Order in this matter, Plaintiffs' expert reports are due on or about October 11, 2013, and discovery being sought herein will be used by the experts in support of their reports.  Accordingly, Plaintiffs respectfully request an oral hearing and/or an order on Toyota's deficient discovery responses at the Court's earliest opportunity and ask that the Court overrule Toyota's general and specific objections.  Plaintiffs ask further that the Court compel immediate responses to the discovery requests so that Plaintiffs may obtain the discovery sufficiently in advance of the deadline for expert reports in order that the experts can incorporate the missing material into their analyses.

## II.      TOYOTA'S DISCOVERY OBSTRUCTIONISM

**A.      Plaintiffs' Contention:**

1.      In response to Plaintiffs' first interrogatory requests, Toyota objected to each of Plaintiffs' thirteen (13) interrogatories, providing incomplete responses, or no responses, to each.

2.      Similarly, in response to Plaintiffs' First Request for Production of Documents, Toyota, in three responses that total 546 pages, objected to virtually each of Plaintiffs' requests and, under the guise of objections, wholly refused to provide clearly discoverable items.

3.      On or about February 24, 2012, Plaintiffs filed a Motion to Compel (the "First Motion to Compel") against the Toyota and VGNA.  The First Motion to Compel was heard on or about March 5, 2012, and an Order was issued on July 18, 2012, setting the scope of discovery, but only as to certain limited items discussed at the hearing.

4.      Following the issuance of the Court's July 18, 2012, Order, Plaintiffs' counsel submitted discovery requests on July 23, 2012, to Toyota's counsel seeking discovery of the issues addressed in the Court's July 18, 2012, Order and FRCP 26.

5.      After receiving some materials from Toyota three months after the Court's July 18, 2012, Order, Plaintiffs' counsel informed Toyota's counsel on October, 24, 2012, that Toyota's responses do not comply with the Court's July 18, 2012, Order.  Plaintiffs' counsel requested that Toyota respond "directly and specifically" to each of the requests for productions and interrogatories contained in Plaintiffs' July 23, 2012, discovery letter.  Toyota's counsel refused to respond specifically to each of the requests for productions and interrogatories contained in the July 23, 2012, discovery requests.

6.      On January 4, 2013, Plaintiffs filed a Second Motion to Compel (the "Second Motion to Compel") against Toyota and VGNA.

7.      The Second Motion to Compel was heard on or about January 22, 2013.  During the January 22, 2013, hearing on Plaintiffs' Second Motion to Compel, the Court issued the following directive to the Toyota Defendants:

> Okay. I want you to treat Exhibit B [Plaintiffs' July 23, 2012, discovery requests] as if it were a formal RFP and respond to it in a week. That doesn't mean produce the documents, necessarily, but give them a written response. You have had it around since July, so I think you can probably give them a written response in a week.

> Okay. Then 30 days for the docs.

8.      On January 29, 2013, Toyota submitted their responses to Plaintiffs' July 23, 2012, discovery requests.  Consistent with Toyota's original 546 page set of objections to Plaintiffs' first set of discovery, Toyota submitted an 83-page set of objections to the July 23, 2012, discovery requests, despite the requests being consistent with the July 18, 2013, Order.

9.      Additionally, Plaintiffs' counsel submitted a letter dated February 1, 2013, to Toyota's counsel asking for the status of the Toyota Defendants' CAD or FEA input data files, computer simulation and computer models of testing.  In a March 1, 2013, letter from Toyota's

counsel, Toyota still failed to provide the nature and extent of the Toyota Defendants' CAD or FEM input files, design files, computer models or computer simulation programs related to the 2003-2009 and the 2010-2012 U.S. bound 4Runners.

10.      On or about June 8, 2013, pursuant to a Fed.R.Civ.P. 30(b)(6) notice of deposition, Plaintiffs took the deposition of TMC representative Ichiro Fukumoto ("Fukumoto"). During the deposition, it was apparent that Fukumoto was not knowledgeable of many of the topics on which examination had been requested.

11.      As a result of questions raised during Fukumoto's deposition and his inability to provide relevant information, on June 25, 2013, Plaintiffs submitted a second set of interrogatories and request for production to the Toyota Defendants.  (APP 001-014; APP 085-097)

12.      On July 29, 2013, TEMA submitted a thirty-three (33) page response to Plaintiffs' June 25, 2013, Second Set of Interrogatories, where TEMA submitted general and prophylactic objections to each of Plaintiffs' twelve (12) interrogatories.  TEMA also submitted a seventy-four (74) page response to Plaintiffs' Second Request for Documents, where TEMA submitted general and prophylactic objections each of Plaintiffs' twenty-six (26) requests for documents.

13.      Also on or about July 29, 2013, TMS submitted a thirty-five (35) page response to Plaintiffs' June 25, 2013, Second Set of Interrogatories, where TMS submitted general and prophylactic objections to each of Plaintiffs' twelve (12) interrogatories.  TMS also submitted a seventy-five (75) page response to Plaintiffs' Second Request for Documents, where TMS submitted prophylactic objections each of Plaintiffs' twenty-six (26) requests for documents.

14.      On August 28, 2013, TMC served a thirty (30) page response to Plaintiffs' June 25, 2013, Interrogatories, where TMC submitted general prophylactic objections to each of

Plaintiffs' twelve (12) interrogatories and did not fully answer any of them.  TMC also submitted

an eighty-seven (87) page response to Plaintiffs' Request for Production, where TMC submitted

general and prophylactic objections to each of Plaintiffs' twenty-six (26) requests for production.

15.    Although Toyota contends that it has cooperated in discovery, the record will

show that Toyota provided a data-dump of many irrelevant documents that were not requested in

an attempt to conceal relevant discovery.   In other words, Toyota's contention that it has

produced 149,000 pages of documents does not square with its obligation to produce the specific

relevant discovery that Plaintiffs seek.   Plaintiffs' motion to compel deals only with clearly

relevant information that has not been produced by Toyota despite numerous demands.

**B.     Toyota's Contention:**

Plaintiffs have now filed eight (8) discovery motions in this case, five of which contain

sweeping and non-specific allegations that the Toyota Defendants have not met their discovery

obligations.  In these motions, Plaintiffs have repeatedly sought to have the Court overrule all of

the Toyota Defendants' objections, and even to order the Toyota Defendants to respond to

discovery without asserting any objections whatsoever, regardless of how absurdly broad a

discovery request may have been.

Despite the flurry of motions filed by Plaintiffs and their repeated accusations that the

Toyota Defendants have not responded fully or appropriately to discovery requests, the Toyota

Defendants have taken their discovery obligations very seriously, and have provided detailed

responses and voluminous document productions in response to Plaintiffs' various discovery

requests.

To date, TMC has served a disclosure statement with nine supplemental disclosures;

responses to three sets of Interrogatories with five additional supplemental responses; and

responses to three sets of Request for Production with three supplemental responses.  In total, TMC has produced over 4,000 files that contain more than 46,500 pages of documents.  TMS has served a disclosure statement and one supplemental disclosure; responses to three sets of Interrogatories with one supplemental response; and responses to three sets of Request for Production with one supplemental response.  In total, TMS has produced over 70,000 pages of information.  TEMA has served a disclosure statement and one supplemental disclosure; responses to three sets of Interrogatories; and responses to three sets of Request for Production. In total, TEMA has produced more than 33,000 pages of information.  The Toyota Defendants also collectively served responses to Plaintiffs' Counsel's Informal Letter Requests, as well as two supplemental responses to the letter requests.  All told, the Toyota Defendants have produced over 149,500 pages of information in this case.

Nevertheless, Plaintiffs have repeatedly claimed that the Toyota Defendants are withholding documents—without providing any specific information as to what exactly the Toyota Defendants are allegedly withholding—and have now filed their Third Motion to Compel, which is the subject of this Joint Submission.  A recitation of the facts relating to Plaintiffs' first two Motions to Compel is necessary to understand the current issues before the Court.

After the Court held its initial hearing on Plaintiffs' Expedited First Motion to Compel, the Court entered an Order on July 18, 2012, addressing Plaintiffs' Expedited Motion to Compel. *See* APP 1003, Doc. No. 111 at p. 1.[1]  That Order provided guidance as to the scope of discovery for this case with regard to four overarching areas identified by Plaintiffs' counsel at the March 5, 2012 hearing.  *Id.*  The Court's ruling regarding the scope of discovery for this case identified

---

[1] A detailed description of the nature of this case and the history of Plaintiffs' discovery requests and the Toyota Defendants' responses as of the time of the Court's Order is set forth in the Toyota Defendants' initial and supplemental response briefs.  Doc. No. 71 at ¶¶ 2-12; Doc. No. 79 ¶¶ 2-4.

areas of appropriate discovery relating to FEM, CAD, other vehicle models, alternative design information applicable to relevant components and systems of the 2003-2009 and 2010-2012 U.S. bound 4Runner, and issues relating to crashworthiness, and vehicle-to-vehicle crash compatibility of 2003-2009 and 2010-2012 U.S. bound 4Runners in rear-end collisions or rollover accidents. *See id.* at APP 1008-09, 1013-14, 1018-19, Doc. No. 111 at pp. 6-7, 11-12, and 16-17.

On July 23, 2012, Plaintiffs sent a letter to the Toyota Defendants attaching two lists of previously served discovery requests that, according to Plaintiffs, fell within the scope of discovery outlined by the Court's Order, and asked for supplementations or new responses. APP 1023. The Toyota Defendants supplemented their original Responses to Plaintiffs' formally served discovery, instead, in compliance with the Court's July 18, 2012 Order, rather than respond to the informal lists provided by Plaintiffs' counsel. The Toyota Defendants made clear to Plaintiffs' counsel at this time that they would not be producing any information that fell outside the scope of discovery discussed by the Court. For example, Plaintiffs requested "all research" involving "passenger vehicles" interacting with heavy trucks, without even limiting the request to research done by Toyota. Plaintiffs requested such broad information despite the Court's Order requiring production of documents applicable only to specific components and performance aspects of the U.S. bound 2003-2009 and 2010-2012 model years of the 4Runner that Plaintiffs have alleged are defective.

On October 23, 2012, Plaintiffs threatened to file a motion for sanctions if they did not receive a complete supplemental production by noon of October 25, 2012. APP 1053. The Toyota Defendants were not finished with the preparation of their supplementations when they received Plaintiffs' counsel's threatening email; nevertheless, the Toyota Defendants worked hard

to provide timely supplemental document productions and supplemental written responses to specific discovery requests on October 24, 2012, by 2:39 p.m.   APP 1059, TMC's First Supplemental Response to Plaintiff William Greene's First Set of Interrogatories; APP 1090, TMC's Third Supplemental Response to Ollie Greene's First Request for Production of Documents; APP 1099, TMC's Fifth Supplemental Disclosures.   Those supplementations contained over 650 new documents totaling over 5,600 pages.

Plaintiffs emailed the Toyota Defendants at 4:28 p.m. on the same day, less than two hours after receiving over 650 new documents totaling over 5,600 pages, stating "[f]rom just a cursory review of your responses it is readily apparent that Toyota has not complied in good faith with the Court's Order." APP 1055.   Plaintiffs again demanded that the Toyota Defendants respond to each of the items contained in the informal lists that accompanied Plaintiffs' July 23, 2012 letter.   *Id.*   Three weeks later, on November 15, 2012, Plaintiffs' counsel emailed the Toyota Defendants claiming that he could not open some of the discs containing Toyota's supplemental document production.   APP 1135.   The issue with the discs was resolved, but the October 24 email from Plaintiffs' counsel begs the question of how Plaintiffs could contend on October 24, before Plaintiffs had even reviewed all of the documents in Toyota's supplemental production, that "…Toyota has not complied in good faith with the Court's Order."

Plaintiffs' renewed their demand that the Toyota Defendants respond to the lists accompanying their July 23, 2012 letter.   The Toyota Defendants stated that they had already responded to Plaintiffs' July 23, 2012 letter through their August 16, 2012 letter, and would not be providing any further response.   APP 1121.   The Toyota Defendants further stated that they would not agree to expand the scope of discovery beyond the scope of the Court's July 18 Order, and that Plaintiffs could serve formal discovery requests within the scope of discovery allowed

11

by the Court if they wanted additional information.  *Id.*  Instead of serving formal discovery requests, Plaintiffs filed their Motion to Continue Plaintiffs' First Motion to Compel.

On December 19, 2012, the Court denied Plaintiffs' Motion to Continue Plaintiffs' First Motion to Compel without oral argument.  The language of the Court's December 19, 2012 Order is highly relevant to the current dispute, and, therefore, the Toyota Defendants note that ruling here:

> Plaintiffs assert that Toyota and Volvo have repeatedly refused to produce documents pursuant to the Court's Order of July 18, 2012 [111] ("July 18 Order").  In the July 18 Order, the Court [] established the scope of permissible discovery in four distinct areas.  Plaintiffs maintain that Toyota and Volvo have violated the terms of the July 18 Order, but Plaintiffs have not identified any of Toyota's or Volvo's specific objections to any of Plaintiffs' specific discovery request that are the bases for withholding any document. Without such specificity, the Court cannot rule on a motion to compel. The Court accordingly denies the motion.

*See* APP 1142-43, Doc. No. 130 at p. 6-7.

Subsequently, rather than confer in any way with the Toyota Defendants or serve formal discovery requests, Plaintiffs filed their Second Motion to Compel on January 4, 2013.  After the issues were fully briefed, the Court ordered the Toyota Defendants to respond to Plaintiffs' letter requests as if they had been formally served, and ordered that the Toyota Defendants must also specify in their responses whether they were withholding any responsive and relevant documents.  APP 1195-96, January 22, 2013 Expedited Hearing Transcript, at 32:18—33:3.

The Toyota Defendants complied with the Court's January 22, 2013 Order by formally responding to Plaintiffs' letter requests, and also included express statements as to whether the Toyota Defendants were withholding any information in their possession based on an objection. These Requests for Production included many of the same requests that Plaintiffs served again in their most recent discovery, and have complained about in this Joint Submission.  These include

12

requests for all FEM and CAD files relating to the 2003-2009 and 2010-2012 U.S. bound 4Runner.

Plaintiffs did not follow up regarding the Toyota Defendants' responses to the informal requests per Court Order, including the assertions that the Toyota Defendants made per Court Order that they were not withholding any relevant documents.

On June 7-8, 2013, Plaintiffs took the deposition of Mr. Ichiro Fukumoto, TMC's FRCP 30(b)(6) designated witness.

After Plaintiffs took the deposition of Mr. Fukumoto, they served an additional set of Interrogatories and an additional set of Requests for Production on all three Toyota Defendants. Many of these Requests and Interrogatories were nearly identical to previously served discovery, including requests for all FEM and CAD relating to the 4Runner.  The Toyota Defendants each prepared complete and accurate responses to this most recent discovery, and asserted only those objections that were necessary to protect the Toyota Defendants from Plaintiffs' overly broad and unduly burdensome requests that asked for information that was unduly burdensome to compile, not relevant and not reasonably calculated to lead to the discovery of admissible evidence.

On August 29, 2013, the Toyota Defendants filed their one and only discovery motion in this case.  APP 1772.  That motion asked the Court to quash the deposition of a TMS witness that Plaintiffs had unilaterally noticed without conferring with Toyota's counsel about witness or counsel availability, directly contravening the Federal Rules of Civil Procedure.

