IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OLLIE GREENE, Individually as the surviving parent of WYNDELL GREENE, SR., WILLIAM GREENE, as the Administrator of the Estate of WYNDELL GREENE, SR., and MARILYN BURDETTE HARDEMAN, Individually and as the surviving parent of LAKEYSHA GREENE, | § § § § § § § | |
| | § | CAUSE NUMBER: 3:11-cv-0207-N |
| Plaintiffs, | § § | |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., TOYOTA MOTOR SALES USA, INC., VOLVO GROUP NORTH AMERICA, LLC., VOLVO TRUCKS NORTH AMERICA, A DIVISION OF VOLVO GROUP NORTH AMERICA, LLC., STRICK TRAILERS, LLC, JOHN FAYARD MOVING & WAREHOUSE, LLC, and DOLPHIN LINE, INC. | § § § § § § § § § § § § § | |
| Defendants. | § § | |

PLAINTIFFS' BRIEF IN SUPPORT OF THEIR RESPONSE TO
TOYOTA DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

AUBREY "NICK" PITTMAN
State Bar No. 16049750

THE PITTMAN LAW FIRM, P.C.
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

DARYL K. WASHINGTON
State Bar No. 24013714

LAW OFFICES OF DARYL K. WASHINGTON
P.C.
325 N. St. Paul St., Suite 1975
Dallas, Texas 75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................ iv

I.       FACTUAL BACKGROUND ................................................................................ 1

II.      ARGUMENT AND AUTHORITIES .................................................................. 1

         A.       The Applicable Summary Judgment Principles..................................... 1

         B.       Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
                  Plaintiffs' Misrepresentation Claims. .................................................... 2

                  1.       Elements of the Misrepresentation Claims. .................................. 2

                  2.       Disputed issues of fact exist regarding Plaintiffs' misrepresentation
                           claims. ......................................................................................... 4

                           a.       Toyota knowingly made material misrepresentations about all
                                    of its vehicles, which obviously includes the 4Runner................... 4

                           b.       Toyota knew, or should have known, that its representations
                                    were false and misleading. ............................................... 9

                           c.       Toyota provided other misleading information regarding this
                                    4Runner.................................................................... 12

                           d.       Others have also noted that Toyota's representations are false
                                    and misleading. .......................................................... 13

                           e.       Toyota intended that its representations be acted upon. ............... 14

                           f.       The Greene Family relied upon Toyota's representations........... 15

                           g.       Toyota's representations caused injury to the Greene family....... 18

         C.       Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
                  Plaintiffs' Marketing Defect and Failure to Warn Claim. .................... 19

                  1.       Elements of the Marketing Defect and Failure to Warn Claim. ................. 19

                  2.       Disputed issues of fact exist regarding the Marketing Defect and
                           Failure to Warn Claim........................................................... 21

                           a.       There is evidence of a risk of harm in the Toyota 4Runner that
                                    arises from its intended or reasonably anticipated use................. 21

b.      Toyota knew or reasonably foresaw the risk of harm at the time  the 4Runner was marketed................................................... 23

c.      There is evidence that the 4Runner possessed a marketing defect........................................................................................ 23

d.      The absence of warnings and/or instructions rendered the 4Runner unreasonably dangerous to the user of the 4Runner. ..... 24

e.      There is evidence upon which a jury could conclude that the  failure to warn and/or instruct caused injury to the Greene family.............................................................................. 24

III.     CONCLUSION........................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................ 26

## TABLE OF AUTHORITIES

**Cases**

*Alman Brothers Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc.,*
 437 F.2d 1295 (5th Cir.1971) ............................................... 20

*Aluminum Co. of America v. Alm,*
 785 S.W.2d 137 (Tex.1990)................................................ 20

*Bituminous Casualty Corp. v. Black & Decker Manufacturing Co.,*
 518 S.W.2d 868 (Tex.Civ.App.-Dallas, 1974), writ ref'd n.r.e.............................. 20

*Bradford v. Vento,*
 48 S.W.3d 749 (Tex.2001).................................................. 3

*Bristol–Myers Co. v. Gonzales,*
 561 S.W.2d 801 (Tex.1978)................................................ 19

*Centocor, Inc. v. Hamilton,*
 372 S.W.3d 140 (Tex.2012)................................................ 19

*Cleveland Mack Sales, Inc. v. Foshee,*
 2001 WL 1013393, *4–6 (Tex.App.-Houston [14th Dist.] Sept. 6, 2001, pet. denied)............ 8

*Crocker v. Winthrop Laboratories,*
 514 S.W.2d 429 (Tex.1974)................................................ 19

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,*
 51 S.W.3d 573 (Tex.2001).................................................. 3

*Federal Land Bank Ass'n v. Sloane,*
 825 S.W.2d 439 (Tex.1991)................................................. 3

*Hiller v. Kawasaki Motors Corp.,*
 671 P.2d 369 (Alaska 1983)................................................. 4

*Isquith v. Middle South Utilities, Inc.,*
 847 F.2d 186 (5th Cir.1988) ................................................ 1

*Jack Roach-Bissonnet, Inc. v. Puskar,*
 417 S.W.2d 262 (Tex.1967)................................................. 3

*King Ranch, Inc. v. Chapman,*
 118 S.W.3d 742 (Tex.2003)................................................. 2

*King v. Kayak Mfg. Corp.,*
 182 W.Va. 276, 387 S.E.2d 511 (1989)........................................ 4

*Koonce v. Quaker Safety Prods.,*
 798 F.2d 700 (5th Cir.1986) ............................................... 20

*Ladd by Ladd v. Honda Motor Co., Ltd.*,
  939 S.W.2d 83 (Tenn.Ct.App.1996) ....................................................... 9

*Lavespere v. Niagara Mach. & Tool Works, Inc.*,
  910 F.2d 167 (5th Cir.1990) .............................................................. 2

*Leichtamer v. American Motors Corp.*,
  67 Ohio St.2d 456, 424 N.E.2d 568 (Ohio 1981) ....................................... 4

*Lewis & Lambert Metal Contractors, Inc. v. Jackson*,
  914 S.W.2d 584 (Tex.App.-Dallas 1994) ................................................ 5

*Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*,
  831 F.2d 77 (5th Cir.1988) .............................................................. 1

*Malek v. Miller Brewing Co.*,
  749 S.W.2d 521 (Tex.App.-Houston 1988) ............................................... 5

*Martinez v. Dixie Carriers, Inc.*,
  529 F.2d 457 (5th Cir.1976) ........................................................... 20

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................................... 1

*Maxey v. Freightliner Corp.*,
  450 F.Supp. 955 (N.D.Tex.1978), *aff'd in pertinent part*, 665 F.2d 1367 (5th Cir.1982) ..... 20

*McCathern v. Toyota Motor Corp.*,
  332 Or. 59, 23 P.3d 320 (Or.2001) ..................................................... 4

*McLennan v. American Eurocopter Corp., Inc.*,
  245 F.3d 403 (5th Cir.2001) ........................................................... 19

*Miles v. Ford Motor Co.*,
  2001 WL 727355 (Tex.App.-Dallas 2001) ................................................ 3

*Milt Ferguson Motor Co. v. Zeretzke*,
  827 S.W.2d 349 (Tex.App.-San Antonio 1991, no writ) .................................. 8

*Moore v. It's All Good Auto Sales, Inc.*,
  907 F.Supp.2d 915 (W.D.Tenn. Oct 01, 2012) ........................................... 9

*Pavlides v. Galveston Yacht Basin, Inc.*,
  727 F.2d 330 (5th Cir.1984) ....................................................... 19, 20

*Rehler v. Beech Aircraft Corp.*,
  777 F.2d 1072 (5th Cir.1985) .......................................................... 4

*Santamaria v. Dallas Indep. Sch. Dist.*,
  2007 WL 1073850, *2 (N.D.Tex. Apr.10, 2007) ....................................... 23, 24

*U.S. Pipe & Foundry Co. v. City of Waco*,
    108 S.W.2d 432 (1937) ........................................................................................... 8

*USX v. Salinas*,
    818 S.W.2d 473 (Tex.App.—San Antonio 1991, writ denied) ............................... 19

*Wallace v. County of Comal*,
    400 F.3d 284 (5th Cir.2005) .......................................................................... 23, 24

*Williams v. Upjohn Co.*,
    153 F.R.D. 110 (S.D.Tex.1994) ........................................................................... 20

## Rules

Tex.Bus.&Com.Code § 17.46(b) ........................................................................... 2

Tex.Bus.&Com.Code § 17.50(a) ........................................................................... 3

## Treatises

E. CARSTARPHEN, Product Defects, 2 TEXAS TORTS AND REMEDIES § 41.01[2] (J.
    Edgar & J. Sales eds.1991) .................................................................................. 19

Restatement (Second) of Torts: Negligence § 402B (1965) ................................ 5

SALES, The Duty to Warn and Instruct for Safe Use in Strict Tort Liability, 13 ST. MARY'S
    L.J. 521, 524 (1982) ........................................................................................... 20

# I.   FACTUAL BACKGROUND

In addition to other claims that are not the subject of Toyota's Motion for Partial Summary Judgment, Plaintiffs' Second Amended Complaint (the "Complaint") alleges that in various commercials, internet postings, periodicals, press releases, etc., the Toyota Defendants have represented that the safety of their customers is paramount.  These representations were intended to, and did, cause consumers, such as the Greene Family, to rely on Toyota's widely distributed statements in making their purchases of Toyota vehicles.  Toyota made these misrepresentations of the quality, reliability and safety of its vehicles, including the Toyota 4Runner, all to the detriment of the Greene Family and Plaintiffs.  In addition, the Complaint alleges that Toyota also did not provide adequate warnings and instructions to the Greene family and other consumers regarding components in the Toyota 4Runner.

The summary judgment submitted with this Response establishes that Plaintiffs have submitted more than a scintilla of evidence to establish that Toyota is not entitled to summary judgment on any of the claims on which Toyota's motion for summary judgment is based. Accordingly, the motion should be denied in its entirely.

# II.   ARGUMENT AND AUTHORITIES

## A.   The Applicable Summary Judgment Principles

In consideration of Toyota's Motion for Partial Summary Judgment, all reasonable inferences must be drawn in favor of the Plaintiffs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, although it may not be in admissible form.  *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc*., 831 F.2d 77, 80 (5th Cir.1988).  Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party.  *Isquith v. Middle South Utilities, Inc*., 847 F.2d 186, 198-

1

200 (5th Cir.1988).  The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue.  *Lavespere v. Niagara Mach. & Tool Works, Inc*., 910 F.2d 167, 178 (5th Cir.1990).  Furthermore, a nonmovant will defeat a no-evidence summary judgment motion if the nonmovant presents more than a scintilla of probative evidence on each element of her claim.  *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003).

### B.  Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Misrepresentation Claims.

As stated above, Plaintiffs' Complaint alleges that in various commercials, internet postings, periodicals, press releases, etc., the Toyota Defendants have represented that the safety of their customers is paramount.  These representations were intended to, and did, cause consumers such as the Greene Family to rely on Toyota's statement and purchase Toyota vehicles.  Specifically, Toyota made misrepresentations of the quality, reliability and safety of its vehicles, including the Toyota 4Runner, all to the detriment of the Greene Family and Plaintiffs.

### 1.  Elements of the Misrepresentation Claims.

First, consumer may bring a DTPA cause of action for either a violation of TEX.BUS.&COM.CODE § 17.46(b) of the DTPA (the "laundry list") relied on by the consumer to the consumer's detriment or for an unconscionable action or course of action if the violation or action "constitute[s] a producing cause of economic damages or damages for mental anguish." TEX.BUS.&COM.CODE § 17.50(a)(1), (3) (West 2011).  Under section 17.46(a), false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful.  In this case, Toyota violated §§ 17.46(b)(7), (13), (24) of the laundry list when it (i) represented that the Toyota 4Runner was of a particular standard, quality, or grade, or that it was of a particular style or model, when it was of another; (ii) knowingly made false or misleading statements of fact concerning the safety of the vehicle and the efforts directed towards safety; and (iii) failed to disclose information concerning the Toyota 4Runner that was known at the time of the transaction since such

2

failure to disclose such information was intended to induce the Greene Family into a transaction into which the family would not have entered had the information been disclosed.

Second, the elements of a cause of action for fraud are: (1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party suffered injury as a result. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co*., 51 S.W.3d 573, 577 (Tex.2001); *Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex.2001).

Third, the elements of a cause of action for negligent misrepresentation are: (1) the representation is made by a defendant in the course of its business, or in a transaction in which it has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991).

As the Court will note, one of the key elements in each of these causes of action is the "representations" made by the seller and/or manufacturer, in this case Toyota.  Plaintiffs are entitled to present evidence regarding the representations made by Toyota in its advertisements, handbooks, manuals, etc.  *See, e.g. Jack Roach-Bissonnet, Inc. v. Puskar*, 417 S.W.2d 262 (Tex.1967)(Puskar relied on the 'Owner's Manual' and dealer's warranty as well as the sales advertising to the public generally. Such reliance is sufficient to support a cause of action based on breach of warranty and negligent misrepresentations); *Miles v. Ford Motor Co*., 2001 WL 727355 (Tex.App.-Dallas 2001)(Ford's instructions in the owner's manual were inadequate to warn of the dangers of the tension eliminator feature and therefore made the seat belt extremely dangerous).  Courts have also held that a manufacturer's advertisements indicate a use of the product a manufacturer was able to

3

foresee. *See, e.g., Hiller v. Kawasaki Motors Corp.*, 671 P.2d 369, 373 (Alaska 1983); *see also King v. Kayak Mfg. Corp.*, 182 W.Va. 276, 387 S.E.2d 511 (1989) (citing cases); *Mikolajczyk v. Ford Motor Co.*, 231 Ill.2d 516, 901 N.E.2d 329, 352 (Ill.2008) (finding advertising content relevant to assess consumer expectations); *Leichtamer v. American Motors Corp.*, 67 Ohio St.2d 456, 424 N.E.2d 568, 578 (Ohio 1981) ("The commercial advertising of a product will be the guiding force upon the expectations of consumers with regard to the safety of a product, and is highly relevant to a formulation of what those expectations might be."); *McCathern v. Toyota Motor Corp.*, 332 Or. 59, 23 P.3d 320, 330–32 (Or.2001) (consumer expectations can be established by manufacturer's representations about product).

Here, Plaintiffs are able to present more than a scintilla of evidence to allow this matter to proceed to a jury trial on each of the three varieties of Plaintiffs' misrepresentation claims.

> **2.     Disputed issues of fact exist regarding Plaintiffs' misrepresentation claims.**
>
>> **a.     Toyota knowingly made material misrepresentations about all of its vehicles, which obviously includes the 4Runner.**

Section 402B provides the following:

> One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though
>
>> (a)     it is not made fraudulently or negligently, and
>>
>> (b)     the consumer has not bought the chattel from or entered into any contractual relation with the seller.

Restatement (Second) of Torts: Negligence § 402B (1965).   The Fifth Circuit recognized the American Law Institute's Comments to § 402B in its decision in *Rehler v. Beech Aircraft Corp.*, 777 F.2d 1072, 1079 n. 11 (5th Cir.1985). Comment "h" provides that § 402B ' "is limited to misrepresentations which are made by the seller to the public at large, in order to induce purchase of the chattels sold, or are intended by the seller to, and do, reach the public. The form of the

4

representation is not important. It may be made by public advertising in newspapers or television, by literature distributed to the public through dealers, by labels on the product sold, or leaflets accompanying it, or in any other manner, whether it be oral or written.'" *Id.* (emphasis added). Comment "j" states that § 402B '"does not apply where the misrepresentation ... does not influence the purchase or subsequent conduct."' *Id.* (emphasis added).  Indeed, it is well-settled in Texas that § 402B addresses misrepresentations that are made to the public. *Lewis & Lambert Metal Contractors, Inc. v. Jackson*, 914 S.W.2d 584, 590 (Tex.App.-Dallas 1994), vacated per settlement, 938 S.W.2d 716 (Tex.1997) (§402B applies only to misrepresentations made to public); *Malek v. Miller Brewing Co.*, 749 S.W.2d 521, 526 (Tex.App.-Houston 1988).

According to a Toyota press release, Toyota Motor Sales (TMS), U.S.A., Inc. is the marketing, sales, distribution and customer service arm of Toyota, Lexus and Scion.  Established in 1957, TMS markets products and services through a network of more than 1,400 Toyota, Lexus and Scion dealers. Toyota directly employs more than 34,000 people in the U.S. and sold more than 2.2 million vehicles in 2008. APP 001-002.   TMS's corporate representative testified that TMS is responsible for the distribution of Toyota products to Toyota's dealer network in the 49 states; all states with the exception of Hawaii.  Amstock Depo at 11:5-12 (APP 13).  TMS has a marketing department that has the responsibility of developing marketing campaigns that will get consumers to buy Toyota vehicles.  Amstock Depo at 15:22 – 16:11 (APP 17-18).  TMS's advertising department is also responsible for generating commercial messaging that is aired on broadcast and cable TV, digital, and print mediums.  Amstock Depo at 18:7-23 (APP 20).

During the relevant time period, to convince consumers to purchase Toyota's vehicles, TMS, along with its advertising agency Saatchi & Saatchi LA, devised Toyota's "Product Leadership" marketing campaign that included the following themes:

> **Dependability** – "Toyota is rated the highest in dependability among all automakers."

**Quality** – "Toyota has won more Total Quality Awards™ than any other automaker."

Reliability – "80% of Toyotas sold in the last 20 years are still on the road today."

Efficiency – "Toyota is the most fuel-efficient full-line automaker today."

**Safety** – "No other automaker has won more Top Safety Pick Awards than Toyota."

Innovation – "Toyota has more hybrids on the road than all other automakers combined."

APP 074-75.  This campaign included a very elaborate (and deceptive) marketing strategy that was designed to pull out all the stops to saturate the market with the message that Toyota vehicles were supposedly the safest on the market for everyone, especially families with kids.  For example, one widely run ad depicts a mom holding a baby with the language:

No matter who you are **or what you drive**, <u>everyone deserves to be safe</u>.  Which is why Toyota had made the Star Safety System™ standard **on every new vehicle**. **Every model**.  Every trim level.  Toyota is the first full-time manufacturer to make the features of the Star Safety System™ standard on all vehicles.  Because nothing is more important to you than your safety.  For more on Toyota's safety innovations, visit toyota.com/safety (emphasis supplied)

APP 076.  By indicating that Toyota's claims of unparalleled safety applied to "what you drive," "every new vehicle," and "every model," Toyota clearly was attempting to convey to families such as the Greene family that the Toyota 4Runner was included in this claim.  Toyota had a similar ad on the front page of Yahoo, shown nationwide, depicting a woman holding a baby and images of a family of four and the slogan "Everyone deserves safety."  APP 077.  Toyota also included ads depicting minorities standing behind Toyota's "everyone deserves to be safe" claim.  APP 078.  But, Toyota did not stop there.  Toyota flooded the market with national ads portraying actors (or employees) who are represented to be a female Automotive Engineer with Toyota,[1] and a minority male Automotive Engineer at Toyota.[2]  The strategy was plainly designed to connect with every demographic.  In another ad designed to convey the message that Toyota's engineers were

---

[1] APP 079.

[2] APP 080.

confirming the alleged safety of Toyota's vehicles (therefore it must be true), Toyota's Chief Engineer was depicted in the same type of national ad leaving the impression to potential purchasers that Toyota (including the 4Runner) was the safest vehicle on the market.[3] Toyota also goes on to allege that it has set up "Smart Teams," comprising "200 highly trained engineers and technical experts....because at Toyota, we know there's nothing more important to you than your safety." APP 082.   Toyota also includes an ad from its "Chief Quality Officer," in a clear attempt to manipulate the reader into believing these claims are true.  APP 083.

In another one of Toyota's widely run television advertisements, you either hear the word "safe" or see it on the screen 13 times 31 seconds:

> Narrator: "Everyone deserves to be **safe** (Everyone deserves **safety** on screen, then it shifts to star **safety** system) that's why every Toyota now comes with the star **safety** system (star **safety** system on screen). It's a combination of 5 accident avoidance technologies (accident avoidance on screen) (scientist looking guy speaks) "the star **safety** system is something that's standard on 100% of Toyota vehicles. We always think of **safety**, even in the concept design of our vehicles" (Star **Safety** system on screen) Narrator: The star **safety** system, now standard.  (star **safety** system on screen) Because we know nothing is more important to you than your **safety**.  All our new **safety** features are at Toyota.com/**safety**"

During one of Toyota's T.V. ad, it depicts various demographics, including a couple,[4] small children about the ages of the Greene kids,[5] a family of four,[6] and an African-American family with kids.[7] The ad announces that Toyota is "recognized for being safe," (APP 088) and that "no other brand has won more (safety awards)." APP 089.   In another 2010 TV ad, Toyota had a bright red Toyota commercial touting their commitment to safety.  The ad declares:

> At Toyota, we care about your safety. That's why we're investing a million dollars every hour to improve our technology and your safety. It's an investment that has helped Toyota win multiple top safety pick awards for 2010 by the Insurance Institute

---

[3] APP 081.

[4] APP 084.

[5] APP 085.

[6] APP 086.

[7] APP 087.

for Highway Safety. No other brand has won more.  These top safety picks and all our new safety innovations are available at Toyota.com/safety.[8]

If you parse the key sentence in the commercial, it says that Toyota is spending $1 million an hour to "improve our technology AND your safety." But by using the term "safety" seven times in 30 seconds, and displaying the words "safety" or "safe" on the screen for much of the commercial, listeners got the net impression that Toyota is spending a million dollars an hour to "improve our technology FOR your safety."  It is clear (or a disputed fact issue) that the average consumer would take away from the commercial that Toyota is spending some number around a million dollars an hour on safety.  In fact, the claim of spending $1 million an hour is displayed prominently on the commercial.  APP 090.  Clearly, the average TV watcher took away the message that Toyota cares about safety, has won a lot of safety awards, and is spending a million dollars an hour to improve safety.  But as discussed herein, these are false and/or grossly misleading statements.

It is also not excusable for Toyota to contend that its statements about alleged unparalleled safety were puffery or a statement of opinion.  Determining whether a statement is one of fact or one of opinion involves consideration (1) of "the specificity of the alleged misrepresentation, (2) the comparative knowledge between the buyer and seller, and (3) whether the representation concerns past or present conditions, or future considerations. Misrepresentations concerning future conditions or performance of a good are actionable under the DTPA. *Cleveland Mack Sales, Inc. v. Foshee*, 2001 WL 1013393, *4–6 (Tex.App.-Houston [14th Dist.] Sept. 6, 2001, pet. denied); *Milt Ferguson Motor Co. v. Zeretzke*, 827 S.W.2d 349, 357 (Tex.App.-San Antonio 1991, no writ).  Here, there is no dispute that the misrepresentations were very specific and that consumers did not have the knowledge about the Toyota products that Toyota had.  *U.S. Pipe & Foundry Co. v. City of Waco*, 108 S.W.2d 432, 436–37 (1937) ("Superior knowledge of seller, in conjunction with the buyer's relative ignorance, operates to make the slightest divergence from mere praise into representations of

---

[8] http://archive.org/details/tv?q=toyota%20+%20million%20+%20safety

fact effective as a warranty."). Furthermore, it is clear that Toyota was making a representation of future considerations, *i.e.*, that the Star Safety features and other Toyota safety features would keep the consumers safe "in the future" once they purchased the vehicle. See also, *Moore v. It's All Good Auto Sales, Inc*., 907 F.Supp.2d 915 (W.D.Tenn. Oct 01, 2012)(at this stage in the pleadings the Court may not weigh the evidence…the question of whether a particular statement amounts to an actionable misrepresentation will generally be left to the jury). Nor can Toyota contend that the Court should not consider statements made about Toyota's products overall. *Ladd by Ladd v. Honda Motor Co., Ltd*., 939 S.W.2d 83, 100 (Tenn.Ct.App.1996)(representations concerning safety of all of manufacturer's products can provide basis for recovery in products liability action based on innocent misrepresentations by manufacturer where advertising contained misrepresentations applicable to all products).

> **b.** **Toyota knew, or should have known, that its representations were false and misleading.**

Toyota has admitted that it was responsible for developing and using the [misleading] campaign that leads consumers to believe that Toyota was spending $1 million per hour on R&D and technology to keep consumers safe. Amstock Depo at 95:13 – 96:13 (APP 051-052). However, if this were true, Toyota would have spent $8.7 billion per year on safety. It did not spend this much <u>on safety</u>; therefore this was clearly a misrepresentation and/or an attempt to deceive. Toyota admits that the purpose of this ad was clearly to get consumers to rely on Toyota's representations of safety. Amstock Depo at 98:17 – 100:20 (APP 054-056). Since Toyota must concede that it does not spend $8.7 billion per year "on safety," it is, at the very least, an issue of disputed fact whether this misrepresentation was intended to cause consumers to rely on it.

In other ad campaigns, Toyota represents that "[n]o other automaker has won more Top Safety Pick Awards than Toyota" and that "Toyota has won more Total Quality Awards than any other automaker." Amstock Depo at 100:14 – 104:23 (APP 056-060). The ads leave the impression

that "**all Toyota vehicles** are among the top safety picks, when the 4Runner was clearly not.  Again,

unless "all" of the Toyota vehicles were top picks this is a misrepresentation.   In other

advertisements, Toyota misleadingly told the general public that the Toyota 4Runner has more safety

features than the Grand Cherokee and the Ford Explorer.  Amstock Depo at 92:8 – 94:19 (APP 048-

050).  The evidence shows, however, that other non-Toyota SUVs were rated higher overall than the

4Runner by Institute for Highway Safety, Highway Loss Data Institute (APP 091-092).  Again, this

is clear evidence of Toyota's misrepresentations.  It is also worth noting that in public testimony,

Toyota's CEO acknowledged that in pursuit of growth, Toyota's priorities of "first, safety; second,

quality; third, volume" "**became confused**:"

> Toyota has, for the past few years, been expanding its business rapidly. Quite frankly,
> I fear the pace at which we have grown may have been too quick. I would like to
> point out here that Toyota's priority has traditionally been the following: First;
> Safety, Second; Quality, and Third; Volume. **These priorities became confused**, and
> we were not able to stop, think, and make improvements as much as we were able to
> before, and our basic stance to listen to customers' voices to make better products has
> weakened somewhat. **We pursued growth** over the speed at which we were able to
> develop our people and our organization, and we should sincerely be mindful of that.
> I regret that **this has resulted in the safety issues described in the recalls we face
> today**, and I am deeply sorry for any accidents that Toyota drivers have experienced.

See, Toyota Press Release. (APP 093-095)  This confusion certainly affected all of Toyota's vehicles,

including the 4Runner.   In other admissions, in a Washington Post op-ed, Toyota's CEO

acknowledged that Toyota had failed the American public on Toyota's previous promises:

> But to regain the trust of American drivers and their families, **more is needed**. **We
> are taking responsibility for our mistakes**, learning from them and acting
> immediately to address the concerns of consumers and independent government
> regulators.

APP 096-097.   Indeed, Toyoda acknowledges that lack of communication – with consumers,

between different areas of the company, and with regulators – was not adequate:

> Third, we fully understand that we need to more aggressively investigate complaints
> we hear directly from consumers and move more quickly to address any **safety issues**
> we identify. That is what we are doing by addressing customer concerns about the
> Prius and Lexus HS250h anti-lock brake systems.

*Id*.

10

There should be no dispute that the evidence is overwhelming that Toyota knew that its vehicles were far from the safest on the road.  Several legal claims and lawsuits have been brought against Toyota for the 4Runner where claims have involved the same types of issues that are involved in this lawsuit.  See, generally, deposition of Harold Clyde at 134:13 – 155:20 (APP 125-146) and accompanying claims.  APP 147-169.  Recently, Toyota paid $1.6 billion to settle claims related to certain recalls (APP 170-171), and earlier paid a record $16.4 million **fine** to the U.S. government for failing to quickly report safety problems.  APP 172.  For years now, we have been hearing about the shoddy safety record of Toyota cars, trucks and SUV's.  Nearly every model has been the subject of a recall, from the flagship Camry sedan for sudden acceleration issues, to its premier Lexus because of problems with its electronic steering system, to the Sequoia SUV and all in between.  See, generally, deposition of Harold Clyde at 55:14 – 69:11 (APP 106-120).  By way of examples, Toyota had a recall in 2010 of thousands of the 2010 Lexus HS 250h due to deadly fuel leaks after collisions.  Deposition of Ichiro Fukumoto, at 113:17 – 115:25 (APP 240-245).  These vehicles did not pass Federal Motor Vehicle Safety Standard 301.  APP 173-174.  In 2007, Toyota recalled the Lexus GS as well as the IS 250 and IS 350 models in the United States due to potential cracks in fuel pipes.  APP 175.  Toyota recalled some of its 2009-2012 4Runners, Sequoias, and other vehicles because Toyota had failed to test the passenger seat occupant sensing system calibration, which meant that the occupant sensing system may not operate as designed.  APP 176-194.  This failure to test meant that this could result in incorrect air bag deployment and possible injury or death to the front passenger occupant(s) in the event of a crash. *Id*.

Toyota also had a recall in April/May 2011 of hundreds of thousands of RAV4 and Highlander SUVs due to defective curtain shield airbags.  APP 195.  In Jan 2012, Toyota recalled even more RAV4 and Highlander SUV models for defective side curtain shield airbags. APP 196.  In April 2013 Toyota had another recall of Toyota Corolla, Sequoia, Tundra vehicles for defective airbag inflators.  APP 197.  Indeed, a casual view of press releases from Toyota's press room

11

confirms that Toyota has had over thirty-five (35) recalls over the last 2-3 years on all of its models for various safety-type issues.  APP 198-205.  At the very least, Toyota's substantial recalls, along with the evidence discussed above of Toyota's misrepresentations of safety features, raise a genuine issue of material fact whether Toyota misled the public, and the Greene family, when it campaigned to convince consumers that Toyota produced the safest vehicles on the market.

> c.   **Toyota provided other misleading information regarding this 4Runner.**

In addition to the misrepresentations discussed above regarding Toyota vehicles overall (which obviously include the 4Runner), Toyota made additional misrepresentations and/or omissions regarding the Toyota 4Runner.  For instance, in its advertising, Toyota uses the 4x4 as the lead feature in all Toyota's marketing communication materials.  Amstock Depo at 18:7-23 (APP 20). However, the 4x4 has different technical capabilities and safety features, yet Toyota never informed consumers that the 2x2 version (*i.e.* the SUV the Greene family purchased) did not have the technical features or safety features that the 4x4 version had.  Amstock Depo at 51:1 – 55:3 (APP 028-030).  In looking at Toyota's marketing materials, Toyota's intention is clearly to give the consumer the impression that the Toyota 4Runner is rugged enough to be used off-road (APP 206), under racing conditions (APP 207), and that it has maximum ground clearance (APP 208).  These ads, combined with other ads suggesting that the 4Runner's fuel system is adequately constructed and protected (APP 209) and stating that the 4Runner can "take on any road to anywhere" (APP 210) are obviously designed to convince consumers that the 4Runner and its fuel system is safe on any road.  This has proven to be untrue.  Moreover, these ads apply only to Toyota's 4x4 version of the 4Runner, yet Toyota never told consumers, or the Greene family, that the fuel system on the 4Runner version they purchased was not fully covered as advertised, or that the Greene family's Toyota 4Runner could not take them on any road to anywhere.

12

Indeed, Toyota did not communicate to consumers that a full protective shield for the fuel system (like the one in the advertised 4x4 version) would be safer than a partial protective shield for the fuel system (like in the Greene's SUV); never communicated to consumers that the design of the fuel system and/or location of the fuel tank in the 4Runner could lead to a massive fire in the event of a collision; never told consumers that the design of the fuel inlet pipe in the 4Runner could lead to a fuel-fed fire in the event of a rear-end collision; and never communicated to consumers that a metal fuel tank could be safer than a plastic fuel tank in the event of a rear-end collision. Amstock Depo at 61:4 – 62:20 (APP 038-039); Amstock Depo at 118:5-9 (APP 65). Toyota also never advertised to consumers the risks inherent in the airbags not deploying or deploying improperly. Amstock Depo at 57:7-15 (APP 034). Nor did Toyota advertise that the side curtain airbags might not deploy in certain types of collisions. Amstock Depo at 59:1 – 60:7 (APP 036-037) and Amstock Depo at 120:11-16 (APP 067). Instead, Toyota advertised the 4Runner as "one of the most trustworthy vehicles on the road." APP 211. Again, this promise of future performance is false and intended solely to persuade families like the Greene family to act on this representation.

> **d.**     **Others have also noted that Toyota's representations are false and misleading.**

In a 2010 New York Times article, the writer notes that Toyota's safety campaign was being blitzed all over the country on virtually every network and all types of TV shows, including nightly news programs, morning shows, talk shows, during the NBA Finals and basically all over the internet. APP 212-213. The writer pens:

> The commercials are pointed straight at the heart. Moms holding babies, concerned-looking young men and entire families testify in silence, overlaid with bold red type that announces "**everyone deserves to be safe**" and "**peace of mind.**" In the backgrounds, components assemble and disassemble themselves in a ballet of technological reassurance.

*Id.* The article also points out that although Toyota attempts to leave the impression that the Toyota Star Safety System is "new" technology that was unique to Toyota, "these are technologies that are not exclusive to Toyota and are available on most new cars, regardless of manufacturer, and

13

have been for years." *Id*.  The article also confers that Toyota's Star Safety System is "a package of underlined standard accident-prevention features, all of them invented by other companies years, if not decades, ago." *Id*.  In fact, Bob Zeinstra, Toyota's manager for advertising and strategic planning in the United Stated, is quoted in the article as admitting that Toyota does not own any patents on the five safety technologies it discusses in these ads.  *Id*.  Indeed, other manufacturers "notably Mercedes-Benz, Volvo and BMW, also offer all these features on every United States model and have for years." *Id*.

In other words, it was a blatant misrepresentation for Toyota to leave the impression that these supposed new safety features made Toyota, including the Toyota 4Runner, the safest brand of vehicles on the road.

### e.    Toyota intended that its representations be acted upon.

The evidence demonstrates that Toyota was aware that families like the Greene family had safety considerations high on their list.  In fact, through surveys taken Toyota was aware that families with kids tended to place safety high on their list of preferences in automotive considerations.  Amstock Depo at 53:25 – 54:18 (APP 030-031).  It is also clear from Toyota's advertisements to every type of demographic, that Toyota's intent was to look like your nice next door neighbor, gain your trust, then once they have that they repeatedly bashed their message over your head until you begin to believe Toyota's message.  In a calculated move to sway customers to purchase Toyota's vehicles, Toyota's CEO acknowledged in his February 9, 2010 Op-Ed in the Washington Post that Toyota is aware that customers [such as the Greene family] place their trust in Toyota when they buy products such as the 4Runner:

> When consumers purchase a Toyota, they are not simply purchasing a car, truck or van. **They are placing their trust in our company**. The past few weeks, however, have made clear that Toyota has not lived up to the high standards we set for ourselves. More important, **we have not lived up to the high standards** you have come to expect from us. I am deeply disappointed by that and apologize. As the president of Toyota, I take personal responsibility. That is why I am personally leading the effort to restore trust in our word and in our products.

APP 096-097.  Therefore, it is undisputed that Toyota's actions were intended to gain the trust of the public (and the Greene family) by appealing to their desire for safety and a need to associate with a manufacturer whose word they felt they could trust.

In fact, one of Toyota's ad boldly claims the "the Star Safety System provides the features that can get you home safely." Amstock Depo at 123:18-23 (APP 070).  Another ad asserts that a 4Runner driver can "take daily nonstop to the middle of nowhere…..then return home to tell us about it thanks to the Star Safety System."  APP 214.  Toyota clearly did not live up to this representation with the Greene family.  Toyota misled the Greene family, as well as other unsuspecting consumers, through its misrepresentations.

### f. The Greene Family relied upon Toyota's representations.

Consistent with the Toyota CEO's proclamation, consumers such as the Greene family "placed their trust in Toyota."  As Toyota has also admitted above, Toyota's intent with its massive safety advertising campaign was to reach families such as the Greene family, who had safety high on their list of what they were looking for in a vehicle.  It should therefore come as no surprise that safety was extremely important to Wyndell Greene, Sr., especially once he had kids.  (APP 217, ¶11).  Safety in vehicles was even more crucial to Wyndell Greene considering that he and his family traveled in their SUVs quite frequently on vacation trips, going back-and-forth from the kids' schools as well as to and from the kids' extracurricular activities.  *Id.*  Mr. Greene spent time reading magazines, newspapers and watching TV with his family, where advertisements of products and cars are displayed.  It was within Wyndell Greene's character to rely on advertisements and representations made by car companies about their vehicles, especially on things such as safety, reliability, and suitability for use by families with kids.  He was a very trusting person. *Id.*  Wyndell Greene's brother recalls that once Wyndell Greene got married and had kids he would do extensive reviews of a company's information before deciding to buy anything that would be used with or around his kids and paid specific attention to whether the products he and his wife purchased were

safe.  (APP 215, ¶4).  Wyndell Greene also expressed to his brother that everything he had seen and heard from Toyota seemed to go out of the way to convince consumers that the Toyota cars and trucks were the safest on the road.  (APP 216, ¶7).  From what materials he saw and read Wyndell Greene indicated that he felt his family was safe driving in or around Toyota cars and trucks.  *Id.*  On one or more instances, Wyndell Greene asked his brother if he had heard anything to the contrary and William Greene told Wyndell Green that he had been seeing the same types of statements about the supposed safety of Toyota cars and trucks and that he had also assumed what Toyota was telling the world was true and felt that there products were the safest as Toyota claimed. (APP 216, ¶7).  In fact, Wyndell Greene's brother recalls that Wyndell Greene had specific advertisements at his home that he had personally reviewed regarding the alleged safety of Toyota's vehicles. (APP 217, ¶10).

As far as the 2010 Toyota 4Runner, it made its debut at the State Fair in Dallas.  The State Fair was chosen because Toyota knew that Texas was a big SUV market and Toyota wanted maximum exposure for the 2010 4Runner to a huge crowd.  Amstock Depo at 70:1-16 (APP 047). When the 2010 4Runner was announced, a press release was issued by Toyota and sent across the country.  (APP 219-224).  The press release touted the alleged safety of the 4Runner and made the bold statement "Every Safety Precaution Considered" when it introduced the 4Runner.  Amstock Depo at 63:21 – 66:17 (APP 043-044).  This statement was used by writers who described the Toyota 4Runner to consumers in Dallas.  APP 225-232; Amstock Depo at 68:6-22 (APP 045).  According to one of Wyndell Greene's colleagues and his best friend, Vincent Canty, the two of them attended the State Fair of Texas in 2009 where the two of them saw a model of the 2010 Toyota 4Runner, were given representations about the alleged safety of it and about the awards Toyota had won.  They were also given brochures and other information about the 2010 Toyota 4Runner. (APP 234, ¶6).   A few months later Wyndell Greene discussed with Mr. Canty his final decision to buy the 2010 Toyota 4Runner.  Wyndell Greene indicated to Mr. Canty that he was impressed with what he was told about the Toyota 4Runner during the State Fair and what was in the information he had been reading and

hearing about as far as how safe the 2010 Toyota 4Runner was supposed to be. (APP 234, ¶7).   Mr. Canty told Wyndell Greene that he had also been hearing about how Toyota cars were supposed to be the safest cars on the road.  (APP 234, ¶7).  Mr. Canty also states that knowing Wyndell Greene the way he did, Wyndell and his wife were not going to buy any car that they did not think was the safest on the market, especially with how concerned they were for the safety of their children.  *Id.*

In fact, Mr. Canty and his wife had a family-like relationship with Wyndell Greene and his wife where they spoke practically daily about what was going on in each other's lives and the plans they had for raising their respective children and their futures.  (APP 233, ¶3).  Their kids attended the same schools, and two families had many family outings together, including times when they would take our families on out of town trips, sometimes where they would drive together in the same vehicle.  *Id.*  Mr. Canty recalls the circumstances behind the purchase of each of the vehicles that Wyndell Greene and his wife owned since he and Wyndell Greene would often have conversations about vehicles they were driving and/or considering for purchase and what features each of them looked for in automobiles.  (APP 233, ¶4).  Mr. Canty recalls having conversations with Wyndell Greene and his wife, Lakeysha, about the previous 4Runner Lakeysha owned as well as the Toyota Camry that Wyndell Greene bought or leased.   (APP 234, ¶5).   Those conversations included discussions about whether those vehicles were considered extremely safe for families.   Mr. Canty knows that Wyndell Greene and his wife were very conscientious when it came to buying any products that would be used around their kids as they were totally safety conscious. (APP 234, ¶5). Mr. Canty recalls Wyndell Greene indicating that he heard a lot publicly from Toyota that their vehicles were the safest on the road and that safety and reliability were important in his decision making.  *Id.*

Wyndell Greene's brother also recalls that just prior to the time Wyndell Greene finally purchased the 4Runner, Wyndell called him and said "'I'm thinking we liked the Toyota 4Runner." It was clear from our previous conversation that his thinking was that the Toyota 4Runner was bigger

and **safer for his family** than the Camry.  Again, Wyndell's emphasis was largely **based on the safety of his family**." (APP 216, ¶9).  Following the accident, as Wyndell Greene laid in the hospital near death, Mr. Canty recalls Wyndell Greene saying that he could not understand how the Toyota 4Runner, which was supposed to be so safe, could lead to his wife dying, his kids burning inside of it, and him nearly burning to death in it.  Mr. Greene also indicated that he wanted to find out from Toyota what happened to its 4Runner that day to cause the losses of life it caused. (APP 235, ¶9).

In sum, the evidence demonstrates that Toyota began making misrepresentations regarding its vehicles, including the Toyota 4Runner, prior to the time the Greene family purchased the Toyota 4Runner.  Toyota's misrepresentations continued throughout the entire time the Greene family owned the 4Runner, and continue through today.  It is undisputed that the Greene family relied on Toyota's misrepresentations when they decided to purchase the Toyota 4Runner and continued to rely on Toyota's continuing misrepresentations as the Greene family continued to use and drive their 4Runner, up until they died in the unsafe 4Runner.

### g. Toyota's representations caused injury to the Greene family.

The evidence is clear that the Greene family relied on Toyota's representations when they decided to purchase the Toyota 4Runner.  The evidence is also clear that these representations caused injury to the Greene family as three of the family members died at the scene in the 4Runner and Mr. Greene died a few months later as the result of the burns he suffered from the fire that originated in the Toyota 4Runner.  Toyota has acknowledged that as a result of the accident "the 4Runner then began to fold under the trailer causing its roof to peel up and to the left at which time the vehicle caught fire.  According to the autopsy reports, Lakeysha Greene and the rear occupants of the 4Runner, Wyndell Greene, Jr. and Wesleigh Greene, died as a result of blunt force trauma.  Wyndell Greene sustained burns and other injuries and died three months later."  See, Docket Entry No. 71.  Thus, it is clear that this element is satisfied.

18

**C.   Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Marketing Defect and Failure to Warn Claim.**

Plaintiffs' Complaint also alleges that Toyota did not provide adequate warnings and instructions to the Greene family and other consumers regarding the Toyota 4Runner's fuel system, as well as the fire prevention and suppression systems in the Toyota 4Runner.

**1.   Elements of the Marketing Defect and Failure to Warn Claim.**

It is a fundamental principle of product liability law in this Circuit that in Texas a manufacturer has a responsibility to instruct consumers as to the safe use of its product and to warn consumers of dangers associated with its product of which the seller either knows or should know at the time the product is sold. *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 153–54 (Tex.2012), citing *Bristol–Myers Co. v. Gonzales*, 561 S.W.2d 801, 804 (Tex.1978); *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338 (5th Cir.1984).   "A marketing defect occurs when a defendant knows or should know of a potential risk of harm presented by the product but markets it without adequately warning of the danger or providing instructions for safe use." *USX v. Salinas*, 818 S.W.2d 473, 482 (Tex.App.—San Antonio 1991, writ denied) (citing *Bristol–Myers*, 561 S.W.2d at 804; *Crocker v. Winthrop Laboratories*, 514 S.W.2d 429, 433 (Tex.1974); and E. CARSTARPHEN, Product Defects, 2 TEXAS TORTS AND REMEDIES § 41.01[2] (J. Edgar & J. Sales eds.1991)); *see also McLennan v. American Eurocopter Corp., Inc.*, 245 F.3d 403, 427 (5th Cir.2001)(product is unreasonably dangerous if manufacturer fails to warn of a foreseeable risk arising from the use of the product, and lack of adequate warnings or instructions renders otherwise adequate product unreasonably dangerous).   "A marketing defect cause of action consists of five elements: 1) a risk of harm that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product must exist; 2) the product supplier must actually know or reasonably foresee the risk of harm at the time the product is marketed; 3) the product must possess a marketing defect; 4) the absence of the warning and/or instructions must render the product unreasonably dangerous to the ultimate user or consumer of the product; and 5) the failure to warn and/or instruct must constitute a causative

nexus in the product user's injury." *Salinas*, 818 S.W.2d at 482–83 (citing SALES, The Duty to Warn and Instruct for Safe Use in Strict Tort Liability, 13 ST. MARY'S L.J. 521, 524 (1982)).

A warning must (1) be designed so it can reasonably be expected to catch the attention of the consumer; (2) be comprehensible and give a fair indication of the specific risks involved with the product; and (3) be of an intensity justified by the magnitude of the risk. *Bituminous Casualty Corp. v. Black & Decker Manufacturing Co*., 518 S.W.2d 868, 872-73 (Tex.Civ.App.-Dallas, 1974), writ ref'd n.r.e. The courts have repeatedly held that in order for a warning to be adequate, it must provide "a complete disclosure of the existence and extent of the risk involved," *Alman Brothers Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc*., 437 F.2d 1295, 1303 (5th Cir.1971). In general, the adequacy of a warning is a question of fact for the jury. *Aluminum Co. of America v. Alm*, 785 S.W.2d 137 (Tex.1990); *Bituminous* 518 S.W.2d at 873; Williams v. Upjohn Co., 153 F.R.D. 110, 114 (S.D.Tex.1994); *Alm*, 717 S.W.2d at 591–92; *see also Koonce v. Quaker Safety Prods*., 798 F.2d 700, 716 (5th Cir.1986) ("Whether a product supplier must provide a warning or instruction in light of the user's expertise is generally a question for the jury."). In assessing what hazards are foreseeable, a manufacturer is held to the status of an expert. *Pavlides*, 727 F.2d at 337. The lack of adequate warnings renders a product defective and unreasonably dangerous even if there is no manufacturing or design defect in the product. *Martinez v. Dixie Carriers, Inc*., 529 F.2d 457, 465-66 (5th Cir.1976).

Additionally, where the evidence shows show that Toyota did not provide adequate warnings, the burden shifts to Toyota to show, as an affirmative defense, that its representations gave the decedents actual-adequate and specific-knowledge of the hazards associated with the 4Runner. *Pavlides*, 727 F.2d at 340; *Maxey v. Freightliner Corp*., 450 F.Supp. 955, 960 (N.D.Tex.1978), *aff'd in pertinent part*, 665 F.2d 1367 (5th Cir.1982) (en banc).

     2.      **Disputed issues of fact exist regarding the Marketing Defect and Failure to Warn Claim.**

         a.      **There is evidence of a risk of harm in the Toyota 4Runner that arises from its intended or reasonably anticipated use.**

As discussed above, the marketing materials used by Toyota displayed Toyota's 4x4 version of the 4Runner, which contains a **full** protective shield for the fuel system.  The 2010 Toyota 4Runner the Greene family purchased contained a **partial** protective shield for the fuel system.  The 2010 Toyota's 4Runner's fuel system was examined by Keith Freidman ("Friedman"), an expert who has been involved in the field of research and development of transportation safety for more than 35 years. Since graduating from Cornell University's Engineering Physics Department, Freidman has been a project and test engineer for Minicars Inc., president of Kinetic Research Inc. and MCR Technology Inc., and is now president of Friedman Research Corporation. (APP 236, ¶2).  Friedman has published more than 80 research papers on the subject of improved vehicle design and automotive safety engineering, and has presented his findings at national and international conferences in Austria, Australia, Ireland, France, Germany, Japan and Italy, as well as throughout the United States.  He holds active memberships in organizations such as the Society of Automotive Engineers (SAE), the Institute of Electrical Engineers, the American Society of Mechanical Engineers, and the American Association for the Advancement of Science. He is a peer reviewer for numerous conferences and journals. (APP 236, ¶3).

Friedman has also conducted more than 300 detailed systems analyses of catastrophic injury accidents in accordance with a protocol published by SAE.  His work has included most kinds of automotive-related tests, including component tests, sled tests, anthropometric dummy tests and full-scale vehicle tests representing impacts in front, side, rear, and rollover modes. In addition, his research has included extensive computer modeling and simulation of dummy, human, vehicle and component impacts, as well as cadaver testing and live-subject testing. (APP 237, ¶4).  Friedman's work has involved all aspects of crashworthiness, reconstruction and impact protection covering

21

front, side, rear and rollover impacts. Studies have involved virtually all types of protective systems, including, for example, seat belts, padding, airbags, seats, glazing systems, doors, child seats, helmets and vehicle structures. (APP 237, ¶5).  Friedman's studies have also involved the protection during impact events of occupants of cars, pickups, SUVs, vans, buses and heavy trucks, as well as pedestrians, bicyclists and motorcyclists, and covered sizes and ages ranging from infants to adults. (APP 237, ¶6).  He is the author of numerous reports and safety studies for the United States Department of Transportation involving, among other things, statistical analyses of crash conditions and their relationship to injuries, effects of recent design changes on vehicle safety performance, passive-restraint performance in passenger vehicles, dynamic crash testing, static crush testing and crashworthiness.  (APP 237, ¶7).

During his analysis in this case, Friedman applied generally accepted engineering principles and concepts utilized in stress analysis to the specific facts of this accident. He and his staff then developed and analyzed various hypotheses regarding the failure of the Toyota components and applied generally accepted engineering principles to project the logical sequence of events from each potential initial point of failure and then determined whether the observed damage was consistent with the mechanics of each potential scenario. Through this process, Freidman eliminated certain hypotheses and refined his conclusions.  (APP 237, ¶8).  As to the 2010 Toyota 4Runner, Friedman observed that the two-wheel drive version contained only a partial protective shield under the fuel tank and in the four-wheel drive version there was a full protective shield under the fuel tank. (APP 238, ¶10).  With respect to the 4Runner that was involved in the accident, Friedman noted that most of the plastic fuel tank's longitudinal dimension that hangs exposed substantially below the vehicle frame is not protected or supported by a shield.  (APP 238, ¶11).  Accordingly, in his expert opinion, Friedman has concluded that there is an inherent higher risk of harm in using the partial protective shield on the Toyota 4Runner, rather than opting for a full protective shield. (APP 238, ¶12).

22

Toyota's motion for summary judgment does not contain any affirmative representation that the partial protective shield is not inherently dangerous under certain driving conditions.  Thus it would be improper for Toyota to contend in a Reply that it was somehow unaware of these risks.  *See Wallace v. County of Comal*, 400 F.3d 284, 291–92 (5th Cir.2005)(issues raised for the first time in a reply brief are waived); *Santamaria v. Dallas Indep. Sch. Dist.*, 2007 WL 1073850, *2 (N.D.Tex. Apr.10, 2007)(same).

> **b.  Toyota knew or reasonably foresaw the risk of harm at the time the 4Runner was marketed.**

The evidence is clear that Toyota knew or reasonably foresaw the risk of harm at the time the 4Runner was marketed in that Toyota did not demonstrate the use of the partial protective shield in off-roads conditions as it knew what the risks were under these conditions.  Indeed, based on the manufacturer's testing and industry engineering principles, the expert has also concluded that Toyota knew or reasonably foresaw the risk of harm in using the partial protective shield at the time the Toyota 4Runner was marketed.  (APP 239, ¶13).  Toyota's motion for summary judgment does not contain any affirmative representation that it could not foresee this harm.  Thus it would be inappropriate for Toyota to contend in a Reply that it was somehow unaware of these risks.  *Wallace*, 400 F.3d at 291–92; *Santamaria*, 2007 WL 1073850 at *2 (same).

> **c.  There is evidence that the 4Runner possessed a marketing defect.**

Toyota never told consumers, or the Greene family, that the fuel system on the 4Runner version they purchased did not have a full protective shield as advertised in the 4x4 versions.  Toyota also did not communicate to consumers that a full protective shield for the fuel system (like the one in the advertised 4x4 version) would be safer than a partial protective shield for the fuel system (like the one in the Greene's SUV); never communicated to consumers that the design of the fuel system and/or location of the fuel tank in the 4Runner could lead to a massive fire in the event of a collision; never told consumers that the design of the fuel inlet pipe in the 4Runner could lead to a fuel-fed fire in the event of a rear-end collision; and never communicated to consumers that a metal fuel tank

could be safer than a plastic fuel tank in the event of a rear-end collision.  Amstock Depo at 61:4 –
62:20 (APP 038-039); Amstock Depo at 118:5-9 (APP 065).   Toyota also did not provide any
instructions that the Toyota 4Runner should not be driven during highway use where the driver is
more likely to encounter heavy commercial traffic or on rough terrain.   Toyota also failed to warn
drivers that consumers had the option to replace the partial protective shield with a full protective
shield.  Plaintiffs' expert has also testified that he did not observe any warnings or instructions in
materials from Toyota that warned of the dangers of using the partial protective fuel tank shield.
(APP 239, ¶14).  Friedman also did not see any materials from Toyota that advised consumers that
they should purchase only the 4Runner version with the full protective shield.  *Id.*

> **d.**      **The absence of warnings and/or instructions rendered the
> 4Runner unreasonably dangerous to the user of the 4Runner.**

Toyota's failure to warn prevented the decedents from knowing that they could have gotten a
full protective shield for the full tank and from knowing that they should not drive the 2x2 4Runner
under highway conditions, especially where it might encounter heavy commercial traffic and rough
terrain. Based on a complete review of the evidence in this matter and his expert analysis, Plaintiffs'
expert has concluded that the absence of a warning and/or instructions rendered the use of the partial
protective shield on the 2010 Toyota 4Runner unreasonably dangerous to the ultimate user or
consumer. (APP 239, ¶15). Toyota's motion for summary judgment does not contain any affirmative
representation that the absence of warnings or instructions did not cause the 2010 Toyota 4Runner to
be unreasonably dangerous.  Thus it would be inappropriate for Toyota to contend in a Reply that it
was somehow unaware of these risks.  *Wallace*, 400 F.3d at 291–92; *Santamaria*, 2007 WL 1073850
at *2 (same).

> **e.**      **There is evidence upon which a jury could conclude that the
> failure to warn and/or instruct caused injury to the Greene
> family.**

As discussed above, the evidence is clear that the lack of warnings and instructions regarding
the dangers of using the partial protective fuel tank shield contributed to the May 28, 2010, accident

that caused thermal injuries to each of the members of the Greene family, and eventually killed them. See also, APP 238, ¶9.  It is also undisputed that the Greene family relied on the representations made by Toyota as to the safety of the 4Runner when they purchased the 4Runner and used it for the ordinary purposes for which they believed it to have been designed.  See, II.B.2(f) *supra*. Accordingly, Plaintiffs have produced more than a scintilla of evidence on this element, thereby precluding summary judgment.

## III.     CONCLUSION

As explained herein, the Toyota Defendants have no justifiable grounds upon which to receive summary disposition of the claims in its motion.  The undisputed evidence demonstrates that there are disputed issues of fact as to each of Plaintiffs' causes of action.  Accordingly, summary judgment should be denied.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that the Court deny Toyota's motion for partial summary judgment, and grant Plaintiffs such other and further relief, in law or in equity, to which Plaintiffs may be entitled.

Respectfully Submitted,

/s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN
State Bar No. 16049750

THE PITTMAN LAW FIRM, P.C.
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

/s/ Daryl K. Washington
DARYL K. WASHINGTON
State Bar No. 24013714

LAW OFFICES OF DARYL K. WASHINGTON
P.C.
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 2, 2013, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.


　/s/ Aubrey "Nick" Pittman　　　　　
AUBREY "NICK" PITTMAN