## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **OLLIE GREENE, Individually as the surviving parent of WYNDELL GREENE, SR., WILLIAM GREENE, as the Administrator of the Estate of  WYNDELL GREENE, SR., and MARILYN BURDETTE HARDEMAN, Individually and as the surviving parent of LAKEYSHA GREENE,** | § § § § § § § | **CAUSE NUMBER: 3:11-cv-0207-N** |
| **Plaintiffs,** | § § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **TOYOTA MOTOR CORPORATION, TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.,  TOYOTA MOTOR SALES USA, INC., VOLVO GROUP NORTH AMERICA, LLC., VOLVO TRUCKS NORTH AMERICA, A DIVISION OF VOLVO GROUP NORTH AMERICA, LLC., STRICK TRAILERS, LLC, JOHN FAYARD MOVING & WAREHOUSE, LLC, and DOLPHIN LINE, INC.** | § § § § § § § § § § § § § | |
| **Defendants.** | § | |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR RESPONSE TO
## DOLPHIN LINE INC.'S MOTION FOR SUMMARY JUDGMENT

AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................... iv

I.   REQUEST TO STRIKE OR DISMISS PURSUANT TO PLAINTIFFS' MOTION
     FOR SANCTIONS FOR SPOLIATION OF EVIDENCE.................................. 1

II.  BACKGROUND FACTS .................................................................................... 2

     A.   The Incident. .............................................................................................. 2

     B.   The Allegations in the Complaint Against Fayard and Dolphin............................ 3

     C.   The Fayard-Dolphin-Sprinkle Joint Relationship and Their Joint Failure to
          Inspect and Test the Adequacy of the Underride Guard. ........................................ 4

III. ARGUMENT AND AUTHORITIES ................................................................. 5

     A.   The Applicable Summary Judgment Principles.................................................... 5

     B.   Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
          Plaintiffs' Strict Liability Claims. ............................................................... 6

          1.   Dolphin is liable in strict liability for providing the defective trailer to
               Daniel Sprinkle. ............................................................................. 6

          2.   Strict Liability Claim of Design Defect ..................................................... 8

               a.   There is evidence of safer alternative designs ............................... 10

               b.   The defects were a producing cause of decedents' deaths............ 11

               c.   The Strick Trailer was unreasonably dangerous. ........................... 12

     C.   Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
          Plaintiffs' Negligence Claims. ............................................................... 14

          1.   Dolphin was negligent in its inspection and operation of the trailer
               with the defective underride guard. ......................................................... 16

          2.   Dolphin was negligent in its inspection and maintenance of records....... 17

          3.   Dolphin's agent, Sprinkle, was negligent in his operation of the tractor
               and defective trailer while he was delivering loads for Dolphin. ............. 19

          4.   Dolphin was negligent in entrusting the tractor and defective trailer
               to an untrained driver. ............................................................... 20

          5.   An experienced reconstructionist and highway traffic expert has also
               concluded that Defendant was negligent. ................................................. 21

          6.   Experts from Friedman Research Corporation have also concluded
               that Dolphin was negligent. ....................................................... 24

     D.   Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
          Plaintiffs' Gross Negligence and Exemplary Damage Claims. ........................... 26

IV.    CONCLUSION ........................................................................................................... 28

CERTIFICATE OF SERVICE ................................................................................................ 29

## TABLE OF AUTHORITIES

**Cases**

*American Tobacco Co. v. Grinnell*, 951 S.W.2d 420 (Tex.1997) .................................................. 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................... 28

*Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222 (5th Cir.2002) ........................ 28

*D. Houston, Inc. v. Love*, 92 S.W.3d 450 (Tex.2002) .................................................................. 15

*EMI Music Mexico v. Rodriguez*, 97 S.W.3d 847 (Tex.App.-Corpus Christi 2003, no pet.) ....... 22

*Evans v. City of Houston*, 246 F.3d 344 (5th Cir.2001).................................................... 15, 20, 28

*Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788 (Tex.2006) ............................................................ 21

*Flock v. Scripto–Tokai Corp.*, 319 F.3d 231 (5th Cir.2003)........................................................ 12

*Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex.2007) .............................................................. 8

*Frendiger v. Keller*, 104 S.W.3d 294 (Tex. App.-Dallas 2003, pet. denied)............................... 17

*Fresh Coat, Inc. v. K–2, Inc.*, 318 S.W.3d 893 (Tex.2010)........................................................... 8

*Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503 (5th Cir. 2003)............................................. 6

*Heil Co. v. Grant*, 534 S.W.2d 916 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.) ....................... 28

*Hernandez v. Tokai Corp.*, 2 S.W.3d 251 (Tex.1999) ........................................................... 12, 13

*Honore v. Douglas*, 833 F.2d 565 (5th Cir.1987) .......................................................................... 6

*Hunter v. Ford Motor Co., Inc.*, 305 S.W.3d 202 (Tex.App.-Waco, Nov.10, 2009, no pet. h.) .. 13

*J.B. Transport, Inc. V. Bently*, 427 S.E.2d 499 (Ga. App. 1992)................................................. 19

*King Ranch, Inc. v. Chapman*, 118 S.W.3d 742 (Tex.2003) ......................................................... 6

*La.-Pac. Corp. v. Knighten.*, 976 S.W.2d 674 (Tex. 1998) ......................................................... 20

*Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167 (5th Cir.1990) ........................... 6

*Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77 (5th Cir.1988) ...................... 6

*Lumpkins v. Thompson*, 553 S.W.2d 949 (Tex.Civ.App.-Amarillo 1977, writ ref'd n.r.e.) ......... 21

*Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409 (5th Cir.2003) .................................................. 6

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................ 6

*McDonald v. Dankworth*, 212 S.W.3d 336 (Tex. App.-Austin 2006, no pet. h.) ........................ 20

*McKisson v. Sales Affiliates*, 416 S.W.2d 787 (Tex.1967) ........................................................ 8, 9

*Metzger v. Gambill*, 37 S.W.2d 1077 (Tex. Civ. App.-Dallas 1931, writ ref'd)........................... 20

*New Tex. Auto Auction Servs. v. Gomez De Hernandez*, 249 S.W.3d 400 (Tex.2008)................. 8

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) ........................................................... 6

*Rash v. Whisennand*, 453 S.W.2d 353 (Tex.Civ.App.-Houston [14th Dist.] 1970,
    writ ref'd n.r.e.) ............................................................................................ 21

*Robins v. Kroger Co.*, 982 S.W.2d 156 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). .......... 9

*Roosth & Genecov Production Co. v. White*, 262 S.W.2d 99 (1953) ...................................... 8, 18

*Rourke v. Garza*, 530 S.W.2d 794 (Tex.1975) ......................................................... 8

*Santamaria v. Dallas Indep. Sch. Dist.*, 2007 WL 1073850, *2 (N.D.Tex. Apr.10, 2007).......... 14

*Southland Supply Company v. Gebhart*, 439 S.W.2d 393 (Tex.Civ.App.)—Texarkana 1969,
    no writ) ..................................................................................................... 21

*TXI Transp. Co. v. Hughes*, 306 S.W.3d 230 (Tex.2010)............................................... 21

*TXI Transp.* v. *Hughes*, 224 S.W.3d 870 (Tex.App.-Fort Worth 2007), rev'd on other grounds,
    306 S.W. 230 (Tex .2010)............................................................................. 22

*Wallace v. County of Comal*, 400 F.3d 284 (5th Cir.2005) ........................................ 14

## Rules

Northern District Local Rule 56.3(d) ............................................................................... ii, 1

Tex. Civ. Prac. & Rem.Code Ann. § 41.001(11)............................................................. 27

Tex. Civ. Prac. & Rem.Code Ann. § 82.005(a)-(b)........................................................ 11

Tex. Transp. Code § 545.062(a) ..................................................................................... 20

Tex. Transp. Code § 545.206 .......................................................................................... 20

Tex. Transp. Code § 545.302 .......................................................................................... 20

Tex. Transp. Code § 545.303 .......................................................................................... 20

Tex. Transp. Code § 545.304 .......................................................................................... 20

Tex. Transp. Code § 545.417 .......................................................................................... 20

## Treatises

Restatement (Second) of Torts § 392 ......................................................................... 8, 18

Restatement (Second) of Torts §402A ....................................................................... 8

Restatement (Third) of Torts: Products Liability, § 1 (1998)............................................ 7

**Regulations**

49 C.F.R. §390.11 ................................................................................................................... 19

49 C.F.R. §390.33 ............................................................................................................... 7, 17

49 C.F.R. §390.37 ................................................................................................................... 19

49 C.F.R. §393.86 .......................................................................................................... 7, 16, 17

49 C.F.R. §396.3 (a) ............................................................................................................... 18

49 C.F.R. §396.3 (c) ............................................................................................................... 18

49 C.F.R. §396.11 ................................................................................................................... 18

49 C.F.R. §396.17 ............................................................................................................... 18, 19

49 C.F.R. 571.223 ............................................................................................................. passim

## I.   REQUEST TO STRIKE OR DISMISS PURSUANT TO PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

Dolphin and its shipping partner, Fayard Moving & Warehouse ("Fayard") have destroyed and/or concealed evidence that is crucial to Plaintiffs' case and for which there was a clear duty for the Defendants to preserve.   Specifically, Fayard and Dolphin conspired to (1) repair the Strick Trailer that was involved in the May 28, 2010 incident before Plaintiffs' experts could inspect and test it; and (2) conceal the improperly attached ICC rear bumper guard, the bloodied panel and damaged mud flap that was on the Strick Trailer on May 28, 2010.   The facts also reveal that there are other items that have been "misplaced," destroyed and/or concealed by Fayard and/or Dolphin, such as repair and inspection documents for the ICC bumper guard, parts information for the ICC bumper, and other inspection documents for Dolphin's Strick Trailer and the Fayard Freightliner tractor.   Accordingly, Plaintiffs filed a motion for sanction for spoliation of evidence (Dkt. Entry No. 86) that is currently pending before the Court.

As indicated in Plaintiffs' spoliation motion, the rigid structures of the Strick Trailer crashed through the Toyota 4Runner's pillars, ripping and contributing to crushing the rear and sides of the 4Runner and penetrating into the rear compartment of the 4Runner.   The effect of this underride, along with the other Defendants' design defects, led to Lakeysha Greene's death by blunt force against components of the trailer and contributed to Kyle Greene's death when the Strick Trailer helped create the mangled metal within the poorly designed Toyota 4Runner that decapitated Kyle Greene in the 4Runner.   Thus, the unrepaired Trailer, ICC bumper, and all evidence of the repair and replacement of the ICC bumper, constitute relevant and significant proof in Plaintiffs' claims as to the allocation of fault among the Defendants.   Fayard's failure to retain the ICC rear bumper guard and the unrepaired trailer has significantly impaired Plaintiffs' ability to illustrate the clear defects and negligence.   Even where Plaintiffs' experts were able to

1

determine a few clear design defects and establish negligent acts of the Defendant, the absence of the records and components impaired Plaintiffs' ability clearly to illustrate other design defects using Defendant's own evidence. Finally, as a result of Fayard's and Dolphin's failure to maintain inspection and repair records, Plaintiffs may encounter difficulty rebutting Dolphin's contention that its, and Fayard's inspections and repairs to the rear bumper guards were somehow adequate.

Accordingly, pursuant to the remedies sought in the spoliation motion, Plaintiffs ask that the Court deny Dolphin's motion for summary judgment. That way, Dolphin would not be rewarded for concealing or destroying evidence and using the absence of that evidence as a basis for summary judgment.

## II.    BACKGROUND FACTS

### A.    The Incident.

On May 28, 2010, Wyndell Greene, Sr. ("Wyndell Sr."), age 34, LaKeysha Greene ("LaKeysha"), age 35, Wyndell Greene, II ("Wyndell II"), age 2, and Wesleigh Greene ("Wesleigh"), age 5, (Wyndell Sr., LaKeysha, Wyndell II and Wesleigh are collectively referred to herein as the "Greene family") were traveling in their Toyota 4Runner (the "Toyota 4Runner") to Louisiana for Wyndell II's third birthday. At approximately 6:25 pm, traffic was slowing on Interstate Highway 20 in the eastbound lane. The driver of a Volvo semi-tractor trailer (the "Volvo Truck") applied the brakes but impacted a 2010 Toyota 4Runner containing the Greene family. The Toyota 4Runner then impacted a 2006 Toyota Corolla in the rear. The Corolla rotated into the freeway median. The Greene's Toyota 4Runner then slid into the rear of a trailer that was manufactured by Strick Trailers, LLC, owned by Dolphin Line, and towed by a freightliner owned by John Fayard Moving and Warehouse. See, police accident report, APP 001-006. The Greene family Toyota 4Runner caught fire and burned up after nearly fifteen

2

minutes.  Crues Depo 51:1-15 (APP 1039).  Mrs. Greene died in the crash, as did the children, one of whom was decapitated.  Crues Depo 55:6-12 (APP 1044).  Mr. Greene was burned over 40% of his body.

The collision came without warning and caused the Toyota 4Runner to collide with a Toyota Corolla and a trailer that was manufactured by Strick Trailers, LLC, owned by Dolphin Line, and towed by a freightliner owned by John Fayard Moving and Warehouse.  The Greene Family's Toyota 4Runner burst rapidly into uncontrollable flames. Thompson Depo at 46:22 – 47:11 (APP 053-054). As a result of the crash, Wyndell II and Wesleigh were trapped in the Toyota 4Runner, unable to escape, and were eventually burned to ashes.  Rushing Depo 20:11 – 22:18 (APP 111-113).  Wyndell II was decapitated while inside the Toyota 4Runner. Rushing Depo 30:21 – 33:24 (APP 121-124).  LaKeysha, although wearing her seatbelt, was ejected from the Toyota 4Runner's seatbelt restraint, suffered burns and lacerations to a significant portion of her body, and eventually died from the trauma as a result of her ejection from her seatbelt and airbag restraints.  Thompson Depo 35:9 – 36:4 and 60:14 – 61:5 (APP 042-043 and 067-068).  Wyndell Sr. sustained unwarranted and excruciating physical pain and mental anguish and emotional distress at the scene and afterwards.   Approximately three months following the accident, Wyndell Sr. died as a result of the burns and other injuries he suffered from the collision, which he sustained while inside the Toyota 4Runner.

**B.     The Allegations in the Complaint Against Fayard and Dolphin.**

Plaintiffs' Complaint specifically alleges that Defendants had a duty to the Greene Family to provide a safely designed and manufactured product.  Defendants also had a duty to train their employees on how to inspect a motor vehicle and trailer to ensure that an unsafe tractor-trailer would not be placed on the road.   Finally, Defendants had a duty to operate a safe

trailer on the highways where the Strick Trailer was towed and to ensure that it hired a driver who would comply with all applicable federal and state regulations and rules of the road. Defendants were grossly negligent when they failed to fulfill these duties to the Greene Family, causing death to the Greene Family and damages to Plaintiffs.  (Dkt. Entry 113).

### C.     The Fayard-Dolphin-Sprinkle Joint Relationship and Their Joint Failure to Inspect and Test the Adequacy of the Underride Guard.

Dolphin and Fayard had a close family-like relationship that carried over to its business. The companies had joint customers and shared employees.  The record demonstrates that Fayard's owner and Dolphin's owner have a long-time personal relationship with each other. Talton Depo 23:2-8 (APP 0159).  The two companies have been doing business together for over 30 years, often partnering to co-broker the delivery of loads to individual or joint customers. Talton Depo 14:18 – 16:1 (APP 150-152).   Dolphin admits that with its working arrangement with Fayard, it simply tells Fayard (and effectively the drivers) to pick up whatever load there is that needs to be delivered and Fayard complies. Earheart Depo 56:17 – 57:13 (APP 290-291); Hatfield Depo 73:3 – 74:5 (APP 365-366).  This constitutes control and sharing of employees. Accordingly, Sprinkle was under Dolphin's legal control on eh day of the incident, and was effectively being paid by Dolphin.

In the days prior to the accident, Daniel Sprinkle ("Sprinkle"), drove the Fayard-owned tractor to the location of a Dolphin/Fayard customer in Loxley, Alabama to pick up a load that was on the Dolphin-owned, Strick-manufactured Trailer.  The load was to be delivered to nine locations of Lowe's Home Improvement stores in Oklahoma City, OK and Dallas, TX.  Sprinkle Depo 9:21 – 12:14 (APP 386-389); Talton Depo 23:21 – 25:19 (APP 159-161).  To assist in the delivery of the customer loads, Dolphin informally leased one of Dolphin's Strick trailers to Fayard, as it had done on many previous occasions.  In fact, Fayard transports lots of loads

4

annually where there is a joint client that is being serviced by Fayard and Dolphin.  Talton Depo 94:24 – 95:7 (APP 230-231).  Under the informal arrangement between Fayard and Dolphin, the customers pay Dolphin once the loads were delivered and Dolphin pays Fayard.  Talton Depo 29:23 – 30:21 (APP 165-166).  At the time of the loading of these particular shipments, neither Fayard nor Dolphin inspected or tested the adequacy of the rear impact bumper guard when they decided jointly to tow the loaded Strick Trailer from Alabama throughout Oklahoma and Texas. Sprinkle Depo 48:13 – 50:4 (APP 425-427); Talton Depo 64:6 – 65:7 (APP 200-201).   When Sprinkle picked up Dolphin's Strick trailer, Sprinkle, Fayard and Dolphin knew or should have known that the trailer had not passed the inspection that is required by 49 CFR §396.

In picking up the Fayard/Dolphin shipment and equipment, as well as while he operated the Freightliner tractor and Dolphin's Strick Trailer, Sprinkle was acting in the course and scope of his employment as an agent for Fayard and Dolphin, as he had done many times in the past. Both Fayard and Dolphin are vicariously liable for the negligent inspection and negligent operation of the tractor and trailer since this negligence occurred in the course of Sprinkle's employment with Fayard and Dolphin as well as while the trailer was under informal lease from Dolphin to Fayard.  Sprinkle was acting (operating the tractor and trailer) within the general authority given to him by Fayard and Dolphin, in furtherance of their business and for the accomplishment of the joint objective for which he was employed.  In other word, both Fayard and Dolphin had the right to control Sprinkle. In this case, Dolphin instructed Sprinkle as to each place to drop off the loads as well as the times in which to pick up the load and return.

### III.    ARGUMENT AND AUTHORITIES

**A.    The Applicable Summary Judgment Principles**

In consideration of Defendant's Motion for Summary Judgment, all reasonable inferences must be drawn in Plaintiffs' favor.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986);  *Palmer v. BRG of Ga., Inc*., 498 U.S. 46, 49 n. 5, (1990); *Martin v. Alamo Cmty. Coll. Dist*., 353 F.3d 409, 412 (5th Cir.2003); *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 507 (5th Cir. 2003). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, although it may not be in admissible form.  *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc*., 831 F.2d 77, 80 (5th Cir.1988).  The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue.  *Lavespere v. Niagara Mach. & Tool Works, Inc*., 910 F.2d 167, 178 (5th Cir.1990). Furthermore, a nonmovant will defeat a no-evidence summary judgment motion if the nonmovant presents more than a scintilla of probative evidence on each element of her claim. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003).

The court does not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir.1987).

**B.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Strict Liability Claims.**

**1.      Dolphin is liable in strict liability for providing the defective trailer to Daniel Sprinkle.**

Accordingly to Sprinkle, Dolphin provide Dolphin's Strick Trailer to him to operate. Sprinkle Depo at 9:21 – 12:14.  APP 386-389.  Federal Motor Carrier Safety Regulation, 49 C.F.R. §393.86 (1998), provides specific standards for the width, height, and rear surface of the rear impact guards on trailers. APP 472.  The regulations also provides that each rear impact guard used to satisfy the requirements of paragraph of this section must be permanently marked or labeled as required by FMVSS No. 223 (49 C.F.R. 571.223, S5.3). APP 473-475. Additionally, 49 C.F.R. §571.223 provides the minimum guidelines for the strength and energy absorptions features that were required on the Trailer involved in the collision.  *Id.*  These safety

regulations are applicable to common carriers, contract carriers, and private carriers. 49 C.F.R. §390.33. Further, the regulations provide that "every motor carrier, and its officers, agents, drivers, representatives, and employees directly concerned with the installation and maintenance of equipment and accessories" must comply with the safety requirements and specifications outlined therein. *Id.* §393.1. Section 1 of the Third Restatement of Torts states: "[o]ne engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY, § 1 (1998) (emphasis added). Section 20(b) provides as follows:

> One otherwise distributes a product when, in a commercial transaction other than a sale, one provides the product to another either for use or consumption or as a preliminary step leading to ultimate use or consumption. Commercial nonsale product distributors include, but are not limited to, lessors, bailors, and those who provide products to others as a means of promoting either the use or consumption of such products or some other commercial activity.

Therefore, in addition to having a duty under the regulations discussed above to maintain the underride guard in accordance with the federal regulations, Fayard is liable in this matter as a lessor/distributor of the defective trailer. *McKisson v. Sales Affiliates*, 416 S.W.2d 787, 789 (Tex.1967), adopting RESTATEMENT (SECOND) OF TORTS §402A; *Rourke v. Garza*, 530 S.W.2d 794, 800 (Tex.1975). As lessor/distributor of the defective trailer to Sprinkle, the law provides that Fayard can be held responsible for injuries caused to others. Moreover, Dolphin, Fayard and Sprinkle were involved with the lack of inspecting and/or maintaining the defective component on the trailer. Accordingly, Fayard is liable under a strict liability theory. *See Fresh Coat, Inc. v. K–2, Inc.*, 318 S.W.3d 893, 895 (Tex.2010). *See also, New Tex. Auto Auction Servs. v. Gomez De Hernandez*, 249 S.W.3d 400, 403 (Tex.2008); *Rourke v. Garza*, 530 S.W.2d 794, 800 (Tex.1975), abrogated on other grounds by, *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45–46

(Tex.2007).   Moreover, as the company that provided the trailer to its agent to drive on the highways, Dolphin has a common law duty to exercise reasonable care to discover its dangerous condition or character before allowing the trailer to be used on the roadways.  *Roosth & Genecov Production Co. v. White*, 262 S.W.2d 99 (1953); RESTATEMENT (SECOND) OF TORTS §392.

Thus, the law is clear that Plaintiffs can proceed in strict liability against Dolphin and that Dolphin is not entitled to summary judgment as a matter of law.

### 2.       Strict Liability Claim of Design Defect

With regard to the design defect claim against Defendant, Plaintiffs specifically allege that Dolphin's Strick Trailer was defective and unreasonably dangerous as designed, manufactured, assembled, marketed, and/or tested because of the following design, manufacturing and/or marketing defects, among others: the trailer did not have strength and energy-absorbing features that optimized the prevention of the underride hazard for vehicles that might crash into the rear of the trailer; and the ICC rear bumper was grossly ineffective in its failure to prevent the intrusion into and crushing of compartments of the Toyota 4Runner.  (Dkt. Entry 113).  "The duty to design a safe product is 'an obligation imposed by law.'"  *See American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex.1997) (quoting *McKisson*, 416 S.W.2d at 789; *Robins v. Kroger Co*., 982 S.W.2d 156, 161 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).

Defendant has moved for summary judgment on whether it is strictly liable for the design defects in the trailer it operated on May 28, 2010.  In doing so, Defendant does not rely on any affirmative evidence that there are no defects in the trailer or any facts that remotely argue that Defendant is not a distributor under RESTATEMENT SECOND OR THIRD so as to be strictly liable for the defect designs.   On the other hand, Plaintiffs submit the detailed expert analysis performed by Keith Friedman ("Friedman") and R. Rhoads Stephenson ("Stephenson") that are

8

contained in two expert reports prepared by Friedman Research Corporation ("Friedman Report I" and "Friedman Report II").   Friedman has been involved in the field of research and development of transportation safety for more than 35 years.   Since graduating from Cornell University's Engineering Physics Department, he has been a project and test engineer for Minicars Inc., president of Kinetic Research Inc. and MCR Technology Inc., and now president of Friedman Research Corporation.   Friedman has published more than 80 research papers on the subject of improved vehicle design and automotive safety engineering, and has presented his findings at national and international conferences in Austria, Australia, Ireland, France, Germany, Japan and Italy, as well as in the United States.   He holds active memberships in organizations such as the Society of Automotive Engineers (SAE), the Institute of Electrical Engineers, the American Society of Mechanical Engineers, and the American Association for the Advancement of Science. He is a peer reviewer for numerous conferences and journals.   APP 480

Friedman has conducted more than 300 detailed systems analyses of catastrophic injury accidents in accordance with a protocol published by SAE.  His work has included most kinds of automotive-related tests, including component tests, sled tests, anthropometric dummy tests and full-scale vehicle tests representing impacts in front, side, rear and rollover modes. In addition, his research has included extensive computer modeling and simulation of dummy, human, vehicle and component impacts, as well as cadaver testing and live-subject testing.  Friedman's work has involved all aspects of crashworthiness, reconstruction and impact protection covering front, side, rear and rollover impacts. Studies have involved virtually all types of protective systems, including, for example, seat belts, padding, airbags, seats, glazing systems, doors, child seats, helmets and vehicle structures.  His studies have involved the protection during impact

9

events of occupants of cars, pickups, SUVs, vans, buses and heavy trucks, as well as pedestrians, bicyclists and motorcyclists, and covered sizes and ages ranging from infants to adults. Friedman is the author of numerous reports and safety studies for the United States Department of Transportation involving, among other things, statistical analyses of crash conditions and their relationship to injuries, effects of recent design changes on vehicle safety performance, passive-restraint performance in passenger vehicles, dynamic crash testing, static crush testing and crashworthiness. APP 481.

Dr. R Rhoads Stephenson spent thirty-six (36) years at NASA's Jet Propulsion Laboratory ("JPL") including three (3 )years as Associate Administrator of R&D for the National Highway Traffic Safety Administration.  After retirement from JPL, he was a consultant to the Motor Vehicle Fire Research Institute where he helped conduct $4 million worth of vehicle fire research funded by a grant from General Motors.  Dr. Stephenson has nearly 40 years of automotive experience.  APP 481. Both Mr. Friedman and Dr. Stephenson are Certified Fire Investigators and Certified Vehicle Fire Investigators by the National Association of Fire Investigators (NAFI). *Id.*

a.      There is evidence of safer alternative designs

To meet the first prong of the statutory test, Plaintiffs need only provide evidence that there was a safer alternative design to any defective design in the trailer, which itself consists of two required elements: (1) that the alternative design would have prevented or significantly reduced the risk of the claimant's damages without substantially impairing the product's utility, and (2) that the alternative design was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.  *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a)-(b).

10

In Friedman Report I, Friedman and Stephenson provide sufficient evidence to meet and exceed the summary judgment threshold on this requirement.   For instance, Friedman Report I identifies the following as economically and technologically safer alternative designs: (a) an energy absorbing rear underride protection system developed by the truck manufacturer, MAN; (b) underride guards used in Canada that are required and implemented through CMVSS 223/224; (c) a readily available Brazilian articulated and pliers type underride system; (d) a rear impact guard that were designed by the Insurance Institute for Highway Safety (IIHS); (e) the Rechnitzer Energy Absorbing Guard; (f) Deleys & Ryder Yielding Guard; (g) Strick's 2007 guard design; or (h) several other listed designs.   APP 504-507.   Accordingly, Plaintiffs have withstood summary judgment on this prong of the statutory test.

### b.       The defects were a producing cause of decedents' deaths

To meet the second prong of the statutory test, Plaintiffs provide evidence that the defects were a producing cause of the personal injury, property damage, or death for which they seek recovery. See TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a). "A producing cause is an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any." *Flock v. Scripto–Tokai Corp.*, 319 F.3d 231, 238 (5th Cir.2003) (citations and internal quotations omitted).   "Producing cause is the cause-in-fact of the harm, meaning that a defendant's conduct must have been a substantial factor in bringing about the injury and that the injury would not have occurred but for the defendant's conduct." *Id*.   The evidence in the record demonstrates that the underride guard snapped off the trailer upon impact by the 4Runner. Trooper Barkley Depo at 60:20 – 61:17 (APP 612-613).   The dislodging of the underride guard, without absorbing any energy, led to the Toyota 4Runner to travel underneath the Strick Trailer all the way up to the Trailer's mud flaps and tandem axles.   Barkley Depo at

11

62:18 – 63:23; 104:3 – 105:9 (APP 614-615; APP 656-657).  Mrs. Greene was ejected from the

4Runner and landed on the hood after striking the underbody of the Strick Trailer.  Thompson

Depo at 35:9 – 36:4; 60:14 – 61:5 (APP 042-043; APP 067-068). Mr. Greene died from the blunt

force of striking her head on the components underneath the Strick trailer.

Plaintiffs' experts have opined that the design defects caused the ICC bumper to fail.

Friedman Report I then concludes that "the failure of the underride guard allowed Mrs. Greene to

be ejected and killed and may have resulted in the decapitation of Wyndell Greene, Jr."  APP

516.   Accordingly, since Plaintiffs present evidence on this prong of the statutory test,

Defendant's motion for summary judgment should be denied.

### c.    The Strick Trailer was unreasonably dangerous.

Finally, a claimant must show, under the common law that the product was defectively

designed so as to be unreasonably dangerous, taking into consideration the utility of the product

and the risks involved in its use.  *Hunter v. Ford Motor Co., Inc*., 305 S.W.3d 202, 2009 WL

3766333, at *2 (Tex.App.-Waco, Nov.10, 2009, no pet. h.) (citing *Hernandez v. Tokai Corp*., 2

S.W.3d 251, 257 (Tex.1999).   "The determination of whether a product is unreasonably

dangerous because of a defective design is often one that involves factual disputes that a party is

entitled to have a jury resolve." *Hernandez*, 2 S.W.3d at 260.  Here, Defendant has not presented

any evidence whatsoever on the risk-utility analysis consideration.  Plaintiffs, however, present

substantial evidence that the ICC bumper on the Strick Trailer is designed defectively and is

unreasonably dangerous. Friedman Report I provides that the "Strick trailer underride guard was

defective in that it effectively fell off the trailer and did not provide significant energy

management or prevent underride of the trailer by the striking Toyota 4Runner."  APP 517.

Friedman Report I determines that the Greene family would not have had rear impact related

injuries absent the failure of the underride guard.  APP 517.  Friedman Report I also discusses that Strick reported that it tested two underride guards in 1998-1999 testing and that one failed. Again in 2007 it reported that of the two underride guards tested one failed.  APP 516.  Thus, it is obvious (or at least a material fact dispute) that a product is unreasonably dangerous when half of the underride guards fail the test requirement.

As far as additional consideration of the utility of the product and the risk involved in its use, here, there is no allegation from Defendant that the alternative designs proposed by Plaintiffs would completely preclude some of the uses for which the Strick Trailer was designed and to which it was put.  In other words, there are no allegations that the designs suggested by Plaintiffs' experts would have impaired the use of the Strick Trailer in any way.  In fact, the safer alternative designs proposed by Plaintiffs' experts would have vastly improved the longevity of the Strick Trailer without detracting from its usefulness.  Therefore, it cannot be said as a matter of law that the Strick Trailer was not unreasonably dangerous, and Plaintiffs are entitled to have a jury decide the matter.  Defendant's motion for summary judgment does not contain any affirmative representation that the designs proposed by Plaintiffs' experts were not safe or that they would affect the Strick Trailer's utility.  Thus it would be improper for Defendant to contend in a Reply that it was somehow unaware of these risks.  *See Wallace v. County of Comal*, 400 F.3d 284, 291–92 (5th Cir.2005) (issues raised for the first time in a reply brief are waived); *Santamaria v. Dallas Indep. Sch. Dist*., 2007 WL 1073850, *2 (N.D.Tex. Apr.10, 2007) (same).

Consequently, there is no doubt that on this record a reasonable jury could find (1) that design defects caused the deaths of one or more members of the Greene Family, (2) that there were feasible, safer alternatives that would have corrected the deficiencies in the Strick Trailer,

and (3) that the Strick Trailer design was unreasonably dangerous.  For these reasons, Dolphin's

motion for summary judgment on Plaintiffs' strict liability design-defect claim should be denied.

### C.   Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Negligence Claims.

Under Texas law, a negligence claim requires proof only of the following three elements:

(1) a legal duty owed by one person to another; (2) breach of that duty; and (3) damages

proximately resulting from that breach. *See, e.g. D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454

(Tex.2002).   The evidence demonstrates that on the day of the collision, although he was

eventually heading back to Gulfport, MS, Sprinkle was on his way to Marshall, TX, where he

intended to check into a motel to rest for a minimum of ten hours.  Sprinkle Depo 16:9 – 17:15

(APP 393-394).  Just prior to the collision, Sprinkle states that he "stopped" his tractor and trailer

on Interstate 20 eastbound.  Sprinkle Depo 19:11-15 (APP 396).  There was no construction in

the immediate area, and others have testified that the other traffic was still moving.  Evans Depo

14:17-25; 53:6-10 (APP 718).  One of the volunteer firefighters testified that traffic was pretty

normal at the time.  Crues Depo 14:16-20 (APP 1002). Sprinkle's sudden stop caused a sudden

impediment to traffic on the interstate.  Sprinkle told the investigating officers that he was not

familiar with this area of Texas as he had not been in this area very often over the years.

Baughman Depo 67:23 – 68:11 (APP 882-883).  Perhaps that is what caused Sprinkle to panic

and react hastily when the traffic began to slow before he could make it to his bed.

Shortly after Sprinkle slowed rapidly or stopped, a collision occurred whereby the Toyota

4 Runner ultimately came into contact with the Dolphin/Strick Trailer.   After the Greene's

Toyota 4Runner was impacted by the Volvo Truck, the 4Runner was left with no place to go

except into the prematurely stopped Strick trailer driven by the Fayard/Dolphin driver, Sprinkle.

As a result of the contact between the Toyota 4Runner and the insufficient rear impact bumper

14

guard, the rear impact bumper guard from Dolphin's Strick Trailer became dislodged and came

to rest in the middle of the interstate.  The Greene's 4Runner SUV continued to travel rapidly

underneath Dolphin's Strick Trailer, during which time Lakeysha Greene's body struck various

portions of the Strick Trailer, leaving her blood and hair follicles on the Strick Trailer.  Barkley

Depo 62:18 – 63:23 (APP 614-615).  Plaintiffs' Complaint provides a few facts of Defendant's

negligence:

1)     failure to ensure that the rear impact bumper guard was installed "and maintained" in compliance with the requirements of 49 CFR §393.86. The regulations provide that "every motor carrier, and its officers, agents, drivers, representatives, and employees directly concerned with the installation and maintenance of equipment and accessories" must comply with the safety requirements and specifications outlined therein;

2)     failure to attach the rear impact bumper guard in accordance with the installation instructions or procedures provided by Strick, if any, pursuant to S5.5 of 49 CFR §571.223, Rear impact bumper guard;

3)     failure to provide installation instructions or procedures for installation of the rear impact guard pursuant to S5.5 of 49 CFR §571.223;

4)     failure to ensure that the rear impact bumper guard complied with the strength requirements of S5.2.1 of 49 CFR §571.223 at each test location and the energy absorption requirements of S5.2.2;

5)     failure to ensure that the trailer had been properly and timely inspected as required by 49 CFR §396.17 and §396.21;

6)     Violation of the general duty under 49 CFR §396.3, and Texas law, of a trucking company to maintain its vehicles and trailers in good working order, to maintain repair records and inspection reports, and to make periodic inspections of each vehicle and trailer;

7)     Failure to properly inspect the Strick/Dolphin trailer before placing the two objects on the highway, as required by CFR §396.13, and Texas law;

8)     Negligently servicing, repairing, installing and/or maintaining the rear impact bumper guard on the trailer involved in the collision;

9)     Failure to properly maintain and service the Strick/Dolphin trailer;

10)     Failing to adequately inform Sprinkle as to how to test for a weak rear impact bumper guard and failing to warn Sprinkle of the dangers of operating the trailer without ensuring the adequacy of the rear impact bumper guard;

15

11) Failing to exercise reasonable care to discover the dangerous condition or character of the trailer's underride bumper guard before allowing the trailer to be used on the roadways;

12) Failing to warn consumers of the unreasonably dangerous nature of the rear impact guard, which industry experts have identified as presenting a threat of harm that would elude the common perception of the product;

13) Entrusting the Strick/Dolphin trailer to Daniel Sprinkle, an incompetent or reckless driver whose negligence on the day of the collision was one of the proximate causes of the collision; and

14) Failing to exercise that degree of care that other drivers would have exercised in maintaining an assured clear distance between vehicles, keeping a proper lookout, stopping safely and/or operating a dangerous instrumentality on the roadways.

Plaintiffs address herein a few of the instances where Defendant has been shown to have been negligent and therefore the cause of the accident and/or cause of the deaths of one or more of the members of the Greene family.

### 1. Dolphin was negligent in its inspection and operation of the trailer with the defective underride guard.

Federal Motor Carrier Safety Regulation, 49 C.F.R. §393.86 (1998), provides specific standards for the width, height, and rear surface of the rear impact guards on trailers. APP 472. The regulations also provides that each rear impact guard used to satisfy the requirements of paragraph of this section must be permanently marked or labeled as required by FMVSS No. 223 (49 C.F.R. 571.223, S5.3). APP 473-475. Additionally, 49 C.F.R. §571.223 provides the minimum guidelines for the strength and energy absorptions features that were required on the Trailer involved in the collision. *Id.* These safety regulations are applicable to common carriers, contract carriers, and private carriers. 49 C.F.R. §390.33. Further, the regulations provide that "every motor carrier, and its officers, agents, drivers, representatives, and employees directly concerned with the installation and maintenance of equipment and accessories" must comply with the safety requirements and specifications outlined therein. *Id.* at §393.1. It is the law that negligence *per se* (or negligence as a matter of law) exists if there is an unexcused violation of a

16

statutory standard, administrative regulation adopted by a court, or a municipal ordinance. *See, e.g., Frendiger v. Keller*, 104 S.W.3d 294 (Tex. App.-Dallas 2003, pet. denied). The ease in which the ICC bumper guard was dislodged demonstrates that the Trailer was clearly unsafe. Friedman Report I and II also conclude that the ICC bumper guard was weak, poorly attached, dislodged too easily, and did not absorb any energy from the collision. *Id*. Moreover, as the owner and lessor of the Trailer, Dolphin had a common law duty to exercise reasonable care to discover its dangerous condition or character before operating the trailer on the roadways. *Roosth & Genecov Production Co. v. White*, 262 S.W.2d 99 (1953); RESTATEMENT (SECOND) OF TORTS § 392. These facts establish a material fact dispute on this negligence claim, which precludes summary judgment.

### 2.    Dolphin was negligent in its inspection and maintenance of records.

The Federal Motor Carrier Safety Act Regulations require that all trucking companies "shall systematically inspect, repair and maintain, or cause to be systematically inspected, repaired and maintained, all motor vehicles subject to its controls.[1]  This general duty of a trucking company to maintain its vehicles in good working order includes a duty to maintain repair records and inspection reports[2], the duty to maintain driver reports, which are to be filed each day on each vehicle driven[3], and a duty to make periodic inspections of each vehicle[4]. Both Dolphin and Fayard were responsible for inspection of the Trailer.[5]  The records required by this section shall be retained where the vehicle is either housed or maintained for a period of 1 year

---

[1] 49 C.F.R. §396.3 (a).
[2] 49 C.F.R. §396.11.
[3] 49 C.F.R. §396.11.
[4] 49 C.F.R. §396.17.
[5] 49 C.F.R. §396.17(b)(a motor carrier shall inspect or cause to be inspected all motor vehicles subject to its control).

and for 6 months after the vehicle leaves the motor carrier's control.[6]  Dolphin admits that it was

its and Fayard's responsibility to ensure that the inspections were current.  Gibson Depo at 19:19

– 23:23.  APP 974-978.  However, contrary to other statements, the policy was "not" to wait

until the last day of the month to conduct the inspection. *Id*.  However, Dolphin produced no

records indicating that it ever checked the adequacy of the underride guard on its trailer.

  Additionally, as mentioned above, a trucking company that breaches the duty to maintain

its vehicles is a safe condition can be subject to a claim of punitive damages for putting a

defective vehicle on the roadway. See, *J.B. Transport, Inc. V. Bently*, 427 S.E.2d 499, 505 (Ga.

App. 1992) (putting a "defective tractor-trailer out on the highway" is a violation of federal

regulations).  In fact, the regulations are clear that it is a violation of federal regulations to

operate a tractor or trailer that has not passed an annual inspection.[7] In this case, the operation of

the Dolphin Trailer on May 28, 2010 constituted statutory violations, subjecting them to civil or

criminal penalties.[8]  Furthermore, the obligations and responsibilities under the FMCSR are

shared by truck drivers and the companies that employ them.  49 C.F.R. §390.11.  Here,

however, Dolphin's shipping partner, Fayard, admits that it never tested the underride guards to

make sure they were of proper strength.  Talton Depo 61:18 – 62: 12 (APP 197-198).  The

Fayard/Dolphin driver admits that he did not inspect the ICC bar and claims that his company

did not require that he inspect it.  Sprinkle Depo 48:13 – 50:4 (APP 425-427).  In fact, Fayard

unabashedly claims that it has no responsibility or obligation to make sure the underride guards

are in compliance with the federal regulations.  Talton Depo 59:21 – 61:5.  (APP 196-197).

Dolphin, also admitted that it did nothing to test the underride guard (Hatfield Depo 29:18 –

---

[6] 49 C.F.R. §396.3 (c).

[7] 49 C.F.R. §396.17(c).

[8] 49 C.F.R. §390.37.

30:22 APP 321-322) and did not test the strength of the Strick Trailer before putting it on the highway.  Hatfield Depo 65:19 – 66:6 (APP 357-358).

      3.      **Dolphin's agent, Sprinkle, was negligent in his operation of the tractor and defective trailer while he was delivering loads for Dolphin.**

As discussed above, it is undisputed that Sprinkle was operating the tractor and Dolphin's Strick Trailer on behalf of Fayard and Dolphin on May 28, 2010.  Sprinkle got paid from funds collected by Dolphin.  There is also no dispute that there is a common law duty for motor vehicle operators to exercise that degree of care which a person of ordinary prudence would have exercised under the same or similar circumstances. *See, e.g., McDonald v. Dankworth*, 212 S.W.3d 336 (Tex. App.-Austin 2006, no pet. h.); *Metzger v. Gambill*, 37 S.W.2d 1077 (Tex. Civ. App.-Dallas 1931, writ ref'd).  In this case, Plaintiffs have alleged that the accident on May 28, 2010, was caused, in part by Sprinkle's failure to maintain an assured clear distance between vehicles when following a vehicle[9]; failure to keep a proper lookout[10]; failure to stop the Fayard truck and Dolphin trailer safely and/or slowing too suddenly[11]; and failure to maintain a safe instrumentality on the roadways.  According to Sprinkle, just before the collision occurred, he stopped his massive truck, with the defective trailer, in the middle of an active freeway and locked his brakes down.  Sprinkle Depo at 28:3-20 (APP 405).  There was no construction in the immediate area, and others have testified that the other traffic was still moving.  Evans Depo 14:17-25; 53:6-10 (APP 718; APP 757).  Therefore, there was no need for Sprinkle to have stopped so rapidly.  Sprinkle's sudden stop caused a sudden impediment to traffic on the interstate.  Sprinkle told the investigating officers that he was not familiar with this area of Texas as he had not been in this area very often over the years.  Baughman Depo 67:23 – 68:11 (APP

---

[9] TEX. TRANSP. CODE § 545.062(a); *La.-Pac. Corp. v. Knighten*., 976 S.W.2d 674 (Tex. 1998).

[10] TEX. TRANSP. CODE § 545.206; TEX. TRANSP. CODE § 545.417.

[11] *See, e.g.* TEX. TRANSP. CODE § 545.302; TEX. TRANSP. CODE § 545.303; TEX. TRANSP. CODE § 545.304.

882-883).   Shortly after Sprinkle slowed rapidly or stopped, a collision occurred whereby the Toyota 4 Runner ultimately came into contact with Dolphin's Strick Trailer.   Sprinkle also testified that there was nothing in the lane next to him (that would have prevented him from moving to that lane to avoid the incident).   Sprinkle Depo at 26:2 - 27:2 (APP 403-404).   He also did not have his signal or hazard lights activated in order to give warnings to others traveling behind him.

Thus, the record evidence proves that: (1) Sprinkle stopped suddenly or too rapidly; (2) there was a shoulder where Sprinkle could have instead driven; (3) Sprinkle could have noticed the Volvo truck approaching if he had been keeping a lookout to the rear; (4) Sprinkle could have moved to the shoulder or to the other lane if he had seen the approaching truck and avoided the accident; and (5) Sprinkle took no such evasive action.   In instances such as this, the law is clear that the issue of negligence should be presented to a jury.   *Lumpkins v. Thompson*, 553 S.W.2d 949, 952–53 (Tex.Civ.App.-Amarillo 1977, writ ref'd n.r.e.) (lead driver owed duty of ordinary care to following driver, and issue of breach was properly submitted to the jury); *Rash v. Whisennand*, 453 S.W.2d 353, 356–59 (Tex.Civ.App.-Houston [14th Dist.] 1970, writ ref'd n.r.e.) (testimony that defendant made "sudden," "abrupt" stop "was sufficient to raise and support the jury's findings of contributory negligence and proximate cause."); *Southland Supply Company v. Gebhart*, 439 S.W.2d 393 (Tex.Civ.App.)—Texarkana 1969, no writ).   Therefore, there is a triable claim as to whether Dolphin's and Fayard's agent exercised that degree of care that other drivers would have exercised in keeping a proper lookout, following other vehicles, stopping safely and/or operating a dangerous instrumentality on the roadways.   Accordingly, Dolphin's motion for summary judgment is meritless and should be denied.

      **4.**      **Dolphin was negligent in entrusting the tractor and defective trailer to an untrained driver.**

Texas recognizes a tort action for negligent hiring and entrustment. *See TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 240–41 (Tex.2010). Employers have a duty to investigate, screen, and supervise employees, and a breach of this duty creates liability for any injury caused as a result of the breach. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 796 (Tex.2006). The elements of a cause of action for negligently hiring, supervising, training, or retaining an employee are (1) the employer owed the plaintiff a legal duty to hire, supervise train, or retain competent employers, (2) the employer breached that duty, and (3) the breach proximately caused the plaintiffs injury. *See TXI Transp*. v. *Hughes*, 224 S.W.3d 870, 901 (Tex.App.-Fort Worth 2007), rev'd on other grounds, 306 S.W. 230 (Tex .2010); *see also EMI Music Mexico v. Rodriguez*, 97 S.W.3d 847, 858 (Tex.App.-Corpus Christi 2003, no pet.). In this case, the record is clear that Defendant's driver received no training in how to properly inspect the tractor-trailer rig that defendant entrusted to the driver. Sprinkle Depo 73:3-6, 51:9-17. (APP 450; APP 428) The Fayard/Dolphin driver testified that his employer had no policy requiring him to inspect the underride guard and admits that he did not inspect the rear impact bumper guard before he placed the defective trailer on the highway. Sprinkle Depo 48:13 – 50:4. (APP 425-427). The driver's boss also admits that Fayard did not provide any training on how a driver should go about inspecting an underride guard. Talton Depo 57:19 – 58:22 (APP 193-194). This lack of training and supervision led to the driver taking the defective trailer on the Texas highways, where the weakened guard snapped off, allowing the Greene's 4Runner to travel underneath the trailer and proximately cause Mrs. Greene's death. Therefore, Defendant is not entitled to summary judgment on this claim.

      **5.    An experienced reconstructionist and highway traffic expert has also concluded that Defendant was negligent.**

Jeff Vick ("Vick"), an accomplished accident reconstructionist and commercial motor vehicle traffic expert was retained to provide an opinion in this matter.  For over 28 years Vick has specialized in traffic crash investigation, including evidence collection and preservation, in matters involving cars, tractor-trailers, pedestrians, motorcycles, etc.  He was a member of the original New Mexico State Police Accident Reconstruction team from 1992 to 2005.  He has substantial experience in traffic crash investigation and analysis, forensic mapping and accident reconstruction, interviews and interrogation techniques, and evidence collection and preservation.  In addition to having analyzed hundreds of crashes involving passenger vehicles, semi tractor-trailers, pedestrians, motorcycles, trains, heavy trucks, etc., Vick has also instructed accident investigation courses.   APP 1056.  He has substantial experience in traffic enforcement and knowledge of traffic laws including laws and regulations involving operation of vehicles on the highways and commercial carrier regulations.   He is a former or current member of the following organizations:   Accreditation Commission for Traffic Accident Reconstruction, National Association of Traffic Accident Reconstructionists and Investigators, National Association of Professional Accident Reconstruction Specialists, Texas Association of Accident Reconstruction Specialists, International Network of Collision Reconstructionists, Accident Reconstruction Network, New Mexico State Police Association, National Troopers Coalition, the New Mexico Private Investigator & Polygraph Board and Texas Private Security Bureau.  APP 1057.  The methodology Vick used in this case is identical to the methodology he has used in previous reconstructions, and is the methodology that is normally employed by experts in the fields of crash analysis and accident reconstruction.  Vick began by performing inspections and collecting detailed measurements of the accident scene and the subject tractor/trailer units on May 30, 2010, (less than two days after the incident occurred).  The measurements and data

obtained in these surveys were downloaded at his office to produce an Auto CAD file for him to

work with.  *Id.*

Based on his expert analysis, Vick formed the following expert opinions:

1)    The Fayard/Dolphin Driver inappropriately divided his attention between looking ahead and looking to the rear of his trailer for rear clearance.

2)    The Fayard/Dolphin Driver should have seen the approaching 4Runner and Volvo tractor, and if he did not it was because he had not complied with the standard driving practices to monitor approaching traffic from the rear.  A reasonable truck driver under the circumstances of this case would have monitored approaching rear traffic, thereby allowing him the opportunity to move forward and/or off the road onto the shoulder, thus preventing the Toyota 4Runner from colliding with the rear of his tractor- trailer.

3)    The Fayard/Dolphin Driver's failure to observe the speed of approaching traffic led to his inability to attempt to veer off to the shoulder, thus potentially preventing the 4Runner from striking the trailer's underride guard.

4)    According to the Fayard/Dolphin Driver's testimony, he was stopped in the freeway when the accident occurred, but had room in front of his tractor-trailer. The driver's decision to stop completely on the freeway contributed to the Toyota 4Runner colliding with the Strick trailer that was being towed by the Freightliner.

5)    A reasonable truck driver who would have had his parking brakes activated, as Sprinkle states he did, would have also activated his hazard lights to warn traffic behind him that he had come to a sudden and complete stop in a travel lane on the roadway.  Failure to do so is imprudent and dangerous.   As a result, the tractor-trailer became a deadly obstruction or barrier in a travel lane on a 65 mph highway.

6)    If the Fayard/Dolphin Driver was not stopped completely as he claims, his decision to slow down rapidly on the freeway reduced the escapable space of the Toyota 4Runner and contributed to the Toyota 4Runner colliding with the Strick trailer that was being towed by the Freightliner.  In circumstance such as this, a driver should brake early and gently when preparing to stop for traffic ahead.

7)    From initial braking of the Volvo Tractor to impact with the Fayard vehicle, valuable seconds passed where if Mr. Sprinkle would have been watching and had his vehicle not been parked with parking brakes applied, he could have moved forward resulting in a lesser collision to preventing a collision to the rear of his trailer.

8)    The available distance the Fayard/Dolphin Driver had in front of him at the time of the collision with his trailer was approximately 125 feet.

9)    The Fayard/Dolphin Driver and his company have responsibility for making sure the tractor and trailer are in compliance with federal and state laws and regulations.

10) The Fayard/Dolphin Driver did not prepare and maintain daily written post-trip inspection reports and did not have reports in his cab on the day of the incident. It is my understanding that this is a federal requirement for motor carriers and drivers such as the Fayard, Dolphin, and the driver.

11) The Fayard vehicle was in violation due to expired annual inspections. Inspection also revealed an air leak was detected in the braking system, axle 5 right inside rim was damaged, axle 5 inside tire was flat which is an out of service violation, and a right rear tail lamp was also damaged and was not operational. Additionally the under ride guard was missing. This vehicle was placed back into service and allowed to continue the trip in this condition.

12) The Fayard/Dolphin Driver's omissions and commissions were precipitating factors leading directly to the cause of the collisions between the Toyota 4Runner and the Fayard/Dolphin trailer and/or the Volvo Tractor-Trailer and the Toyota 4Runner.

APP 1067-1068  Based on the record presently before the Court, Plaintiffs have provided enough evidence with which a jury can find that the Defendant and his agent was negligent. Accordingly, summary judgment should be denied.

### 6.  Experts from Friedman Research Corporation have also concluded that Dolphin was negligent.

As further validation of Dolphin's negligence, the experts, as presented in Friedman Report II, using deponents' testimony and a reconstruction of the incident, conclude that Dolphin, Fayard, and Sprinkle were negligent as a result of the following facts related to the defectively designed and/or installed underride guard:

1) The underride guard on the trailer was defective in that it effectively fell off the trailer and did not provide significant energy management or prevent underride of the trailer by the striking Toyota 4Runner.

2) The failure of the underride guard contributed to the entrapment of the occupants.

3) The failure of the underride guard led to the ejection of the right front passenger.

4) An improved Strick underride guard was available for this trailer that would have prevented the significant underride that occurred in the accident.

5) Dolphin did not comply with federal regulations by failing to maintain the trailer in proper condition that would have even met the bare minimum of federal regulations with regard to the underride guard.

6) Dolphin did not comply with federal law by operating a truck/trailer that did not have the appropriate safety inspections and was out of compliance with 49 CFR 396 regulations.30

24

7)      Dolphin did not comply with federal law by not maintaining proper records regarding the maintenance and operation of the tractor-trailer.

8)      Dolphin failed to meet the minimum requirements for the maintenance of vehicles for interstate trucking in accordance with 49 CFR 396.

9)      Dolphin did not comply with federal law by failing to ensure that the underride guard was repaired properly and that the recommended procedures for installing and maintaining the underride guard were followed according to the manufacturer's instructions such that the vehicle would meet federal regulations for interstate trucking operations in accordance with FMVSS 223/224 and 49 CFR 396.

10)    Dolphin failed to ensure that the underride guard was installed with proper documentation and quality assurance checking to ensure that the trailer was in proper operating conditions as required by federal regulations.

APP 1122-1123.  In addition, the experts identified additional facts from the testimony

and on-scene analysis that establish Defendant's negligence in other regards:

1)      Dolphin allowed its partner, Fayard, to have an underride guard installed on the Strick trailer after the accident that was not designed or approved by Strick for use on this Strick trailer, despite the requirements of FMVSS 223/224.

2)      Dolphin ignored the requirements of FMCSR 396.11 by failing to ensure that the records required to document that required daily inspections of equipment occurred were available to be reviewed by the next driver. No documents showing that these inspections and reports were prepared have been produced.

3)      Dolphin failed to ensure that the tractor trailer being driven was in a safe operating condition as required by 49 CFR 396.13. The safety inspection for both vehicles were both out of date and no Vehicle Inspection Report was available to inspect hence items 1 and 2 of 396.13 could not have been satisfied.

**Driver Pre-Operation Vehicle Inspection (§ 396.13)**

Before beginning a haul, a driver must:

a.      be satisfied that the motor vehicle he or she is assigned is in safe operating condition;

b.      review the last driver VIR; and

c.      sign the VIR only if defects or deficiencies were noted by the driver who originally prepared the VIR, to acknowledge that the driver has reviewed it and that a certification has been made that the required repairs have been performed.

4)      The tractor trailer operated by Dolphin's agent should not have been on the road since neither had a valid safety inspection as required by law as shown in the citation issued by TXDPS Commercial Vehicle Enforcement (TX10440EAQ01, CP#: 0798253, 5/28/2010).

25

5)      Dolphin failed to ensure that the tractor trailer being driven was in a safe operating condition as required by 49 CFR 396.13. The safety inspection for both vehicles were both out of date and no Vehicle Inspection Report was available to inspect hence items 1 and 2 of 396.13 could not have been satisfied.

6)      Dolphin did not ensure that Sprinkle had been trained on how to inspect a vehicle prior to operation.

7)      Dolphin did not provide training to the driver Sprinkle on how to inspect an underride guard.

8)      Dolphin failed to ensure that the trailer met FMVSS 223/224.

9)      Dolphin failed to ensure that the underride guard was maintained in accordance with Strick Trailer installation and maintenance requirements.

10)    Dolphin did not obtain training on the need and manner of maintaining the underride guards received from Strick Trailers.

11)    Dolphin did not obtain or act on information on the availability of improved underride guards available from Strick Trailers.

12)    The failure of the underride guard contributed to the entrapment of the occupants.

13)    The failure of the underride guard led to the ejection of the right front passenger.

See, APP 1094-1160. The experts' conclusions are based on facts that are contained in the record and are therefore competent evidence that precludes summary judgment on these claims.

**D.     Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Gross Negligence and Exemplary Damage Claims.**

Gross negligence" means:  an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.  TEX. CIV. PRAC. & REM.CODE Ann. § 41.001(11).  As Defendant was aware there was considerable uproar over the inadequacy of rear impact guards.  According to the Fatality Analysis Reporting System (FARS), about 10 percent of passenger vehicle occupant fatalities occur in crashes involving large trucks.  In fact, the Insurance Institute for Highway Safety (the IIHS") petitioned the National Highway Traffic

Safety Administration for more stringent standards for underride guards, considering the current standards allow underride guard designs that fail catastrophically when struck by passenger vehicles at speeds that frequently produce minimal intrusion and injury risk in regulatory and consumer information frontal crash test programs. The IIHS asked that standards be upgraded to require underride guards that are strong enough to remain in place during a crash, allowing the energy absorbing structures of passenger vehicles to deform and provide protection to their occupants. APP_____

Despite the number of deaths being caused unnecessarily by weak underride guards, Dolphin did not have any type of program whereby its employees were trained to inspect or maintain the underride guards.  There was no program to ensure that the underride guards were properly maintained and the strength of the guards was never tested before the trailers were placed on the highways where they could easily cause death or decapitation.  Dolphin's failure to have any type of adequate repair, maintenance or inspection policy for its underride guards, along with the evidence discussed above of Dolphin turning a blind-eye to safety features, and Dolphin's driver stopping in the middle of an active freeway with no hazard lights, raise a genuine issue of material fact whether Dolphin acted with gross negligence.  Punitive damages are available for gross negligence or malice in strict liability. *See Heil Co. v. Grant*, 534 S.W.2d 916, 926 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.).  Moreover, as the Court is well aware, a trial court does not weigh the evidence and say at the summary judgment stage that no reasonable jury could find that defendant acted with "conscious indifference to the rights, safety or welfare of others." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256, (1986)(the high court reiterated that the trial court still may not make credibility determinations, nor weigh the evidence, nor draw legitimate inferences from the facts other than in favor of the nonmovant).

27

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir.2001); *see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222, 227 (5th Cir.2002). Based on the record presently before the Court, Plaintiffs have provided enough evidence with which a jury can find gross negligence. Accordingly, summary judgment should be denied.

### IV.    CONCLUSION

As explained herein, Dolphin has no justifiable grounds upon which to receive summary disposition of the claims in its motion. The undisputed evidence demonstrates that there are disputed issues of fact as to each of Plaintiffs' causes of action against Dolphin. Accordingly, summary judgment should be denied.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that the Court deny Dolphin's motion for summary judgment, and grant Plaintiffs such other and further relief, in law or in equity, to which Plaintiffs may be entitled.

Respectfully Submitted,

/s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

/s/ Daryl K. Washington
DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2013, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.

   /s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN