# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **OLLIE GREENE, Individually as the surviving parent of WYNDELL GREENE, SR., WILLIAM GREENE, as the Administrator of the Estate of WYNDELL GREENE, SR., and MARILYN BURDETTE HARDEMAN, Individually and as the surviving parent of LAKEYSHA GREENE,** | § § § § § § § | **CAUSE NUMBER: 3:11-cv-0207-N** |
| **Plaintiffs,** | § § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **TOYOTA MOTOR CORPORATION, TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., TOYOTA MOTOR SALES USA, INC., VOLVO GROUP NORTH AMERICA, LLC., VOLVO TRUCKS NORTH AMERICA, A DIVISION OF VOLVO GROUP NORTH AMERICA, LLC., STRICK TRAILERS, LLC, JOHN FAYARD MOVING & WAREHOUSE, LLC, and DOLPHIN LINE, INC.** | § § § § § § § § § § § § § | |
| **Defendants.** | § | |

---

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR RESPONSE TO TOYOTA'S' 3RD AND 4TH MOTIONS FOR SUMMARY JUDGMENT

---

AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas 75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................iv

I.     REQUEST TO STRIKE OR DISMISS PURSUANT TO LOCAL RULE 56.2(b) ........... 1

II.    REQUEST TO STRIKE OR DISMISS PURSUANT TO PLAINTIFFS'
       SPOLIATION MOTION ........................................................................................ 1

III.   PRELIMINARY STATEMENT ............................................................................. 2

IV.    BACKGROUND FACTS ....................................................................................... 3

V.     ARGUMENT AND AUTHORITIES ...................................................................... 5

       A.     The Applicable Summary Judgment Principles........................................ 5

       B.     Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
              Plaintiffs' Strict Liability Claims............................................................. 6

              1.     Strict Liability Claim of Marketing Defect and Failure to Warn................ 6

              2.     Strict Liability Claim of Design Defect ..................................... 6

                     a.     There is evidence of safer alternative designs ................................ 8

                     b.     The defects were a producing cause of decedents' deaths............ 12

                     c.     The 2010 4Runner was unreasonably dangerous.......................... 13

       C.     Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
              Plaintiffs' Negligence Claims. ............................................................... 17

       D.     Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
              Plaintiffs' Gross Negligence and Exemplary Damage Claims. ............................ 19

              1.     Gross negligence in design issues............................................................ 19

              2.     Gross negligence in marketing and public representations...................... 21

       E.     Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
              Plaintiffs' Breach of Warranty Claims. ................................................... 24

              1.     Toyota breached express warranties ....................................... 24

              2.     Toyota breached implied warranties........................................ 25

       F.     Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
              Plaintiffs' Misrepresentation Claims. ...................................................... 27

G.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law in Favor of Toyota Motor Engineering & Manufacturing North America. ........................ 27

VI.    CONCLUSION ........................................................................................................... 28

CERTIFICATE OF SERVICE ................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*American Tobacco Co. v. Grinnell*, 951 S.W.2d 420 (Tex.1997) .................................................. 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 24

*Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222 (5th Cir.2002)......................... 24

*Capers v. Dallas Independent School Dist.*, 2004 WL 993549 (N.D.Tex. May 03, 2004) ............ 1

*Chandler v. Gene Messer Ford*, 81 S.W.3d 493 (Tex.Ct.App.2002) ........................................... 26

*Dion v. Ford Motor Company*, 804 S.W.2d 302 (Tex.App.-Eastland 1991, writ denied) .......... 19

*Evans v. City of Houston*, 246 F.3d 344 (5th Cir.2001).............................................................. 24

*Flock v. Scripto–Tokai Corp.*, 319 F.3d 231 (5th Cir.2003)........................................................ 12

*Ford Motor Co. v. Miles*, 141 S.W.3d 309 (Tex.App.-Dallas 2004, pet. denied) ....................... 18

*Gen. Motors Corp. v. Brewer*, 966 S.W.2d 56 (Tex.1998)........................................................... 25

*General Supply & Equip. Co. v. Phillips*, 490 S.W.2d 913 (Tex. Civ. App.-Tyler 1972,
    writ ref'd n.r.e.) ..................................................................................................................... 24

*Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867 (Tex.1978) ............................................. 18

*Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503 (5th Cir.), cert. denied,
    540 U.S. 815 (2003).................................................................................................................. 5

*Hennessy v. Estate of Perez*, 725 S.W.2d 507 (Tex.Civ.App.—Houston [1st Dist.] 1987,
    no writ)................................................................................................................................... 19

*Hernandez v. Tokai Corp.*, 2 S.W.3d 251 (Tex.1999) ................................................................. 13

*Home Depot U.S.A., Inc. v. Nation Fire Ins. Co. of Hartford*, 3:06–CV–0073–D, 2007 WL
    1969752 (N.D.Tex. June 27, 2007)........................................................................................... 1

*Honore v. Douglas*, 833 F.2d 565 (5th Cir.1987) ......................................................................... 6

*Hunter v. Ford Motor Co., Inc.*, 305 S.W.3d 202 (Tex.App.-Waco, Nov.10, 2009, no pet. h.) .. 13

*In re Exmark Mfg. Co., Inc.*, 299 S.W.3d 519 (Tex.App.-Corpus Christi 2009)......................... 10

*Jampole v. Touchy*, 673 S.W.2d 569 (Tex. 1984)........................................................................ 10

*Khan v. Veliscol Chemical Corp.*, 711 S.W.2d 310 (Tex. App.-Dallas 1986, writ ref'd n.r.e.).... 25

*King Ranch, Inc. v. Chapman*, 118 S.W.3d 742 (Tex.2003) ......................................................... 6

*Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167 (5th Cir.1990)........................... 6

*Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77 (5th Cir.1988) ..................... 6

*Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409 (5th Cir.2003) ............................................ 1, 5

*Martin v. Zoley*, 2011 WL 6976311 (N.D.Tex. Oct 25, 2011) ....................................................... 1

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................ 5

*McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967) .................................................. 7

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990); ......................................................................... 5

*Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442 (Tex.1989) ................................................. 26

*Robins v. Kroger Co.*, 982 S.W.2d 156 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) .......... 7

*Romo v. Ford Motor Co.*, 798 F.Supp.2d 798 (S.D.Tex.2011) ..................................................... 19

*Santamaria v. Dallas Indep. Sch. Dist.*, 2007 WL 1073850 (N.D.Tex. Apr.10, 2007)................ 17

*Senior Living Properties LLC Trust v. Clair Odell Ins. Agency LLC*, 2005 WL 1862172
    (N.D.Tex. Aug 05, 2005) ....................................................................................................... 1

*Syrie v. Knoll Int'l*, 748 F.2d 304 (5th Cir.1984) ...................................................................... 18

*Taylor v. Southwestern Bell Tel. Co.*, 483 S.W.2d 330 (Tex.Civ.App.—El Paso 1972, no writ) 19

*Vaughn v. Am. Honda Motor Co., Ltd.*, No. 2–04–CV–142 (TJW), slip op. at 4–5
    (E.D.Tex. Mar. 31, 2005)....................................................................................................... 26

*Wallace v. County of Comal*, 400 F.3d 284 (5th Cir.2005) ........................................................ 17

**Rules**

Local Rule 56.2(b) ........................................................................................................................... ii, 1

TEX. BUS. & COM. CODE ANN. § 17.41 et seq. (Vernon 1987)................................................... 24

TEX. BUS. & COM.CODE § 2.314............................................................................................. 24, 25

TEX. BUS. & COM.CODE § 2.314(b). ............................................................................................ 25

TEX. BUS. & COM.CODE § 2.314(b). ....................................................................................... 24, 25

TEX. CIV. PRAC. & REM.CODE Ann. § 41.001(11)...................................................................... 19

TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a)-(b)................................................................... 9

## I.        REQUEST TO STRIKE OR DISMISS PURSUANT TO LOCAL RULE 56.2(b)

Local Rule of Civil Procedure 56.2(b) sets a limit on the number of summary judgment motions that can be filed without leave of court and provides: "Unless otherwise directed by the presiding judge, or permitted by law, a party may file no more than one motion for summary judgment." *See also, Home Depot U.S.A., Inc. v. Nation Fire Ins. Co. of Hartford*, 3:06–CV– 0073–D, 2007 WL 1969752, at *2 (N.D.Tex. June 27, 2007); *Martin v. Zoley*, 2011 WL 6976311 (N.D.Tex. Oct 25, 2011); *Senior Living Properties LLC Trust v. Clair Odell Ins. Agency LLC*, 2005 WL 1862172 (N.D.Tex. Aug 05, 2005); *Capers v. Dallas Independent School Dist.*, 2004 WL 993549 (N.D.Tex. May 03, 2004). The Toyota Defendants have filed four (4) separate motions for summary judgment: Document No. 88 was filed on April 10, 2012; Document No. 179 was filed on September 12, 2013; Document No. 253 was filed on December 12, 2013; and Document 256 was filed on December 10, 2013. Toyota's conduct constitutes a severe violation of Local Rule 56.2(b), and Toyota did not request leave of Court to file the 2nd, 3rd and 4th motion for summary judgment. Indeed, filing four separate motions demonstrates Toyota's blatant circumvention of the rule, wastes the Court's judicial resources on four separate motions and creates unnecessary and additional work to Plaintiffs' counsel in having to respond to four separate motions for summary judgment. Accordingly, Plaintiffs ask that the motions for summary judgment be dismissed, stricken and/or denied on these grounds.

## II.       REQUEST TO STRIKE OR DISMISS PURSUANT TO PLAINTIFFS'SPOLIATION MOTION

The evidence in this case reveals that Toyota destroyed and/or concealed evidence that is crucial to Plaintiffs' case and for which there was a clear duty for Toyota to preserve. Specifically, Toyota intentionally misplaced, destroyed and/or concealed key computer aided engineering and design files, as well as finite element models, from which the crashworthiness

1

characteristics and safety features of the Toyota 4Runner's design was evaluated from the computer analysis results.   Toyota's intentional destruction of this valuable evidence has prejudiced Plaintiffs' ability effectively to prove and/or illustrate certain of their claims against Toyota and/or refute Toyota's multiple defenses.   Plaintiffs have filed a motion for sanctions for spoliation of evidence that is pending with the Court (Dkt. Entry No. 269), through which Plaintiffs have asked the Court to impose pre-trial and trial sanctions on Toyota.

As indicated in Plaintiffs' spoliation motion, Toyota's failure to preserve and produce FE and CAE models have significantly impaired Plaintiffs' ability to illustrate the issues and solutions in this case and refute Toyota's defenses as to many of the potential defects, the hypotheses of which could have been effectively tested with such models.   Examples of such hypotheses include, but are not limited to, restraint systems, interior padding, side curtain airbags, door performance, structural side integrity, weld unzipping, and overall structural integrity of the Toyota 4Runner.   As also explained in the spoliation motion, even where Plaintiffs' experts were able to determine a few clear design defects and economically feasible alternative design approaches in the Toyota 4Runner, the absence of the FE and CAE impaired Plaintiffs' ability to detect other likely defects and to clearly illustrate other design defects using Toyota's own FE.   Accordingly, pursuant to the remedies sought in the spoliation motion, Plaintiffs ask that the Court deny Toyota's motions for summary judgment.   That way, Toyota would not be permitted to conceal or destroy evidence and use the absence of that evidence as a basis for summary judgment.

### III.   PRELIMINARY STATEMENT

With regard to the substance of Toyota's 3rd and 4th motions for summary judgment, the presence of substantial summary judgment evidence makes clear that these motions were filed merely as a ploy by Toyota to force Plaintiffs to preview the evidence that Plaintiffs plan to

2

present at trial on their claims against Toyota.  More importantly, Toyota's hastily prepared bare-bones no-evidence motions for summary judgment were simply a ruse with which Toyota simply wanted Plaintiffs to waste valuable time and resources responding to the meritless motions for summary judgment at the precise moment when Plaintiffs' counsels should be preparing to present and/or to take the depositions of nearly two dozen expert witnesses in this matter.  As the Court will observe, the motions for summary judgment have no merit and should be summarily denied.

## IV.   BACKGROUND FACTS

### A.    The Incident.

On May 28, 2010, Wyndell Greene, Sr. ("Wyndell Sr."), age 34, LaKeysha Greene ("LaKeysha"), age 35, Wyndell Greene, II ("Wyndell II"), age 2, and Wesleigh Greene ("Wesleigh"), age 5, (Wyndell Sr., LaKeysha, Wyndell II and Wesleigh are collectively referred to herein as the "Greene family") were traveling in their Toyota 4Runner (the "Toyota 4Runner") to Louisiana for Wyndell II's third birthday.  At approximately 6:25 pm, traffic was slowing on Interstate Highway 20 in the eastbound lane.  The driver of a Volvo semi-tractor trailer (the "Volvo Truck") applied the brakes but impacted a 2010 Toyota 4Runner containing the Greene family. The Toyota 4Runner then impacted a 2006 Toyota Corolla in the rear.  The Corolla rotated into the freeway median.  The Greene's Toyota 4Runner then slid into the rear of a trailer that was manufactured by Strick Trailers, LLC, owned by Dolphin Line, and towed by a freightliner owned by John Fayard Moving and Warehouse.  The Greene family Toyota 4Runner caught fire and burned up.  The Greene family children died in the crash as did Mrs. Greene. Mr. Greene was burned over 40% of his body. See, police accident report, APP 001-006.

The collision came without warning and caused the Toyota 4Runner to collide with a Toyota Corolla and a trailer that was manufactured by Strick Trailers, LLC, owned by Dolphin

Line, and towed by a freightliner owned by John Fayard Moving and Warehouse.  The Greene Family's Toyota 4Runner burst rapidly into uncontrollable flames. Thompson Depo at 46:22 – 47:11 (APP 053-054). As a result of the crash, Wyndell II and Wesleigh were trapped in the Toyota 4Runner, unable to escape, and were eventually burned to ashes.  Rushing Depo at 20:11 – 22:18 (APP 111-113).  Wyndell II was decapitated while inside the Toyota 4Runner. 30:21 – 33:24 (APP 121-124) LaKeysha, although wearing her seatbelt, was ejected from the Toyota 4Runner's seatbelt restraint, suffered burns and lacerations to a significant portion of her body, and eventually died from the trauma as a result of her ejection from her seatbelt and airbag restraints.  Thompson Depo at 35:9 – 36:4 and 60:14 – 61:5 (APP 042-043; APP 067-068). Wyndell Sr. sustained unwarranted and excruciating physical pain and mental anguish and emotional distress at the scene and afterwards.  Approximately three months following the accident, Wyndell Sr. died as a result of the burns and other injuries he suffered from the collision, which he sustained while inside the Toyota 4Runner.

> **B.     The Allegations in the Complaint Against the Toyota Defendants.**

Plaintiffs' Complaint specifically alleges that Toyota, *inter alia*, failed to design and incorporate widely available, safer and feasible, alternative designs into the Toyota 4Runner's fuel system, fire prevention and suppression systems, seat restraints, air bag systems, rear occupant compartment and structural integrity of the Toyota 4Runner that would have prevented or significantly reduced the injuries and deaths to the Greene Family.  If the Toyota 4Runner had been properly designed, it could have aided in significantly reducing the injuries to, and/or preventing the eventual deaths of, each member of the Greene Family.  (Dkt. Entry 113).  The Complaint also makes clear that Toyota was grossly negligent in its conduct.  The Complaint alleges further that Toyota breached express warranties that the 4Runner was safe, reliable and of

paramount importance.   Toyota also impliedly warranted that Toyota's vehicles were of merchantable quality and able to perform under specific types of circumstances.   Toyota breached the warranty of merchantability by designing, manufacturing, distributing, selling and refusing to adequately repair or replace their vehicles after it became apparent they were defective.   The Complaint also alleges that in commercials, internet postings, periodicals, press releases, etc., Toyota represented that the safety of their customers is paramount and sold vehicles that did not meet or perform according to Toyota's representations.  *Id.*

### V.      ARGUMENT AND AUTHORITIES
#### A.      The Applicable Summary Judgment Principles

In consideration of Toyota's 3rd and 4th Motions for Summary Judgment, all reasonable inferences must be drawn in favor of the Plaintiffs.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);  *Palmer v. BRG of Ga., Inc*., 498 U.S. 46, 49 n. 5, (1990); *Martin v. Alamo Cmty. Coll. Dist*., 353 F.3d 409, 412 (5th Cir.2003); *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 507 (5th Cir.), cert. denied, 540 U.S. 815 (2003). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, although it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc*., 831 F.2d 77, 80 (5th Cir.1988).  The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue.  *Lavespere v. Niagara Mach. & Tool Works, Inc*., 910 F.2d 167, 178 (5th Cir.1990).  Furthermore, a nonmovant will defeat a no-evidence summary judgment motion if the nonmovant presents more than a scintilla of probative evidence on each element of her claim.  *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003).

The court does not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir.1987).

**B.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Strict Liability Claims.**

**1.      Strict Liability Claim of Marketing Defect and Failure to Warn**

As demonstrated more fully by the evidence presented in Plaintiffs' Brief in Support of the Response (Dkt. Entry No.248) to Toyota's 2nd Motion for Summary Judgment, Toyota is not entitled to summary judgment on Plaintiffs' marketing defect or failure to warn claim.  Toyota unmistakably had a responsibility to instruct consumers as to the safe use of its 4Runner and to warn consumers of dangers associated with its product of which Toyota either knew or should have known at the time the 4Runner was sold.  Plaintiffs respectfully direct the Court's attention to Dkt. Entry No. 248 for argument and evidence as to this claim, which supports the Court's denial of summary judgment on that claim.

**2.      Strict Liability Claim of Design Defect**

With regard to the design defect claim against Toyota, Plaintiffs specifically allege that the Toyota Defendants, inter alia, failed to design and incorporate widely available, safer and feasible, alternative designs into the Toyota 4Runner's fuel system, fire prevention and suppression systems, seat restraints, air bag systems, rear occupant compartment and structural integrity of the Toyota 4Runner that would have prevented or significantly reduced the injuries and deaths to the Greene Family. (Dkt. Entry 113).  "The duty to design a safe product is 'an obligation imposed by law.'" *See American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex.1997) (quoting *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 789 (Tex.1967)); *Robins v. Kroger Co.*, 982 S.W.2d 156, 161 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).

Toyota has moved for summary judgment on whether it is strictly liable for the design defects in the 2010 Toyota 4Runner.  In doing so, Toyota does not rely on any affirmative

evidence that there are no defects in the 2010 Toyota 4Runner.  On the other hand, Plaintiffs submit the detailed expert analysis performed by Keith Friedman ("Friedman") and R. Rhoads Stephenson ("Stephenson") that is contained in Friedman Research Corporation's expert report (the "Friedman Report")(APP 137-223).  Friedman has been involved in the field of research and development of transportation safety for more than 35 years.  Since graduating from Cornell University's Engineering Physics Department, he has been a project and test engineer for Minicars Inc., president of Kinetic Research Inc. and MCR Technology Inc., and now president of Friedman Research Corporation.  Friedman has published more than 80 research papers on the subject of improved vehicle design and automotive safety engineering, and has presented his findings at national and international conferences in Austria, Australia, Ireland, France, Germany, Japan and Italy, as well as in the United States.  He holds active memberships in organizations such as the Society of Automotive Engineers (SAE), the Institute of Electrical Engineers, the American Society of Mechanical Engineers, and the American Association for the Advancement of Science. He is a peer reviewer for numerous conferences and journals.  APP 141

Friedman has conducted more than 300 detailed systems analyses of catastrophic injury accidents in accordance with a protocol published by SAE.  His work has included most kinds of automotive-related tests, including component tests, sled tests, anthropometric dummy tests and full-scale vehicle tests representing impacts in front, side, rear and rollover modes. In addition, his research has included extensive computer modeling and simulation of dummy, human, vehicle and component impacts, as well as cadaver testing and live-subject testing.  Friedman's work has involved all aspects of crashworthiness, reconstruction and impact protection covering front, side, rear and rollover impacts. Studies have involved virtually all types of protective

systems, including, for example, seat belts, padding, airbags, seats, glazing systems, doors, child seats, helmets and vehicle structures.  His studies have involved the protection during impact events of occupants of cars, pickups, SUVs, vans, buses and heavy trucks, as well as pedestrians, bicyclists and motorcyclists, and covered sizes and ages ranging from infants to adults. Friedman is the author of numerous reports and safety studies for the United States Department of Transportation involving, among other things, statistical analyses of crash conditions and their relationship to injuries, effects of recent design changes on vehicle safety performance, passive-restraint performance in passenger vehicles, dynamic crash testing, static crush testing and crashworthiness. APP 141-142

Dr. R Rhoads Stephenson spent thirty-six (36) years at NASA's Jet Propulsion Laboratory ("JPL") including three (3) years as Associate Administrator of R&D for the National Highway Traffic Safety Administration.  After retirement from JPL, he was a consultant to the Motor Vehicle Fire Research Institute where he helped conduct $4 million worth of vehicle fire research funded by a grant from General Motors.  Dr. Stephenson has nearly 40 years of automotive experience.  APP 143. Both Mr. Friedman and Dr. Stephenson are Certified Fire Investigators and Certified Vehicle Fire Investigators by the National Association of Fire Investigators (NAFI). *Id.*

### a.    There is evidence of safer alternative designs

To meet the first prong of the statutory test, Plaintiffs need only provide evidence that there was a safer alternative design to any defective design in the 2010 4Runner, which itself consists of two required elements: (1) that the alternative design would have prevented or significantly reduced the risk of the claimant's damages without substantially impairing the product's utility, and (2) that the alternative design was economically and technologically

feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.  *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a)-(b).

In the Friedman Report, Friedman and Stephenson provide sufficient evidence to meet and exceed the summary judgment threshold on this requirement.   The experts opine that there are a number of design approaches that could have made the 4Runner's structure and the fuel system safer:  As to the structure, the rear-impact structure should have been designed and tested to handle expected rear impacts.  The rear compartment could have utilized a structure that was much stiffer under expected rear-loading conditions in order to prevent excessive deformation and intrusion into the occupant space. Improving the structural integrity of the rear structure could have been accomplished, for example, by using higher strength steel with a progressively collapsing structure that crushes progressively from rear.  Further, the 4Runner's frame structure should protect the fuel tank all the way to its end rather than expose the tank to the rear axle and suspension member intrusion. The rear structure should not be designed to intrude into the easily protected 2nd row occupant space; doing so increases crash severity locally for the rear seat occupants unnecessarily. The frame should be designed to protect the fuel tank; the crush zones of the frame should be away from the part of the frame protecting the tank.  APP 176-181.  With the fuel tank being unprotected from the rear by the frame, the rear structure should maximize the crush stroke available and not be compromised by the inclusion of a non-crushable spare wheel positioned in a way that transmits loads from the rear to the rear axle, thus inefficiently utilizing the available crush space, increasing the risks of impingement on the fuel tank, and exposing the occupants to unnecessary risks.  Id.

As to the fuel system, the Friedman Report concludes that there are numerous design approaches that could have been utilized to protect the fuel for the 4Runner.  An example would have been to design the frame to have the bulk of the crush zone be at the rear of the frame rather than where the fuel tank is positioned and under the rear seat occupants. Another example would be to change the fuel tank design and location so that it is positioned out of the frame crush zone. APP 182-189.  The fuel tank should have been protected all around by the frame as was required by Toyota's design requirement.  With the current frame, the fuel tank should be positioned forward of the end of the horizontal portion of the frame structure. A crush zone pivot point of the frame should not be designed to be forward of the rear most portion of the tank thus enabling intruding structure to engage with the fuel tank and puncture or catastrophically deform it.  The fuel tank could have utilized the space consumed by the muffler. (as illustrated by Toyota's Rav4 SUV).  APP 182-189.  Whether a safer fuel system design suitable for one vehicle is adaptable to another is a question of feasibility to be decided by the trier of fact.  *In re Exmark Mfg. Co., Inc*., 299 S.W.3d 519, 529–30 (Tex.App.-Corpus Christi 2009); *Jampole v. Touchy*, 673 S.W.2d 569, 573-74 (Tex. 1984).

In addition, the 4Runner's tank should have been placed so that it was protected by the frame from impacts by the rear axle or other structures that could compromise its integrity through distortion or penetration.  The fuel tank should have had a full length pan below it to protect from various road hazards and concentrated loading conditions that were possible with the existing design.  The plastic unprotected fuel tank should not protrude below the frame.  The available technology utilized on other vehicles' tanks should have been utilized with the plastic fuel tank to prevent fuel leakage in the presence of a failure in a hose to the tank.  APP 178-180. The Friedman Report provides examples of plunger driven systems that could have been used in

10

the 2010 Toyota 4Runner.  *Id.*  The Friedman Report concludes that there are two key design approach solutions that should have been implemented.  One approach changes the fuel tank location and design so that it is not in the crush zone and does not leak; this will prevent the fire. The second approach changes the frame design and tank characteristics so that the tank is protected and the crush zone from the rear impacts is moved away from the rear seat occupants. This approach would protect the rear seat occupants better and prevent the fire.  *Id*.

Addressing only the fuel tank, the shape of it would be changed, using readily available substitutes, to utilize the available space and the volume would be reduced somewhat to be consistent with the capability to protect the tank with this structure.  Addressing both the structure and the tank the structure would be updated to a more modern approach where the frame crush zone is rearward of the rear seat occupant space. An example of how this is accomplished is by bringing the structure from the front back to the rear wheels and at the wheel well the structure is buttressed and brought inward around the wheels, and then outward around the wheels again. In this way the structure deforms and the wheels support the rear structure between the forward and rearward portions of the structure. The suspension system could also be updated to reflect a more modern independent suspension at the same time. The tank would be adapted to the revised structure.  APP 176-185

The Friedman Report opines that "the Greene family would not have had rear impact related injuries and certainly no fire related injuries absent the failure of the vehicle's crashworthiness system with regard to the prevention of fuel fed fires and the maintenance of the occupant survival space and the management of crash energy."  APP 183.  Furthermore, the Friedman Report stated that the safer alternative designs that were available to Toyota at the time the 2010 4Runner was produced were both economically and technologically feasible for a

vehicle manufacturer.  APP 188.  Accordingly, Plaintiffs have withstood summary judgment on this prong of the statutory test.

### b.      The defects were a producing cause of decedents' deaths

To meet the second prong of the statutory test, Plaintiffs provide evidence that the defects were a producing cause of the personal injury, property damage, or death for which they seek recovery. See TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a). "A producing cause is an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any." *Flock v. Scripto–Tokai Corp.*, 319 F.3d 231, 238 (5th Cir.2003) (citations and internal quotations omitted).  "Producing cause is the cause-in-fact of the harm, meaning that a defendant's conduct must have been a substantial factor in bringing about the injury and that the injury would not have occurred but for the defendant's conduct." *Id.*  The evidence in the record demonstrates that the 4Runner burned rapidly and intensely and that Mr. Greene's head was burning from the fire that ran up the side of the 4Runner.  Kyle Evans Depo at 38:13 – 40:13 (APP 261-262).  Mrs. Greene and the Greene kids were also burned in the fire that originated in the 4Runner.  Kyle Evans Depo at 57:14 – 60:24 and 63:19 – 64:16 (APP 280-283; APP 286-287). Indeed, as a result of the volume size of the fuel tank and the fuel system's defective design, the fire was so intense that 70 or 80 fire extinguishers could not douse the fire. Greg Rushing Depo at 40:14 – 41:9. (APP 131-132).  The fire was fully involved when the firefighters arrived and took firefighters a long time to put fire out after they arrived.  Rushing Depo 18:21-24; 29:4-22 (APP 109; APP 120)

Here, Plaintiffs' experts have opined that the design defects caused the fuel system and the occupant-protection system to fail.  The Friedman Report then concludes that Toyota could have prevented the burn injuries that caused the death of one or more of the Greene family

members by adopting alternative design approaches that have been shown to be widely available and technologically and economically feasible.  (APP 188).  Accordingly, since Plaintiffs present evidence on this prong of the statutory test, Toyota's motions for summary judgment should be denied.

**c.      The 2010 4Runner was unreasonably dangerous.**

Finally, a claimant must present evidence that the product was defectively designed so as to be unreasonably dangerous, taking into consideration the utility of the product and the risks involved in its use.  *Hunter v. Ford Motor Co., Inc*., 305 S.W.3d 202, 2009 WL 3766333, at *2 (Tex.App.-Waco, Nov.10, 2009, no pet. h.) (citing *Hernandez v. Tokai Corp*., 2 S.W.3d 251, 257 (Tex.1999).  "The determination of whether a product is unreasonably dangerous because of a defective design is often one that involves factual disputes that a party is entitled to have a jury resolve." *Hernandez*, 2 S.W.3d at 260. Here, Toyota has not presented any evidence whatsoever on the risk-utility analysis considerations.  Plaintiffs, however, present substantial evidence that the rear-impact fuel and occupant-protection system in the 2010 Toyota 4Runner is designed defectively and is unreasonable dangerous. The Friedman report provides examples of particular elements that are applicable to this element including:

1.   The structural energy absorption is accomplished in large measure by deformation under the rear occupants that further exposes the already largely unprotected fuel tank to addition impact hazards.

2.   Rear structure forward of the rear axle rotates upward into the occupant seating area.

3.   The fuel tank position does not meet Toyota's design approach that the fuel tank will be surrounded by the frame.

4.   The fuel tank is not placed where it will least likely to be affected by a collision.[21]

5.   The frame structure does not protect the tank.[22]

6.   The plastic fuel tank is not protected along its length by a shield.

13

7.    Excessive intrusion into the rear seat area contributing to death of the two children in the rear seat.

8.    The floor pan separates allowing the pool fire to rapidly spread into the passenger compartment.

9.    Axle displacement can sever fuel lines or hoses, or pull those lines and hoses from the tank.

10.    The front seat backs deform into the rear occupant seat area in a rear impact.

11.    The rear frame design allows deformation to move the rear seat occupants forward into the deforming front seat backs.

12.    The fuel tank does not prevent fuel leaks when a fuel system line is detached.

APP 175.   The Friedman Report then concludes that the 2010 Toyota 4Runner rear impact protection system, including the vehicle structure, seats, and fuel system violated the principles of crashworthiness, particularly in maintaining the occupant survival space, managing the collision energy and preventing fuel fed fires.   Meeting the principles of proper protection under crash conditions with an effectively designed crashworthiness system including effectively integrated restraint, appropriate vehicle structure, seat and occupant survival space design and preventing fuel fed fires was Toyota's responsibility.   APP 183. The Friedman Report determines that the Greene family would not have had rear impact related injuries and certainly no fire related injuries absent the failure of the vehicle's crashworthiness system with regard to the prevention of fuel fed fires and the maintenance of the occupant survival space and the management of crash energy:

1.    The vehicle's survival space was not adequately maintained.

2.    The vehicle did not manage the energy properly

3.    The vehicle did experience a fuel fed fire.

4.    The vehicle occupant restraints did not provide effective protection.

APP 182.   The failure of the vehicle's crashworthiness system to maintain the survival space, manage the crash energy effectively, and prevent fuel fed fires violates the basic

14

principles of crashworthiness because the violations rendered the crashworthiness system ineffective.  Here, the crashworthiness system, including the fuel system, structure, and restraints failed to perform their function, and the Greene family received fatal injuries.  *Id*.  The Friedman Report also opines that the 4Runner was unreasonably dangerous as a result of Toyota moving the fuel system closer to the rear axle and suspension system than was necessary.   Toyota protected the muffler system from impact better than it protected the fuel system.   Toyota could have moved the muffler to the area rear of the rear axle and moved the fuel system away from the rear axle. The earlier model Toyota 4Runners had the fuel tank further away from the axle as shown below. Indeed it appears that many Toyota vehicles have the fuel tank further from the rear axle, or at least separated by an attempt at a protective structure as designed in the 1994 Toyota 4Runner, 2008 Toyota Rav4, and 2008 Toyota Sequoia.  APP 184

The Friedman Report also demonstrates that the 4Runner's frame design was defective in that a major portion of its crush zone area was under the rear seat occupant area. In addition, this crush zone further exposed the unprotected fuel tank in rear impacts. The frame design was defective in that it relies on deformation of the frame at a pivot point in the area of the rear seat allowing intrusion from the rear end crush to accelerate the seat back unnecessarily. The frame design simply reflected simplistic design practices not effectively utilizing frame designs that would more effectively utilize the available crush space. The design did not account for, nor was it tested under the impact conditions that could be expected under real world impact conditions involving heavy trucks that represent a significant portion of the vehicle exposure to rear impacts. Allowing the major portion of the energy dissipation to be through frame rotation about a point under the rear seat occupants allows the already unprotected fuel tank to be further exposed. The Toyota 4Runner has its origins as a pickup where the frame kick-up for the rear

wheels was typically far from the occupant space. The use of the same frame was a profitable but did not account for the effects on the rear seat occupant. Also, as the fuel tank grew larger and larger it grew closer to the rear axle and became even less protected by the frame.  APP 185-186.

In addition, the protrusion of the plastic fuel tank into the wheel well area and in close proximity to the rear axle and suspension members unnecessarily exposed the fuel tank to hazardous impact loading.  The failure to provide more than a partial shield for the plastic tank further exposed the tank to hazards from the rear and underside of the tank.   The fuel tank historically had been smaller and grew over time; it also became more exposed over time as the tank was moved closer to the rear axle. The addition of excess volume was not necessary and increased the hazard associated the unprotected tank.  Other SUVs did not find the need to have a 24 gallon fuel tank. For example, some SUV's had an 18 gallon fuel tank that was more than adequate.  Protecting the fuel tank was not accounted for when it was made large and put within a couple of inches of the rear axle components while hanging well outside the protection of the frame.  APP 186

As far as additional consideration of the utility of the product and the risk involved in its use, here, there is no allegation from Toyota that the alternative designs proposed by Plaintiffs would completely preclude some of the uses for which the 4Runner was designed and to which it was put.  In other words, there are no allegations that the designs suggested by Plaintiffs' experts would have impaired the use of the 4Runner in any way.  In fact, the safer alternative designs proposed by Plaintiffs' experts would have vastly improved the longevity of the 4Runner without detracting from its usefulness.  Therefore, it cannot be said as a matter of law that the 4Runner was not unreasonably dangerous, and Plaintiffs are entitled to have a jury decide the matter. Toyota's motion for summary judgment does not contain any affirmative representation that the

designs proposed by Plaintiffs' experts were not safe or that they would affect the 4Runner's utility. Thus it would be improper for Toyota to contend in a Reply that it was somehow unaware of these risks. *See Wallace v. County of Comal*, 400 F.3d 284, 291–92 (5th Cir.2005) (issues raised for the first time in a reply brief are waived); *Santamaria v. Dallas Indep. Sch. Dist.*, 2007 WL 1073850, *2 (N.D.Tex. Apr.10, 2007) (same).

Consequently, there is no doubt that on this record a reasonable jury could find (1) that design defects caused the deaths of one or more members of the Greene Family, (2) that there were feasible, safer alternatives that would have corrected the deficiencies in the 2010 4Runner, and (3) that the 2010 4Runner design was unreasonably dangerous. For these reasons, Toyota's motion for summary judgment on Plaintiffs' strict liability design-defect claim should be denied.

### C.   Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Negligence Claims.

Plaintiffs' Complaint contends that the deaths of the Greene Family were proximately caused by the negligent actions or omissions of Toyota in failing to exercise ordinary care in the design, testing, manufacture and marketing of the 2010 4Runner. Toyota argues that the negligence claim is based entirely on the 4Runner being unreasonably dangerous, and is therefore subsumed into Plaintiffs' strict liability claim. (Brf. at 4.) However, Plaintiffs' negligence claim is not based entirely on the allegation that the 4Runner was unreasonably dangerous due to a design defect. Nevertheless, even if Plaintiffs' negligence claim is subsumed in strict liability, Texas law makes clear that, "[w]hen a trial court is confronted with several theories of recovery, the court must submit a charge to the jury with all questions, instructions, and definitions raised by the pleadings and evidence." *Ford Motor Co. v. Miles*, 141 S.W.3d 309, 315 (Tex.App.-Dallas 2004, pet. denied); *General Motors Corp. v. Paiz*, No. 05–98–01340–CV, 2000 WL 1751096, at *3 (Tex.App.-Dallas 2000, no pet.).

17

"Traditionally in Texas law, negligence and strict liability have been distinct causes of action." *Miles*, 141 S.W.3d at 315 (citing *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 871 (Tex.1978)).   The Fifth Circuit and the Texas Supreme Court have summarized the difference between the two causes of action in the context of product liability as follows:

> The care taken by the supplier of a product in its preparation, manufacture, or sale is not a consideration in strict liability; this is, however, the ultimate question in a negligence action. Strict liability looks at the product itself and determines if it is defective. Negligence looks at the act of the manufacturer and determines if it exercised ordinary care in design and production.

*Syrie v. Knoll Int'l*, 748 F.2d 304, 307 (5th Cir.1984) (citing *Gonzales,* 571 S.W.2d at 871. To prevail on a strict liability cause of action, a plaintiff must show that: "(1) a product is defective; (2) the defect rendered the product unreasonably dangerous; (3) the product reached the consumer without substantial change in its condition from the time of original sale; and (4) the defective product was the producing cause of the injury to the user." *Syrie* 748 F.2d at 306. To prevail on a negligence cause of action, a plaintiff must show "(1) the existence of a duty on the part of one party to another; (2) the breach of that duty; and (3) the injury to the person to whom the duty is owed as a proximate result of the breach." *Romo v. Ford Motor Co.*, 798 F.Supp.2d 798, 807 (S.D.Tex.2011) (citing *Dion v. Ford Motor Company*, 804 S.W.2d 302, 310 (Tex.App.-Eastland 1991, writ denied)).

Indeed, the evidence demonstrates that some of the failures of components in the 2010 4Runner to properly function resulted from some other act of negligence that is separate and distinct from Toyota's design process. Other examples of Toyota's negligence have been detailed in Plaintiffs' Response to Brief in Support of the Response (Dkt. Entry No.248) to Toyota's 2nd Motion for Summary Judgment, where Plaintiffs provide evidence of Toyota's negligence in failing to offer full-cover protective shields to customers, failing to properly warn consumers, as well as negligence in marketing the 4Runner and other Toyota vehicles as

allegedly the safest brand on the market. Toyota's conduct does not warrant summary judgment as a matter of law on Plaintiffs' negligence claim. Proximate causation is inherently a fact issue and is generally contested in most negligence cases; accordingly, a summary judgment procedure is not well adapted to the disposition of negligence cases. *Hennessy v. Estate of Perez*, 725 S.W.2d 507, 509 (Tex.Civ.App.—Houston [1st Dist.] 1987, no writ); *Taylor v. Southwestern Bell Tel. Co.*, 483 S.W.2d 330, 332 (Tex.Civ.App.—El Paso 1972, no writ).

### D. Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Gross Negligence and Exemplary Damage Claims.

Gross negligence" means:  an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. TEX. CIV. PRAC. & REM.CODE Ann. § 41.001(11).

### 1. Gross negligence in design issues

Here, Plaintiffs' experts conclude that Toyota could have moved the muffler to the area rear of the rear axle and moved the fuel system away from the rear axle. The earlier model Toyota 4Runners had the fuel tank further away from the axle as shown below. Indeed it appears that many Toyota vehicles have the fuel tank further from the rear axle, or at least separated by an attempt at a protective structure as designed in the 1994 Toyota 4Runner, 2008 Toyota Rav4, and 2008 Toyota Sequoia. APP 186. There was also evidence that the failure to provide more than a partial shield for the plastic tank further exposed the tank to hazards from the rear and underside of the tank. *Id.* In addition, the fuel tank historically had been smaller and grew over time; it also became more exposed over time as the tank was moved closer to the rear axle. The

addition of excess volume was not necessary and increased the hazard associated the unprotected tank. Other SUVs did not find the need to have a 24 gallon fuel tank. For example, some SUV's had an 18 gallon fuel tank that was more than adequate. Protecting the fuel tank was not accounted for when it was made large and put within a couple of inches of the rear axle components while hanging well outside the protection of the frame. APP 185-186.

Toyota also never tested the 4Runner to see whether the airbag would deploy in the event of a rear-end collision. Fukumoto Depo Vol 2 at 60:12 – 61:20 (APP 546-547). It did not communicate to consumers that a full protective shield for the fuel system (like the one in the advertised 4x4 version) would be safer than a partial protective shield for the fuel system (like in the Greene's SUV); never communicated to consumers that the design of the fuel system and/or location of the fuel tank in the 4Runner could lead to a massive fire in the event of a collision; never told consumers that the design of the fuel inlet pipe in the 4Runner could lead to a fuel-fed fire in the event of a rear-end collision; and never communicated to consumers that a metal fuel tank could be safer than a plastic fuel tank in the event of a rear-end collision. Amstock Depo at 61:4 – 62:20 (APP 376-377); Amstock Depo at 118:5-9 (APP 403). Toyota also never advertised to consumers the risks inherent in the airbags not deploying or deploying improperly. Amstock Depo at 57:7-15 (APP 372). Nor did Toyota advertise that the side curtain airbags might not deploy in certain types of collisions. Amstock Depo at 59:1 – 60:7 (APP 374-375) and Amstock Depo at 120:11-16 (APP 405). Instead, Toyota advertised the 4Runner as "one of the most trustworthy vehicles on the road." APP 525. Again, this promise of future performance is false and intended solely to persuade families like the Greene family to act on this representation.

Although there is evidence of other conduct that would justify a conclusion of gross negligence, the flagrant actions by Toyota discussed above clearly warrant a finding of gross negligence and the imposition of exemplary damages.

### 2.      Gross negligence in marketing and public representations.

The evidence demonstrates that Toyota made representations and/or omissions regarding the Toyota 4Runner.  For instance, in its advertising, Toyota uses the 4x4 as the lead feature in all Toyota's marketing communication materials.  Amstock Depo at 18:7-23 (APP 358).  However, the 4x4 has different technical capabilities and safety features, yet Toyota never informed consumers that the 2x2 version (*i.e.* the SUV the Greene family purchased) did not have the technical features or safety features that the 4x4 version had.  Amstock Depo at 51:1 – 55:3 (APP 366-370).  In looking at Toyota's marketing materials, Toyota's intention is clearly to give the consumer the impression that the Toyota 4Runner is rugged enough to be used off-road (APP 412), under racing conditions (APP 413), and that it has maximum ground clearance (APP 414).  These ads, combined with other ads suggesting that the 4Runner's fuel system is adequately constructed and protected (APP 415) and stating that the 4Runner can "take on any road to anywhere" (APP 416) are obviously designed to convince consumers that the 4Runner and its fuel system is safe on any road.  This has proven to be untrue.  Moreover, these ads apply only to Toyota's 4x4 version of the 4Runner, yet Toyota never told consumers, or the Greene family, that the fuel system on the 4Runner version they purchased was not fully covered as advertised, or that the Greene family's Toyota 4Runner could not take them on any road to anywhere.

As also argued in Plaintiffs' Response to Toyota's 2nd motion for summary judgment (Dkt. Entry No. 248) in various commercials, internet postings, periodicals, press releases, etc., the Toyota Defendants have represented that the safety of their customers is paramount. These representations were intended to, and did, cause consumers, such as the Greene Family, to rely

on Toyota's widely distributed statements in making their purchases of Toyota vehicles. Toyota made these misrepresentations of the quality, reliability and safety of its vehicles, including the Toyota 4Runner, all to the detriment of the Greene Family and Plaintiffs. In addition, Toyota also did not provide adequate warnings and instructions to the Greene family and other consumers regarding components in the Toyota 4Runner.   However, the evidence is overwhelming that Toyota knew that its vehicles were far from the safest on the road.   Several legal claims and lawsuits have been brought against Toyota for the 4Runner where claims have involved the same types of issues that are involved in this lawsuit.   See, generally, deposition of Harold Clyde at 134:13 – 155:20 (APP 444-465) and accompanying claims.   APP 466-488. Recently, Toyota paid $1.6 billion to settle claims related to certain recalls (APP 489-490), and earlier paid a record $16.4 million **fine** to the U.S. government for failing to quickly report safety problems. APP 491.   For years now, we have been hearing about the shoddy safety record of Toyota cars, trucks and SUV's.   Nearly every model has been the subject of a recall, from the flagship Camry sedan for sudden acceleration issues, to its premier Lexus because of problems with its electronic steering system, to the Sequoia SUV and all in between.   See, generally, deposition of Harold Clyde at 55:14 – 69:11 (APP 425-439).   By way of examples, Toyota had a recall in 2010 of thousands of the 2010 Lexus HS 250h due to deadly fuel leaks after collisions. Deposition of Ichiro Fukumoto, at 113:17 – 115:25 (APP 335-340).   These vehicles did not pass Federal Motor Vehicle Safety Standard 301.   APP 492-493.   In 2007, Toyota recalled the Lexus GS as well as the IS 250 and IS 350 models in the United States due to potential cracks in fuel pipes.   APP 494.   Toyota recalled some of its 2009-2012 4Runners, Sequoias, and other vehicles because Toyota had failed to test the passenger seat occupant sensing system calibration, which meant that the occupant sensing system may not operate as designed.   APP 495-513.   This failure

to test meant that this could result in incorrect air bag deployment and possible injury or death to the front passenger occupant(s) in the event of a crash. *Id.*

Toyota also had a recall in April/May 2011 of hundreds of thousands of RAV4 and Highlander SUVs due to defective curtain shield airbags.   APP 514.   In Jan 2012, Toyota recalled even more RAV4 and Highlander SUV models for defective side curtain shield airbags. APP 515.   In April 2013 Toyota had another recall of Toyota Corolla, Sequoia, Tundra vehicles for defective airbag inflators.   APP 516.   Indeed, a casual view of press releases from Toyota's press room confirms that Toyota has had over thirty-five (35) recalls over the last 2-3 years on all of its models for various safety-type issues.   APP 517-524.   At the very least, Toyota's substantial recalls, along with the evidence discussed above of Toyota's misrepresentations of safety features, raise a genuine issue of material fact whether Toyota acted with gross negligence when it misled the public, and the Greene family, when it campaigned to convince consumers that Toyota produced the safest vehicles on the market.   Punitive damages are available for gross negligence or malice in strict liability. *See Heil Co. v. Grant*, 534 S.W.2d 916, 926 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.).

Moreover, as the Court is well aware, a trial court does not weigh the evidence and say at the summary judgment stage that no reasonable jury could find that defendant acted with "conscious indifference to the rights, safety or welfare of others." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, (1986)(the high court reiterated that the trial court still may not make credibility determinations, nor weigh the evidence, nor draw legitimate inferences from the facts other than in favor of the nonmovant).   When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir.2001); *see also Boston Old*

23

*Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222, 227 (5th Cir.2002).  Based on the record presently before the Court, Plaintiffs have provided enough evidence with which a jury can find gross negligence.  Accordingly, summary judgment should be denied.

      **E.**    **Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Breach of Warranty Claims.**

A breach of warranty cause of action may be brought at common law, under the DTPA, or Chapter 2 of the Texas Business and Commerce Code.  To establish a common law breach of warranty, plaintiff must establish (1) a warranty; (2) breach of that warranty; and (3) damages caused by such breach. *See General Supply & Equip. Co. v. Phillips*, 490 S.W.2d 913, 917 (Tex. Civ. App.-Tyler 1972, writ ref'd n.r.e.). A breach of warranty cause of action under the DTPA occurs when the defendant makes false and misleading representations. TEX. BUS. & COM. CODE ANN. § 17.41 et seq. (Vernon 1987).  The Code recognizes that a breach of warranty cause of action may be based on express warranties under section 2.313 and implied warranties under 2.314 and 2.315. See, TEX. BUS. & COM. CODE ANN. § 2.313 - 315 (Tex. UCC) (Vernon 1987). An implied warranty of merchantability under section 2.314 and implied warranty of fitness for ordinary use under section 2.315 of the Code are not based on any express representation.  These warranties are implied in the contract of sale unless excluded or modified. See TEX. BUS. & COM. CODE ANN. §§ 2.314, 2.315 (Tex. UCC) (Vernon 1987); *Khan v. Veliscol Chemical Corp.*, 711 S.W.2d 310, 318 (Tex. App.-Dallas 1986, writ ref'd n.r.e.)

      **1.**    **Toyota breached express warranties**

Toyota made representations regarding the Toyota 4Runner that are express warranties regarding the abilities of the Toyota 4Runner. In looking at Toyota's marketing materials, Toyota's intention is clearly to give the consumer the impression that the Toyota 4Runner is rugged enough to be used off-road (APP 412), under racing conditions (APP 413), and that it has maximum ground

clearance that allow it to avoid components striking the ground (APP 414). These ads, combined with other ads suggesting that the 4Runner's fuel system is adequately constructed and protected (APP 415) and stating that the 4Runner can "take on any road to anywhere" (APP 416). One of Toyota's ads boldly warrants "the Star Safety System provides the features that can get you home safely." Amstock Depo at 123:18-23 (APP 408). Another ad asserts that a 4Runner driver can "take daily nonstop to the middle of nowhere…..then return home to tell us about it thanks to the Star Safety System." APP 528. Toyota clearly did not live up to this warranty with the Greene family. Thus, Plaintiffs have provided evidence of warranties made, and breached, by Toyota.

### 2.    Toyota breached implied warranties

As mentioned above, Texas law provides that, in the sale of goods, a seller impliedly warrants that those goods are merchantable. TEX. BUS. & COM.CODE § 2.314; *Gen. Motors Corp. v. Brewer*, 966 S.W.2d 56, 57 (Tex.1998). To be considered merchantable, goods must, among other criteria, "pass without objection in the trade under the contract description," be "fit for the ordinary purposes for which such goods are used," and "conform to the promises or affirmations of fact made on the container or label if any." TEX. BUS. & COM.CODE § 2.314(b). The warranty is breached if goods are "defective—that is, they must be 'unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy.' " *Brewer*, 966 S.W.2d at 57 (citing *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 443–44 (Tex.1989)). Toyota argues that the warranty has not been breached, as the 4Runner purchased by the Greene family was allegedly fit for its ordinary purpose. However, Toyota errs in focusing exclusively on the fitness of the 4Runner as a whole, and that the proper question is, rather, the fitness of the fuel system and restraint systems themselves. Texas courts have analyzed the merchantability of individual components of a car—which nevertheless are usually sold as part and parcel of the car—as separate from the merchantability of the car itself. *Chandler v. Gene Messer Ford*, 81

25

S.W.3d 493, 503 (Tex.Ct.App.2002) (analyzing the merchantability of an air bag); *Brewer*, 966 S.W.2d at 57 (analyzing the merchantability of seatbelts); *Vaughn v. Am. Honda Motor Co., Ltd.*, No. 2–04–CV–142 (TJW), slip op. at 4–5 (E.D.Tex. Mar. 31, 2005) (analyzing the merchantability of an odometer). For example, in *Chandler*, the plaintiffs' claims arose when their child, who was riding in the front seat of their car, was injured in an accident when the car's air bag deployed. *Chandler*, 81 S.W.3d at 497. In analyzing the plaintiffs' implied warranty claims, the court considered the ordinary purpose and merchantability of the car itself as distinct from the ordinary purpose and merchantability of the airbag. *See id*. at 503. Likewise, in *Brewer*, the court considered an implied warranty claim involving a seatbelt system and analyzed the merchantability of the seatbelt system itself. *Brewer*, 966 S.W.2d at 57.

A plaintiff does not have to use direct or expert opinion evidence to show that a product has a defect; he can instead meet his burden by using circumstantial evidence. *Plas-Tex,* 772 S.W.2d at 444. A consumer may satisfy his burden by showing that a product functioned improperly under normal use. *See id*. at 444-45.  In this case, it is clear that the fuel system failed when it burned two kids alive and caused the burns that later killed Mr. Greene.  In other words, Plaintiffs clearly allege that the fuel system and the occupant restraint systems were not fit for their ordinary purposes.  As discussed in the Friedman Report, the fuel system failed to perform. APP 137-223.  In addition, the evidence demonstrates that the restraint system also failed. Indeed, an eye witness testified that Mrs. Greene was ejected from the 4Runner and landed on the hood after striking the underbody of the Strick Trailer.  Brian Thompson Depo at 35:9 – 36:4 and 60:14 – 61:5 (APP 042-043; APP 067-068).   Accordingly, Plaintiffs have presented sufficient evidence to withstand Toyota's no-evidence motion.

**F.     Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Misrepresentation Claims.**

As demonstrated more fully by the evidence presented in Plaintiffs' Brief in Support of the Response (Dkt. Entry No.248) to Toyota's 2nd Motion for Summary Judgment, Toyota is not entitled to summary judgment on Plaintiffs' misrepresentation claim.   In various commercials, internet postings, periodicals, press releases, etc., the Toyota Defendants have represented that the safety of their customers is paramount.   These representations, as well as representations made specifically to Wyndell Greene, were intended to, and did, cause consumers such as the Greene Family to rely on Toyota's statement and purchase Toyota vehicles.   Specifically, Toyota made misrepresentations of the quality, reliability and safety of its vehicles, including the Toyota 4Runner, all to the detriment of the Greene Family and Plaintiffs.   Plaintiffs respectfully direct the Court's attention to Dkt. Entry No. 248 for argument and evidence as to this claim.

**G.     Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law in Favor of Toyota Motor Engineering & Manufacturing North America.**

Toyota's 3rd Motion for summary judgment (Dkt. Entry No. 256) was brought on behalf of Toyota Motor Engineering & Manufacturing North America ("TEMA").   The motion alleges that there is no evidence that TEMA participated in designing, manufacturing, assembling, promoting, advertising, distributing, and selling the 2010 U.S. bound Toyota 4Runner. However, the evidence indicates otherwise.   In fact, in one of Toyota's pleadings, Toyota judicially admits,

> TEMA was established in 2006 to **integrate Toyota's research and development and manufacturing operations** in North America.   These functions were previously handled by Toyota Technical Center, U.S.A., Inc. and Toyota Motor Manufacturing North America, Inc.
>
> TEMA is headquartered in Erlanger, Kentucky.   For its Erlanger offices, TEMA **supports Toyota's manufacturing operations throughout North America**, and the planning and administration functions of Toyota's North American manufacturing, research and development operations.   **TEMA also continues to**

27

**direct North American research and development** from TEMA's Toyota Technical Center facilities in Ann Arbor, Michigan.

**TEMA conducts engineering design, development, and testing** for certain Toyota vehicles in North America, works with North American Suppliers to evaluate parts and materials and conducts powertrain design, tuning, evaluation, environmental safety and emissions certification. **TEMA also engages in prototype development and materials and technical research**. (emphasis supplied)

See, TEMA's First Supplemental Initial Disclosures (APP 529-545). Toyota also admits that "TEMA had some limited involvement with durability testing of the vehicle." *Id.* Accordingly, there clearly exists a disputed issue of material fact regarding TEMA's involvement in the issue in Plaintiffs' Complaint and whether TEMA is liable for the damages that Plaintiffs sustained.

## VI.    CONCLUSION

As explained herein, the Toyota Defendants have no justifiable grounds upon which to receive summary disposition of the claims in its motion. The undisputed evidence demonstrates that there are disputed issues of fact as to each of Plaintiffs' causes of action. Accordingly, summary judgment should be denied.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that the Court deny Toyota's motions for summary judgment, and grant Plaintiffs such other and further relief, in law or in equity, to which Plaintiffs may be entitled.

Respectfully Submitted,


/s/ Aubrey "Nick" Pittman                     /s/ Daryl K. Washington         
AUBREY "NICK" PITTMAN                 DARYL K. WASHINGTON
State Bar No. 16049750                    State Bar No. 24013714

**THE PITTMAN LAW FIRM, P.C.**         **LAW OFFICES OF DARYL K. WASHINGTON**
100 Crescent Court, Suite 700        **P.C.**
Dallas, Texas 75201-2112           325 N. St. Paul St., Suite 1975
214-459-3454                         Dallas, Texas  75201
214-853-5912 – fax                   214-880-4883
pittman@thepittmanlawfirm.com      469-718-0380 - fax
                                     dwashington@dwashlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 31, 2013, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.


  /s/ Aubrey "Nick" Pittman        
AUBREY "NICK" PITTMAN

30