IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OLLIE GREENE, Individually as the surviving parent of WYNDELL GREENE, SR., WILLIAM GREENE, as the Administrator of the Estate of WYNDELL GREENE, SR., and MARILYN BURDETTE HARDEMAN, Individually and as the surviving parent of LAKEYSHA GREENE, | § § § § § § § § | CAUSE NUMBER: 3:11-cv-0207-N |
| Plaintiffs, | § § | |
| v. | § § | JURY TRIAL DEMANDED |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., TOYOTA MOTOR SALES USA, INC., VOLVO GROUP NORTH AMERICA, LLC., VOLVO TRUCKS NORTH AMERICA, A DIVISION OF VOLVO GROUP NORTH AMERICA, LLC., STRICK TRAILERS, LLC, JOHN FAYARD MOVING & WAREHOUSE, LLC, and DOLPHIN LINE, INC. | § § § § § § § § § § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR RESPONSE TO VOLVO GROUP NORTH AMERICA'S MOTION FOR SUMMARY JUDGMENT

AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas 75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iii

I.      REQUEST TO STRIKE OR DISMISS PURSUANT TO LOCAL RULE 56.2(b) ........... 1

II.     PRELIMINARY STATEMENT ...................................................................................... 1

III.    BACKGROUND FACTS ................................................................................................. 2

IV.     ARGUMENT AND AUTHORITIES ............................................................................... 4

        A.      The Applicable Summary Judgment Principles ..................................................... 4

        B.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
                Plaintiffs' Strict Liability Claims. ......................................................................... 5

                a.      There is evidence of safer alternative designs ............................................ 7

                b.      The defects were a producing cause of decedents' deaths ......................... 11

                c.      The Volvo Tractor was unreasonably dangerous ....................................... 12

        C.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
                Plaintiffs' Negligence Claims. ............................................................................. 14

        D.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
                Plaintiffs' Gross Negligence and Exemplary Damage Claims. ............................ 19

        E.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on
                Plaintiffs' Misrepresentation Claims. ................................................................... 21

V.      CONCLUSION .............................................................................................................. 22

CERTIFICATE OF SERVICE ................................................................................................ 23

# TABLE OF AUTHORITIES

## Cases

*American Tobacco Co. v. Grinnell*, 951 S.W.2d 420 (Tex.1997) .................................................. 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 21

*Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222 (5th Cir.2002) ......................... 21

*Capers v. Dallas Independent School Dist.*, 2004 WL 993549 (N.D.Tex. May 03, 2004) ............ 1

*Dion v. Ford Motor Company*, 804 S.W.2d 302 (Tex.App.-Eastland 1991, writ denied) ........... 15

*Evans v. City of Houston*, 246 F.3d 344 (5th Cir.2001) ................................................................ 21

*Flock v. Scripto–Tokai Corp.*, 319 F.3d 231 (5th Cir.2003) ........................................................ 11

*Ford Motor Co. v. Miles*, 141 S.W.3d 309 (Tex.App.-Dallas 2004, pet. denied) ........................ 15

*Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867 (Tex.1978) .............................................. 15

*Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503 (5th Cir.2003) .............................................. 4

*Hernandez v. Tokai Corp.*, 2 S.W.3d 251 (Tex.1999) .................................................................. 12

*Home Depot U.S.A., Inc. v. Nation Fire Ins. Co. of Hartford*, 3:06–CV–0073–D, 2007 WL 1969752, at *2 (N.D.Tex. June 27, 2007) ................................................................................. 1

*Honore v. Douglas*, 833 F.2d 565 (5th Cir.1987) .......................................................................... 4

*Hunter v. Ford Motor Co., Inc.*, 305 S.W.3d 202 (Tex.App.-Waco, Nov.10, 2009, no pet. h.) .. 12

*King Ranch, Inc. v. Chapman*, 118 S.W.3d 742 (Tex.2003) ........................................................ 4

*Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167 (5th Cir.1990) ........................... 4

*Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77 (5th Cir.1988) ...................... 4

*Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409 (5th Cir.2003) ............................................. 1, 4

*Martin v. Zoley*, 2011 WL 6976311 (N.D.Tex. Oct 25, 2011) ...................................................... 1

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................ 4

*McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967) ................................................... 5

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990); ........................................................................ 4

*Robins v. Kroger Co.*, 982 S.W.2d 156 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) ........... 5

*Romo v. Ford Motor Co.*, 798 F.Supp.2d 798 (S.D.Tex.2011) ................................................... 15

*Santamaria v. Dallas Indep. Sch. Dist.*, 2007 WL 1073850, *2 (N.D.Tex. Apr.10, 2007).......... 14

*Senior Living Properties LLC Trust v. Clair Odell Ins. Agency LLC*, 2005 WL 1862172 (N.D.Tex. Aug 05, 2005) ......................................................................................................... 1

*Syrie v. Knoll Int'l*, 748 F.2d 304 (5th Cir.1984) .......................................................................... 15

*Wallace v. County of Comal*, 400 F.3d 284 (5th Cir.2005) ........................................................... 14

**Rules**

TEX. CIV. PRAC. & REM.CODE Ann. § 41.001(11)...................................................................... 21

TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a)-(b).................................................................. 8

## I.       REQUEST TO STRIKE OR DISMISS PURSUANT TO LOCAL RULE 56.2(b)

Local Rule of Civil Procedure 56.2(b) sets a limit on the number of summary judgment motions that can be filed without leave of court and provides:  "Unless otherwise directed by the presiding judge, or permitted by law, a party may file no more than one motion for summary judgment." *See also, Home Depot U.S.A., Inc. v. Nation Fire Ins. Co. of Hartford*, 3:06–CV–0073–D, 2007 WL 1969752, at *2 (N.D.Tex. June 27, 2007); *Martin v. Zoley*, 2011 WL 6976311 (N.D.Tex. Oct 25, 2011); *Senior Living Properties LLC Trust v. Clair Odell Ins. Agency LLC*, 2005 WL 1862172 (N.D.Tex. Aug 05, 2005); *Capers v. Dallas Independent School Dist.*, 2004 WL 993549 (N.D.Tex. May 03, 2004).  VGNA has filed three (3) separate motions for summary judgment: Document No. 90 was filed on April 11, 2012; Document No. 250 was filed on December 4, 2013; and Document 267 was filed on December 10, 2013.  VGNA's conduct constitutes a severe violation of Local Rule 56.2(b), and VGNA did not request leave of Court to file the excess motions for summary judgment.  Indeed, filing three separate motions demonstrates VGNA's blatant circumvention of the rule, wastes the Court's judicial resources on separate motions and creates unnecessary and additional work to Plaintiffs' counsel in having to respond to separate motions for summary judgment.  Accordingly, Plaintiffs ask that the motion for summary judgment be dismissed, stricken and/or denied on these grounds.

## II.       PRELIMINARY STATEMENT

VGNA's motion for summary judgment is nothing short of a complete waste of time and effort for all parties involved and creates noting but a drain on the Court's judicial resources even to review it.  Despite knowing that its parent, Volvo Group, developed and uses safer and economically feasible alternative energy-absorbing front end designs in Europe, Volvo bases its motion for summary judgment on the alleged absence of evidence of safer designs.  Furthermore, in view of substantial expert evidence with which VGNA has been confronted regarding its

1

defective designs and inappropriate refusal to use collision warning systems that were tested by Volvo, VGNA resorts to submitting a meritless motion.  The Court should deny the motion.

### III.    BACKGROUND FACTS

#### A.    The Incident.

On May 28, 2010, Wyndell Greene, Sr. ("Wyndell Sr."), age 34, LaKeysha Greene ("LaKeysha"), age 35, Wyndell Greene, II ("Wyndell II"), age 2, and Wesleigh Greene ("Wesleigh"), age 5, (Wyndell Sr., LaKeysha, Wyndell II and Wesleigh are collectively referred to herein as the "Greene family") were traveling in their Toyota 4Runner (the "Toyota 4Runner") to Louisiana for Wyndell II's third birthday.  At approximately 6:25 pm, traffic was slowing on Interstate Highway 20 in the eastbound lane.  The driver of a Volvo semi-tractor trailer (the "Volvo Truck") applied the brakes but impacted a 2010 Toyota 4Runner containing the Greene family. The Toyota 4Runner then impacted a 2006 Toyota Corolla in the rear.  The Corolla rotated into the freeway median.  The Greene's Toyota 4Runner then slid into the rear of a trailer that was manufactured by Strick Trailers, LLC, owned by Dolphin Line, and towed by a freightliner owned by John Fayard Moving and Warehouse.  The Greene family Toyota 4Runner caught fire and burned up.  The Greene family children died in the crash as did Mrs. Greene. Mr. Greene was burned over 40% of his body. See, police accident report, APP 001-006.

The collision came without warning and caused the Toyota 4Runner to collide with a Toyota Corolla and a trailer that was manufactured by Strick Trailers, LLC, owned by Dolphin Line, and towed by a freightliner owned by John Fayard Moving and Warehouse.  The Greene Family's Toyota 4Runner burst rapidly into uncontrollable flames. Thompson Depo at 46:22 – 47:11 (APP 053-054). As a result of the crash, Wyndell II and Wesleigh were trapped in the Toyota 4Runner, unable to escape, and were eventually burned to ashes.  Rushing Depo at 20:11 – 22:18 (APP 111-113).  Wyndell II was decapitated while inside the Toyota 4Runner. Rushing

2

Depo 30:21 – 33:24 (APP 121-124) LaKeysha, although wearing her seatbelt, was ejected from the Toyota 4Runner's seatbelt restraint, suffered burns and lacerations to a significant portion of her body, and eventually died from the trauma as a result of her ejection from her seatbelt and airbag restraints.  Thompson Depo at 35:9 – 36:4 and 60:14 – 61:5 (APP 042-043; APP 067-068).  Wyndell Sr. sustained unwarranted and excruciating physical pain and mental anguish and emotional distress at the scene and afterwards.  Approximately three months following the accident, Wyndell Sr. died as a result of the burns and other injuries he suffered from the collision, which he sustained while inside the Toyota 4Runner.

### B.    The Allegations Against VGNA.

Plaintiffs' Complaint alleges that Volvo, *inter alia*, failed to design and incorporate widely available, safer and feasible, alternative designs into the Volvo Heavy Truck.  In other words, Plaintiffs' first claim against VGNA is that the Volvo truck was an incompatible mismatch, in a crash, with other vehicles on the road and designed in such a manner as to inflict, upon impact, its entire mass and stiffness upon passenger vehicles such as the Greene Family's Toyota 4Runner, without any consideration to installing more energy-absorbing components, less rigid materials or technology that would have reduced the Volvo truck's aggressivity towards the Greene SUV and other vehicles.  If the Volvo Heavy Truck had been properly designed, it could have aided in significantly reducing the injuries to, and/or preventing the eventual deaths of, each member of the Greene Family.

Second, it is undisputed that Volvo and other manufacturers have long been aware that collision warning systems save lives and are a needed component on Volvo's trucks. In fact, after analyzing the top safety issues that impact transportation nationwide and changes that are needed to reduce accidents and save lives, the National Transportation Safety Board decided to

petition the National Highway Traffic Safety Administration to establish performance standards for motor vehicle collision avoidance technologies and make them standard equipment in passenger vehicles and commercial motor vehicles.[1] For these reasons, summary judgment is not the proper time during which to debate Volvo's foreseeability, gross negligence and liability. Accordingly, the summary judgment should be denied.

## IV.    ARGUMENT AND AUTHORITIES

### A.    The Applicable Summary Judgment Principles

In consideration of VGNA's Motion for Summary Judgment, all reasonable inferences must be drawn in favor of the Plaintiffs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Palmer v. BRG of Ga., Inc*., 498 U.S. 46, 49 n. 5, (1990); *Martin v. Alamo Cmty. Coll. Dist*., 353 F.3d 409, 412 (5th Cir.2003); *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir.), cert. denied, 540 U.S. 815 (2003). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, although it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc*., 831 F.2d 77, 80 (5th Cir.1988). The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc*., 910 F.2d 167, 178 (5th Cir.1990). Furthermore, a nonmovant will defeat a no-evidence summary judgment motion if the nonmovant presents more than a scintilla of probative evidence on each element of her claim. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003).

The court does not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir.1987).

---

[1] http://www.ntsb.gov/news/2012/121114.html

**B.**   **Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Strict Liability Claims.**

It is undisputed that heavy trucks are responsible for between 3,000-5,000 fatalities a year in other vehicles in the United States alone. Volvo knew of technology to avoid and/or mitigate many of these impacts yet did nothing to implement the various components and technology on this Truck.  With regard to the design defect claims alleged against VGNA, the evidence makes clear that VGNA is strictly liable for not installing safer and readily available energy-absorbing components, less rigid materials, and technology that would have reduced the Volvo truck's aggressivity towards the Greene's SUV.  In addition, the Volvo Truck should have been equipped with collision warning systems, such as those that were tested by Volvo as part of a government pilot program, whereby the technology was found to be extremely effective in saving lives. (Dkt. Entry 113).  "The duty to design a safe product is 'an obligation imposed by law.'"  *See American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex.1997) (quoting *McKisson v. Sales Affiliates, Inc*., 416 S.W.2d 787, 789 (Tex.1967)); *Robins v. Kroger Co*., 982 S.W.2d 156, 161 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).

VGNA has moved for summary judgment on whether it is strictly liable for the design defects in the Volvo Tractor that collided into the Greene's SUV on May 28, 2010.  In doing so, VGNA does not rely on any affirmative evidence that there are no defects in the VGNA Tractor.  On the other hand, Plaintiffs submit the detailed expert analysis performed by Keith Friedman ("Friedman") and R. Rhoads Stephenson ("Stephenson") presented in Friedman Research Corporation's expert report (the "Friedman Report")(APP 137-217).  Friedman has been involved in the field of research and development of transportation safety for more than 35 years. Since graduating from Cornell University's Engineering Physics Department, he has been a project and test engineer for Minicars Inc., president of Kinetic Research Inc. and MCR

Technology Inc., and now president of Friedman Research Corporation.  Friedman has published more than 80 research papers on the subject of improved vehicle design and automotive safety engineering, and has presented his findings at national and international conferences in Austria, Australia, Ireland, France, Germany, Japan and Italy, as well as in the United States.  He holds active memberships in organizations such as the Society of Automotive Engineers (SAE), the Institute of Electrical Engineers, the American Society of Mechanical Engineers, and the American Association for the Advancement of Science.  He is a peer reviewer for numerous conferences and journals.  APP 141

Friedman has conducted more than 300 detailed systems analyses of catastrophic injury accidents in accordance with a protocol published by SAE.  His work has included most kinds of automotive-related tests, including component tests, sled tests, anthropometric dummy tests and full-scale vehicle tests representing impacts in front, side, rear and rollover modes. In addition, his research has included extensive computer modeling and simulation of dummy, human, vehicle and component impacts, as well as cadaver testing and live-subject testing.  Friedman's work has involved all aspects of crashworthiness, reconstruction and impact protection covering front, side, rear and rollover impacts. Studies have involved virtually all types of protective systems, including, for example, seat belts, padding, airbags, seats, glazing systems, doors, child seats, helmets and vehicle structures.  His studies have involved the protection during impact events of occupants of cars, pickups, SUVs, vans, buses and heavy trucks, as well as pedestrians, bicyclists and motorcyclists, and covered sizes and ages ranging from infants to adults. Friedman is the author of numerous reports and safety studies for the United States Department of Transportation involving, among other things, statistical analyses of crash conditions and their relationship to injuries, effects of recent design changes on vehicle safety performance, passive-

restraint performance in passenger vehicles, dynamic crash testing, static crush testing and crashworthiness. APP 141-142

Dr. R Rhoads Stephenson spent thirty-six (36) years at NASA's Jet Propulsion Laboratory ("JPL") including three (3) years as Associate Administrator of R&D for the National Highway Traffic Safety Administration.   After retirement from JPL, he was a consultant to the Motor Vehicle Fire Research Institute where he helped conduct $4 million worth of vehicle fire research funded by a grant from General Motors.   Dr. Stephenson has nearly 40 years of automotive experience.   APP 143. Both Mr. Friedman and Dr. Stephenson are Certified Fire Investigators and Certified Vehicle Fire Investigators by the National Association of Fire Investigators (NAFI). *Id*.

### a.      There is evidence of safer alternative designs

To meet the first prong of the statutory test, Plaintiffs need only provide evidence that there was a safer alternative design to any defective design in the 2010 4Runner, which itself consists of two required elements: (1) that the alternative design would have prevented or significantly reduced the risk of the claimant's damages without substantially impairing the product's utility, and (2) that the alternative design was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.   *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a)-(b).   In the Friedman Report, Friedman and Stephenson provide sufficient evidence to meet and exceed the summary judgment threshold on this requirement.   The experts identify at least four areas for which there are safer alternatives:

### Brake systems

The experts conclude that the Volvo truck should have been equipped with a better braking system.  Volvo knew that the disc brake systems that they were supplying provided about 50% improvement in braking effectiveness from 75 mph compared with drum brakes.4 Disc brakes have been available since the 1980s and almost all heavy trucks in Europe, where Volvo is headquartered, use them. Bendix, the brake supplier for this truck and a subsidiary of the major supplier of heavy truck brakes in Europe indicate the availability of a significantly improved braking system compared with those that just met FMVSS 121 - but these were not utilized on this truck. APP 164 "A plaintiff can prove technological feasibility of a safer alternative design with evidence that another manufacturer uses it." *See Boatland of Houston, Inc. v. Baile*y, 609 S.W. 2d 743, 746 (Tex. 1980); *Honda of Am. Mfg. v. Norman*, 104 S.W.3d 600, 607 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

### Collision Avoidance

In 1994 Eaton Corporation had its VORAD radar collision avoidance system available for use and on heavy trucks.  By 2004 Volvo was aware of the technology and participated in demonstrating that the VORAD system would eliminate more than 20% of rear end collisions (without consideration for how many would have reduced impact speeds).  By 2006 Volvo had the VNM630 tractors tested with the VORAD systems implemented but did not provide the technology to the trucking industry as standard equipment. By 2008, Volvo knew that the VORAD system would, with statistical certainty, provide significant reductions in rear end impacts, yet they did not incorporate the vehicle.  APP 167.  The experts opine that Volvo should have utilized the radar based collision warning and avoidance systems, such as VORAD[©], that were available since the 1990s. Volvo had demonstrated this technology for the National

Highway Transportation Safety Administration ("NHTSA") in the 2000-2003 timeframe.  Volvo

had implemented these systems on this truck design but suddenly decided not to provide them as

standard equipment despite knowing that significant improvements in crash avoidance were

available specifically for exactly the kind of crash that occurred here. Id.   The Friedman Report

identifies three levels of sophistication and performance enhancement that were available when

Volvo manufactured the truck that helped contribute to the deaths of the Greene family.

> a.   CWS - Collision Warning System (Audio alarms to warns driver of levels of
>       impending danger e.g. driver was distracted by a Cell Phone)
> b.   ACC – Adaptive Cruise Control (Engine only control spacing behind cars)
> c.   advBS – advanced electronic Braking System (new disk brakes/ servoactuators
>       and controller – system was able to apply brakes without action by the driver)

APP 165.  According to the experts, the radars consist of sophisticated diagnostic and/or

controller systems.  "For example, they can simultaneously track 20 vehicles and get distance,

speed and position up to 300 feet away.  Each tracked vehicle then goes into a logic tree within

the system for the computer to decide what to do or how to warn the driver. All types of

scenarios are present, including parked cars, low overhanging signs, vehicles cutting in front, a

curved road where oncoming cars are directly ahead, the truck passing other vehicles, rain, etc.

But the simplest and most reliable scenario for the radar is an SUV  in the same lane slowing

down." APP 165.  This technology if it had been installed in the Truck would have sent a visual

and audible alert to the driver alerting him of congested traffic ahead.

### Front-end Crash Compatibility Design

The need for compatibility of heavy trucks with the passenger vehicle fleet has been

known since 1953 when a rear underride guard requirement (§393.86) was created by the

Interstate Commerce Commission.   APP 168 In Europe, the European Union has addressed

underride protection more aggressively. In Europe many trailers have a lower ride height and

9

hence have a more natural protection against underride. Moreover, frontal underride protection has been addressed with requirements to prevent underride with the introduction of ECER 93 in 1994. Rigid front underride protection was estimated to reduce fatalities by about 900 a year and injuries by about 19,000. Further, the EU has demonstrated that rigid front underride guard is preferable to no prevention system. Energy absorbing designs have the ability to reduce fatalities by an additional 11% compared to the significant benefits associated with the rigid front underride protection systems (FUPs). APP 170 In 2004, most truck manufacturers operating in Europe joined to make recommendations on improving heavy truck safety performance. They reported that some manufacturers have incorporated energy absorbing Front Underride Protection (eaFUP) devices that increases the survivable collision speed by an additional 60 kph (38 mph) relative to the fixed underride protection systems. They found that systems that avoid crashes were the most important to implement, systems that minimize the consequences once there was a crash was second most important, and that the combination of the two would have the greatest impact on reducing fatalities. APP 171

In 2009, NHTSA reported that one out of nine traffic fatalities in 2008 was a result of a collision with a large truck. Texas had the largest number of such involvements – the scene of this accident. In 2010, it was demonstrated that energy absorbing FUPDs could handle impacts with a passenger car at least up to 75 kph with the energy absorbing aspects of the FUPD. They also found that in impacts up to 56 kph the passenger vehicle was designed to handle a rigid version of the FUPD, but much lower deformation were observed when the same vehicle impacted the Energy absorbing FUPD (EFUPD) at 75 kph, demonstrating that higher speeds still could likely be handled by such a system. They found that the EFUPD can be an effective collision partner in such collisions. APP 172

10

Therefore, Volvo should have incorporated a crash compatibility design such as the Front Underride Protection System (FUPS) which was available and that had been in Europe for years. Either a rigid or energy absorbing system could have been utilized.  APP 171-173.

**Energy-Absorbing Front end**

In addition, the front end of the Volvo tractor could have been equipped with an airbag collision mitigation system or other energy absorbing designs that would reduce the crush stroke on the struck vehicle by absorbing a significant portion of the crash energy. Opportunities to apply static or deployable systems were available, possible and economically feasible. APP 166-167.  Volvo also failed to incorporate technology to increase the effective crush length and height of its front end to ensure better compatibility with the rear end designs of existing vehicles on the road. *Id.*

In sum, the Friedman Report identifies, for multiple components, several safer alternatives that should have been designed and manufactured into Volvo Tractor (APP 164-175).  The Friedman Report also opines that the Greene family would not have had rear impact related injuries and certainly no deaths were it not for the inadequacies noted above. Accordingly, Plaintiffs have withstood summary judgment on this prong of the statutory test.

### b.      The defects were a producing cause of decedents' deaths

To meet the second prong of the statutory test, Plaintiffs provide evidence that the defects were a producing cause of the personal injury, property damage, or death for which they seek recovery. See Tex. Civ. Prac. & Rem.Code Ann. § 82.005(a). "A producing cause is an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any." *Flock v. Scripto–Tokai Corp*., 319 F.3d 231, 238 (5th Cir.2003) (citations and internal quotations omitted).  "Producing cause is the cause-in-fact of the harm,

meaning that a defendant's conduct must have been a substantial factor in bringing about the injury and that the injury would not have occurred but for the defendant's conduct." *Id.* The evidence demonstrates that the Volvo tractor crashed into the back of the Toyota 4Runner and was the sole cause of the rear crush to the 4Runner. Barkley Depo at 107:6-13; 111:3-17. (APP 329; APP 333). See, also APP 001-006. Here, the experts have opined that (1) the Greene accident would have had a high probability of a safe outcome if the VGNA truck had been equipped with a radar system; (2) the injuries would not have occurred if VGNA had utilized the FUPS it has in Europe; (3) the accident or its severity could have been prevented with proper brakes; and (4) a less aggressive front end on the Volvo tractor could potentially have saved one or more of the Greene family. See, APP 137-217. The alternative design approaches that are disclosed in the Friedman Report have been shown to all be widely available and technologically and economically feasible. Accordingly, since Plaintiffs present evidence on this prong of the statutory test, VGNA's motions for summary judgment should be denied.

### c.      The Volvo Tractor was unreasonably dangerous.

Finally, a claimant must present evidence that the product was defectively designed so as to be unreasonably dangerous, taking into consideration the utility of the product and the risks involved in its use. *Hunter v. Ford Motor Co., Inc.*, 305 S.W.3d 202, 2009 WL 3766333, at *2 (Tex.App.-Waco, Nov.10, 2009, no pet. h.) (citing *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 257 (Tex.1999). "The determination of whether a product is unreasonably dangerous because of a defective design is often one that involves factual disputes that a party is entitled to have a jury resolve." *Hernandez*, 2 S.W.3d at 260. Here, VGNA has not presented any evidence whatsoever on risk-utility analysis considerations. Plaintiffs, however, present evidence that the VGNA Truck is designed defectively and is unreasonable dangerous taking into consideration the utility

of the product and the risks involved in its use. The Friedman report provides examples of particular elements that are applicable to this element including:

1. Volvo Trucks North America undertook a series of tests in the late 1990s to understand the performance improvements offered by disc brakes and ECBS. Volvo found that at 75 mph drum brakes in services had a stopping distance that was about 50% longer than disc brakes;

2. Heavy trucks are responsible for between 3,000-5,000 fatalities a year in other vehicles in the United States alone. Volvo knew of technology to avoid and/or mitigate many of these impacts yet did nothing to implement it on this vehicle. Prior to 2008 Volvo knew that the VORAD system would, with statistical certainty, provide significant reductions in rear end impacts;

3. The need for compatibility of heavy trucks with the passenger vehicle fleet has been known since 1953 when a rear underride guard requirement (393.86) was created by the Interstate Commerce Commission;

4. In Europe, the European Union has addressed underride protection more aggressively. In Europe many trailers have a lower ride height and hence have a more natural protection against underride. Moreover, frontal underride protection has been addressed with requirements to prevent underride with the introduction of ECER 93 in 199426. Rigid front underride protection was estimated to reduce fatalities by about 900 a year and injuries by about 19,000. Further, the EU has demonstrated that rigid front underride guard is preferable to no prevention system. It was reported that energy absorbing designs have the ability to significantly reduce fatalities.

5. In 2004, most truck manufacturers operating in Europe reported that some manufacturers have incorporated energy absorbing Front Underride Protection (eaFUP) devices that increases the survivable collision speed by an additional 60 kph (38 mph) relative to the fixed underride protection systems.

6. These manufacturers found that systems that avoid crashes were the most important to implement, systems that minimize the consequences once there was a crash was second most important, and that the combination of the two would have the greatest impact on reducing fatalities.

APP 173-177. The Friedman Report then concludes that the research and facts reviewed validate that it was well-known by Volvo and others in the industry that Volvo trucks were too aggressive in an accident, lacked energy absorbing features in the front end and needed collision warning systems to save lives. As far as additional consideration of the utility of the product and the risk involved in its use, here, there is no allegation from VGNA that the alternative designs

13

proposed by Plaintiffs would completely preclude some of the uses for which the Truck was designed and to which it was put.  In other words, there are no allegations that the designs suggested by Plaintiffs' experts would have impaired the use of the Truck in any way.  In fact, the safer alternative designs proposed by Plaintiffs' experts would have vastly improved the longevity of the Truck without detracting from its usefulness.  Therefore, it cannot be said as a matter of law that the Truck was not unreasonably dangerous, and Plaintiffs are entitled to have a jury decide the matter.  VGNA's motion for summary judgment does not contain any affirmative representation that the designs proposed by Plaintiffs' experts were not safe or that they would affect the Truck's utility.  Thus it would be improper for VGNA to contend in a Reply that it was somehow unaware of these risks.  *See Wallace v. County of Comal*, 400 F.3d 284, 291–92 (5th Cir.2005) (issues raised for the first time in a reply brief are waived); *Santamaria v. Dallas Indep. Sch. Dist.*, 2007 WL 1073850, *2 (N.D.Tex. Apr.10, 2007) (same).

Consequently, there is no doubt that on this record a reasonable jury could find (1) that design defects caused the deaths of one or more members of the Greene Family, (2) that there were feasible, safer alternatives that would have corrected the deficiencies in the Volvo Truck, and (3) that the Volvo Truck design was unreasonably dangerous.  For these reasons, VGNA's motion for summary judgment on Plaintiffs' strict liability design-defect claim should be denied.

### C.   Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Negligence Claims.

Plaintiffs' Complaint contends that the deaths of the Greene Family were proximately caused by the negligent actions or omissions of VGNA in failing to exercise ordinary care in the design, testing, manufacture and marketing of the Volvo Truck.  VGNA argues that the negligence claim is based entirely on the Volvo Truck being unreasonably dangerous, and is therefore subsumed into Plaintiffs' strict liability claim. (Brf. at 6.)   However, Plaintiffs'

14

negligence claim is not based entirely on the allegation that the 4Runner was unreasonably dangerous due to a design defect.  Nevertheless, even if Plaintiffs' negligence claim is subsumed in strict liability, Texas law makes clear that, "[w]hen a trial court is confronted with several theories of recovery, the court must submit a charge to the jury with all questions, instructions, and definitions raised by the pleadings and evidence." *Ford Motor Co. v. Miles*, 141 S.W.3d 309, 315 (Tex.App.-Dallas 2004, pet. denied); *General Motors Corp. v. Paiz*, No. 05–98–01340–CV, 2000 WL 1751096, at *3 (Tex.App.-Dallas 2000, no pet.).

"Traditionally in Texas law, negligence and strict liability have been distinct causes of action." *Miles*, 141 S.W.3d at 315 (citing *Gonzales v. Caterpillar Tractor Co*., 571 S.W.2d 867, 871 (Tex.1978)).  The Fifth Circuit and the Texas Supreme Court have summarized the difference between the two causes of action in the context of product liability as follows:

> The care taken by the supplier of a product in its preparation, manufacture, or sale is not a consideration in strict liability; this is, however, the ultimate question in a negligence action. Strict liability looks at the product itself and determines if it is defective. Negligence looks at the act of the manufacturer and determines if it exercised ordinary care in design and production.

*Syrie v. Knoll Int'l*, 748 F.2d 304, 307 (5th Cir.1984) (citing *Gonzales,* 571 S.W.2d at 871.  To prevail on a strict liability cause of action, a plaintiff must show that: "(1) a product is defective; (2) the defect rendered the product unreasonably dangerous; (3) the product reached the consumer without substantial change in its condition from the time of original sale; and (4) the defective product was the producing cause of the injury to the user." *Syrie* 748 F.2d at 306. To prevail on a negligence cause of action, a plaintiff must show "(1) the existence of a duty on the part of one party to another; (2) the breach of that duty; and (3) the injury to the person to whom the duty is owed as a proximate result of the breach." *Romo v. Ford Motor Co*., 798 F.Supp.2d 798, 807 (S.D.Tex.2011) (citing *Dion v. Ford Motor Company*, 804 S.W.2d 302, 310 (Tex.App.-Eastland 1991, writ denied)).

### 1.    Negligence in Design

In reviewing the Friedman Report, the record is clear that VGNA was negligent in at least the following ways:

a.    Volvo did not utilize the available technology to mitigate impacts between its front end and the rear of other vehicles. (Volvo website talks about the "Front Underrun Protection System" (FUPS) which they first developed and which is now required in Europe.

b.    Volvo's personnel knew or should have known about the effectiveness of the collision warning and braking systems both through their counterparts in Europe and the work going on in the US.

c.    Volvo's personnel knew or should have known about the vehicle crash compatibility work being done in other Volvo divisions, since there were only a few persons that were part of the safety team at Volvo - one of which was Mr. Adams in the US.

d.    The Volvo in the US was aware that truck compatibility work was being done in Europe.

e.    Volvo personnel in the US were aware that the FUPD was associated with reducing injuries in a vehicle struck by the heavy truck.

f.    Volvo personnel in the US had determined that the FUPD would work on vehicles in the US, but did not make any effort to pursue the implementation of that system or any other system to protect occupants of the other vehicle in an impact.

g.    Volvo has tried to hide the work done on crash compatibility by suggesting that when asked to look for work, they did not look in "advanced engineering projects". Even though such systems have been in Europe since the early 1990s, Volvo personnel in the US claimed not to find out Volvo had performed computer simulations to evaluate energy absorbing characteristics of FUPS until the late 2000s despite the dissemination publicly of FUPS work by VOLVO since the 1990s.50

VGNA's refusal to obtain this energy-absorbing technology from its European parent so that it could be shared with U.S. truck drivers and those who share the road with the truck drivers is negligence, at a minimum.

### 2.    Negligence in offering lifesaving technology

The evidence demonstrates that some of the failures of components in the Volvo Truck to properly function resulted from some other act of negligence that is separate and distinct from

16

VGNA's design process.  In addition to the above, VGNA knew that the VORAD collision warning systems were available for Volvo's trucks and that the technology saves lives.  Yet, Volvo did not supply this crucial information to its customers, nor did it strongly recommend that customers obtain this technology.  Prinzo Depo (APP 381-385___).  Volvo clearly had a duty to inform truck buyers of this life-saving technology and a duty to the general public not to conceal this information.  This is especially true considering that Volvo received government financial assistance in a pilot program to test this collision warning technology.  Similarly, as Plaintiffs' expert establishes, in 2004, most truck manufacturers operating in Europe joined to make recommendations on improving heavy truck safety performance.  Some manufacturers were incorporating energy absorbing Front Underride Protection (eaFUP) devices that increase the survivable collision speed by an additional 60 kph (38 mph) relative to the fixed underride protection systems.  Also in 2006, the NTSB reported that in large truck accidents almost 5,000 people were killed and over 120,000 injured annually in the US and 85% of the fatalities were in the other vehicle. They defined aggressivity as differences in stiffness, geometry and weight. They pointed out there were no U.S. requirements addressing heavy truck aggressivity. Results were presented in Europe showing crash tests and simulations demonstrating the use of moving deformable barriers with FUPs on Volvo tractors as well as the positive effects associated with energy absorbing FUPs.  Aluminum foam was reported to absorb up to 44kJ.  APP 171.  Volvo was aware of these tests but did not provide the information to the government or the unsuspecting U.S. public.

### 3.    Negligence in public representations

In addition to the above, the record is clear that VGNA was grossly negligent, at the very least, in its representations to the public.  In an effort to convince consumers to feel comfortable

riding in and around Volvo trucks, Volvo promotes publicly that "[a]t Volvo Trucks, safety isn't an option. It's standard."  APP 464-65.  In publicly distributed material Volvo represents that "trucks safety is of utmost concern to us" APP 406.  Volvo has also promised road users, "Volvo Trucks is in the forefront of traffic safety and today's Volvo trucks are among the safest in the world."  APP 407.  Volvo has another campaign where it has consistently represented that Volvo practices a "safety for life" philosophy, where it promises safety for life and represents that it builds vehicles "primarily to help the driver to avoid accidents," and "that take account of the safety of the occupants of other cars and of <u>unprotected road user</u>s."  APP 410-413

> Volvo also publicly stated,
>
> The top priority for us at Volvo Trucks is to prevent accidents from occurring and to minimise possible injuries by building trucks with maximum safety and protection of the driver and passenger.  **Since safety also involves <u>other road-users</u>, our product safety programme is designed to encompass them as well**.

APP 408-09.  In other words, Volvo is attempting to inform other drivers that Volvo has recognized that safety has to involve other users on the road and that Volvo is working to protect those other road users, not just Volvo truck drivers. Volvo has also used average consumers to represent in advertisements that Volvo has a "reputation for safety."  APP 405  In the years before the Greene's accident, Volvo was issuing press releases advertising that it has the safest cars on the market and that it has advanced grades of steel with energy-absorbing abilities.  APP 466-70. But, as discussed below, these representations were false.  Volvo Trucks in the United States did not have energy-absorbing abilities.   Volvo was even representing that it was developing cars and technology that would prevent "anyone" from getting killed. APP 470-471.  Around this same time, Volvo was also representing across the world that Volvo was such a safety leader that by the year 2020, no one would be "killed or injured in a Volvo." APP 474-475.  In or about 2010, Volvo was also representing that "n]ew systems such as adaptive cruise

control and monitoring of blind spots considerably boost safety levels for drivers, <u>other road users</u>, the truck and its cargo."   APP 414-4151   And Volvo represented that its trucks were "[e]quipped with the latest safety technology."   *Id*.   But, as explained below, these representations were false.   Volvo trucks in the United States were not provided with this so-called latest technology.   At its worst, this conduct was fraudulent.   At its very least, it constitutes negligence.

> **D.     Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Gross Negligence and Exemplary Damage Claims.**

Gross negligence" means:  an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.   TEX. CIV. PRAC. & REM.CODE Ann. § 41.001(11).   The evidence also clearly establishes that VGNA had knowledge of and unfettered access to FUPS technology prior to the time the VGNA truck at issue was manufactured.   Additionally, the fact that other Volvo entities, as well as all truck manufacturers in Europe use FUPS makes clear that Volvo had full awareness of the lives that FUPS could save.   See, also Friedman Report.   Indeed, no one disputes that compatibility assessment is a major topic in crash safety research worldwide and has been for years. Documents produced by VGNA recognize the foreseeability specifically of Volvo trucks, unless redesigned, killing occupants of passenger vehicles struck by Volvo trucks:

> Vehicles with high aggressivity, such as heavy trucks, often compromise the survivable space within any smaller vehicles they strike, in part because the difference in height between the two vehicle in override and permits the stiffer elements of the commercial vehicle's front structure to intrude into the passenger vehicle…..Deflection of the passenger car and energy absorption into the truck

frame might be achieved by design modification, thereby providing some reduction of heavy vehicle aggressivity.

APP 393-404  Furthermore, with the changing fleet composition, the differences between cars and trucks have increased in terms of mass, front end stiffness and geometry.  Volvo and the rest of the truck manufacturers foresaw and continue to recognize this imbalance.  Undeniably, according to Volvo's documentation, the benefits and objectives of FUPS technology, which has existed at Volvo since at least 2003, are described as follows:

1. FUPS is based on the principle that a car colliding with a truck impacts the vehicle at exactly the correct height to activate the car's own crumple zone, while FUPS absorbs the collision forces as efficiently as possible.

2. Every measure that can be taken to make a heavy vehicle more 'collision-friendly' is a benefit and front underrun protection is one of the most important steps in that direction.

3. Front underrun protection is one of the most important steps in the direction of making a heavy vehicle more collision friendly.

4. The underrun protection beam serves as a crumple zone considerably reducing penetration into the car's passenger component."

5. With the truck bumper situated on the same level as that of a typical car bumper, the deformation zone of the car can be utilized in the best possible way.

6. If all of the trucks on European roads were equipped with FUPS in accordance with ECE R-93, it's **estimated that approximately 20,000 fewer people would suffer death or severe injury every year**.

Adams Depo at 66:18 – 71:21 (APP 360-365) and Plaintiffs' Deposition Exhibit 108 (APP 391-392).  Additionally, Adams testified that VGNA used FUPS technology in the mid 2000's to see whether a rigid version of FUPS could be used on VGNA's trucks.  Adams Depo at 64:6 – 66:9 (APP 358-360).  Adams also testified that VGNA was aware as early as the mid-2000's that a group called VC-COMPAT was conducting an industry study in Europe regarding compatibility-type crashes between cars and trucks.  Adams Depo at 84:4-25 (APP 366).

However, despite knowing the technology it was using in Europe could save 20,000 a year from death or injury, VGNA chose not to implement this technology on the trucks sold in the United States.  This is clear evidence of a conscience indifference to the rights and welfare of others, and warrants punitive damages.  Punitive damages are available for gross negligence or malice in strict liability. *See Heil Co. v. Grant*, 534 S.W.2d 916, 926 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.).

Moreover, as the Court is well aware, a trial court does not weigh the evidence and say at the summary judgment stage that no reasonable jury could find that defendant acted with "conscious indifference to the rights, safety or welfare of others."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, (1986)(the high court reiterated that the trial court still may not make credibility determinations, nor weigh the evidence, nor draw legitimate inferences from the facts other than in favor of the nonmovant).  When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party."  *Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir.2001); *see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222, 227 (5th Cir.2002).  Based on the record presently before the Court, Plaintiffs have provided enough evidence with which a jury can find gross negligence.  Accordingly, summary judgment should be denied.

**E.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Misrepresentation Claims.**

As demonstrated more fully by the evidence presented in Plaintiffs' Brief in Support of the Response (Dkt. Entry No. 301) to VGNA's Motion for Partial Summary Judgment, VGNA is not entitled to summary judgment on Plaintiffs' misrepresentation claim.  In various commercials, internet postings, periodicals, press releases, etc., VGNA represented that the safety of its vehicles is paramount.  These representations were intended to, and did, cause

consumers such as the Greene Family to rely on VGNA's representations and feel comfortable riding in and around Volvo vehicles.  Plaintiffs respectfully direct the Court's attention to Dkt. Entry No. 301 for argument and evidence as to this claim.

## V.     CONCLUSION

As explained herein, the VGNA has no justifiable grounds upon which to receive summary disposition of the claims in its motion.  The evidence demonstrates that there are disputed issues of fact as to each of Plaintiffs' causes of action.  Accordingly, summary judgment should be denied.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that the Court deny VGNA's motion for summary judgment, and grant Plaintiffs such other and further relief, in law or in equity, to which Plaintiffs may be entitled.

Respectfully Submitted,

/s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN
State Bar No. 16049750

THE PITTMAN LAW FIRM, P.C.
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

/s/ Daryl K. Washington
DARYL K. WASHINGTON
State Bar No. 24013714

LAW OFFICES OF DARYL K. WASHINGTON P.C.
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 31, 2013, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.


   /s/ Aubrey "Nick" Pittman_____
AUBREY "NICK" PITTMAN