# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **OLLIE GREENE, Individually as the surviving parent of WYNDELL GREENE, SR., WILLIAM GREENE, as the Administrator of the Estate of WYNDELL GREENE, SR., and MARILYN BURDETTE HARDEMAN, Individually and as the surviving parent of LAKEYSHA GREENE,** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CAUSE NUMBER: 3:11-cv-0207-N** |
| **Plaintiffs,** | §<br>§ | |
| **v.** | §<br>§ | **JURY TRIAL DEMANDED** |
| **TOYOTA MOTOR CORPORATION, TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., TOYOTA MOTOR SALES USA, INC., VOLVO GROUP NORTH AMERICA, LLC., VOLVO TRUCKS NORTH AMERICA, A DIVISION OF VOLVO GROUP NORTH AMERICA, LLC., STRICK TRAILERS, LLC, JOHN FAYARD MOVING & WAREHOUSE, LLC, and DOLPHIN LINE, INC.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| **Defendants.** | §<br>§ | |

---

## PLAINTIFFS' OBJECTIONS TO STRICK TRAILERS, LLC'S SUMMARY JUDGMENT EVIDENCE AND BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO STRICK TRAILERS, LLC'S MOTION FOR SUMMARY JUDGMENT

---

AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas 75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................ iv

I.      PRELIMINARY STATEMENT ................................................................... 1

II.     BACKGROUND FACTS ............................................................................. 1

    A.      The Incident. ...................................................................................... 1

    B.      Allegations in the Complaint Against Strick. ...................................... 3

III.    ARGUMENT AND AUTHORITIES .......................................................... 3

    A.      The Applicable Summary Judgment Principles.................................... 3

    B.      Objections to Strick's Summary Judgment Evidence........................... 4

        1.      Deposition of Gary Hatfield.................................................... 5

        2.      Unsworn and Unauthenticated Repair Orders. ......................... 5

        3.      Deposition of James Ray Jackson. ........................................... 6

        4.      Photographs of an ICC bumper................................................ 6

    C.      Overview of Federal Regulations Regarding Underride Guards. .......... 6

    D.      The Real Life Deadly Consequences of Inadequate Underride Guards. ............... 8

    E.      Studies Demonstrated to Strick That U. S. Underride Guards (e.g. such as the one involved in this collision) Are Inadequate. ........................... 9

    F.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Strict Liability Claims. ......................................... 10

        1.      There is evidence of safer alternative designs. ....................... 13

        2.      The defects in the Strick Trailer were a producing cause of one or all of the decedents' deaths. ........................................ 14

        3.      The Strick Trailer was unreasonably dangerous. ..................... 16

    G.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Negligence Claims. ................................................ 18

        1.      Strick cannot establish as an undisputed fact that the underride guard involved in the May 28, 2010, accident was not a Strick-manufactured underride guard, or that Strick is entitled to judgment as a matter of law. 19

        2.      Strick cannot meet its burden of establishing as an undisputed fact that the underride guard involved in the May 28, 2010, accident was substantially altered, and that Strick is entitled to judgment as a matter of law. ....................................................... 20

            a.      Strick has no evidence that the Strick underride guard on the Fayard/Dolphin Trailer had been substantially altered. ................ 21

ii

b.      Strick's substantial alteration legal arguments are incomplete in their applicability in this action. ................................................ 22

3.      Strick breached its duty to provide installation or other instructions to its aftermarket parts distributor, which could have been used by the end users to save lives. ............................................................................. 24

4.      Strick was negligent, even grossly negligent, in refusing to provide NTHSA with information regarding the need for, and availability of, stronger underride guards. ....................................................................... 26

5.      Strick was negligent in failing to warn others of the inadequacy of its underride guards and to notify its trailer owners of the availability of stronger underride guards. .................................................................... 29

H.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Gross Negligence and Exemplary Damage Claims. ............................ 30

IV.    CONCLUSION ........................................................................................................... 31

CERTIFICATE OF SERVICE ................................................................................................ 33

## TABLE OF AUTHORITIES

### Cases

*American Tobacco Co. v. Grinnell*, 951 S.W.2d 420 (Tex.1997) .......................................... 11, 29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 31

*Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222 (5th Cir.2002)......................... 31

*Braswell v. Cincinnati Inc.*, 731 F.3d 1081 (10th Cir.2013) ........................................ 22

*D. Houston, Inc. v. Love*, 92 S.W.3d 450 (Tex.2002)................................................. 18

*Dion v. Ford Motor Co.*, 804 S.W. 2d 302 (Tex.App.--Eastland [11th Dist.] 1991) ................. 22

*Fisher v. Walsh Parts & Serv. Co.*, 296 F.Supp.2d 551 (E.D.Pa.2003) ..................................... 23

*Flock v. Scripto–Tokai Corp.*, 319 F.3d 231 (5th Cir.2003)........................................... 14

*General Motors v. Hopkins*, 548 S.W.2d 344 (Tex.1977)........................................... 20

*Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503 (5th Cir. 2003)................................ 3

*Heil Co. v. Grant*, 534 S.W.2d 916 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.) ...................... 31

*Hernandez v. Tokai Corp.*, 2 S.W.3d 251 (Tex.1999) ........................................ 14, 16

*Hollinger v. Wagner Mining Equip. Co.*, 667 F.2d 402 (3d Cir.1981)...................................... 23

*Honore v. Douglas*, 833 F.2d 565 (5th Cir.1987) .......................................... 4

*Hunter v. Ford Motor Co., Inc.*, 305 S.W.3d 202 (Tex.App.-Waco, Nov.10, 2009, no pet. h.) .. 16

*King Ranch, Inc. v. Chapman*, 118 S.W.3d 742 (Tex.2003) ........................................... 4

*Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167 (5th Cir.1990)........................... 4

*Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77 (5th Cir.1988) ...................... 3

*Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990) ................................................. 5

*Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319 (5th Cir. 1998)........................ 5

*Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409 (5th Cir.2003) .................................... 3

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................ 3

*Newman v. General Motors Corporation*, 524 So.2d 207 (La.App. 4th Cir.1988)...................... 5

*Nuzzie v. Fruehauf Corp.*, 1991 WL 33099 (Ohio app 7 Dist. 1991).......................................... 22

*Olympic Arms, Inc. v. Green*, 176 S.W.3d 567 (Tex.App.—Hous. [1st Dist.] 2004, no pet.)...... 20

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46. 5, (1990) ................................................. 3

*Placencio v. Allied Indus. Intern., Inc.*, 724 S.W.2d 20 (Tex.1987)............................................. 20

*Robins v. Kroger Co.*, 982 S.W.2d 156 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). ........ 11

*Santamaria v. Dallas Indep. Sch. Dist.*, 2007 WL 1073850, *2 (N.D.Tex. Apr.10, 2007).......... 18

*USX Corp. v. Salinas*, 818 S.W.2d 473 (Tex.App.-San Antonio 1995, writ denied) ................... 23

*Wallace v. County of Comal*, 400 F.3d 284 (5th Cir.2005) ......................................................... 18

*Walmart v. Texas Tech Univ.*, 80 F.3d 1042 (5th Cir. 1996)......................................................... 4

*White v. National Surety Corporation*, 436 So.2d 751 (La.App. 3d Cir.1983) ............................. 5

## Rules

FED.R.CIV.P. 56(c) ......................................................................................................................... 4

TEX. CIV. PRAC. & REM.CODE Ann. § 41.001(11)...................................................................... 30

TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a)................................................................. 13, 14

TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a)-(b)................................................................ 13

## Treatises

Section 402A of the Restatement (Second) of Torts .................................................................... 23

Texas Jurisprudence, Products Liability § 109 (3d ed. 2006)..................................................... 21

## Regulations

49 C.F.R. § 390.1 ............................................................................................................................ 7

49 CFR 571.223 ................................................................................................................. 7, 17, 24

49 CFR 571.224 ................................................................................................................. 7, 17, 24

49 CFR 573.6 ................................................................................................................................ 28

49 U.S.C. § 30102(a)(8) ............................................................................................................... 28

49 U.S.C. § 30102(a)(9) ............................................................................................................... 27

49 U.S.C. § 30103 ........................................................................................................................ 27

49 U.S.C. § 30166(l)(1) ............................................................................................................... 28

49 U.S.C. §30115 ......................................................................................................................... 26

49 U.S.C. 301 ............................................................................................................................... 26

49 U.S.C. 30118(c) ...................................................................................................................... 28

61 Fed. Reg. 2004 (Jan. 24, 1996) ................................................................................................ 8

61 Fed. Reg. 2007 ........................................................................................................................... 8

64 Fed.Reg. 47,703 (Sept. 1, 1999) ............................................................................................... 7

Federal Motor Carrier Safety Regulation §393.86 ........................................................................ 7

Ollie Greene, Individually and as parent of Wyndell Greene, Sr., William Greene, as Administrator of the Estate of Wyndell Greene, Sr. and Marilyn Burdette Hardeman, Individually and the parent of LaKeysha Greene (collectively "Plaintiffs") file their Objections to Strick Trailers, LLC's ("Strick") summary judgment evidence and Brief in Support of Plaintiffs' Response to Strick's Motion for Summary Judgment and show the Court as follows:

## I.      PRELIMINARY STATEMENT

Strick's Motion for Summary Judgment rests solely upon misrepresentations of facts and misstatements or misapplication of the related law.  In an attempt to explain away its clear breaches of duty under the applicable federal regulations and common law, Strick presents the Court with unsworn documents and argues that it was really Dolphin that provided a shoddy and dangerously maintained underride guard on the Fayard/Dolphin trailer, the result of which led to the death of the Greene family.  However, once the Court ignores Strick's incompetent evidence and applies Strick's legal duties to the facts of this case, it is obvious that Strick was responsible for designing the original underride guard, was obligated to instruct Dolphin and Fayard on proper installation of the underride guard and bears some responsibility for what happened to the Greene family on May 28, 2010.

## II.      BACKGROUND FACTS

### A.      The Incident.

On May 28, 2010, Wyndell Greene, Sr. ("Wyndell Sr."), age 34, LaKeysha Greene ("LaKeysha"), age 35, Wyndell Greene, II ("Wyndell II"), age 2, and Wesleigh Greene ("Wesleigh"), age 5, (Wyndell Sr., LaKeysha, Wyndell II and Wesleigh are collectively referred to herein as the "Greene family") were traveling in their Toyota 4Runner (the "Toyota 4Runner") to Louisiana for Wyndell II's third birthday.  At approximately 6:25 pm, traffic was slowing on Interstate Highway 20 in the eastbound lane.  The driver of a Volvo semi-tractor trailer (the

1

"Volvo Truck") applied the brakes but impacted a 2010 Toyota 4Runner containing the Greene family. The Toyota 4Runner then impacted a 2006 Toyota Corolla in the rear.  The Corolla rotated into the freeway median.  The Greene's Toyota 4Runner then slid into the rear of a trailer that was manufactured by Strick Trailers, LLC, owned by Dolphin Line, and towed by a freightliner owned by John Fayard Moving and Warehouse.  See, police accident report, APP 001-006.  The Greene's Toyota 4Runner caught fire and burned up after nearly fifteen minutes. Crues Depo 51:1-15 (APP 1039).  Mrs. Greene died in the crash, as did the two children, one of whom was decapitated.  Crues Depo 55:6-12 (APP 1044).  Mr. Greene was burned over 40% of his body.

The collision came without warning and caused the Toyota 4Runner to collide with a Toyota Corolla and a trailer that was manufactured by Strick Trailers, LLC, owned by Dolphin Line, and towed by a freightliner owned by John Fayard Moving and Warehouse.  The Greene Family's Toyota 4Runner burst rapidly into uncontrollable flames. Thompson Depo at 46:22 – 47:11 (APP 053-054). As a result of the crash, Wyndell II and Wesleigh were trapped in the Toyota 4Runner, unable to escape, and were eventually burned to ashes.  Rushing Depo 20:11 – 22:18 (APP 111-113).  Wyndell II was decapitated while inside the Toyota 4Runner.  Rushing Depo 30:21 – 33:24 (APP 121-124).  LaKeysha, although wearing her seatbelt, was ejected from the Toyota 4Runner's seatbelt restraint, suffered burns and lacerations to a significant portion of her body, and eventually died from the trauma as a result of her ejection from her seat restraints and contact with the Strick Trailer.  Thompson Depo 35:9 – 36:4 and 60:14 – 61:5 (APP 042-043 and 067-068).  Wyndell Sr. sustained unwarranted and excruciating physical pain and mental anguish and emotional distress at the scene and afterwards.  Approximately three months

following the accident, Wyndell Sr. died as a result of the burns and other injuries he suffered

from the collision, which he sustained while inside the Toyota 4Runner. (APP 1394-1461)

**B.      Allegations in the Complaint Against Strick.**

Plaintiffs' Complaint alleges specifically that Strick had, and breached, a duty to provide

a safely designed and manufactured trailer, complete with proper underride guards.  Strick also

had a duty under the federal and state regulations to provide installation and repair instructions to

its aftermarket distributor.  Strick also had a duty to warn consumers of the dangerous nature of

the inadequate underride guards.  Finally, Strick had a duty to ensure that end-users who repaired

or installed Strick underride guards were provided with sufficient installation and/or repair

instructions to ensure that the underride guards would comply with all applicable federal and

state regulations and be reasonably safe, even without regard to the compliance with any federal

regulations.  Strict was negligent, even grossly negligent, when it failed to fulfill these duties, the

result of which caused the deaths of the Greene Family from contact with the Strick Trailer's rear

impact guard.  (Dkt. Entry 113).

**III.      ARGUMENT AND AUTHORITIES**

**A.      The Applicable Summary Judgment Principles**

In consideration of Strick's Motion for Summary Judgment, all reasonable inferences

must be drawn in Plaintiffs' favor.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986);  *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n. 5, (1990); *Martin v. Alamo*

*Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir.2003); *Gowesky v. Singing River Hosp. Sys.,* 321

F.3d 503, 507 (5th Cir. 2003). In reviewing evidence favorable to the party opposing a motion

for summary judgment, a court should be more lenient in allowing evidence that is admissible,

although it may not be in admissible form.  *See Lodge Hall Music, Inc. v. Waco Wrangler Club,*

*Inc.*, 831 F.2d 77, 80 (5th Cir.1988).   The non-moving party may also identify evidentiary

documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc*., 910 F.2d 167, 178 (5th Cir.1990). Furthermore, a nonmovant will defeat a no-evidence summary judgment motion if the nonmovant presents more than a scintilla of probative evidence on each element of her claim. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003).

Furthermore, the court does not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence. "*Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir.1987).  Applying these legal principles, Strick's motion for summary judgment must be denied.

## B.    Objections to Strick's Summary Judgment Evidence.

Plaintiffs object generally to Strick's summary judgment pleadings and all evidence submitted in support thereof to the extent Strick's argument for summary judgment and documentation tendered in support thereof do not meet the evidentiary and procedural requirements applicable to summary judgment proceedings. Strick's Motion and Brief in Support violate many of the tenets associated with summary judgment proceedings and relies principally on unauthenticated documents, inadmissible hearsay, legal conclusions and argument of counsel. Try as it may, however, Strick's summary judgment evidence does not, and cannot, establish entitlement to summary judgment as a matter of law.  In fact, Strick has submitted substantially inadequate and/or incompetent summary judgment evidence.   Proper summary judgment evidence consists of affidavits, admissions, and stipulations of the parties, authenticated or certified public records, deposition transcripts, and interrogatory answers. FED.R.CIV.P. 56(c). Defendants' Motion itself is not summary judgment evidence.  *Walmart v. Texas Tech Univ*., 80 F.3d 1042, 1047 (5th Cir. 1996).  To the extent Strick's summary judgment proof does not meet

these requirements, and relies on counsel argument, Plaintiffs object to the summary judgment "proof" offered by Strick.

Indeed, the law is clear that summary judgment evidence must be in a form admissible at a conventional trial and must state facts, not subjective opinions and conclusions. *See, e.g. Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Bare allegations of fact, ultimate or conclusory facts or conclusions of law cannot be utilized on a summary judgment motion. *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 324 (5th Cir. 1998). The evidence submitted in connection with motions for summary judgment must be made upon personal knowledge, setting forth such facts as would be admissible in evidence and must affirmatively show the affiant is competent to testify as to the matter stated therein. *Newman v. General Motors Corporation*, 524 So.2d 207 (La.App. 4th Cir.1988); *White v. National Surety Corporation*, 436 So.2d 751 (La.App. 3d Cir.1983). In addition to Plaintiffs' objection to counsel's argument in Strick's motion and brief, Plaintiffs object more specifically to the following items:

### 1. Deposition of Gary Hatfield.

Plaintiffs object to the deposition excerpts of Gary Hatfield since he has no personal knowledge of the events (e.g. alleged repairs) contained therein. In fact, Hatfield concedes at page:line 17:17 – 18:2 and 19:3-19 that he was not involved in the alleged repairs, does not know what, if anything was done, and that there is no one at his company who has such knowledge. (APP 1507-08). Accordingly, Plaintiffs ask that the Hatfield deposition excerpts be stricken in their entirety under FED. R. EVID. 401, 402, 403, 602. 801, and 802.

### 2. Unsworn and Unauthenticated Repair Orders.

Plaintiffs object to the unsworn and unauthenticated alleged repair orders included with Strick's Motion as Exhibits B, C, D, and E.  No witness with personal knowledge has testified as to what these documents purport to demonstrate, therefore they constitute incompetent summary judgment evidence:  In addition, the law is well settled that evidence based on hearsay is inadmissible and may not be considered on summary judgment. *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir.1995).  Accordingly, Plaintiffs ask that the repair orders be stricken under FED. R. EVID. 401, 402, 403, 602, 801, 802, and 901.

### 3.   Deposition of James Ray Jackson.

Plaintiffs object to the excerpts from the deposition of James Ray Jackson to the extent they rely on hearsay, are misleading or inconsistent with other portions of his deposition, are speculative and/or constitute improper legal conclusions.  Accordingly, Plaintiffs ask that the Jackson deposition excerpts be stricken under FED. R. EVID. 401, 402, 403, 602, 801, and 802.

### 4.   Photographs of an ICC bumper.

Plaintiffs object to the unsworn and unauthenticated photographs included with Strick's Motion as Exhibit G.  Strick has not included with these photographs the statement of any witness with personal knowledge as to what these photographs purport to demonstrate:  Evidence based on hearsay is inadmissible and may not be considered on summary judgment. *Fowler,* 68 F.3d at 126.  Accordingly, Plaintiffs ask that the photographs be stricken under FED. R. EVID. 401, 402, 403, 602, 801, 802, and 901.

### C.   Overview of Federal Regulations Regarding Underride Guards.

Underride guards on medium and heavy trucks have been controlled, regulatorily, under two standards in the United States.  The first standard was issued in 1953 (the "1953 Standards") by the Interstate Commerce Commission ("ICC"), whose duties relevant to the issues in this case are now held by the Federal Highway Administration ("FHWA").  The 1953 Standards applied

to motor vehicles manufactured after December 31, 1952 and governed straight trucks and trailers. The 1953 Standards were designed to address the widespread problem of "underride," which occurs when a passenger vehicle collides with the rear end of a trailer and slides under the trailer. This underride can lead to what the FHWA refers to as "passenger compartment intrusion," in which the trailer itself invades the passenger space of a vehicle, often causing serious injury and severe death. *Id*. Accordingly, to address the serious dangers posed by underride guards, Federal Motor Carrier Safety Regulation §393.86 ("FMCSR 393.86") commanded certain requirements for the underride guards (also known as the "ICC bar"), including mandating that the underride guards be "substantially constructed" and "firmly attached." *Id*.

After a subsequent series of proposals and tests regarding strengthening the protections against the dangerous underride problem, the National Highway Traffic Safety Administration ("NHTSA") promulgated new regulations for rear guards (the "1998 Standards"). See 49 C.F.R. §§ 390.1, 390.5, and 393.86 (1996), and later extended to all commercial motor vehicles, see 64 Fed.Reg. 47,703 (Sept. 1, 1999). The 1998 Standards establish two Federal Motor Vehicle Safety Standards ("FMVSS") applicable to underride guards. FMVSS 223 is the "equipment standard." See, 49 CFR 571.223; Rear impact guards. It sets forth the requirements that an underride guard must meet and specifies the procedures that NHTSA will use when testing an underride guard. FMVSS 224, also known as the "vehicle standard," requires that all new trailers be equipped with an underride guard that meets the equipment standard. See, 49 CFR 571.224, Rear Impact Protection. These standards apply to trailers and semitrailers manufactured after January 26, 1998. The 1998 Standards require that the underride guard extend to within four inches of the sides of the trailer, have a ground clearance of no more than

twenty-two inches, and be placed as close to the rear of the trailer as possible.  61 Fed. Reg. 2007.  The static load test[1] requirements (to determine strength and energy absorption) provide that each vertical member must withstand a defined static load test and the testing must displace the guard by at least five inches. *Id.*  NHTSA issued these rules to "reduce the number of deaths and serious injuries occurring when light duty vehicles impact the rear of trailers and semitrailers with a gross vehicle weight rating of 4,536 kg or more."  Title 49 Code of Federal Regulations (CFR) Part 571, rear impact protection.  The standards have been in place since 1998, but their adequacy has not been evaluated apart from two series of controlled crash tests.

### D.      The Real Life Deadly Consequences of Inadequate Underride Guards.

Underride guards are important because when a passenger vehicle impacts the back of a semi-trailer, the trailer's load floor is approximately the same height as the passenger vehicle's windshield, and the trailer's wheels are not always located under the rearmost portion of the load floor. A passenger vehicle impacting the back of a semi-trailer without underride guards would take the brunt of the force at the window level, bypassing vehicle structures and other systems that may have been designed to help protect occupants, leaving them vulnerable to serious injury or even death.

During consideration of the 1998 Standards, NHTSA noted that 11,551 rear-end crashes with trucks occur annually, resulting in about 423 passenger vehicle occupant deaths and over 5,000 non-fatal injuries.  See, 61 Fed. Reg. 2004 (Jan. 24, 1996). Trailers, although accounting for only 28% of registered heavy vehicles, account for 73% of these occupant fatalities and 82% of the injuries. *Id*. at 2006.  In 2008, there were 539 fatal crashes in which the rear of a truck was struck by another vehicle. This amounted to about 12.8 percent of truck fatal involvements.  APP

---

[1] During a static load test, the rear impact guard is mounted to a rigid test fixture, while force is slowly applied until the guard has been deflected by approximately five inches. 61 Fed. Reg. 2007.

1245-1334.  In 2011, passenger-vehicle crashes with large trucks killed 2,241 people, with 260 of the fatalities the result of passenger vehicles striking the rear of a truck.  A 2011 study conducted by the Insurance Institute for Highway Safety ("IIHS") of 115 crashes involving passenger vehicles and large trucks showed that nearly half of the vehicles involved had suffered severe or catastrophic underride damage, resulting in 23 fatalities. APP 1335-37

   **E.    Studies Demonstrated to Strick That U. S. Underride Guards (e.g. such as the one involved in this collision) Are Inadequate.**

   Another study conducted by the IIHS analyzed case files from the Large Truck Crash Causation Study, a federal database of roughly 1,000 real-world crashes in 2001-03, to identify crash patterns leading to rear underride of heavy trucks and semi-trailers with and without guards. APP 1338.  Underride was a common outcome of the 115 crashes involving a passenger vehicle striking the back of a heavy truck or semi-trailer.  Only 22 percent of the crashes didn't involve underride or had only negligible underride, a finding in line with prior studies. In 23 of the 28 cases in which someone in the passenger vehicle died, there was severe or catastrophic underride damage, meaning the entire front end or more of the vehicle slid beneath the truck." APP 1338.  The study also concluded that when a passenger vehicle impacts only a small portion of the underride guard to the left or right of center, "...most trailers fail to prevent potentially deadly underride."  Strick has testified that it has first-hand knowledge of this study.  Jackson Deposition at 79:6-23 (APP 1345).  There have been other studies that have also concluded, before the subject trailer was manufactured, that the underride guard problem is significant. Friedman Affidavit ¶11(b) (APP 1096)

   In this IIHS study, eight trailers from the largest semi-trailer manufacturers were tested, all equipped with underride guards that meet current regulations in the United States and Canada. The study included a trailer manufactured by Strick Trailers.  The IIHS conducted a total of 24

crash tests, using previous-generation 2010 Chevrolet Malibu midsize family sedans.  In each test, a Malibu was crashed into the back of the trailer at 35 mph.  In its third round of testing, the IIHS reduced the degree of overlap from 50 percent to 30 percent "because it is the minimum overlap under which a passenger vehicle occupant's head is likely to strike a trailer if an underride guard fails." When an underride guard fails, the IIHS says, the top of a passenger vehicle's occupant compartment is crushed. In this test, every trailer failed except one sold by Manac under the brand name Trailmobile.  The report states specifically that Strick's trailers also failed.  The only trailer manufacturer to pass all three tests, Manac, designs its underride guard supports to attach to a reinforced trailer floor and spaces them 18 inches from the edge of the trailer.  Clearly the Manac design alerts Strick to the existence of an alternative and safer design.

In sum, the IIHS study concluded that the current standards allow underride guard designs that fail catastrophically when struck by passenger vehicles at speeds that frequently produce minimal intrusion and injury risk in regulatory and consumer information frontal crash test programs.  Following the tests, the IIHS petitioned NHTSA for tougher semi-trailer underride standards, and to require other types of large trucks to have underride guards.  The IIHS requested that the standards should be upgraded "to require underride guards that are strong enough to remain in place during a crash, allowing the energy absorbing structures of passenger vehicles to deform and provide protection to their occupants." APP 1240

## F.    Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Strict Liability Claims.[2]

---

[2] LR 56.3(a)(1) provides that a motion for summary judgment must "on the first page, under the heading "summary," state concisely the elements of each claim or defense as to which summary judgment is sought."  Alternatively, "[a] moving party may satisfy the requirements of subsection (a) of this rule by stating in its motion that each of the required matters will be set forth in the party's brief."  Strick has done neither.  In its "motion" for summary judgment Strick merely states a desire for judgment "on all claims." [Dkt. Entry No. 271-1].  However, in its "brief in support," Strick does not argue against, and does not brief, Plaintiffs' strict liability claim against Strick.  [Dkt. Entry No. 271-2].  Accordingly, Plaintiffs' strict liability claim against Strick is not before the Court on Strick's motion for summary

With regard to the design defect claim against Strick, Plaintiffs specifically allege that the Strick Trailer was defective and unreasonably dangerous as designed, manufactured, assembled, marketed, and/or tested because of the following design, manufacturing and/or marketing defects, among others: the trailer did not have strength and energy-absorbing features that optimized the prevention of the underride hazard for vehicles that might crash into the rear of the trailer; and the ICC rear bumper was grossly ineffective in its failure to prevent the intrusion into and crushing of compartments of the Toyota 4Runner.  (Dkt. Entry 113).  Plaintiffs also argue that any applicable FMVSS were inadequate to protect the public from unreasonable risks of injury or danger, or Strick, before or after marketing the trailer, withheld or misrepresented the information or material relevant to the federal government's or agencies' determination of the adequacy of the safety standards or regulations at issue. *Id.*

"The duty to design a safe product is 'an obligation imposed by law.'" *See American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex.1997) (quoting *McKisson*, 416 S.W.2d at 789; *Robins v. Kroger Co*., 982 S.W.2d 156, 161 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). Although Strick has not moved specifically for summary judgment on Plaintiffs' strict liability claim against Strick, Strick certainly has not submitted any affirmative evidence that there are no defects in the trailer or any facts that the applicable FMVSS standards are inadequate.  On the other hand, Plaintiffs submit the detailed expert analysis performed by Keith Friedman ("Friedman") and R. Rhoads Stephenson ("Stephenson") that are contained in the expert report prepared by Friedman Research Corporation (the "Friedman Report").  Friedman Affidavit ¶10 (APP 1096).  Friedman has been involved in the field of research and development of transportation safety for more than 35 years.  Since graduating from Cornell University's

---

judgment.  Out of an abundance of caution, however, Plaintiffs have provided evidence and argument establishing this claim as a matter of law.

Engineering Physics Department, he has been a project and test engineer for Minicars Inc., president of Kinetic Research Inc. and MCR Technology Inc., and now president of Friedman Research Corporation.  Friedman has published more than 80 research papers on the subject of improved vehicle design and automotive safety engineering, and has presented his findings at national and international conferences in Austria, Australia, Ireland, France, Germany, Japan and Italy, as well as in the United States.  He holds active memberships in organizations such as the Society of Automotive Engineers (SAE), the Institute of Electrical Engineers, the American Society of Mechanical Engineers, and the American Association for the Advancement of Science. He is a peer reviewer for numerous conferences and journals.  Friedman Affidavit ¶10 (APP 1096).

Friedman has conducted more than 300 detailed systems analyses of catastrophic injury accidents in accordance with a protocol published by SAE.  His work has included most kinds of automotive-related tests, including component tests, sled tests, anthropometric dummy tests and full-scale vehicle tests representing impacts in front, side, rear and rollover modes.  In addition, his research has included extensive computer modeling and simulation of dummy, human, vehicle and component impacts, as well as cadaver testing and live-subject testing.  Friedman's work has involved all aspects of crashworthiness, reconstruction and impact protection covering front, side, rear and rollover impacts. Studies have involved virtually all types of protective systems, including, for example, seat belts, padding, airbags, seats, glazing systems, doors, child seats, helmets and vehicle structures.  His studies have involved the protection during impact events of occupants of cars, pickups, SUVs, vans, buses and heavy trucks, as well as pedestrians, bicyclists and motorcyclists, and covered sizes and ages ranging from infants to adults. Friedman Affidavit ¶¶ 4-6 (APP 1095). Friedman is the author of numerous reports and safety

studies for the United States Department of Transportation involving, among other things, statistical analyses of crash conditions and their relationship to injuries, effects of recent design changes on vehicle safety performance, passive-restraint performance in passenger vehicles, dynamic crash testing, static crush testing and crashworthiness. *Id*.

Dr. R Rhoads Stephenson spent thirty-six (36) years at NASA's Jet Propulsion Laboratory ("JPL") including three (3) years as Associate Administrator of R&D for the National Highway Traffic Safety Administration.  After retirement from JPL, he was a consultant to the Motor Vehicle Fire Research Institute where he helped conduct $4 million worth of vehicle fire research funded by a grant from General Motors.  Dr. Stephenson has nearly 40 years of automotive experience.  APP 481.  Both Mr. Friedman and Dr. Stephenson are Certified Fire Investigators and Certified Vehicle Fire Investigators by the National Association of Fire Investigators (NAFI). *Id.*

### 1.    There is evidence of safer alternative designs.

To meet the first prong of the statutory test, Plaintiffs need only provide evidence that there was a safer alternative design to any defective design in the trailer, which itself consists of two required elements: (1) that the alternative design would have prevented or significantly reduced the risk of the claimant's damages without substantially impairing the product's utility, and (2) that the alternative design was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.  *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a)-(b).

In the Friedman Report, Friedman and Stephenson provide sufficient evidence to meet and exceed the summary judgment threshold on this requirement. As indicated in the expert report, there are several alternative designs  that Strick could have used that would have

prevented or significantly reduced the risk of the damages sustained in the May 28, 2010, collision without substantially impairing the product's utility, and these alternative designs were economically and technologically feasible at the time the Strick Trailer left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.  Friedman Affidavit at ¶11 (APP 1096).  For instance, the expert report identifies underride guards from Wabash, Vanguard, Hyundai, and Strick's 2007 underride guard, among others, as having substantially higher peak force and energy capability than the Strick underride guard utilized on this Strick trailer.   These were clearly economically and technologically safer alternative designs.  These alternative designs all have a higher peak force and energy capability than the Strick underride guard utilized on the Strick trailer involved in the accident.  *Id*.

In addition, the Insurance Institute of Highway Safety (the "IIHS") identified a "Manac" designed trailer with a rear impact guard that would have been more sufficient than the design in the May 28, 2010, crash.   (APP 1521).   Moreover, Strick admitted under oath that it had a stronger alternative design that it could have manufactured, but choose not to do so.   Jackson Depo at 73:14 – 74:9 (APP 1343).  Accordingly, Plaintiffs have withstood summary judgment on this prong of the statutory test.

> **2.      The defects in the Strick Trailer were a producing cause of one or all of the decedents' deaths.**

To meet the second prong of the statutory test, Plaintiffs provide more than a scintilla of evidence that the defects were a producing cause of the personal injury, property damage, or death for which they seek recovery. See TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a). "A producing cause is an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any." *Flock v. Scripto–Tokai Corp*., 319 F.3d 231, 238 (5th Cir.2003) (citations and internal quotations omitted).  "Producing cause is the

cause-in-fact of the harm, meaning that a defendant's conduct must have been a substantial factor in bringing about the injury and that the injury would not have occurred but for the defendant's conduct." *Id*. The evidence in the record demonstrates that the underride guard snapped off the trailer upon impact by the 4Runner. Trooper Barkley Depo at 60:20 – 61:17 (APP 612-613). The dislodging of the underride guard, without absorbing any energy, led to the Toyota 4Runner traveling underneath the Strick Trailer all the way up to the Trailer's mud flaps and tandem axles. Barkley Depo at 62:18 – 63:23; 104:3 – 105:9 (APP 614-615; APP 656-657). Mrs. Greene was ejected from the 4Runner and landed on the hood after striking the underbody of the Strick Trailer. Thompson Depo at 35:9 – 36:4; 60:14 – 61:5 (APP 042-043; APP 067-068).

According to the Friedman Report, the facts demonstrate that the underride guard failed upon impact by the 4Runner. The dislodging of the underride guard, without absorbing any significant energy, led to the Toyota 4Runner traveling underneath the Strick Trailer sufficiently to allow contact with the Strick Trailer's mud flaps and rear wheels. Mrs. Greene was ejected from the 4Runner and landed on or near the hood as a result of the failure of the underride guard. It is the experts' opinion that the failure of the underride guard allowed Mrs. Greene to be ejected and killed and may have resulted in the decapitation of Wyndell Greene, Jr. Friedman Affidavit at ¶12 (APP 1097). In addition, the expert report of Dr. Joseph Burton also concludes that Mrs. Greene died from the blunt force of striking her head on the components underneath the Strick trailer, caused by "the collapse of the underride guard mounted on the rear of the trailer." Burton Affidavit at ¶12 (APP 1350).

As to Wyndell Greene, Sr., the expert testimony concludes that the failure of the underride guard created a large downward force which pushed the frame and undercarriage of the 4Runner onto the pavement that led to a shower of mechanical sparks, which would be able

to ignite, or reignite, the gasoline leaking from the failed 4Runner fuel system. The flame from the ignited fuel and hot vapors penetrated the passenger compartment through one or more ruptures in the floor pan or other pathways and rapidly spread upward and forward until the front seats and instrument panel ignited and Wyndell Greene, Sr. and his family were burned. Friedman Affidavit at ¶26 (APP 1100).  And Dr. Burton concludes that Wyndell Greene, Sr. died as a result of pulmonary thromboemboli due to complications of burns from the accident, including the results from contact with the underside of the Strick Trailer.  Burton Affidavit at ¶14 (APP 1351).  Accordingly, since Plaintiffs present evidence on this prong of the statutory test, Strick's motion for summary judgment should be denied.

### 3.      The Strick Trailer was unreasonably dangerous.

Finally, a claimant must show under the common law that the product was defectively designed so as to be unreasonably dangerous, taking into consideration the utility of the product and the risks involved in its use.  *Hunter v. Ford Motor Co., Inc*., 305 S.W.3d 202, 2009 WL 3766333, at *2 (Tex.App.-Waco, Nov.10, 2009, no pet. h.) (citing *Hernandez v. Tokai Corp*., 2 S.W.3d 251, 257 (Tex.1999).   "The determination of whether a product is unreasonably dangerous because of a defective design is often one that involves factual disputes that a party is entitled to have a jury resolve." *Hernandez*, 2 S.W.3d at 260.  Here, Strick has not presented any evidence whatsoever on the risk-utility analysis consideration.   Plaintiffs, however, present substantial evidence that the ICC bumper on the Strick Trailer was designed defectively and is unreasonably dangerous. The Friedman Report provides facts demonstrating that the Strick trailer's underride guard was defective as evinced by the manner in which it separated from the trailer and did not provide significant energy management or prevent underride of the trailer by the striking Toyota 4Runner.  Friedman Affidavit at ¶13 (APP 1097).  Strick reported that it

16

tested two underride guards in 1998-1999 testing and that one failed.  Again in 2007 it reported that of the two underride guards tested one failed.  Friedman Affidavit at ¶13 (APP 1097).  Thus, as additional evidence of the defective nature of the underride guard, the expert concluded that this guard is unreasonably dangerous where half of the underride guards tested failed the test requirements. *Id*.  While FMVSS 223 and 224 were created and applicable to vehicles made after 1998, its requirements were inadequate and did not reflect the need to keep pace with vehicle technology as was pointed out by the Canadian motor vehicle safety community with the CMVSS requiring higher strengths to be provided, by the Insurance Institute for Highway Safety and others.  *Id*.  Friedman summarized his analysis by opining that the version of the underride guard that was on the original trailer had insufficient peak force and energy capability to effectively address real world crashes and was therefore defectively designed.  Friedman Affidavit at ¶26 (APP 1100).  Thus, it is obvious (or at least a material fact dispute) that a product is unreasonably dangerous when half of the underride guards fail the test requirement.

As far as additional consideration of the utility of the product and the risk involved in its use, here, there is no allegation from Strick that the alternative designs proposed by Plaintiffs would completely preclude some of the uses for which the Strick Trailer was designed and to which it was put.  In other words, there are no allegations that the designs suggested by Plaintiffs' experts would have impaired the use of the Strick Trailer in any way.  On the other hand, as Friedman indicates in his expert report, there are several alternative designs  that Strick could have used that would have prevented or significantly reduced the risk of the damages sustained in the May 28, 2010, collision without substantially impairing the product's utility, and these alternative designs were economically and technologically feasible at the time the Strick Trailer left the control of the manufacturer or seller by the application of existing or reasonably

achievable scientific knowledge.  Friedman Affidavit at ¶11 (APP 1096).  Therefore, it cannot be said as a matter of law that the Strick Trailer was not unreasonably dangerous, and Plaintiffs are entitled to have a jury decide the matter.  Strick's motion for summary judgment does not contain any affirmative representation that the designs proposed by Plaintiffs' experts were not safe or that use of these alternative designs would affect the Strick Trailer's utility.  Thus it would be improper for Strick to contend in a Reply that it was somehow unaware of these risks or that the alternative designs would not be feasible.  *See Wallace v. County of Comal*, 400 F.3d 284, 291–92 (5th Cir.2005) (issues raised for the first time in a reply brief are waived); *Santamaria v. Dallas Indep. Sch. Dist.*, 2007 WL 1073850, *2 (N.D.Tex. Apr.10, 2007) (same).

Consequently, there is no doubt that on this record a reasonable jury could find that (1) design defects caused the deaths of one or more members of the Greene Family, (2) there were feasible, safer alternatives that would have corrected the deficiencies in the Strick Trailer, and (3) the Strick Trailer design was unreasonably dangerous.  In addition, Plaintiffs' experts, as well as the IIHS, have concluded that the minimum federal safety standards for underride guards are inadequate; that a trailer designed only to meet the minimum federal safety standards will therefore be inadequate; and that designs for more effective underride guards have been available for several decades.  For these reasons, Strick is clearly not entitled to judgment on Plaintiffs' strict liability design-defect claim and its motion should be denied.

### G.   Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Negligence Claims.

Under Texas law, a negligence claim requires proof only of the following three elements: (1) a legal duty owed by one person to another; (2) breach of that duty; and (3) damages proximately resulting from that breach. *See, e.g. D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex.2002).

18

    **1.**    **Strick cannot establish as an undisputed fact that the underride guard involved in the May 28, 2010, accident was not a Strick-manufactured underride guard, or that Strick is entitled to judgment as a matter of law.**

Strick's entire motion for summary judgment hinges on its allegation that the ICC underride guard "was not designed, manufactured, sold, or installed by Strick." Mot. at 6. However, this is a gross misrepresentation of the evidence, the correction of which must result in the outright denial of Strick's motion for summary judgment. In an effort to support its theory, Strick first alleges that one of its managers, James Jackson ("Jackson"), testified that the "bumper" was not a Strick bumper. A closer review of Jackson's testimony indicates, however, that although Mr. Jackson eventually stated that a portion of the underride guard (the bumper tube) was not a Strick bumper, Jackson initially concluded that the bumper tube "could be" a Strick product. Jackson Depo at 80:5-9 (APP 1346). A jury should be permitted to assess Jackson's credibility on the stand as to whether the bumper tube component of the underride guard involved in the accident is a Strick component part. More importantly, however, Jackson admits that the vertical struts on the underride guard are indeed Stick-manufactured struts. Jackson Depo at 81:22 – 82:4 (APP 1347). Furthermore, during his work in this case, Friedman was able to examine underride guards on actual Strick trailers that are in operation, photographs and diagrams from Strick depicting actual designs of Strick underride guards, the underride guards received directly from Strick's exclusive parts distributor, as well as the Dolphin depositions stating they only utilize original equipment parts. In Friedman's expert opinion, these designs are substantially similar, if not identical, to the photographs of the underride guard he observed in the highway after the accident and the photographs of the underride guard lying in the grassy field. It is therefore his professional opinion that the underride guard that was on the trailer involved in the May 28, 2010 accident was a Strick manufactured underride guard.

Friedman Affidavit at ¶25 (APP 1100).  In addition, Thomas Truss ("Truss"), a trucking industry expert hired by one of the other defendants, also provided testimony regarding the probable source of the subject underride guard.  Although Truss could not state with absolute certainty the source of the underride guard, he testified that based on his many years of experience with trucks and trailers, as well as his visual inspection of the underride guards, he concluded "the underride guard from the May 28 accident and those affixed to other 2005 Strick trailers are comparable." Truss Deposition at 40:2 – 41:17 (APP 1501).  At the very least, the photographic evidence of the comparable underride guards, Friedman's expert observations, and Truss's testimony establish a dispute issued of material fact regarding the identity of the manufacturer of the subject underride guard.  To accept only Jackson's testimony, as Strick argues, would involve the Court making a credibility assessment of witnesses and the evidence, a process in which courts do not engage during the summary judgment phase.  Accordingly, summary judgment is precluded on this basis.

> **2.** **Strick cannot meet its burden of establishing as an undisputed fact that the underride guard involved in the May 28, 2010, accident was substantially altered, and that Strick is entitled to judgment as a matter of law.**

To begin with, it is Strick that has the burden of proof to demonstrate that the Strick underride guard that was on the Strick Trailer on May 28, 2010, had been subjected to a substantial alteration.  *See Olympic Arms, Inc. v. Green*, 176 S.W.3d 567, 587 (Tex.App.—Hous. [1st Dist.] 2004, no pet.) ("Substantial alteration of a product is a type of product misuse and an affirmative defense for which the defendant bears the burden of proof." (citing *Placencio v. Allied Indus. Intern., Inc*., 724 S.W.2d 20, 22 (Tex.1987) ("In *General Motors v. Hopkins*, 548 S.W.2d 344 (Tex.1977), this court treated alteration as a type of misuse and thus as an affirmative defense on which the defendant had the burden of proof."))); see also Texas

Jurisprudence, Products Liability § 109 (3d ed. 2006) ("There is no burden on the plaintiff to show that the product involved in an accident-producing event was not subjected to misuse or alteration after leaving the hands of the product supplier.").

> **a.**      **Strick has no evidence that the Strick underride guard on the Fayard/Dolphin Trailer had been substantially altered.**

Strick argues that the underride guard that was on the Strick Trailer on May 28, 2010, was allegedly a replacement underride guard and/or that the original underride guard had been substantially altered. Mot. at 3, 8-10. The problem with this argument, however, is that Strick has no competent summary judgment evidence with which to establish this defense. As discussed above, the alleged repair records on which Strick relies are unsworn and unauthenticated alleged repair orders. A closer inspection of these unsworn documents does not confirm that any repairs were actually performed or the specifics of the alleged repairs. The documents are simply repair "orders." No witness with personal knowledge has testified as to what these documents purport to demonstrate; therefore, these documents constitute incompetent summary judgment evidence. In fact, Dolphin's representative, Hatfield, testified that there is no one at the company who can provide evidence regarding these alleged repair records. Hatfield Depo at 19:3-19. (APP 1509). Hatfield does acknowledge, however, that Dolphin's policy is that it will only use Strick underride equipment on its trailers. Hatfield Depo at 22:22 – 23:24 (APP 1512). Hatfield was also clear that, contrary to Strick's assertion, the original underride guard on the subject trailer was "never ever completely removed." Hatfield Depo at 76:7 – 77:22 (APP 1517). Furthermore, Hatfield also testified that Dolphin never alters from Strick's original design. Hatfield Depo at 26:10-23 (APP 1516). Accordingly, the record allows a jury to conclude that a Strick underride guard was on the trailer on May 28, 2010, for which Strick maintains some responsibility and that there was no substantial alteration.

Second, Strick contends that if Dolphin used welding prior to May 28, 2010, to attach the underride guard, this constitutes "an improper manner of attaching any subsequent ICC bumper." Mot. at 10. However, as discussed above, Strick has no competent summary judgment evidence establishing that a replacement underride guard was ever used or that the replacement was "substandard." Strick also cannot deny that Strick itself uses welds in various manners in testing and using its underride guards. APP 1462 (bumper gussets are welded to the sill base plate as well as the slider rails.) In addition, Friedman directed his staff to place orders for two Strick underride guards. One of the underride guards they received has no bolt holes, is welded together and appears to requiring welding for attachment to the trailer. Friedman Affidavit at ¶¶ 16-17 (APP 1098). In other words, even if Strick were able to get past the absence of evidence that the underride guard was replaced, it is unable to demonstrate that welding would have substantially altered the underride guard. Therefore, although it is Strick's burden of proof on this affirmative defense, this record demonstrates that there is clearly sufficient evidence with which a jury could conclude in Plaintiffs' favor that (1) the underride guard on the trailer on May 28, 2010 was a Strick underride guard; (2) there was no substantial alteration of the underride guard; and (3) Strick cannot demonstrate that the underride bar was replaced using an "improper manner of attaching" the underride guard or substandard components.

### b. Strick's substantial alteration legal arguments are incomplete in their applicability in this action.

In its Motion, Strick relies on a line of substantial alteration cases that have no relevance to the facts of this case. For instance, *Nuzzie v. Fruehauf Corp.*, 1991 WL 33099 (Ohio app 7 Dist. 1991), *Braswell v. Cincinnati Inc.*, 731 F.3d 1081, 1091-1092 (10th Cir.2013), and *Dion v. Ford Motor Co.*, 804 S.W. 2d 302 (Tex.App.--Eastland [11th Dist.] 1991)) address factual scenarios where a manufacturer's original component is replaced with a separate substandard

component.  Those facts do not exist here.  Strick cannot establish that its original underride guard was replaced and/or that it was replaced with a substandard product.  The proper legal propositions to be considered here are that not every change to a product after it leaves the manufacturer will suffice to preclude liability. *USX Corp. v. Salinas*, 818 S.W.2d 473, 488 n. 16 (Tex.App.-San Antonio 1995, writ denied).  Only alterations or modifications that are not reasonably foreseeable are sufficient to preclude liability. *Id.  Hollinger v. Wagner Mining Equip. Co*., 667 F.2d 402, 407 (3d Cir.1981) ("[I]t is obvious that not every change in a vehicle will relieve a manufacturer of liability under Section 402A of the Restatement (Second) of Torts.  For a change to be considered 'substantial' for this purpose, the change must have some causal connection with the accident.").  See, also, *Hollinge*r, 667 F.2d at 408 (summary judgment wrongly granted in defendant's favor in case in which evidence raised factual question concerning "an essential ingredient of substantial change, a causal connection between the modification [removal of a manual horn from a scooptram] and the resulting injury[.]"); *Fisher v. Walsh Parts & Serv. Co*., 296 F.Supp.2d 551, 563 (E.D.Pa.2003) (questions whether post-delivery modification constituted "substantial change" and, if so, whether change was foreseeable are for factfinder "unless the inferences are so clear that a court can say as a matter of law that a reasonable manufacturer could not have foreseen the change").

Here, there is a genuine issue of material fact regarding whether the underride guard was altered at all, much less substantially altered.  Strick asserts, without evidence, that the underride guard was repaired or replaced.  Dolphin's representative testified that even if the underride guard was replaced, it would have used a Strick replacement.  Experts have concluded that the underride guard that was on the trailer on May 28, 2010, was a Strick underride guard.  However, in the absence of any evidence from Strick establishing that the Strick underride guard

was replaced with a substandard underride guard, a jury could reasonably conclude that the Strick underride guard failed. That is, it fell off, due to a design defect, on its own.  Thus, Strick is not entitled to summary judgment.

> **3.    Strick breached its duty to provide installation or other instructions to its aftermarket parts distributor, which could have been used by the end users to save lives.**

The provision in the Safety Act pertaining to installation instructions came into the rule as a proposal in 1992.  In that year, the agency responded to heavy industry resistance to a 1981 Notice of Proposed Rulemaking by proposing to split the standard in two: one for the rear guard itself, and a separate standard for the vehicle.[3]  The equipment standard would specify the strength requirements that the guard would have to meet when tested on a rigid fixed test fixture and not on the vehicle itself.  The new vehicle standard would apply to new vehicles only.  As part of that Supplemental Notice of Proposed Rulemaking, the agency proposed to add S 5.5 *Installation Instructions.* On January 24, 1996, NHTSA published a final rule establishing two Federal Motor Vehicle Safety Standards (FMVSS) - 223, Rear Impact Guards, and 224, Rear Impact Protection. In this notice, it addressed these issues.    FMVSS No. 223, Rear Impact Guards, sets strength and energy absorption requirements for rear impact guards. The guard manufacturer, who may also be a trailer manufacturer, must certify the guards with the DOT symbol, the guard manufacturer's name, and the statement "Manufactured in _____" (inserting the month and year of guard manufacture). The guard manufacturer must "include with each guard printed instructions in English for installing the guard, including an explanation of the method of attachment and detailed testing instructions for underride guards.  In other words, the regulators who wrote NHTSA's rear underride rulemaking did so acknowledging the possibility

---

[3] Supplemental Notice of Proposed Rulemaking; Docket 01-11, Notice 9; National Highway Traffic Safety Administration; January 3, 1992.

that one company could manufacture the guard and another company install it.  The intent of this regulation was to "ensure that independent guard fabricators and installers would be in a position to install underride guards to trailers in compliance with regulatory requirements."  See, e.g. Analysis of Rear Underride in Fatal Truck Crashes, 2008 (APP 1245).

Here, there is a material issue of disputed fact as to whether Dolphin purchased another rear impact guard from New Life Distributors, Strick's original equipment distributor. According to the testimony of Gary Hatfield, it is Dolphin's practice to replace underride guards with OEM equipment, which in this case would have been a Strick underride guard.  Hatfield Depo at 23:19 – 24:13 (APP 1513).  Therefore, there is sufficient evidence upon which a jury could conclude that Dolphin replaced the underride guard with a new replacement Strick underride guard.  However, Hatfield also testified that Dolphin did not receive any installation instructions from Strick or its parts distributor.   Hatfield Depo at 24:9-25 (APP 1514). Furthermore, Friedman testified that he directed his staff to place orders for two Strick underride guards.  Strick's exclusive distributor shipped these underride guards to his place of business. During his inspection of the contents, Friedman was able to confirm that Strick authorized parts do not come with instructions or installation procedures or information on what trailer it could properly be used on.  Friedman Affidavit at ¶16 (APP 1098).  The trailer care and maintenance manual supplied in discovery by Strick for this trailer also do not provide instructions not to weld the underride guard and no instructions on how to install it properly.  Friedman Affidavit at ¶18 (APP 1098).   Additional testimony, albeit somewhat equivocal, from one of the defendants' experts confirms that he expects for an underride guard purchased after-market to contain installation instructions.  Truss Deposition at 90:22 – 91:7 (APP 1502).

It is clear the Strick violated its duty to provide installation instructions to its distributors. Strick's failure to do so prevented the distributor from being able to provide installation instructions to end-users.   In this case, there is sufficient evidence with which a jury could conclude that Strick's and its distributor's failure to provide instructions to Dolphin led to Dolphin improperly affixing the underride to the subject trailer, the result of which led to installation of a faulty underride guard that attributed to the deaths of one or more members of the Greene family.   This is clearly something that a jury should be permitted to consider.

### 4.   Strick was negligent, even grossly negligent, in refusing to provide NTHSA with information regarding the need for, and availability of, stronger underride guards.

The United States Code, at section 49 U.S.C. 301, provides that, as a general rule, a person may not manufacture for sale, sell, offer for sale, introduce or deliver for introduction in interstate commerce, or import into the United States, any motor vehicle or motor vehicle equipment manufactured on or after the date an applicable motor vehicle safety standard prescribed under this chapter takes effect unless the vehicle or equipment complies with the standard and is covered by a certification issued under section 30115.   Under the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act") manufacturers self-certify that their vehicles and equipment comply with applicable federal standards.49 U.S.C. §30115.   In other words, it is the responsibility of a manufacturer of vehicles and/or items of motor vehicle equipment to certify that each motor vehicle and/or equipment item is in full compliance with the minimum performance requirements of all applicable Federal Motor Vehicle Safety Standards (FMVSSs). This self-certification process is unlike the approval process that is used in some other countries such as Japan.   Fabricating manufacturers (i.e., the actual assemblers) and importers of motor vehicles and motor vehicle equipment have duties as manufacturers under the

Vehicle Safety Act.  The NHTSA does not issue approval tags, stickers or labels for vehicles or equipment items before or after the first sale.

The Safety Act defines a motor vehicle safety standard as a "minimum" standard for motor vehicle or motor vehicle equipment performance. 49 U.S.C. § 30102(a)(9). Thus, a FMVSS does not establish the state of the art, or an optimal level of performance, but rather a minimum level of performance that a manufacturer must meet in order to sell its product. It has long been NHTSA's position that a FMVSS "establishes only a minimum performance level." *Id*. A manufacturer's compliance with these minimum standards does not relieve a manufacturer from its common law duty to design safe vehicles.  Congress has made it clear that compliance with a FMVSS does not constitute a defense in a product liability suit.  49 U.S.C. § 30103.  See H.R. Rep. No. 1776, 89th Cong. 2nd Sess. (1966) at 24 ("It is intended, and this subsection [§ 108(c) of the original Safety Act] specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those relating to warranty, contract, and tort liability.").  In other words, FMVSSs do not define a manufacturer's total or complete responsibility for the safe design of its motor vehicles; and mere compliance with applicable Federal Motor Vehicle Safety Standards does not relieve a manufacturer of its duty to safely design its products.  Federal Motor Vehicle Safety Standards are not intended to define what a safe product is under all circumstances, or to relieve a manufacturer from its responsibility to design a safe product.  Strick was clearly negligent in its responsibility to design a safe trailer.

With regard to a manufacturer's duty to report defects it discovers about its products, notwithstanding its certification of a product, a fabricating manufacturer may subsequently determine that a noncompliance with an FMVSS or a safety-related defect exists in a motor

vehicle or a motor vehicle equipment item it has produced.  Manufacturers have a duty to notify

NHTSA if they learn the vehicle or equipment contains a defect and in good faith they decide

that the defect is related to motor vehicle safety, or in good faith they decide that the vehicle or

equipment does not comply with an applicable FMVSS.  See 49 U.S.C. 30118(c).  The

manufacturer must notify NHTSA within five working days after determining the existence of a

noncompliance or a safety-related defect.  See 49 CFR 573.6.  Alternately, as discussed above,

NHTSA may determine the existence of a noncompliance or a safety-related defect in a

particular motor vehicle or motor vehicle equipment item and order the responsible manufacturer

to recall the product.  See 49 U.S.C. 30118(b).

Chapter 301 defines motor vehicle safety as "the performance of a motor vehicle or

motor vehicle equipment in a way that protects the public against unreasonable risk of accidents

occurring because of the design, construction, or performance of a motor vehicle, and against

unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor

vehicle." 49 U.S.C. § 30102(a)(8).  A defect includes "any defect in performance, construction, a

component, or material of a motor vehicle or motor vehicle equipment." 49 U.S.C. §

30102(a)(2). If a manufacturer determines that a product does not comply with the FMVSS <u>or

there is a safety-related defect</u>, the manufacturer must notify NHTSA within 5 days of making

such a determination. 49 U.S.C. § 30166(l)(1).  In this case, as discussed herein, the evidence is

undisputed that Strick was aware that the underride guard on the subject trailer was inadequate

and that stronger guard designs were available to Strick in the way of the Canadian design and

the other safer alternatives discussed above.  Considering the research done by Strick and the

IIHS on the inadequacy of the underride guards, such as the subject underride guard, it was clear

that the subject underride guard was a safety defect under Chapter 301 in that it "poses an

unreasonable risk of death or injury in an accident."  Indeed, as discussed in more detail herein, Strick made a conscious decision that it "would not" inform trailer owners of their right to have the defective underride guard replaced with a stronger more energy-absorbing design.  As a result of Strick's breach of its clearly defined duty, the defective underride guard remained on the subject trailer and contributed to the deaths of one or more members of the Greene family. Therefore, summary judgment in Strick's favor is unavailable.

> **5.     Strick was negligent in failing to warn others of the inadequacy of its underride guards and to notify its trailer owners of the availability of stronger underride guards.**

Generally, a manufacturer has a duty to warn if it knows or should know of the potential harm to a user because of the nature of its product." *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex.1997).  Here Strick clearly had a duty to warn others of the unsafe underride guards since it (a) manufactured and installed the original defective underride guard and/or manufactured the replacement underride guard that was on the trailer; (b) failed to include installation instruction for its underride guards; and (c) assumed a duty to warn by not placing adequate warnings on the underride guard.  In addition, Strick has a duty to warn of dangers inherent in maintaining and repairing its products, especially since Strick was aware of all the studies and real life reports of deaths, decapitations and the overall dangerous nature of the inadequate underride guards in the United States.  Here, Strick provided no warnings at all.

Strick also failed to warn purchasers of its trailers about the availability of an improved underride guard to replace its deficient design from the 1990s.  Strick claimed not to know who the buyers of its trailers were (Defendant Dolphin bought at least 50 Strick Trailers), but Strick's own bill of materials for building the trailer shows it knew who had possession of the trailers. Friedman Affidavit at ¶15 (APP 1098).

**H.      Disputed Issues of Fact Preclude Summary Judgment as a Matter of Law on Plaintiffs' Gross Negligence and Exemplary Damage Claims.**

Gross negligence" means:  an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.  TEX. CIV. PRAC. & REM.CODE Ann. § 41.001(11).   Strick was aware there was considerable uproar over the inadequacy of underride guards.   According to the Fatality Analysis Reporting System (FARS), about 10 percent of passenger vehicle occupant fatalities occur in crashes involving large trucks.  In fact, the Insurance Institute for Highway Safety (the IIHS") petitioned the National Highway Traffic Safety Administration for more stringent standards for underride guards, considering the current standards allow underride guard designs that fail catastrophically when struck by passenger vehicles at speeds that frequently produce minimal intrusion and injury risk in regulatory and consumer information frontal crash test programs. The IIHS asked that standards be upgraded to require underride guards that are strong enough to remain in place during a crash, allowing the energy absorbing structures of passenger vehicles to deform and provide protection to their occupants. APP 1240

Despite the large number of deaths being caused unnecessarily by weak underride guards, Strick did nothing to notify the government that the existing guards were inadequate.   This is true despite that Strick was manufacturing stronger guards for its trailers that were being used in Canada. Indeed, Strick admitted under oath that it could have manufactured stronger guards, but choose not to do so.  Jackson Depo at 73:14 – 74:9 (APP 1343).  In addition, the evidence also proves that Strick made a conscious decision that it would not notify existing trailers owners of

the existence of stronger designs that could have been retrofitted onto existing trailers.   APP 1519.  This conduct certainly raises a genuine issue of material fact whether Strick acted with gross negligence.

In addition, Strick never instituted any recall of the underride guards that it was selling even though it knew that it had one with improved performance and that the previous version would be considered defective, especially on a comparative basis.  Friedman Affidavit at ¶20 (APP 1101).  Strick never made a decision to stop selling the underride guards that had inferior performance even though they had an improved design.  Friedman Affidavit at ¶21 (APP 1099). Punitive damages are available for gross negligence or malice in strict liability. *See Heil Co. v. Grant*, 534 S.W.2d 916, 926 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.).  Moreover, as the Court is well aware, a trial court does not weigh the evidence and say at the summary judgment stage that no reasonable jury could find that defendant acted with "conscious indifference to the rights, safety or welfare of others." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, (1986)(the high court reiterated that the trial court still may not make credibility determinations, nor weigh the evidence, nor draw legitimate inferences from the facts other than in favor of the nonmovant). When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir.2001); *see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222, 227 (5th Cir.2002).  Based on the record presently before the Court, Plaintiffs have provided enough evidence with which a jury can find gross negligence.  Accordingly, summary judgment should be denied.

## IV.    CONCLUSION

As explained herein, Strick has no justifiable grounds upon which to receive summary disposition of the claims in its motion.  The undisputed evidence demonstrates that there are

disputed issues of fact as to each of Plaintiffs' causes of action against Strick, as well as on

Strick's affirmative defenses.   Accordingly, summary judgment in Strick's favor should be

denied.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that the Court deny Strick's

motion for summary judgment, and grant Plaintiffs such other and further relief, in law or in equity,

to which Plaintiffs may be entitled.

Respectfully Submitted,

/s/ Aubrey "Nick" Pittman           
AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

/s/ Daryl K. Washington          
DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 5, 2014, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.


  /s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN

33