Plaintiffs subsequently filed their Third Motion to Compel, which is now the subject of this Joint Submission.  Counsel for the Toyota Defendants met with Plaintiffs' counsel on September 11, 2013 to attempt to resolve these disputes as ordered by the Court, but the following disputes remain unresolved.

# III.   ARGUMENT AND AUTHORITIES

## A.   The Discovery Standard

### 1.   Plaintiffs' Contention:

FED.R.CIV.P. 26(b)(1) provides that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." The rule provides further that relevant evidence need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. *Id*. However, despite the application of FRCP 26 and the July 18, 2012, Order establishing the scope of certain discovery in this matter, Toyota continues to assert meritless objections and refuses to produce information plainly relevant and likely to lead to the discovery of admissible evidence. Indeed, none of Toyota's objections has merit. Furthermore, Plaintiffs contend that Toyota has waived its objections by asserting boilerplate objections in each response and ask that the Court overrule each of Toyota's objections.

### 2.   Toyota's Contention

#### a.   Plaintiffs' discovery requests exceed the scope of permissible discovery in this case.

Parties may generally only obtain discovery "regarding any non-privileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26. "Th[e] desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing needs and rights of both plaintiff and defendant." *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 906 (6th Cir. 1991). Specifically, district courts are to limit discovery that would be unreasonably cumulative, duplicative, can be obtained more easily from another source, or the burden or expense which outweighs its likely benefit. Fed. R. Civ. P. 26(b)(2)(C); *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007). While a plaintiff should not be denied

access to information necessary to establish his claim, neither may a plaintiff "go fishing." *Marshall v. Westinghouse Elec. Corp.*, 576 F.2d 588, 592 (5th Cir. 1978).  Notably, the party seeking discovery bears the initial burden to establish that the requested discovery is relevant. *See* APP 1007, Doc. No. 111 at p. 5, citing *Abraham v. Alpha Chi Omega*, 271 F.R.D. 556, 559 (N.D. Tex. 2011) (Furgeson, J.).

> **B.      The Discovery Relates Clearly to the Claims and Defenses of the Parties.**
>> **1.      Plaintiffs' Contention:**

Plaintiffs' Complaint specifically alleges that Toyota, *inter alia*, failed to design and incorporate widely available, safer and feasible, alternative designs into the Toyota 4Runner's fuel system, fire prevention and suppression systems, seat restraints, air bag systems, rear occupant compartment and structural integrity of the Toyota 4Runner that would have prevented or significantly reduced the injuries and deaths to the Greene Family.  If the Toyota 4Runner had been properly designed, it could have aided in significantly reducing the injuries to, and/or preventing the eventual deaths of, each member of the Greene Family.  In their Answers, Toyota asserts as an affirmative defense that its trucks complied with all Federal Motor Vehicle Standards.  See e.g. paragraph 69 of TMC's Original Answer (Dkt. Entry 14).

The Complaint also makes clear that Toyota breached express warranties that the 4Runner was safe, reliable and that quality was of paramount importance.  The warranty of merchantability requires that products be of reasonable workmanlike quality and free from defects.  Toyota impliedly warranted that Toyota's vehicles were of merchantable quality. Toyota breached the warranty of merchantability by designing, manufacturing, distributing, selling and refusing to adequately repair or replace their vehicles after it became apparent they were defective.  The Complaint also alleges that in commercials, internet postings, periodicals, press releases, etc., Toyota represented that the safety of their customers is paramount.

Accordingly, FRCP 26 allows discovery that seeks to establish Plaintiffs' claims against Toyota or refute the applicability of Toyota's defenses.

> **2.      Toyota's Contention:**
>
> **a.      Plaintiffs have not pled specific defect allegations in this case, and have used discovery as a fishing expedition in an attempt to manufacture a cause of action.**

Plaintiffs have not made any specific defect allegations in this case.  Rather, Plaintiffs have only generally alleged that entire crashworthiness related systems of the 2010 U.S. bound 4Runner were defective, without any specificity as to how or why any particular components were defective.

Instead of providing specificity, Plaintiffs continue to treat the discovery process as a fishing expedition in the hopes of stumbling upon evidence out of which a cause of action may be manufactured.  Courts have held that this is not a legitimate purpose or method for pretrial discovery. *Summers v. Deutsche Seereederei Rostok GmbH*, 220 Ga. App. 125, 127, 469 S.E.2d 289, 292 (Ga. App. 1996), citing *Gray v. Gober*, 185 Ga. App. 624, 627-8, 365 S.E.2d 279, 282 (Ga. App. 1988).  Therefore, Plaintiffs simply have no legal or factual grounds for compelling the Court to overrule the well-taken objections that the Toyota Defendants asserted to Plaintiffs' overly broad, unduly burdensome and mostly irrelevant discovery requests.

Plaintiffs have not provided any case law supporting their position that the Toyota Defendants' objections are improper.  That is because the Toyota Defendants are entirely within their rights to provide specific objections to Plaintiffs' discovery requests in addition to answering the Interrogatories and Requests within the scope contemplated by the Federal Rules of Civil Procedure and Judge Godbey's July 18, 2012 Order.   Further, Plaintiffs have failed to identify any specific objection made by any Toyota Defendant that was allegedly improper.

Instead, Plaintiffs continue to make sweeping assertions that all of the Toyota Defendants' objections are improper.

To the extent the issue of objections is raised again by Plaintiffs in the following sections, the Toyota Defendants will lay out specific reasons as to why they made specific objections to particular discovery requests in the sections that follow.

**C.  The Court Should Wholesale Overrule Toyota's Objections That Full Discovery Was Defined By a July 18, 2012, Order.**

**1.  Plaintiffs' Contention:**

Throughout their responses, Toyota objects that Plaintiffs' discovery allegedly "exceeds the scope of permissible discovery set by the Court's July 18 Order."  However, this is a misrepresentation of the July 18, 2012, Order.  In fact, the Court has already admonished Defendants that the July 18, 2012, Order related only to discrete issues that were before the Court during that specific motion to compel and is not to be used as an attempt to limit the scope of otherwise permissible discovery in this matter:

> And I get some sense from the Defendants that they are interpreting the prior order on July 18 as defining the full permissible scope of discovery in the case, period, and I don't think it was intended to do that. I think it was intended to mediate the issues that were raised in the prior motion to compel.

Excerpt from the January 23, 2012 hearing on Plaintiffs' Motion to Compel.  (APP 277-281).  There is nothing in Plaintiffs' Motion to Compel that exceeds or is inconsistent with the Court's July 18, 2012, Order.  Accordingly, the Court should overrule any attempt by Toyota to limit discovery according to Toyota's improper use of the July 18, 2012, Order.

**2.  Toyota's Contention:**

**a.  The Toyota Defendants have closely followed the guidance Judge Godbey provided in his July 18, 2012 Order regarding the appropriate scope of discovery for this case relating to four overarching areas of discovery.**

The Toyota Defendants have not made "improper use of the July 18, 2012, Order." Although Plaintiffs directly assert that "there is no Court-limitation on discovery," and thus that the Court's July 18, 2012 Order had no effect in this case, the Court's Order clearly lays out particular limitations to the scope of discovery in several areas. As the Court unequivocally stated in its December 19, 2012 Order denying Plaintiffs' Motion to Continue Plaintiffs' First Motion to Compel: "In the July 18 Order, the Court [] established the scope of permissible discovery in four distinct areas." *See* APP 1008-09, Doc. No. 111 at p. 6-7.

The "four distinct areas" for which the Court "established the scope of permissible discovery" are "(1) FEM and CAD information; (2) alternative designs; (3) crashworthiness, vehicle crash compatibility, and "due diligence" – which Plaintiffs have recast as crashworthiness;[2] and (4) other vehicle models." APP 1005-06, Doc. No. 111 at p. 3-4. As the Court will see in the sections that follow, Plaintiffs now raise all four of these issues again – FEM, CAD, alternative design, crashworthiness, and other vehicle models. These are indeed the same issues at the heart of the current dispute, and it is the Toyota Defendants' understanding that the Court's July 18, 2012 Order "established" the scope of appropriate discovery for each of those areas as follows:

1.     **The Court limited the scope of FEM and CAD discovery to the components and systems of the 2010-2012 U.S. bound 4Runner that Plaintiffs allege are defective in this case.**

Regarding FEM and CAD information, the Court explicitly ruled that Toyota must produce FEM and CAD information relating to "the 2010-2012 Toyota 4Runner's fuel system, fire prevention and suppression systems, seat restraints, air bag systems, rear occupant compartment and structural integrity . . . ." *See* APP 1009, Doc. No. 111 at p. 7.

---

[2] The limitations regarding crashworthiness and vehicle crash compatibility are listed here only for the Court's reference, as they are not relevant to the issues addressed in this Joint Submission.

**2.      The Court limited the scope of alternative design discovery to include only limited components of the Toyota 4Runner, and to include only those alternatives that Toyota actually considered for the 2010-2012 U.S. bound 4Runner.**

Regarding alternative designs, the Court ordered that "Plaintiff may discover information about alternate designs Toyota . . . considered for the 2010-2012 4Runner . . . with respect to the specific systems Plaintiffs allege are defective:  the 4Runner's fuel system; fire prevention system; rear, side, and roof structure; fire suppression systems; and fire prevention systems . . . ."  *See* APP 1013, Doc. No. 111 at p. 11.

**3.      The Court limited the vehicle model scope to include only the 2003-2009 and 2010-2012 U.S. bound 4Runner.**

With regard to the discovery of information relating to vehicles other than the 2010-2012 U.S. bound 4Runner, the Court ruled that "Plaintiffs may discover the same information [discussed above] with regard to one previous generation of the Toyota 4Runner – the 2003-2009 Toyota 4Runner – that the Court allows Plaintiffs to discover with regard to the 2010-2012 4Runner."  *See* APP 1015, Doc. No. 111 at p. 13.  The Court went on to "limit discovery pertaining to the 2010-2012 Toyota 4Runner or the 2003-2009 Toyota 4Runner to 'U.S. bound' models." APP 1015, Doc. No. 111 at n.14.  The Court also ruled that Plaintiffs were not entitled to discovery relating to vehicles other than the 2003-2009 and 2010-2012 U.S. bound 4Runner, including the Lexus GX460 and the Toyota Corolla.  APP 1018-19, Doc. No. 111 at pp. 16-17.

The Toyota Defendants do understand that new issues may arise in this case that are outside the scope of the prior July 18, 2012 Order.  For example, Plaintiffs may add a defect allegation relating to a component or system of the 2010 U.S. bound 4Runner that is not currently part of this case.  In such an instance Judge Godbey's July 18, 2012 Order would not necessarily apply to such a "new" claim.  However, as Judge Godbey re-affirmed in his December 19, 2012 Order, his July 18, 2012 Order did set the scope of discovery regarding the issues that were raised

in Plaintiffs' First Motion to Compel; namely, FEM, CAD, alternative design, crashworthiness, and other vehicle models as they relate to fuel systems, fire prevention and suppression systems, seat restraints, air bag systems, rear occupant compartment and structural integrity.  APP 1142-43, Doc. No. 130 at p. 6-7.  As described below, these are exactly the same issues that Plaintiffs have made the subject of their most recent motion that is before this Court now.  Plaintiffs have not demonstrated any reason to deviate from Judge Godbey's July 18, 2012 Order on these matters.

**D.     TMC Failed to Designate a Proper Witness under Fed.R.Civ.P. 30(b)(6) to Give Complete and Knowledgeable Answers Regarding the Matters Designated in the Notice.**

**1.     Plaintiffs' Contention:**

Federal Rule of Civil Procedure 30(b)(6) makes clear that a party may notice an organization by describing the subject matter for examination and allowing the organization to designate one or more officers, directors, managing agents, or other consenting person who are familiar with that subject matter.   In this situation, the noticing party provides a concise identification of the designated areas of requested testimony.  Fed.R.Civ.P. 30(b)(6); *U.S. Taylor*, 166 F.R.D. 356, 360 (M.D.N.C.1996), aff'd, 166 F.R.D. 367 (M.D.N.C.1996).  In response, the organization must designate an agent or other person to testify on its behalf. *Id*. "The persons designated must testify about information known or reasonably available to the organization." *Id*. "The duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved.  The deponent must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources." *Brazos River Auth. v. GE Ionics, Inc*., 469 F.3d 416, 433 (5th Cir.2006).  In explaining the duties of a corporation responding to a Rule 30(b) (6) deposition notice, the Fifth Circuit has held that:

20

> [w]hen a corporation or association designates a person to testify on its behalf, the corporation appears vicariously through that agent. If that agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all.

*Resolution Trust Corp. v. S. Union Co.*, 985 F.2d 196, 197 (5th Cir.1993) (an organization can be sanctioned if it designates someone without knowledge of the matters about which the organization will testify). The organization must also prepare the witness so they will give complete, knowledgeable, and binding answers. *Poole v. Textron, Inc.*, 192 F.R.D. 494, 504 (D.Md.2000); *Securities and Exchange Commission v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y., 1992) (citing *Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Authority*, 93 F.R.D. 62, 67 (D.P.R. 1981)) ("under Rule 30(b)(6), the deponent 'must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed…as to the relevant subject matters.'"); ABA Civil Discovery Standards (Aug. 1999), §19(f)("Counsel for the [corporation] should prepare the designated witness to be able to provide meaningful information about any designated area(s) of inquiry.").   On April 10, 2013, Plaintiffs served notice to take the deposition of the TMC corporate representative(s).  APP 282-294.  The deposition notice provided TMC with specific areas upon which examination was requested.  *Id*.  On June 8, 2013, TMC produced Ichiro Fukumoto ("Fukumoto") as the sole witness for TMC as to the areas designated in the notice. The following excerpts from Fukumoto's deposition, however, establish that TMC failed to designate a proper representative to testify on several matters in the notice, including some of the most critical areas:

      a.      **Deponent did not provide complete information regarding TMC's use of and policies regarding using and preserving CAD, CAE and FEM**.

The deposition notice designated multiple topics regarding the nature, use and existence of the CAD, CAE and FEM used by TMC as well as Toyota's policy on preserving this crucial information.   In his testimony Fukumoto provided vague responses about whether, or when, Toyota ever did any FE modeling for the Toyota 4Runner and states that, although this is a topic in the deposition notice, he did not check with others at Toyota to discover the answer to this question. Fukumoto Depo Vol. 1 at 51:25 – 53:21 and 57:7-16 (APP 322-24, 328).   When asked what department would have done FE modeling for the Toyota 4Runner, Fukumoto replied "'if that were necessary,' then it would have been the division that specializes the CAE at Toyota." Fukumoto Depo Vol. 2 at 28:25 – 30:1 (APP 357-59).   At other times when asked about the type of FE was used to evaluate the 2010 Toyota 4Runner, the witness kept repeating the phrase "if it were used." Fukumoto Depo Vol. 1 at 69:2 – 70:1 (APP 330-31); Fukumoto Depo Vol. 1 at 73:7-15. (APP 357-59).   He reiterated that he does not know if FE was done on the Toyota 4Runner or where these files would be kept.   Fukumoto Depo Vol. 1 at 82:4 – 83:17 (APP 335-36). Fukumoto feigned knowledge of the last time TMC had access to the CAD and FE files and stated that he did not prepare himself to be able to answer these questions.   Fukumoto Depo Vol. 1 at 86:3 – 87:15 (APP 339-340).   Although at times the witness indicated that FE had been preserved at Toyota, at other times he indicated that he cannot testify whether FE for the SUV at issue has been discarded and did not prepare himself to be able to answer this question. Fukumoto Depo Vol. 1 at 88:25 – 90:21 (APP 341-43).

Fukumoto also testified that he does not know if Toyota keeps an archive of FE models; that he does not know if Toyota ever used a previous FE model to design a subsequent generation SUV and states that it "could have happened;" and does not "think" that Toyota ever used FE to conduct safety research.   Fukumoto Depo Vol. 2 at 27:10 – 28:10 (APP 356-57).

Plaintiffs were entitled to a witness who could provide testimony about crucial discovery. Accordingly, the Court should find that TMC violated the requirements of Fed.R.Civ.P. 30(b)(6).

        **b.**      **Deponent did not provide complete information regarding TMC's fuel tank designs and fuel design alternatives used by Toyota.**

The deposition notice also designated topics regarding TMC's knowledge and actual use of fuel tank designs in the SUVs, design rules and testing of these actual designs. The notice also asked for a witness to testify as to fuel tank designs in Toyota's other SUVs and protective designs known by Toyota at the time of the manufacture of the SUV at issue. In his testimony Fukumoto testified that he does not know about the designs of the fuel tanks in the other Toyota SUVs. Fukumoto Depo Vol. 2 at 46:1 – 47:8 (APP 361-62). He also stated that he does not know when metal tanks were used in Toyota vehicles or even what types of materials were used in the other SUVs sold by Toyota. Fukumoto Depo Vol. 2 at 51:19 – 55:6 (APP 363-67). Fukumoto also could not specify the additional locations that were considered by Toyota for placement of its fuel tanks. Fukumoto Depo Vol. 2 at 68:16 – 70:1 (APP 373-75). He was also vague and incomplete about TMC's design rules on its locations and other information regard fuel tanks. Fukumoto Depo Vol. 1 at 126:1-19 (APP 348).

TMC failed to provide a knowledgeable witness to testify on behalf of TMC as to matters in the Notice of Intent to take the TMC Deposition. It was this witness' utter lack of complete responses and information that required Plaintiffs to serve the subsequent interrogatories and requests for production to TMC that serve as the basis of this motion to compel. Accordingly, the Court should find that TMC did not produce a proper witness on the topics in the notice.

        **2.**      **Toyota's Contention:**

           **a.**      **TMC provided a knowledgeable and well prepared FRCP 30(b)(6) witness in response to Plaintiffs' Notice of Deposition to TMC.**

TMC provided a knowledgeable and well prepared FRCP 30(b)(6) witness in response to Plaintiffs' Notice of Deposition to TMC.   In response to the fifty topics listed in Plaintiffs' deposition notice to TMC, many of which contained sub-topics and requests for irrelevant information, Toyota designated Mr. Ichiro Fukumoto as their corporate representative.   An employee of TMC since 1989, Mr. Fukumoto is the project manager of the Collision Safety Division and has been involved in the evaluation and development of all 4Runner models since 2003.   APP 1365, 1369-70, Fukumoto Vol. 1 at 9:11-14, 13:15—14:20.   Mr. Fukumoto was a knowledgeable and well prepared witness, and he provided testimony regarding the information known or reasonably available to TMC regarding the relevant topics noticed by Plaintiffs.   *See* Fed. R. Civ. P. 30(b)(6).

Prior to Mr. Fukumoto's deposition, TMC served its Response to Plaintiffs' Notice of Deposition, which included TMC's carefully crafted objections.   *See* APP 1287.   Through its responses and objections, TMC made clear that many of the topics noticed by Plaintiffs were outside the scope of permissible discovery in this case and asked for irrelevant testimony. Although Plaintiffs knew of TMC's objections and had an opportunity to discuss the scope of testimony TMC had offered to provide, they raised no issues with TMC's counsel regarding the scope of the deposition prior to Mr. Fukumoto's deposition.   Nevertheless, TMC agreed to produce Mr. Fukumoto for all of Plaintiffs' relevant topics, subject to reasonable and appropriate limitations that TMC provided through its objections.   At the deposition, Mr. Fukumoto provided responsive and knowledgeable testimony in response to the non-objectionable questions posed by Plaintiffs' counsel.   *See S. Louisiana Ethanol, L.L.C. v. Fireman's Fund Ins. Co.*, 2013 WL 1196604, at *6 (E.D. La. Mar. 22, 2013); *see also* Fed. R. Civ. P. 30(b)(6).

Nevertheless, Plaintiffs now claim that Mr. Fukumoto had an "utter lack of complete responses and information," and ask the Court to order TMC to provide another witness. APP 1808, Plaintiffs' Expedited Third Motion to Compel, at p. 9. However, alleged inadequacies in a deponent's testimony must be egregious and not simply lacking in desired specificity. *Boland Marine & Mfg. Co., Inc. v. M/V Bright Field*, 1999 WL 280451, at *3 (E.D. La. May 3, 1999). An inability to answer every question completely does not demonstrate any willfulness or bad faith. *United States v. Massachusetts Indus. Fin. Agency*, 162 F.R.D. 410, 412 (D.Mass. 1995). If a deponent cannot testify to the full extent expected by the movant, this does not indicate that the defendant acted willfully or in bad faith to obstruct discovery. Producing another 30(b)(6) deposition witness is not necessary. *See Barron v. Caterpillar, Inc.*, 168 F.R.D. 175, 178 (E.D. Pa. 1996); *see also Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 1995 WL 686715, at *8 (S.D.N.Y. Nov. 17, 1995) (when deponent lacked information about all entities on a certain list, better course was to obtain production of documents rather than depose another witness who would merely testify to contents of list after reviewing it); *contrast with Resolution Trust*, 985 F.2d at 196-97 (Court held sanctions were appropriate when deponent testified that he had no knowledge regarding any single topic from the deposition notice).

As discussed in the following sections, Mr. Fukumoto provided substantive and relevant responses to the non-objectionable questions posed by Plaintiffs' counsel with the information that was known or reasonably available to TMC. Thus, there is no reason for the Court to order TMC to produce another witness for deposition.

        **b.**      **Mr. Fukumoto's testimony regarding TMC's use of CAD, CAE, and FEM and the presentation of such information was knowledgeable and complete.**

Mr. Fukumoto provided detailed testimony regarding CAD, CAE, and FEM. For example, Mr. Fukumoto testified that the CAE Technical Division (or Design Division) within

TMC is responsible for deciding what FEM modeling to use and determining the analytical work needed in the evaluation process for a new vehicle model .  APP 1397-98, Fukumoto Vol. 1 at 41:24—42:12.   He further testified that if FEM is to be employed, TMC's design division, including various component groups, prepares an initial design of an FEM model for a given vehicle.  APP 1400, Fukumoto Vol. 1 at 44:6-21.   During that design process, the design division will also work with an evaluation division that assists with the performance and engineering judgment for the new design.  APP 1400-01, Fukumoto Vol. 1 at 44:22—45:8.  If a judgment is made that computer-aided engineering models are necessary, including FEM, the design and evaluation divisions will work jointly in that process.   APP 1401, Fukumoto Vol. 1 at 45:9-22.   However, FEM modeling is not prepared for all new designs, but is instead conducted on an as-needed basis.  APP 1402, Fukumoto Vol. 1 at 46:13-17.  If TMC had prepared FEM for the 2010-2012 U.S. bound 4Runner, the LS-DYNA application software would have been used to create the model.  APP 1423-24, Fukumoto Vol. 1  at 67:16—68:1.  Any FEM modeling that is prepared by TMC for a new design is kept in the CAD database in the Engineering Information Management Division at TMC.  APP 1428, Fukumoto Vol. 1 at 72:11-17.  Any FEM modeling that may have been prepared for a portion of the 2010-2012 U.S. bound 4Runner, would be kept in the Engineering Information Management Division at TMC.  APP 1439-40, Fukumoto Vol. 1 at 83:18—84:3.

With regard to TMC's retention of FEM files, Mr. Fukumoto testified that FEM documents are generated during the design and evaluation process, but when they no longer serve their purpose after the vehicle is fully developed, they become unnecessary and are routinely discarded.  APP 1438, Fukumoto Vol. 1 at 82:12-21; *see also* APP 617-19, TMC's Response to Request for Production No. 94 of Plaintiff Ollie Greene's First Request for Production of

Documents.  However, if it is determined that the documents are necessary for Toyota's ongoing business, then they are retained.  APP 1446, Fukumoto Vol. 1 at 90:15-21.  The CAE division at TMC determines when these documents have completed their intended purpose, and are no longer necessary.  APP 1456, Fukumoto Vol. 1 at 100:7-16.

Despite Mr. Fukumoto's extensive testimony about TMC's use of FEM, Plaintiffs argue that Mr. Fukumoto was not prepared to answer specific questions relating to the use of FEM with respect to the 2003-2009 and 2010-2012 U.S. bound 4Runner, and therefore that a new corporate representative deposition is necessary.  Although Mr. Fukumoto admittedly was unable to provide specific instances of what FEM modeling was used on these particular models in his deposition, Mr. Fukumoto has since confirmed that any FEM modeling in TMC's possession relating to the components and systems of the 2003-2009 and 2010-2012 U.S. bound 4Runner alleged to be defective in this case and that are covered by Judge Godbey's July 18, 2012 Order, has been produced in this case.  APP 1888, Declaration of Ichiro Fukumoto, at ¶ 5.

> **c.** **Mr. Fukumoto's testimony regarding TMC's fuel tank designs and fuel tank design alternatives was knowledgeable and complete.**

Plaintiffs' contention that TMC did not provide "complete information" regarding TMC's fuel tank designs and fuel tank design alternatives is inaccurate.  Mr. Fukumoto even discussed the design of fuel tanks in other Toyota SUVs, including applicable design considerations and testing.

For example, Mr. Fukumoto detailed the process utilized by TMC to determine the shape and location of the fuel tank in Toyota vehicles.  He testified that when determining where to place the fuel tank in each vehicle, Toyota engineers consider many factors, including but not limited to, the likelihood that the fuel tank may be compromised in a crash, whether there are sharp edges around the fuel tank, crush-survival space, and the height of the tank from the ground.

APP 1481-82, 1521, Fukumoto Vol. 1 at 125:18—126:14, Vol. 2 at 30:2-13.  He also testified that these same factors are considered when determining the volume and shape of the fuel tank, along with engine size, fuel economy, engine displacement, and vehicle structure, among other factors. APP 1484-85, Fukumoto Vol. 1 at 128:7-13, 129:3-16.   Fuel tank locations vary from model to model based on these different factors and characteristics.  APP 1484, Fukumoto Vol. 1 at 128:7-13.  Mr. Fukumoto further explained that there is a specific division responsible for designing the fuel systems in Toyota vehicles.  APP 1395-97, Fukumoto Vol. 1 at 39:19-23, 40:24—41:1.

In addition to discussing the design and testing considerations for fuel tanks, Mr. Fukumoto identified specific shapes and locations of fuel tanks in other Toyota vehicles.  For instance, he testified that the fuel tank in the Toyota Highlander "has a rectangular shape horizontally to the vehicle and approximately located under the seat of the rear occupant."  APP 1483, Fukumoto Vol. 1 at 127:3-10.  The fuel tank for the current model Lexus GX is located forward of the rear axle and is "located in the left half of the vehicle and surrounded by the frame, meaning that the fuel tank is inside the frame."  APP 1483-84, Fukumoto Vol. 1 at 127:19—128:1.  Finally, Mr. Fukumoto identified the fuel tank location in the 2010 Toyota 4Runner.  APP 1480, Fukumoto Vol. 1 at 124:12-17.  As demonstrated above, therefore, Plaintiffs' complaints regarding Mr. Fukumoto's alleged lack of knowledge on fuel tank design and placement have no merit.

Mr. Fukumoto provided Plaintiffs with detailed testimony in response to the non-objectionable and relevant portions of the deposition topics, including all sub-topics, that were listed in Plaintiffs' deposition notice.  By doing so, Mr. Fukumoto and TMC satisfied the requirements of Federal Rule of Civil Procedure 30(b)(6).  Thus, Plaintiffs' request for another corporate representative deposition should be denied.

**E.     The Court Should Overrule Toyota's Boilerplate Objections to Plaintiffs' Discovery Requests.**

      **1.     Plaintiffs' Contention:**

Toyota asserts improper boilerplate objections to virtually all of the requests.  To assert a proper objection on the basis of burdensome, vagueness or overbreadth, one must do more than "simply intone [the] familiar litany that the interrogatories are burdensome, oppressive or overly broad." *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 42 (S.D.N.Y.1984).  Instead, the objecting party [Toyota] bears the burden of demonstrating "specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Id.; see also  Taylor*, 329 U.S. at 507 (stating that "the deposition-discovery rules are to be accorded a broad and liberal treatment").  Toyota did not do this. Therefore, the boilerplate objections should be overruled and considered waived.

      **2.     Toyota's Contention:**

          **a.     The Toyota Defendants' objections are appropriate, and should not be overruled.**

Plaintiffs' arguments regarding the Toyota Defendants' objections suffer from the same flaw that resulted in the denial of Plaintiffs' Motion to Continue Plaintiffs' First Motion to Compel.  Plaintiffs have not demonstrated why a single objection made by any Toyota Defendant was improper.  Nor have Plaintiffs been able to show that any Toyota Defendant has withheld relevant and responsive documents based on an allegedly improper objection.  As the Court stated in its December 19, 2012 Order,

      Plaintiffs maintain that Toyota and Volvo have violated the terms of the July 18 Order, but Plaintiffs have not identified any of Toyota's or Volvo's specific objections to any of Plaintiffs' specific discovery request that are the bases for withholding any document.

> **Without such specificity, the Court cannot rule on a motion to compel**. The Court accordingly denies the motion.

*See* APP 1143, Doc. No. 130 at p. 7 (emphasis added).

Just like before, Plaintiffs have not provided any authority or factual basis supporting their position that the Toyota Defendants' objections are improper.  As discussed above, the Toyota Defendants are entirely within their rights to assert proper objections to Plaintiffs' discovery requests in addition to answering the Interrogatories and Requests within the scope contemplated by the Federal Rules of Civil Procedure and Judge Godbey's July 18, 2012 Order. Further, Plaintiffs have failed to identify any specific objection made by any Toyota Defendant that was allegedly improper.  Rather, despite the Court's prior admonishment to Plaintiffs regarding their failure to specify which objections they take issue with, Plaintiffs continue to make sweeping assertions that all of the Toyota Defendants' objections are improper and should be overruled.

Instead of providing specificity, Plaintiffs simply cite to a New York State case that suggests a party need provide more than just generic objections.  The Toyota Defendants agree that generic objections are insufficient.  This is why the Toyota Defendants provided explicit reasons in each of their objection as to why certain portions of the Request or Interrogatory were objectionable.  The Toyota Defendants' objections are not "boilerplate" by any means.  On the contrary, they were carefully crafted to apply only to the objectionable portions of a specific question.

The fact remains that Plaintiffs continue to ask for vastly more information than is reasonably relevant to this case, including information that goes beyond the limits for discovery provided by Judge Godbey on July 18, 2012.  The extent of the overbreadth of Plaintiffs'

discovery requests is discussed below in more detail, with reference to specific Requests and Interrogatories.

**F.    The Court Should Order that Toyota Provide Full Responses to Interrogatories Where Toyota's Responses Simply Refer Plaintiffs to Other Documents or Sources: <u>Interrogatory Nos. 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, and12</u>.**

**1.    Plaintiffs' Contention:**

In several interrogatories, Toyota has refused wholly to respond to the questions asked. Instead, Toyota simply refers Plaintiffs to websites or voluminous nonspecific documents. The websites do not contain the information sought and Toyota refuses to identify, by bate-numbers, the documents that allegedly contain the information sought. Although there are many purposes for interrogatories the general aims are to expeditiously narrow the scope of litigation, reduce the element of surprise, serve as admissions for trial, and in a significant matter, avoid unnecessary discovery and minimize the expense." *Trueman v. New York State Canal Corp.*, 2010 WL 681341, at *2 (N.D.N.Y. Feb. 24, 2010) (citing Moore's Federal Practice § 33.03 (3d ed.2009)). These are the purposes Plaintiffs hoped to achieve with the interrogatories. To be adequate, an answer must completely and specifically respond to the interrogatory, without being evasive. *In re Savitt/Adler Litig.*, 176 F.R.D. 44, 49 (N.D.N.Y.1997). Federal Rule of Civil Procedure 33 provides that "[e]ach interrogatory must, to the extent it is not [properly] objected to, be answered separately and fully in writing under oath." FED.R.CIV.P. 33(b)(3).

Answers to interrogatories must be complete and responsive to the questions without referring to other documents where such references make it impossible to determine whether an adequate answer has been given without an elaborate comparison of answers. *Scaife v. Boenne*, 191 F.R.D. 590, 594 (N.D.Ind.2000) (quotations omitted). Rule 33(d) provides that:

> If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining

the answer will be substantially the same for either party, the responding party may answer by:

> (1)  specifying the records that must be reviewed in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and

> (2)  giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

FED.R.CIV.P. 33(d).  Rule 33(d) applies only where providing an answer would require the answering party to engage in burdensome or expensive research into his own business records in order to give an answer." *United States v. Kellogg Brown & Root Servs., Inc.*, —— F.R.D. ——, 2012 WL 3776708, at *6 (D.D.C. Aug. 31, 2012). Moreover, if a party references records when responding to interrogatories it must do so with specificity. FED.R.CIV.P. 33(d). "It is not sufficient for a responding party to simply direct the interrogating party to a mass of business records." *Graske v. Auto–Owners Ins. Co*., 647 F.Supp.2d 1105, 1108 (D.Neb.2009) (finding that a response to interrogatories merely indicating that the 7,000 pages of documents already produced were responsive to each request was insufficient, even though the documents were electronically produced and could be searched by key term, and requiring the defendant to provide more detailed responses).  *See also Herdlein Techs., Inc v. Century Contractors, Inc*., 147 F.R.D. 103, 105 (W.D.N.C.1993) (requiring interrogated party to either respond to the interrogatory or specify the document where the response merely stated that the answer was available in the documents already produced);  *Fann v. Hartford Underwriters Ins. Co*., 2013 WL 1858462 (D.Colo. Apr 16, 2013)(a party is not required to pour over the responding party's records to determine information that is readily available to responding party).

Thus, Toyota could rely on Rule 33(d) <u>only</u> upon a showing that it would be burdensome for Toyota to compile or extract the information beyond what is necessary to sufficiently refer to the records. *T.N. Taube Corp. v. Marine Midland Mortg. Corp*., 136 F.R.D. 449 (W.D.N.C.1991)

(finding defendant could not invoke the rule because it failed to meet the requirements regarding specificity and burden of ascertaining answers).  The "party resisting discovery has the burden of establishing facts justifying its objection." *Davis v. Precoat Metals*, 2002 WL 1759828, at *3 (N.D.Ill.2002); *American Needle, Inc. v. New Orleans*, 2012 WL 4237395, at *6 (N.D.Ill. Aug. 17, 2012) (declining to find an undue burden exists where the interrogated party failed to provide specific detail what the burden would be).

In this case, Toyota cannot seriously contend that providing an answer would require burdensome or expensive research on their part.  The responses can be easily obtained from Toyota's records or from a company representative.  Toyota has also failed to sustain the burden of proof in demonstrating that identifying documents (e.g. by bate-numbers), if they truly exist, would be overly burdensome to Toyota.  *Brown v. JP Morgan Chase Bank, N.A.*, 2013 WL 709062 (N.D.W.Va. Feb 26, 2013)(referring to documents without providing a bate-number and reasons why document supported the response is an evasive answer).  Additionally, where Toyota simply refers Plaintiffs to web links, the Court should order that Toyota answer the responses fully.  These third-party websites do not contain the responses to the interrogatories, **which ask for information that is contained solely in Toyota's internal records**.  Accordingly, Toyota's responses to Interrogatory Nos. 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, and 12 are all evasive, which is the equivalent of a failure to answer. Fed.R.Civ.P. 37(a)(4).  Considering that Toyota now boasts that it has data-dumped over 149,000 pages of documents upon Plaintiffs, it cannot be sufficient to simply state that the documents are "**somewhere within the 149,000 documents**."   Additionally, contrary to Toyota's contention below, Plaintiffs have never conceded that any of the requests were beyond the scope or overbroad.

2.      **Toyota's Contention:**

a.   **The Toyota Defendants provided complete and appropriate Responses to each of Plaintiff Hardeman's Interrogatories, including specific and accurate references to documents that contain the answers to those Interrogatories.**

Each of the Toyota Defendants provided complete and appropriate responses to each of Plaintiff Hardeman's Interrogatories to the extent they are not objectionable. Indeed, at the meet and confer, Plaintiffs' counsel impliedly agreed that at least some of Plaintiffs' discovery requests were overly broad when he conceded that Interrogatories Nos. 9-12 should have been limited to the 2003-2009 and 2010 to current 4Runner. The interrogatories were not so phrased and objections were required. In any event, each response to an interrogatory included specific references to the documents the Toyota Defendants had already produced in this case and to publicly available information that contains the information Plaintiffs were asking for through the interrogatory. To the extent that the Toyota Defendants referred to previously produced documents and publicly available information, such responses constitute full and complete responses to the interrogatories under Federal Rule of Civil Procedure 33(d). All of the Toyota Defendants' Responses to Plaintiff Hardeman's Interrogatories are attached, so that the Court can see that the Toyota Defendants provided non-evasive answers to the non-objectionable portions of the interrogatories. *See* APP 1579, 1614, 1651, TEMA, TMS, and TMC's Responses to Plaintiff Marilyn Hardeman's Interrogatories.

The Supreme Court ruled in *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 357 (1978), that "when one party directs an interrogatory to another party which can be answered by examination of the responding party's business records, 'it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained and to afford the party serving the interrogatory reasonable opportunity to' examine and copy records, if the burden of deriving the answer would be 'substantially the same' for either party." However,

Rule 33(d) does not require specificity to the degree of re-identifying each Bates number of each responsive document. *Cont'l Ins. Co. v. Chase Manhattan Mortgage Corp.*, 59 F. App'x 830, 838-39 (7th Cir. 2003); *Triangle Residential Designs, Inc. v. Ashley Turner Enterprises, Inc.*, 2011 WL 7293428, at *3 n.5 (E.D.N.C. Feb. 24, 2011) (defendant was not required to identify documents by Bates number).  Instead, Rule 33(d) provides that "specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could" constitutes a sufficient response to an interrogatory.

The Toyota Defendants have done what Rule 33(d) requires.  As the Court can see in the Toyota Defendants' attached Interrogatory responses, each response contains specific and tailored references to the previously produced documents and publicly available information from which Plaintiffs can derive the answer to the interrogatory.  The Toyota Defendants did not provide vague references to all of the documents they had previously produced, as was the case in the *Graske* case that Plaintiffs cite, above.  Rather, the Toyota Defendants' responses specifically identified which categories of documents were responsive to each interrogatory, and also pointed Plaintiffs to the individual prior discovery response in which each category of documents was produced.  Those prior discovery responses include Bates numbered lists of the documents that the Toyota Defendants produced, and the lists contain descriptions of each document, including which model year vehicle they relate to, if applicable.  These references are by no means ambiguous.  *See, e.g.*, APP 1059, TMC's First Supplemental Response to Plaintiff William Greene's First Set of Interrogatories.

Furthermore, the fact that TMC was able to refer to a large of number of previously produced documents as containing responsive information demonstrates that TMC is not hiding anything or avoiding the question.  Rather, the referenced documents contain the information

35

Plaintiffs requested.  For example, Interrogatory No. 5 of Plaintiff Hardeman's Interrogatories asks for information relating to the placement of the fuel tank.  APP 1662.  In response, TMC referred to the documents that show the position of the fuel tank, including engineering drawings and related documents, repair manuals, MVMA specifications, and new car feature guides that show the fuel tank location.  APP 1663-65.  Plaintiffs have complained that TMC referred to "too many documents" to allow Plaintiffs to deduce the answer, but if Plaintiffs had simply looked at any of the documents TMC identified, Plaintiffs would have all of the information they sought through the Interrogatory.

Likewise, in response to Interrogatory Nos. 1 and 2, which ask for the identities of the lead persons at TMC's Advanced CAE Division over a 12 year period, TMC originally referred Plaintiffs to its organizational charts and manager's lists that TMC produced through its Response to Request No. 17 of Plaintiffs' Second Requests for Documents.  APP 1655-56.  Those documents contain the identities of members of the Advanced CAE division that Plaintiffs requested.  However, because TMC's organizational charts and manager's lists are maintained in Japanese, in the interest of cooperative discovery, TMC has now served Plaintiffs with supplemental responses to Interrogatory Nos. 1 and 2 that provide English translations of the names of the General Managers of the Advanced CAE Division from the time of its creation in 2004 to present.  *See* TMC's First Supplemental Response to Plaintiff Marilyn Hardeman's Interrogatories. Although the Toyota Defendants have no obligation under the Federal Rules to translate documents maintained in Japanese, TMC has done so here in a good-faith effort to resolve this dispute.

Nevertheless, Plaintiffs continue to assert that all of the Toyota Defendants' interrogatory responses are incomplete.  As described above, and as is evident by reviewing the Toyota

Defendants' Responses to Plaintiff Hardeman's Interrogatories, the Toyota Defendants' interrogatory responses were prepared in accordance with the Federal Rules of Civil Procedure and the Court's July 18, 2012 Order.   Beyond this, the Toyota Defendants do not have any obligation under the Federal Rules to re-identify each document that contains responsive information by Bates number in each Interrogatory response.   The Toyota Defendants' interrogatory responses and supplementations are complete.

### G.   Toyota's Other Objections to Plaintiffs' Discovery Requests.

#### 1.   Plaintiffs' Contention:

Toyota refused to fully and unevasively answer any of the twelve (12) interrogatories and responded, albeit incompletely, to only six (6) of twenty-six (26) Requests for Production. Plaintiffs ask that the Court find Toyota's responses evasive and order full responses.

##### a.   Information regarding Toyota's use of CAD and FEM and related information is relevant and discoverable.

It is undisputed that vehicle manufacturers such as Toyota make use of computer modeling and simulation to test crashworthiness and safety features in new designs.  Computer Aided Design (CAD) is used to predict the accuracy of performance predictions. Computer Aided Engineering (CAE) consists of CAD and Finite Element Analysis (FEA).  FEA, a subset of CAE used for analyses, is performed with a computer program that uses the finite element method (FEM) to analyze materials and objects.  By building a finite element model of a vehicle or component and running a simulation on the computer the manufacturers save lots of time, effort and cost that would otherwise be required to build a unique prototype to test all of the vehicle's components. FE computer models can also capture all the important phenomenological events during a crash impact related to vehicle kinematics. The FEM of vehicles and vehicle components are applied, for example, in design analysis and system crashworthiness evaluation. Through FEM, the crashworthiness characteristics and safety features of a vehicle's designs are

evaluated from computer analysis results. FEM also allows the accurate prediction of a vehicle's reaction and deformation in crash simulations.

Toyota's FEM input data files and computer modeling, for example, are discoverable. *See, e.g. Gibson v. Ford Motor Co*., 510 F. Supp. 2d 1116, 1123 (N.D. Ga. 2007) (requiring defendant to produce computer models of testing, benchmarking studies, and design and testing information for roof structure of allegedly defective truck at issue). In fact, when this Court ruled that the FEM and CAD information is discoverable it noted that other courts have required defendants to produce computer models of testing, benchmarking studies, and design and testing information. APP 300-01. More specifically, the July 18, 2012, Order held that Plaintiffs are entitled to CAD and FEA evidence of the fuel system, fire prevention and suppression systems, seat restraints, air bag systems, rear occupant compartment and structural integrity for the 2003-2009 and the 2010-2012 U.S. bound 4Runners. *Id*.

During a hearing on a previous motion to compel CAD and FE information, a discussion was had with the Court regarding Toyota's FE simulation models during which time Toyota's counsel represented that information had been destroyed. APP 376-378. During this hearing the Court suggested that Plaintiffs take a FRCP 30(b)(6) deposition regarding Toyota's FE information and return to Court to advise the Court whether this information exists. APP 378. Fukumoto's testimony suggests that the FE for the 2010-2012 4Runner still exists.

> **(1)    The CAD, FE, CATIA information, as well as the related research and electronically stored information: Interrogatory Nos. 1, 2, and 3.**

During his testimony, Fukumoto testified that there is a division called the CAE Technical Division or CAE Design Division that is responsible for analytical work when CAE is used. Fukumoto Depo Vol. 1 at 86:3 – 87:15 (APP 339-40). However, Fukumoto could not answer questions regarding the last time TMC had access to the CAD and FE files and stated that

he did not prepare himself to be able to answer these questions. *Id*. Although he stated that the FE information for the 2010 model should have been preserved he also indicated that he cannot testify whether FE for the SUV at issue has been discarded and did not prepare himself to be able to answer this question. Fukumoto Depo Vol. 1 at 41:24 – 42:12; 90:1-21 (APP 318-19, 343). Therefore, Plaintiffs were forced to submit interrogatories to obtain responses to the following CAD, FE and CATIA questions:

1. Please Identify[3] the name of the person (s) who has (have) directed or been the head of the CAE technical division or CAE design division, as that phrase is used in the Vol. 1 of the deposition of Ichiro Fukumoto at 41:24 – 42:12.

2. Please Identify the name of the person (s) who has (have)? directed or been the head of the Advanced CAE Division (as referred to internally and externally) during the period 1999-2013 including but not limited to the Advanced CAE Division referenced at http://www.toyota-global.com/company/history_of_toyota/75years/data/automotive_business/products_technology/technology_development/performance/details_window.html

3. Regarding TOYOTA's use of Computer Aided Design (CAD), Computer Aided Engineering (CAE), CATIA, LS-DYNA, Finite Element Analysis (FEA), Finite Element Method or Modeling (FEM) in designing, manufacturing, testing, crashworthiness analysis, evaluations, and accident reconstruction related in any way to what became the 2010 or later Toyota 4Runner:

   a. State the approximate month and year of TOYOTA's first use of Computer Aided Design (CAD), Computer Aided Engineering (CAE), CATIA, LS-DYNA, Finite Element Analysis (FEA), Finite Element Method or Modeling (FEM) with the Toyota 4Runner;

   b. State the approximate month and year of TOYOTA's last use of Computer Aided Design (CAD), Computer Aided Engineering (CAE), CATIA, LS-DYNA, Finite Element Analysis (FEA), Finite Element Method or Modeling (FEM) with the Toyota 4Runner;

   c. State all purposes for which the following were used for any purpose related to the Toyota 4Runner (e.g. in the design, evaluation, crashworthiness testing, etc.):

      i. CAD, CATIA and CAE files;

---

[3] Please use the definition of this term in responding to each request, as provided in the Instructions and Definitions above.

    ii.  Finite Element Analysis and Finite Element Method or Modeling;

    iii.  Finite element mesh, including the file containing the mesh geometry;

    iv.  Input data files; and

    v.  Computer simulation and computer models of testing.

   d.  State the approximate month and year that TOYOTA discarded, erased, stopped retaining or otherwise disposed of the following items, files, models, etc. used for the any purpose for each model year or generation of the Toyota 4Runner:

    i.  CAD, CATIA and CAE files;

    ii.  Finite Element Analysis and Finite Element Method or Modeling;

    iii.  Finite element mesh, including the file containing the mesh geometry;

    iv.  Input data files; and

    v.  Computer simulation and computer models of testing.

   e.  Identify all documents (by bates-number) from which your response to this request can be verified.

Toyota did not provide full and complete responses to any of these interrogatories. As discussed in Section IV.F., supra, this constitutes an evasive answer. Also, in Toyota's response to Interrogatory No. 3, Toyota contends that it "is conducting a search" for this information. APP 022. This is a disingenuous statement and another attempt by Toyota to stall responding. Toyota received requests for this information two years ago and has had this specific interrogatory since June 25, 2013. Accordingly, there is no reason why this search should not have taken place already. For these reasons, the Court should overrule each of Toyota's objections and order that Toyota respond fully.

     **(2)  The CAD, FE, CATIA information, as well as the related research and electronically stored information: <u>Requests for Production – Nos. 1, 2, and 5</u>.**

Fukumoto testified that there is a division at Toyota called the engineering information management division that is responsible for maintaining all of the FE, CAD and CATIA files.

Fukumoto Depo Vol. 1 at 72:11-17, 83:13-21, and 101:11-16. (APP 333, 336, 346).  Fukumoto

also testified that Toyota has an Advanced CAE Division, the Vehicle Evaluation & Engineering

Division and the collision safety and division related to safety and legal issues.  Fukumoto Depo

Vol. 1 at 38:3 – 39:18 and 107:10-16.  (APP 315-16, 347).  Based on this testimony, in the

requests for production that were served on Toyota following the Fukumoto deposition, Plaintiffs

seek information relating to CAD, FE and CATIA information as well as electronically stored

information, research, and other information related to Toyota's Advanced Engineering Division:

2. Provide the entire CAD and CATIA database and all input files for the U.S.-bound 2003-2009 and 2010-2012 Toyota 4Runners and any other vehicle modified to represent the U.S.-bound 2003-2009 and 2010-2012 Toyota 4Runners including, but not limited to, the database referenced in Vol. 1 of the deposition of Ichiro Fukumoto at 72:11-17, 83:13-21, and 101:11-16.

2. Computer Aided Design (CAD), Computer Aided Engineering (CAE), Finite Element Analysis (FEA), Finite Element Method or Modeling (FEM) information including, but not limited to, input data files, finite element mesh, including the file containing the mesh geometry, computer simulation and computer models of testing related to the U.S.-bound 2003-2009 and 2010-2012 Toyota 4Runners and any other vehicle modified to represent the U.S.-bound 2003-2009 and 2010-2012 Toyota 4Runners. (what about similar to?)[sic]

5. Electronically Stored Information, since 1999, sent to or from, or exchanged between members of the Advanced CAE division regarding Toyota's use of Computer Aided Design (CAD), Computer Aided Engineering (CAE), CATIA, Finite Element Analysis (FEA), Finite Element Method or Modeling (FEM) in designing, manufacturing, testing, crashworthiness simulation or analysis, evaluations, occupant simulations, fire safety, research, or accident reconstruction.

In their production, Toyota has refused to produce most of this material.  Although

Toyota argues that it has produced "output" and "drawings," the record is clear that it has not

produced the "input files, computer simulation and CAE and FE material" that Fukumoto

acknowledged exists at Toyota.  Plaintiffs sought to have Toyota (a) respond fully as to whether

Toyota has any CAD or FEM **input files, design files, computer models or computer simulation programs**, whether for the entire SUV or otherwise; (b) if so, specify the nature and full extent of such CAD or FEM files, input information, models, simulations, and information; and (c) provide an explanation why Toyota is not producing the requested CAD and FEA discovery. Accordingly, Toyota should be ordered to produce the finite element representation of the U.S.-bound 2003-2009 and 2010-2012 Toyota 4Runners, including the computer program information, bulk data files or decks, input files, analyses' trees, as well as any computer simulation and associated documentation reflecting the FEMs for the entire design and evaluation of the U.S.-bound 2003-2009 and 2010-2012 Toyota 4Runners. That way, Plaintiffs' experts can do their analyses of the dangers Toyota knew of in the design, evaluation and testing phases of its 4Runner SUV. As a further example of Toyota's bad faith, Toyota produced only material responsive to RFP No. 5, which has been redacted and is solely in Japanese. See, e.g. production bate-labeled 0000105RN.0001-0000150RN.0001 (designated as confidential).

Moreover, although Toyota contends below that Plaintiffs' current requests for CAD and FEM information are duplicative of previously served discovery, this is not true. The point is that Toyota has yet to produce the input files and simulation. Additionally, Judge Godbey suggested that Plaintiffs take the deposition of a TMC corporate representative and inquire about the Fe and CAD information. Ichiro was that deponent. Accordingly, these requests are for the specific information that Ichiro testified still exists at Toyota that has never been produced.

### b. Plaintiffs are entitled to discovery regarding Toyota's alleged policy of destroying or discarding its CAD and FE.

When asked what department would have done FE modeling for the Toyota 4Runner, Fukumoto replied "'if that were necessary,' then it would have been the division that specializes the CAE at Toyota." Fukumoto Depo Vol. 2 at 28:25 – 30:1 (APP 357-59). Fukumoto could not

42

answer questions regarding the last time TMC had access to the CAD and FE files and acknowledged that he did not prepare himself to be able to answer these questions.  Fukumoto Depo Vol. 1 at 86:3 – 87:15 (APP 339-40).   The witness also indicated that he cannot testify whether FE for the 4Runner at issue has been discarded and did not prepare himself to be able to answer this question either.   Fukumoto Depo Vol. 1 at 88:25 – 90:21 (APP 341-43). Furthermore, when Plaintiffs' counsel pressed the question of when the FE material was destroyed, Toyota's counsel instructed the witness not to respond.  Fukumoto Depo Vol. 1 at 100:7 – 101:10. (APP 345-46).  Plaintiffs are entitled to discover what policies exist, if any, that allowed Toyota to destroy clearly relevant CAD and FE information used for the SUV. *McDonald v. Wal-Mart Stores East, LP*, 2008 WL 153783, at *1 & n. 1 (E.D.Va. Jan. 14, 2008).

### (1)     Toyota's policy of destroying its clearly relevant CAD and FE information:  Interrogatory Nos. 7 and 8.

As a result of Fukumoto's inability to answer questions regarding TMC's destruction of FE, CAD and CATIA files, Plaintiffs were forced to submit interrogatories to obtain responses:

7.     Identify all documents and ESI that describe Toyota's policy regarding retention and discarding of its Computer Aided Design (CAD), Computer Aided Engineering (CAE), CATIA, LS-DYNA, Finite Element Analysis (FEA), Finite Element Method or Modeling (FEM) used with its SUVs and other vehicles.

8.     Identify all documents that describe Toyota's policy to "promptly discard any documents that became unnecessary for its business" as that practice is described in the deposition of Ichiro Fukumoto at Vol. 1, 86:8 – 87:24.

Toyota did not provide full and complete responses to these interrogatories.  Instead, Toyota refers Plaintiffs to vague documents.  APP 070-71.  As discussed in Section IV.F., supra, this constitutes an evasive answer.  For these reasons, the Court should overrule each of Toyota's objections including, but not limited to, objections allegedly on the basis of vagueness, ambiguousness, burdensome, overbreadth, open to interpretation, and exceeding the scope and order that Toyota respond fully  to these interrogatories.

43

**(2)     Toyota's policy of discarding its CAD and FE information:  <u>Request for Production No. 18</u>.**

Based on Fukumoto's testimony, Plaintiffs submitted the following request for production to Toyota on the issue of destruction of clearly relevant documents:

18.     All written documents and ESI that describe Toyota's policy to "promptly discard any documents that became unnecessary for its business" as that practice is described in the deposition of Ichiro Fukumoto at Vol. 1, 86:8 – 87:24.

Toyota did not provide a complete response to this request.  Instead, Toyota refers Plaintiffs to vague documents.  As discussed in Section IV.F., supra, this constitutes an evasive answer.  Plaintiffs are entitled to a full response to this request in that it will provide an insight into Toyota's practices when it is designing its SUVs. The Court should overrule Toyota's objections including, objections allegedly on the basis of vagueness, ambiguousness, burdensome, overbreadth, open to interpretation, and exceeding the scope and order that Toyota respond fully to these interrogatories.

**2.     Toyota's Contention:**

**a.     TMC has produced to Plaintiffs the relevant CAD and FEM information in TMC's possession that TMC was able to locate after conducting multiple searches in places where such information would reasonably be located at TMC.**

As discussed below, Plaintiffs have repeatedly asked for CAD and FEM information in their requests and interrogatories throughout the discovery process in this case.  TMC has, therefore, repeatedly responded by informing Plaintiffs that it has conducted numerous searches in places where such information could reasonably be located at TMC, for CAD and FEM relating to the components and systems of the 2003-2009 and 2010-2012 U.S. bound 4Runner that Plaintiffs allege are defective in this case. TMC has also stated that it has produced the information it was able to locate as a result of its searches.  APP 441, 443, 445, TMC's Response

to Request Nos. 2, 3, and 4 of Plaintiff Ollie Greene's First Request for Production of Documents; APP 1216-17, 1219-21, 1223-24, 1225-26, The Toyota Defendants Response to Nos. A1, A2, A3, and A4 of Plaintiffs' Counsel's Letter Requests. Plaintiffs simply refuse to believe that TMC has produced the responsive information in its possession.

FEM and CAD information was also the subject of Plaintiffs' First Motion to Compel, Plaintiffs' Motion to Continue Plaintiffs' First Motion to Compel, Plaintiffs' Second Motion to Compel, and, now, Plaintiffs' Third Motion to Compel. APP 896. Because it was part of Plaintiffs' First Motion to compel, FEM and CAD information is one of the areas of discovery that is expressly governed by Judge Godbey's July 18, 2012 Order. The Court's July 18, 2012 Order provided that the proper scope of discovery for FEM and CAD was the FEM and CAD related to Plaintiffs' defect allegations. Specifically, the Court limited FEM and CAD discovery to the U.S. bound 2003-2009 and "the 2010-2012 Toyota 4Runner's fuel system, fire prevention and suppression systems, seat restraints, air bag systems, rear occupant compartment and structural integrity . . . ." *See* APP 1009, 1015, 1018-19, Doc. No. 111 at p. 7, p. 13, n.14, and p. 16-17.

Despite the Court's Order, Plaintiffs subsequently filed the interrogatories and Requests for Production that are the subject of this Joint Submission, all of which are overly broad and exceed the permissible scope of FEM and CAD discovery discussed in the Court's July 18, 2012 Order. As but one example of the overbreadth of these interrogatories and requests, the Toyota Defendants refer to the text of Request for Production No. 5:

> Electronically Stored Information, since 1999, sent to or from, or exchanged between members of the Advanced CAE division regarding Toyota's use of Computer Aided Design (CAD), Computer Aided Engineering (CAE), CATIA, Finite Element Analysis (FEA), Finite Element Method or Modeling (FEM) in designing, manufacturing, testing, crashworthiness simulation or

> analysis, evaluations, occupant simulations, fire safety, research, or accident reconstruction.

*See* APP 1816.  This request is not limited to any one vehicle, but instead asks for electronically stored information ("ESI") spanning a 14-year period covering generic issues as broad as "designing" and "evaluations."  Nevertheless, TMC referred Plaintiffs to the responsive ESI that TMC had previously produced in this case.  APP 1663-65, TMC's Response to Request No. 5 of Plaintiffs' Second Requests for Production of Documents.  TMC also searched for and produced additional ESI that included correspondence pertaining to FEM and CAD utilized in the design and development of the components and systems of the 2010-2012 U.S. bound 4Runner that Plaintiffs claim are defective.  Finally, TMC informed Plaintiffs that it was unable to locate any such documents relating to the 2003-2009 U.S. bound 4Runner after searching.  *See id.*  In each of TMC's responses to the FEM and CAD related requests and interrogatories, TMC provided similarly appropriate responses.  *See id.*

However, despite TMC's thorough responses and extensive efforts, Plaintiffs still maintain that TMC has not produced responsive CAD and FEM information in its possession that is within the scope of permissible discovery in this case, despite the lack of support for such a contention.  As discussed in detail below, Plaintiffs' current requests for CAD and FEM information are duplicative of previously served discovery, and TMC's responses and objections to these requests and interrogatories which referred to TMC's prior discovery responses and document productions are therefore appropriate.

1. **Plaintiffs' New FEM and CAD Requests are Duplicative of Requests that the Court previously ruled were Overly Broad. Such Requests Attempt to Force the Toyota Defendants to Search for Irrelevant Information.**

A comparison of Plaintiffs' current requests and their prior requests reveals Plaintiffs' attempt to circumvent Judge Godbey's July 18, 2012 Order where he specifically addressed the scope of FEM and CAD related requests.

For example, the following are requests from Ollie Greene's First Request for Production, which were the subject of Plaintiffs' First Motion to Compel:

> Request for Production No. 2
> All Computer Aided Engineering files and associated documentation, analyses, and reports for the subject platform vehicle from 5 years prior to product line inception to present, including all CAD and FE files and associated documents.
>
> Request for Production No. 3
> Documents related to finite element modeling for the subject platform vehicle.
>
> Request for Production No. 4
> All crashworthiness finite element models for the subject platform vehicle that would be used with finite element modeling programs, for example, LS-DYNA, RADIOSS, or PAMCRASH.
>
> Request for Production No. 7
> All computer aided engineering files and associated documentation, analyses, and reports for the subject platform vehicle from 5 years prior to the product inception to present.

*See* APP 385.  When Plaintiffs made these requests an issue in their First Motion to Compel, the Court concluded that these requests were overly broad, and limited the scope of FEM and CAD discovery to only include information relating to the components and systems of the 2003-2009 and 2010-2012 U.S. bound 4Runner that Plaintiffs allege are defective.  *See* APP 1009, 1015, 1018-19, Doc. No. 111 at p. 7, p. 13, n.14, and p. 16-17.

The following are the texts of Request Nos. 1 and 2 of Plaintiffs' Second Requests for Documents, about which Plaintiffs now complain in this Joint Submission:

> 1.  Provide the entire CAD and CATIA database and all input files for the U.S.-bound 2003-2009 and 2010-2012 Toyota 4Runners and any other vehicle modified to represent the U.S.-bound 2003-2009 and 2010-2012 Toyota 4Runners including, but not limited to, the

> database referenced in Vol. 1 of the deposition of Ichiro Fukumoto at 72:11-17, 83:13-21, and 101:11-16.
>
> 2. Computer Aided Design (CAD), Computer Aided Engineering (CAE), Finite Element Analysis (FEA), Finite Element Method or Modeling (FEM) information including, but not limited to, input data files, finite element mesh, including the file containing the mesh geometry, computer simulation and computer models of testing related to the U.S.-bound 2003-2009 and 2010-2012 Toyota 4Runners and any other vehicle modified to represent the U.S.-bound 2003-2009 and 2010-2012 Toyota 4Runners. (what about similar to?)[sic]

APP 1816.

These two requests are substantively identical to Requests 2, 3, 4, and 7 of Plaintiff Ollie Greene's Requests for Production. In fact, these two requests, which ask for "entire databases" and are not limited to any component alleged to be defective in this case, are arguably even broader than Plaintiffs' earlier requests that the Court previously concluded were overly broad. Likewise, Request for Production No. 5, relating to ESI sent to, or from TMC's Advanced CAE division, does not specify any Toyota vehicle model or year.  Therefore, this request literally encompasses Toyota, Lexus, and Scion vehicles from all over the world.  The request is also not limited to the allegedly defective components in the case.  As a result, each of these requests asks for information that is outside the scope of the Court's July 18, 2012 Order.

Furthermore, not only are these requests overly broad, but they attempt to impose a grossly undue burden on the Toyota Defendants.  For example, Request for Production No. 5 would require TMC to search for and produce all ESI from the Advanced CAE Division at TMC for every component of every model year Toyota, Lexus, and Scion vehicle.  This would constitute a severe and tremendous burden on TMC.  APP 1888, Declaration of Ichiro Fukumoto, at ¶ 8.  As described below, TMC has already undertaken extensive and burdensome searches for the information that is within the permissible scope of discovery, and ordering TMC

to search for more information will not result in the discovery of additional information that is likely to be relevant or admissible evidence.

> **2.** **TMC has performed extensive searches for responsive FEM and CAD in its possession, and has provided appropriate responses to Plaintiffs' requests regarding FEM and CAD information.**

Despite the fact that Plaintiffs' discovery requests are duplicative and burdensome, TMC has conducted searches where information responsive to these requests would reasonably be located if it existed at TMC.  In addition to searching various databases, TMC's searches included speaking with multiple TMC engineers involved in the design and development of the 2003-2009 and 2010-current model year U.S. bound 4Runner, and searching their computers. APP 1888, Declaration of Ichiro Fukumoto, at ¶ 5.  After conducting these searches, "TMC has produced such FEM, CAE and CAD materials in its possession, and is not withholding any such FEM, CAE or CAD information related to the fuel system, body structure and restraint system components for the 2003-2009 or the 2010-2013 U.S. bound 4Runner." *Id.*  This includes FEM, CAE and CAD materials, as well as design drawings and other engineering materials that even contain proprietary and trade secret information that is competitively sensitive.  *Id.* at ¶ 7. Through its supplemental responses, TMC also provided Plaintiffs with instructions regarding how to view the drawings and the name of a free, publicly available 3D viewer for the XVL data that works with Internet Explorer.  APP 1890.

Plaintiffs' assertion that TMC has withheld responsive materials is therefore mere conjecture and contrary to what TMC has affirmatively represented through its discovery responses – that TMC has produced the documents in its possession that are responsive to the

non-objectionable portions of Plaintiffs' requests regarding FEM, CAE, and CAD applicable to

the components alleged to be defective in the 2003-2009 and 2010-2013 U.S. bound 4Runner.[4]

       **Toyota's policy regarding the retention of CAD and FE.**

         **3.**     **Toyota's Contention:**

            **a.**     **Through both its written discovery responses and 30(b)(6) witness testimony, TMC has provided documents and information relating to its document retention policy, including information relating to the retention of CAD and FEM files.**

As TMC has explained to Plaintiffs a number of times, when TMC develops a new

vehicle, TMC engineers evaluate the design and performance of the vehicle in terms of its

intended function and the likelihood and consequences of component failure during its ordinary

use.  Such evaluations may include computer-based analyses such as FEA, FMEA, or finite

element analyses.  However, in the ordinary course of business, upon adoption of the final

vehicle design, such analyses are discarded in accordance with TMC's normal document

retention policies, because there is no further business purpose for retaining such information

indefinitely.  *See* APP 617-19, TMC's Response to Request No. 94 of Plaintiff Ollie Greene's

First Requests for Production of Documents.[5]  However, the results of TMC's analyses are

incorporated into TMC's final design drawings and test reports for the production vehicle, and

---

[4] Furthermore, with respect to Interrogatory No. 3, Plaintiffs' complaints are premature.  TMC specifically stated in its original Response to Plaintiff Hardeman's Interrogatory No. 3 that TMC was searching for information responsive to the broad and compound Interrogatory, and that TMC would supplement the response when the search was complete.  APP 1658-59.  While TMC was performing that search, Plaintiffs filed their Third Motion to Compel, which is the subject of this Joint Submission.  Subsequently, TMC served a Supplemental Response to Plaintiff Hardeman's Interrogatories that includes a Supplemental Response to Interrogatory No. 3 where TMC provided the information it located as a result if its search.  Therefore, TMC has fully, completely, and appropriately responded to Interrogatory No. 3 of Plaintiff Hardeman's Interrogatories, and no further response is necessary or appropriate.

[5] TMC has also produced the Document Retention Policy at TMC Engineering, as well as the Document Retention Policy Attachment.

these documents have already been produced to Plaintiffs through TMC's Disclosures, First and Second Supplemental Disclosure, and discovery responses.

Further, TMC's designated corporate witness, Mr. Fukumoto, provided testimony regarding Toyota's document retention policy. As discussed above, CAD and/or FE documents are prepared on an as-needed basis during the new vehicle's design and evaluation process, but once they no longer serve their intended purpose, they become unnecessary and are discarded. APP 1402, 1438, Fukumoto Vol. 1 at 46:13-17, 82:12-21. However, if it is determined that the documents are necessary for Toyota's ongoing business, they will be retained. APP 1446, Fukumoto Vol. 1 at 90:15-21. The CAE division makes the determination of when these documents have completed their intended purpose, and are no longer necessary. APP 1456, Fukumoto Vol. 1 at 100:7-16. There is no single document that describes the process by which TMC discards its FE modeling. APP 1444, Fukumoto Vol. 1 at 88:1-8. As such, TMC has already produced and identified all of the information and documents responsive to these requests that are in TMC's possession. To the extent additional FEM, CAE, and/or CAD materials may still be in existence, they are outside TMC's control and custody, but may reside in the possession of Hino Motors, Ltd., the entity that performed the primary design, development and manufacture of the 2010 U.S. bound 4Runner. *See* APP 1888, Declaration of Ichiro Fukumoto, at ¶ 6.

When asked who manufactured the subject 4Runner in this case, Mr. Fukumoto testified that Hino was responsible for the manufacture of the 2010 U.S. bound 4Runner. APP 1385, Fukumoto Vol. 1 at 29:12-15. However, Plaintiffs' counsel failed to ask any follow-up questions relating to the extent or specificity of Hino's involvement in the design and development of the 2003-2009 and 2010-2012 U.S. bound 4Runner. To the extent additional FEM, CAE, and/or

CAD materials may still exist somewhere, Hino may have some such materials, but they are not within TMC.  APP 1888, Declaration of Ichiro Fukumoto, at ¶ 6.

Although TMC is affiliated with Hino Motors, and Hino Motors manufactures and assembles various vehicle models for TMC, including the 2010 to current model U.S. bound 4Runner, Hino remains a separate corporate entity from TMC.  APP 1888, Declaration of Ichiro Fukumoto, at ¶ 6.  Moreover, TMC does not have control over Hino.  This Court has made clear that corporate defendants like TMC are not required to produce documents from an affiliated company if no control can be shown.  *See* APP 1039, 1042, July 23, 2012 Hearing Transcript, at 11:18-19, 14:6-8 (Judge Godbey states, "I'm not going to require the Strick defendant to produce documents from its affiliated companies."  "I don't yet have anything in front of me that says Strick has control over these affiliates.").  TMC does not have the ability to force Hino to produce documents that possibly could be in their possession.  APP 1042, July 23, 2012 Hearing Transcript, at 14:10-13.

> **c.**  **Plaintiffs are entitled to discovery on Toyota's fuel tank designs, other alternative designs within Toyota's knowledge and cost information.**

> **1.**  **Plaintiffs' Contention:**

As indicated above, Plaintiffs Complaint alleges that the Toyota Defendants, *inter alia*, failed to design and incorporate widely available, safer and feasible, alternative designs into the Toyota 4Runner's fuel system, fire prevention and suppression systems.  In addition to being able to discover information specifically regarding the 2010 4Runner, Plaintiffs are also entitled to discovery on alternative designs considered by Toyota as to these components and engineering principles.  Information relating to the feasibility and effectiveness of alternative designs, and a manufacturer's knowledge of potentially safer designs, is highly relevant and thus discoverable.  *See Cardenas v. Dorel Juvenile Grp., Inc.*, 230 F.R.D. 611, 614-16 (D.Kan.2005) (granting

plaintiff's motion to compel the production of information concerning the defendant manufacturer's European version of a child car seat in a lawsuit involving an American child car seat manufactured by the same parent corporation, where the challenged discovery was relevant to the feasibility of a safer, alternative design); *Jampole v. Touchy*, 673 S.W.2d 569, 573-74 (Tex. 1984) (documents showing manufacturer's knowledge of alternative designs is discoverable and design differences between vehicles that might prevent certain alternative designs from being adopted to vehicle in question do not necessarily undermine relevance or discoverability of documents relating to such alternatives); *Boatland of Houston v. Bailey*, 609 S.W.2d 743, 746 (Tex.1980).   Additionally, information regarding the costs of implementing alternative designs is clearly relevant and discoverable. *See, e.g. Tidwell v. Terex Corp.*, 2012 WL 3776027, at *5 (Tex.App.-Houston [1st Dist.] 2012, no pet.).

> **a.   The 4Runner fuel tank designs, alternative designs, and cost information:  Interrogatory Nos. 4, 5 and 6.**

Fukumoto testified that he does not know about the designs of the fuel tanks in the other Toyota SUVs.  Fukumoto Depo Vol. 2 at 46:1 – 47:8 (APP 361-62).  He also stated that he does not know when metal tanks were used in Toyota vehicles or even what types of materials were used in the other Toyota SUVs.  Fukumoto Depo Vol. 2 at 51:19 – 55:6 (APP 363-67).  Fukumoto also could not specify the additional locations on the SUV that were considered by Toyota for placement of its fuel tanks.  Fukumoto Depo Vol. 2 at 68:16 – 70:1 (APP 373-75).  Therefore, Plaintiffs were forced to submit interrogatories to obtain responses to relevant matters.  In interrogatories served following Fukumoto's deposition, Plaintiffs sought responses regarding fuel tank designs used by Toyota, other alternative designs of which Toyota was aware, and cost information for the alternate feasible designs:

> 4.   Please state separately for each year 1996-2013, the following information for each of the following vehicles: (i) Toyota 4Runner, (ii) Hilux Surf; (iii)

RAV 4; (iv) Prado; (v) Land Cruiser; (vi) Highlander; (vii) Lexus RX; and viii) Lexus GX 470/460:

    a.    For each year, whether a metallic fuel tank was used on the vehicle;

    b.    For each year, whether a nonmetallic fuel tank was used on the vehicle;

    c.    For each year, whether a High Density Polyethylene (HDPE) fuel tank was used on the vehicle;

    d.    For each year, the volume size of each tank (in liters or gallons) that was used on each vehicle;

    e.    For each year, whether a Half Cover Type fuel tank protector was used in the vehicle and, if so, on what model styles;

    f.    For each year, whether a Full Cover Type fuel tank protector was used in the vehicle and, if so, on what model styles; and

    g.    Identify all documents (by bates-number) from which your response to this request can be verified.

5.    Please state separately for each model year 1996-2013, the following information for the following vehicles: (i) Toyota 4Runner, (ii) Hilux Surf; (iii) RAV 4; (iv) Prado; (v) Land Cruiser; (vi) Highlander; (vii) Lexus RX; and viii) Lexus GX 470/460:

    a.    For each year, whether the fuel tank in each specific vehicle was located:

        1.    over the rear axle;

        2.    forward the rear axle;

        3.    behind the rear axle;

        4.    surrounded by the frame;

        5.    not within (or surrounded by) the frame; or

        6.    _____ (specify location).

    b.    Identify all documents (by bates-number) from which your response to this request can be verified.

6.    Please state separately for each year 1999-2013, the following information for the fuel tank protector subassemblies used on the Toyota 4Runner, as referenced in Vol. II of the deposition of Ichiro Fukumoto at 45:3-25.

    a.    the 4Runner generation or model year on which the Half Cover Type fuel tank protector was first used;

    b.    the 4Runner generation or model year on which the Full Cover Type fuel tank protector was first used;

  c.  the actual or average cost to Toyota, by year, of the Half Cover Type fuel tank protector;

  d.  the actual or average cost to Toyota, by year, of the Full Cover Type fuel tank protector;

  e.  the actual or average cost to the customer, by year, of the Half Cover Type fuel tank protector;

  f.  the actual or average cost to the customer, by year, of the Full Cover Type fuel tank protector;

  g.  identify all documents (preferably by bates-number) from which your response to this request can be verified.

Toyota did not provide full and complete responses to these interrogatories. Instead, Toyota refers Plaintiffs to a multitude of general, nonspecific and vague documents including, but not limited to, technical drawings, engineering change sheets, assembly drawings, new car feature guides, owners' manuals, sales brochures, and MVMA specifications. APP 056-069. Not only will these documents not contain the information being sought, these documents are not sufficiently identified, e.g. by bate-numbers. As discussed in Section IV.F., supra, this constitutes an evasive answer. Toyota also objects by contending that this request exceeds some alleged Court restriction on discovery. However, as discussed in Section IV.C., supra, there is no Court-limitation on discovery. Additionally, during the previous motion to compel, the issue addressed was whether two vehicles, the Lexus GX 460/470 and Corolla, were substantially similar so as to allow Plaintiffs to introduce evidence of other accidents involving these vehicles as direct proof of negligence, a design defect, or notice of the defect. The Court did not address the issue of whether alternative designs are discoverable to show access to and knowledge of more feasible alternate designs. That motion to compel was also limited to designs "actually considered by" Toyota. Accordingly, Toyota can find no relief in the Court's July 18, 2013 Order in refusing to provide evidence and knowledge of alternative designs.

As discussed in Section IV.G.3., Plaintiffs are entitled to discovery on alternate designs and related costs. Also, the websites referenced by Toyota do not contain the costs of the designs "to Toyota" or the costs that Toyota "passes on" to customers.

> **b.** **The 4Runner fuel tank designs, alternative designs, and cost information:  Requests for Production Nos. 12, 14, 15, 16, 23, and 24.**

Based on Fukumoto's testimony, Plaintiffs submitted the following requests for production to Toyota on the issues of fuel tank designs and cost information:

12. All written design rules for the location of fuel tanks, volume size of fuel tanks, location and use of shields, materials used in fuel systems, location and use of inlet components, and fuel pump shutoff systems in the Toyota 4Runner and TOYOTA SUV's since 2000. (1999?) [sic]

14. Documents regarding the Toyota Hilux Surf sold in Japan during the period 1999 – 2013 sufficient to demonstrate the type of fuel system and tank used, as well as the materials used in the fuel system and tank, volume size of the tank, whether the ground shield fully covered the bottom of the tank, and location of the fuel tank on the vehicle.

15. Exemplar documents showing any and all models, by model year, of SUV's sold in Japan during the period 1995 – 2013 that contained metallic fuel tanks.

16. Exemplar documents showing any and all models, by model year, of SUV's sold in Japan during the period 1995 – 2013 that contained nonmetallic fuel tanks.

23. Documents and information reflecting the actual or marginal cost to Toyota, in the 2003-2013 periods, of the full and half fuel tank protector shields.

24. Documents and information reflecting the actual cost to a customer, in the 2003-2013 periods, of the full and half fuel tank protector shields.

Toyota did not provide full and complete responses to these requests.  Instead, Toyota objects by contending that this request exceeds some alleged Court restriction on discovery. However, as discussed in Section IV.C., supra, there is no Court-limitation on discovery. Additionally, during the previous motion to compel, the issue addressed was whether two vehicles, the Lexus GX 460/470 and Corolla, were substantially similar so as to allow Plaintiffs

to introduce evidence of other accidents as direct proof of negligence, a design defect, or notice of the defect. The Court did not address the issue of whether alternative designs are discoverable to show access to and knowledge of more feasible alternate designs. That motion to compel was also limited to designs "actually considered by" Toyota. As discussed in Section IV.G.3., Plaintiffs are entitled to discovery on alternate designs and costs related to those designs.

### 2. Toyota's Contention:

**a. TMC has provided Plaintiffs with the information in its possession relating to the alternative designs considered by TMC for the fuel tank of the 2003-2009 and 2010-2012 U.S. bound 4Runner, as well as information relating to the cost of relevant fuel system components.**

The Court provided guidance to the parties regarding the appropriate scope for alternative design discovery in its July 18, 2012 Order when it addressed Plaintiffs' Expedited Motion to Compel. *See* APP 1012-13, Doc. No. 111 at p. 10-11. Because the Toyota Defendants followed the Court's guidance in responding to Plaintiffs' discovery regarding alternative designs, the Toyota Defendants should not be required to expand the scope of alternative design discovery.

The Court said:

> Plaintiff may discover information about **alternate designs Toyota and Volvo considered for the 2010-2012 4Runner** and Volvo Truck with respect to the specific systems Plaintiffs allege are defective: the 4Runner's fuel system; fire prevention system; rear, side, and roof structure; fire suppression systems; and fire prevention systems . . . .

APP 1013, Doc. No. 111 at 11 (emphasis added.) As Judge Godbey reiterated in his December 19, 2012 Order, the July 18, 2012 Order set the scope of discovery for alternative designs, as specified above. APP 1142-43, Doc. No. 130 at p. 6-7.

Despite the Court's ruling that alternative design discovery was limited to "alternative designs **that Toyota . . . considered** for the 2010-2012 4Runner," Plaintiffs served Interrogatory

Nos. 4-6 and Request for Production Nos. 12, 14, 15, 16, 23, and 24, described above, which do not comply with the Court's July 18, 2012 Order.   TMC should not be required to respond further.

> **b.** **The Toyota Defendants provided appropriate Responses to Interrogatory Nos. 4-6 of Plaintiff Hardeman's Interrogatories, and objected only as necessary to limit discovery to the appropriate scope.**

As discussed above, each of the Toyota Defendants provided complete and appropriate responses to each of Plaintiff Hardeman's Interrogatories even though the interrogatories were not tailored to ask for information that fell within the permissible scope of discovery.

Interrogatory Nos. 4 and 5 ask for information relating to eight different vehicles, spanning a 17-year period for each vehicle.   Two of the vehicles identified in the Interrogatories are not even sold in the United States.   Furthermore, these Interrogatories are not limited to alternative designs that TMC actually considered when designing the 2010-2012 U.S. bound 4Runner.   Rather, they ask for information relating to fuel tank design in numerous unrelated vehicles over a 17-year period.   These interrogatories not only exceed any reasonable scope of discovery for this case, but they also exceed the scope of discovery regarding alternative designs set by the Court.   Nevertheless, when TMC responded to these Interrogatories, TMC referred Plaintiffs to the documents that had already been produced in this case relating to the 2003-2009 and 2010-2012 U.S. bound 4Runner's fuel tank design that provided the information Plaintiffs requested.   APP 1660-62, 1663-65, TMC's Response to Nos. 4 and 5 of Plaintiff Marilyn Hardeman's Interrogatories.   Referring to documents that contain information responsive to an interrogatory is appropriate, pursuant to FRCP 33(d).   Plaintiffs, in fact, have made no claim that they reviewed the documents TMC referenced and found them not to contain the information Plaintiffs asked for through the Interrogatories.

Instead, Plaintiffs simply state "[n]ot only will these documents not contain the information being sought, these documents are not sufficiently identified, e.g. by bate-numbers." By doing so, Plaintiffs have implied that they did not examine the documents to determine if they contain responsive information before they motioned this Court to compel further responses. Further, because the documents to which TMC referred Plaintiffs were identified by Bates number in the original responses where they were produced. TMC did not re-identify the responsive documents by Bates number in the Interrogatory responses because of the exceptionally large volume of documents involved. However, by referring Plaintiffs to the original responses where the responsive documents were identified in great detail with both descriptions and Bates numbers, TMC did indeed provide Bates numbers for the responsive documents.

Furthermore, although information relating to vehicles other than the 2003-2009 and 2010-2012 U.S. bound 4Runner is not relevant to this case, in the interest of cooperative discovery, TMC also referred Plaintiffs to a website where Plaintiffs could conduct their own research relating to vehicle models other than the 4Runner. APP 1660-62, 1663-65, TMC's Response to Nos. 4 and 5 of Plaintiff Marilyn Hardeman's Interrogatories. Rather than look for the information they want through the website reference TMC provided, Plaintiffs moved this Court to compel TMC to provide further responses.

Likewise, Interrogatory No. 6 also exceeds the scope of reasonable discovery, as well as the scope of discovery set by the Court's July 18, 2012 Order. The Court limited discovery of previous 4Runner models to only include one previous model series: the 2003-2009 U.S. bound 4Runner. APP 1015, Doc. No. 111 at p. 13. Interrogatory No. 6, however, asks for information relating to fuel systems in the 1999-2002 4Runner, which exceeds the scope of discovery set by

59

the Court.  In its Response, TMC provided information and referred to documents that provided responsive information relating to the 2003-2009 and 2010-2012 model series of the U.S. bound 4Runner, consistent with the Court's Order.  APP 1666-69.  TMC also provided references to fuel tank protector retail cost information, and further advised Plaintiffs that TMC will search for records relating to the actual cost to Toyota of buying the components that are the subject of the Interrogatory.  *Id.*  Subsequently, TMC served a Supplemental Response to Request for Production No. 17 of Plaintiffs' Second Requests for Documents that included the accounts payable documents it was able to locate that contain the relevant component cost information, and also provided a Supplemental Response to Interrogatory No. 6 to refer Plaintiffs to the newly produced information.  *See* TMC's First Supplemental Response to Plaintiffs' Second Request for Documents.  Those documents contain the information Plaintiffs requested in the Interrogatory relating to the cost to TMC of the fuel tank protectors installed in the 2006-2009 and 2010-2012 U.S. bound 4Runner.  TMC could not locate accounts payable documents applicable to the U.S. bound 4Runner models prior to 2006.

Again, Plaintiffs have provided no grounds for overruling any objections asserted by Toyota, and they have not demonstrated how TMC's discovery response was insufficient.

> **c.** **The Toyota Defendants provided complete and appropriate Responses to Request for Production Nos. 12, 14, 15, 16, 23, and 24 of Plaintiffs' Second Request for Production, and objected only as necessary to limit the scope of discovery where it exceeded reasonable limits.**

With regard to Request for Production Nos. 12, 14, 15, 16, 23, and 24, Plaintiffs again failed to ask only for relevant information that complies with the Court's July 18, 2012 Order. As the Court can see from the text of these six requests listed by Plaintiffs in their Motion, not one of the six listed Requests is limited to the Toyota 4Runner, let alone to the 2003-2009 and

2010-2012 U.S. bound 4Runner.  As previously discussed, Judge Godbey explicitly ruled that the only vehicle models that were properly within the scope of discovery in this case are the 2003-2009 U.S. bound 4Runner and the 2010-2012 U.S. bound 4Runner.  *See* APP 1015, Doc. No. 111 at p. 13 and n.14.  Therefore, these six requests ask for information relating to vehicles that are outside the scope of permissible discovery in this case, and the Toyota Defendants should not be required to provide further responses to such requests.  Notwithstanding, although Request No. 23 asks for irrelevant information relating to the cost to TMC of fuel tank protectors for any Toyota, Lexus, or Scion vehicle spanning a 10-year period, in the interest of cooperative discovery, TMC has now produced to Plaintiffs accounts payable documents that list the price to TMC of the fuel tank protectors in the 2006-2009 and 2010-2012 U.S. bound 4Runner.  TMC could not locate accounts payable documents applicable to the U.S. bound 4Runner models prior to 2006.  *See* TMC's First Supplemental Response to Request No. 23 of Plaintiffs' Second Requests for Documents.

Furthermore, with regard to Request No. 24, which asks for irrelevant information relating to the cost to a customer to purchase a fuel tank protector for any Toyota, Lexus, or Scion vehicle at any time spanning a 10-year period, the Toyota Defendants appropriately objected that the Request was overly broad, unduly burdensome and asked for irrelevant information.  APP 1762-64. Further, because the Request asks for the price of a particular component part over 10 years, the undue burden to Toyota to even begin to search for such information greatly exceeds the marginal relevance, if any, that such information may have to Plaintiffs' defect allegations.  Nevertheless, in an attempt to avoid a dispute, the Toyota Defendants referred Plaintiffs to websites where the relevant parts are currently available for

retail purchase.  *Id.*  This reference meets the Toyota Defendants' obligations to respond to this overly broad Request.

In summary, the Toyota Defendants provided full and complete answers to all of Plaintiffs' Second Requests for Documents and Plaintiff Hardeman's Interrogatories, and included only the appropriate and necessary objections required to limit the discovery to what was reasonable and relevant in this case.  TMC has even searched for and produced arguably irrelevant cost-related information in an attempt to cooperate with Plaintiffs and resolve this dispute.  Plaintiffs' representation that "Toyota did not provide full and complete responses to these requests" is therefore inaccurate, and the Court should not order the Toyota Defendants to provide any additional information.

> **d.**   **Plaintiffs are entitled to discovery regarding specific crash and simulated tests and the FMEA and DRBFM information related to relevant components: <u>Interrogatory Nos. 9, 10, 11, and 12</u>**

> **1.**   **Plaintiffs' Contention:**

It is undisputed that crash test evidence is clearly relevant and admissible at trial.  *See, e.g. Frazier v. Honeywell Int'l Inc.*, 518 F.Supp.2d 831, 838-39 (E.D. Tex. 2007).  *See also, Jampole* 673 S.W.2d 569 granting mandamus and holding that a plaintiff is entitled to discover design and test documents of other model lines); *O'Connor v. AM General Corp.*, 1992 WL 382366 at *3-4 (E.D.Pa. Dec 07, 1992) (allowing discovery related to all "design, tests, and standards" for model of allegedly defective transmission at issue, though plaintiff specifically theorized transmission was defective because it lacked a "sharp crest on the transmission indent tooth"); *Cardenas,* 230 F.R.D. at 628-29 (granting plaintiffs' motion to compel documents related to allegedly defective child seat, including any "reverse engineering" tests of these seats,

to ascertain how that testing may have led defendant-manufacturer to exclude those materials in its child seat).

During his deposition, Fukumoto was asked about a TMC policy that "Failure Modes and Effects Analysis ("FEMA") will be kept for five years or after completion of the development of the next full-model change and the fault tree analysis shall be kept three years after the SOP," yet the witness gave very vague responses regarding the existence and use of this information. Fukumoto Depo Vol. 2 at 15:4 – 19:2 (APP 351-55).  Therefore, Plaintiffs were forced to submit the following interrogatories to obtain responses to the FMEA information as well as other tests that may have been performed by TMC:

9.    Identify all documents, if any, that list each and every specific failure mode, FMEA (Failure Modes and Effects Analysis), and DRBFM (Design Review Based on Failure Mode) allegedly considered by Toyota as discussed in Vol. 2 of the deposition of Ichiro Fukumoto at 13:17 – 14:20.

10.   Identify the documents, if any, by bates number, that demonstrate whether Toyota undertook specific crash or simulated tests to determine whether the frame rail, axle, bolts, brackets, springs, suspension parts, mounting straps and/or flanges could engage, dislodge, rupture or puncture the fuel tank or fuel inlet pipe during a crash.

11.   Identify the documents, if any, by bates number, that demonstrate whether Toyota undertook specific crash or simulated tests to determine whether ground contact of the fuel tank could abrade, engage, dislodge, rupture , puncture, or otherwise cause a failure of the fuel tank.

12.   Identify the documents, if any, by bates number, that demonstrate whether Toyota undertook specific crash or simulated tests to determine whether the screw on caps or other coverings on the fuel tank could be dislodged during a crash or impact loading condition.

In his testimony, Ichiro contends that Toyota undertook the various tests and that they are reflected in Toyota documents.  Fukumoto Depo Vol. 2 at 17:1 – 18:1 (APP 353-54) and 65:20 – 68:3 (APP 370-73).  Despite that these interrogatories are very narrow and specific, Toyota did not provide full and complete responses.   Instead, Toyota refers Plaintiffs to a multitude of general, nonspecific and vague documents. Not only will these documents not contain the

information being sought, these documents are not sufficiently identified, e.g. by bate-numbers. As discussed in Section IV.F., supra, this constitutes an evasive answer.  Toyota also objects by allegedly contending that this request exceeds some alleged Court restriction on discovery of CAD, FEM, crashworthiness, alternative designs and model series.   However, as discussed in Section IV.C., supra, there is no Court-limitation on discovery.   Additionally, during the previous motion to compel, the Court did not address whether alternative designs are discoverable to show access to and knowledge of more feasible alternate designs.  That motion to compel was limited to designs "actually considered by" Toyota. As discussed in Section IV.G.3., Plaintiffs are entitled to discovery on alternate designs and related costs.

### 2.   Toyota's Contention:

#### a. TMC has produced to Plaintiffs the crash testing information in its possession that is relevant to the defect allegations in this case and responsive to Plaintiffs' Interrogatories.

Plaintiffs have repeatedly failed to craft narrowly tailored discovery requests that conform to Judge Godbey's July 18, 2012 Order.   Although Plaintiffs contend that "these interrogatories are very narrow and specific," a review of the interrogatories shows that they are not limited to any particular vehicle or timeframe, but instead ask TMC to search for testing information relating to any Toyota vehicle ever manufactured.   These requests are overly broad, unduly burdensome, oppressive and harassing because they are not limited to the 2003-2009 or 2010-2012 U.S. bound 4Runner and they do not conform to the Court's July 18, 2012 Order. Requiring TMC to search for and produce crash test information for unlimited Toyota, Lexus, and Scion vehicles would constitute a severe and tremendous burden on TMC.  APP 1888, Declaration of Ichiro Fukumoto, at ¶ 8.

Nevertheless, TMC provided appropriate responses to each of Plaintiffs' overly broad, oppressive, and harassing Interrogatories, as is described below. Interrogatory No. 9 requests specific documents that list each and every specific failure mode, FMEA, and DRBFM discussed in Mr. Fukumoto's deposition.  Mr. Fukumoto testified during his deposition that TMC does not maintain a specific document that lists each FMEA test that was conducted on the 2010 4Runner. APP 1507-09, Fukumoto Vol. 2 at 16:14—18:1.  Instead, the FMEA information that Plaintiffs seek is incorporated within the final engineering drawings relating to the fuel tanks in the 2003-2009 and 2010-2012 U.S. bound 4Runner that Plaintiffs already have.  *Id.*   Therefore, although Plaintiffs complain that "Toyota refers Plaintiffs to a multitude of general, nonspecific and vague documents," the information that Plaintiffs want is contained within the voluminous number of engineering documents that Plaintiffs previously requested, and which TMC produced to them. Plaintiffs are now complaining that TMC has produced "too many" relevant documents which they would rather not have to review.

Through Interrogatories 10, 11, and 12, Plaintiffs ask for documents related to crash or simulated tests on Toyota vehicles, without limitation.  Although Plaintiffs' interrogatories are overly broad and unduly burdensome, Toyota has already identified and produced testing pertaining to the 2003-2009 and 2010-2012 U.S. bound 4Runner's fuel system, including crash testing that shows that components of the vehicle did not become dislodged and puncture the fuel tank or fuel tank inlet pipe; and testing that shows that the fuel tank does not contact the ground during crash testing.  APP 1675, 1677, 1679.  TMC identified these documents specifically, including, but not limited to, FMVSS 301 test reports and the corresponding Toyota Engineering Standards that describe the procedures for each test.  *See* section 3 of TMC's First and Second Supplemental Disclosure Statements (APP 395 and APP 862); and TMC's Response and

Supplemental Response to Request for Production Nos. 33 of Plaintiff Ollie Greene's First Request for Production of Documents (APP 491-93 and APP 875). If Plaintiffs want to know more about the testing that was conducted on the 4Runner and how the 4Runner performed during these tests, Plaintiffs need only read the test reports and Toyota Engineering Standards that TMC produced. It would be unduly burdensome, expensive, and oppressive for TMC to create and produce summaries of these documents when TMC has already produced the test documents themselves. Moreover, because Plaintiffs already have the documents that provide the information that Plaintiffs are seeking the burden on Plaintiffs to create their own summary is no greater than the burden on TMC.

> **e.    Plaintiffs are entitled to specific Electronically Stored Information and narrowly tailored email on clearly relevant materials: <u>Request for Production Nos. 8, 9, 11, and 25</u>.**

> **1.    Plaintiffs' Contention:**

FED.R.CIV.P. 34(a)(1)(A) of the Federal Rules of Civil Procedure provides that a party may request "electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." Accordingly, Plaintiffs served the following requests to TMC:

> 8.    Electronically Stored Information, since 1999, sent to or from, or exchanged between members of the collision safety and division related to safety and legal issues (as that term is used in Vol. 1 of the deposition of Ichiro Fukumoto at 38:3 – 39:18 and 107:10-16) in the design, manufacture, testing, crashworthiness simulation or analysis, evaluations, occupant simulations, fire safety, research, or accident reconstruction of the Toyota 4Runners.

> 9.    Electronically Stored Information, since 1999, sent to or from, or exchanged between representatives of Toyota Central R&D Labs, Inc. (as that term is used in Vol. 1 of the deposition of Ichiro Fukumoto at 42:25 – 43:3) in the design, manufacture, testing, crashworthiness simulation or

analysis, evaluations, occupant simulations, fire safety, research, or accident reconstruction of the Toyota 4Runners.

11. Electronically Stored Information, since 1999, sent to or from, or exchanged between members of the tank-designing division (as that term is used in Vol. 1 of the deposition of Ichiro Fukumoto at 41:2-8) that discusses, in any manner, the dangers of fire risks from Toyota's tanks and steps taken, if any to eliminate these risks. (aside from tests required by or derived from government regulatory requirements. [sic]

25. Furnish Emails, e-Discovery and ESI during 2000-2013 pertaining to (a) fuel tank integrity failures, (b) fuel tank design rules, (c) side curtain airbag failures; or (d) side curtain airbag design rules.

Plaintiffs ask that the Court overrule Toyota's objections to these requests and order that Toyota provide the requested information.

### 2.    Toyota's Contention:

**TMC has produced the relevant ESI in its possession that applies to this case and is responsive to Plaintiffs' Requests for Production.**

Plaintiffs do not argue that the searches that TMC performed, and the documents TMC produced or referred to through its Responses to the Requests referenced above, are deficient in any way. Plaintiffs cannot make such an argument because TMC provided full and appropriate responses to Request for Production Nos. 8, 9, 11, and 25 in Plaintiffs' Second Requests for Documents. TMC's Responses to those Requests were appropriate, and the objections TMC stated in those Responses were well-taken. As TMC stated in those Responses, TMC conducted searches in places where the types of ESI Plaintiffs requested may reasonably be located within TMC. TMC subsequently produced the responsive ESI that it located. TMC also provided Plaintiffs with specific references to the extensive ESI productions that TMC has made throughout the discovery process in this case. Generally, these included engineering drawings and related documents in PDF format, test reports and related documents in PDF format, CAD information in three separate electronic formats, as well as the FEM and FMEA related information that TMC was able to locate that relate to the components of the 2003-2009 and

67

2010-2012 U.S. bound 4Runner that Plaintiffs allege are defective.   For a more specific recitation of the documents TMC produced or referred to through its Response to Request for Production Nos. 8, 9, 11, 25 from Plaintiffs' Second Requests for Documents, see TMC's Response to Plaintiffs' Second Requests for Documents.  APP 1717, 1725, 1734, 1764.

Although TMC produced or referred to extensive documents through its Responses to Request Nos. 8, 9, 11, 25, TMC was also forced to assert appropriate objections to the over broad scope of the Requests.  The most egregious of the Requests is No. 25, which asks TMC to " [f]urnish Emails, e-Discovery and ESI during 2000-2013 pertaining to (a) fuel tank integrity failures, (b) fuel tank design rules, (c) side curtain airbag failures; or (d) side curtain airbag design rules."  APP 1764.  This Request asks for any electronically stored information that may have been generated over a 13-year period that relates to "airbags and fuel tanks," but it contains no reasonable parameters indicating that it is even limited to Toyota vehicles, let alone a relevant model series.  Further, the Request is not limited to information held by TMC in a particular geographic area. Furthermore, through the use of the term "e-discovery," the Request also asks for Toyota's litigation files relating to open and closed lawsuits and claims, including information generated or maintained by the Defendants' legal departments.  Such information is protected from discovery by the attorney-client privilege, the work product doctrine or the consulting expert privilege.  *See International Ins. Co. v. RSR Corp.*, 426 F.3d 281, 299 (5th Cir. 2005); *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989).

Rather than crafting narrow requests that ask for relevant information as required by case law and the Federal Rules of Civil Procedure, Plaintiffs served sweeping and overly broad requests, asking for "all" electronic documents. Fed. R. Civ. P. 26(c); *see Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1205 (11th Cir. 2003) (In upholding a district court's ruling

denying a motion to compel discovery of a "'computer diskette or tape copy of all word processing files created, modified and/or accessed by, or on behalf' of five employees over a two and one-half year period," the Court held that "[Plaintiff] made no attempt to narrow his request to something more meaningful and relevant during the discovery period despite an appropriate objection from [Defendant].  The district court denied [Plaintiff's] motion to compel these items as being overly broad and unduly burdensome.  The court also found that [Plaintiff] failed to make a "reasonable showing of relevance" for these items.").  Plaintiffs' overly broad and unduly burdensome Requests would not be allowed were it a request to produce documents or information in paper form, and should not be permitted in this instance.

Plaintiffs' overly broad ESI requests in this case also amount to an impermissible fishing expedition. Discovery "'based on pure speculation and conjecture' [is] not permissible." *In re PE Corp. Securities Litigation*, 221 F.R.D. 20, 23 (D.Conn. 2003) (citations omitted). Fishing expeditions are considered inappropriate. *Id.*; *see also Williams*, 226 F.R.D. at 146; *Collens v. City of New York*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004); *Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628, 644 (D.S.C. 1992); *Segan v. Dreyfus Corp.*, 513 F.2d 695, 696 (C.A.N.Y. 1975); *Hamel v. General Motors Corp.*, 128 F.R.D. 281, 284 (D.Kan. 1989); *MCG Electronics, Inc. v. Purcell*, 513 N.Y.S.2d 763, 764 (N.Y.A.D. 1987). Permitting the types of fishing expeditions that Plaintiffs attempt in this case "run counter to the important but often neglected Rule 1 of the Federal Rules of Civil Procedure which requires that all rules 'shall be construed and administered to secure the just, speedy, and inexpensive determination of every action.'" *See Fidelity and Deposit Co. of Maryland v. McCulloch*, 168 F.R.D. 516, 526 (E.D. Pa. 1996); *see also North River Ins. Co. v. Greater New York Mut. Ins. Co.*, 872 F. Supp. 1411, 1412

(E.D. Pa. 1995). "Although the scope of civil discovery is broad, it is not limitless." *Calcor*

*Space Facility, Inc. v. Superior Court*, 61 Cal.Rptr.2d 567, 573 (Cal.App. 1997).

TMC conducted appropriate searches for ESI information that is relevant to this case or

reasonably calculated to lead to the discovery of admissible evidence.  TMC then produced

extensive volumes of responsive ESI to Plaintiffs.  Indeed, Plaintiffs have not demonstrated that

any aspect of TMC's ESI production is lacking relevant information.  Rather, Plaintiffs demand a

blanket overruling of all of TMC's well-taken objections.  Because Plaintiffs have not met their

burden to justify overruling TMC's objections, the Court should deny this portion of Plaintiffs'

Motion to Compel.

> **f.**   **Plaintiffs are entitled to Toyota advertisements where it
> represents its safety features to the public: <u>Request for
> Production No. 22.</u>**

**1.**   **Plaintiffs' Contention:**

As mentioned earlier, Toyota represented to consumers such as the Greene Family that

the 4Runner and Toyota vehicles are the safest in the industry and that Toyota is concerned more

about safety than other companies.  Plaintiffs have evidence of reliance and each of the elements

necessary for its misrepresentation claim.  These documents are also relevant to the consumer

expectation element of strict liability.  Accordingly, Plaintiffs served the following request:

> 22.   Exemplar copies of advertisements placed in Cosmopolitan, Ebony, Jet,
> Black Enterprise, People Magazine, ESPN Magazine, Sports Illustrated,
> Popular Mechanic, and US Weekly during 2007-2012 depicting,
> advertising and discussing any **safety features** of other Toyota cars and
> SUV's.

Plaintiffs ask that the Court overrule Toyota's objections to this requests and order that

Toyota provide the specific information requested, which is different than Request for

Production No. 21. Accordingly, TMS cannot simply refer to its response to RFP No. 21.

**2.**   **Toyota's Contention:**

### a. Advertising and marketing documents are not relevant to this case.

Advertising and marketing documents are not relevant to this case because Plaintiffs have presented no evidence that Plaintiffs' decedents relied on any alleged "misrepresentation" made by a Toyota Defendant.  To maintain their "misrepresentation" claim and be able to legitimately ask for advertising documents, if at all, Plaintiffs must first provide evidence that Plaintiffs' decedents relied on a "misrepresentation" made by one of the Toyota Defendants.  Plaintiffs, however, have offered no evidence that any members of the Greene Family relied upon any alleged misrepresentation made by any Toyota Defendants when purchasing the subject vehicle. APP 1837-39.  This issue is also separately before the Court through the Toyota Defendants' Motion for Partial Summary Judgment on Plaintiffs' misrepresentation claim.   APP 1884. Because Plaintiffs cannot show reliance, this request asks for irrelevant information and should be denied.

Request for Production No. 22 is also overly broad, unduly burdensome, and asks for irrelevant information because it asks for advertising materials for all model year Toyota, Lexus, and Scion vehicles.  This request is also not limited in scope to the 2003-2009 and 2010-2012 U.S. bound 4Runner.  Because the request is not at all limited in scope, the request is overly broad on its face and should be denied.  *See Reyes v. Red. Gold, Inc.*, 2006 WL 2729412, at *2 (S.D. Tex. Sept. 25, 2006).

### H. The Court Should Order That TMC Produce, at TMC's Cost, a Representative for a Deposition on the Information Sought in This Motion.

#### 1. Plaintiffs' Contention:

Despite multiple discovery requests to Toyota for production of much of the discovery that serves as a basis of this lawsuit, prior to the deposition of the TMC representative in Gardena, CA, TMC refused to do so.  TMC also produced an ill-prepared witness as its FRCP

30(b)(6) representative. These acts have led to the filing of this motion. Accordingly, Plaintiffs request that the Court order TMC to produce a corporate representative for a deposition within the Northern District of Texas, and prior to September 20, 2013. Plaintiffs also ask that the Court order that TMC shall be financially responsible for all oral and video deposition fees as well as all other costs incurred in the taking of the deposition(s).

### 2.   Toyota's Contention:
#### a.   TMC already provided a knowledgeable and well prepared FRCP 30(b)(6) witness in response to Plaintiffs' Notice of Deposition to TMC.

As discussed above, TMC complied with Federal Rule of Civil Procedure 30(b)(6) by providing a knowledgeable and well-prepared witness. For all the reasons the Toyota Defendants discussed in their response above, Plaintiffs' request for another corporate representative deposition should be denied.

## IV.   CONCLUSION

### 1.   Plaintiffs' Contention:

Each of the items Plaintiffs request is relevant to a party's claim or defense and reasonably calculated to lead to the discovery of admissible evidence. Additionally, each of Plaintiffs' previous motions to compel has resulted in an order from the Court compelling Toyota to provide most of the discovery requested. Toyota simply did not fully comply. Accordingly, the Court should order that Defendants produce the requested discovery. The Court should also grant Plaintiffs their attorneys' fees and all other relief to which they may be entitled.

### 2.   Toyota's Contention:

Despite the Toyota Defendants producing over 149,500 pages of information in this case that contain relevant information that is responsive to Plaintiffs' overly broad discovery requests, Plaintiffs have repeatedly claimed that the Toyota Defendants are withholding documents,

without providing any specificity as to what documents are allegedly being withheld. Further, instead of focusing on the documents that they already have, Plaintiffs continue to demand information that is outside the scope of reasonable discovery in this case. The Toyota Defendants have been cooperative throughout the discovery process. Despite the Toyota Defendants' goodwill, however, Plaintiffs continue their relentless pursuit of excessive information that falls outside the scope of relevant discovery and the Court's prior discovery related rulings. Therefore, Plaintiffs' Motion should be denied in its entirety and the Toyota Defendants should be awarded attorneys' fees and other appropriate relief.

Respectfully Submitted,

/s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

/s/ Daryl K. Washington
DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON**
325 N. St. Paul St., Suite 1975
Dallas, Texas 75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

/s/ David P. Stone
KURT C. KERN
State Bar No. 11334600
kurt.kern@bowmanandbrooke.com
DAVID P. STONE
State Bar No. 19289060
david.stone@bowmanandbrooke.com
JUDE T. HICKLAND
State Bar No. 24065416
jude.hickland@bowmanandbrooke.com
BOWMAN AND BROOKE LLP
2501 N. Harwood Street, Suite 1700
Dallas, Texas 75201
(972) 616-1700
(972) 616-1701 (fax)

## CERTIFICATE OF CONFERENCE

We hereby certify that on September 11, 2013, a face-to-face conference, lasting nearly three (3) hours, was attended by Plaintiffs' counsel Aubrey "Nick" Pittman and Daryl Washington and Toyota's counsel, Kurt Kern, David Stone and Brian Mason.   During this conference, arguments were made regarding each side's positions.   Despite such discussions, counsels were unable to resolve the disagreements that are presented in this Joint Submission.

 /s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN

 /s/ David Stone
DAVID STONE

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2013, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.

   /s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN