## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **OLLIE GREENE, Individually as the surviving parent of WYNDELL GREENE, SR., WILLIAM GREENE, as the Administrator of the Estate of WYNDELL GREENE, SR., and MARILYN BURDETTE HARDEMAN, Individually and as the surviving parent of LAKEYSHA GREENE,** | § § § § § § § § | |
| **Plaintiffs,** | § | |
| **v.** | § § | **CAUSE NUMBER: 3:11-cv-0207-N** |
| **TOYOTA MOTOR CORPORATION, TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., TOYOTA MOTOR SALES USA, INC., VOLVO GROUP NORTH AMERICA, LLC., VOLVO TRUCKS NORTH AMERICA, A DIVISION OF VOLVO GROUP NORTH AMERICA, LLC., STRICK TRAILERS, LLC, JOHN FAYARD MOVING & WAREHOUSE, LLC, and DOLPHIN LINE, INC.** | § § § § § § § § § § § § § | |
| **Defendants.** | § | |

## PLAINTIFFS' MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF ROBERT LANGE AND DOLPH LOHWASSER AND BRIEF IN SUPPORT

AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax

**ATTORNEYS FOR PLAINTIFFS**

DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas 75201
214-880-4883
469-718-0380 - fax

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES................................................................................... iv

I.    SUMMARY OF ARGUMENT ...................................................................... 1

II.   ARGUMENT  AND AUTHORITIES ............................................................ 1

A.    Governing Principles Applicable to Defendants' Proffer of This Testimony. ........... 1

B.    The Nature of The Alleged Testimony Sought to Be Introduced............................. 3

C.    Grounds Upon Which to Exclude Defendants' Experts........................................ 4

1.    Lange and Lohwasser should not be permitted to give opinions on the history, meaning and/or interpretations of NHTSA and the Safety Act or whether Toyota complied with it........................................................ 4

2.    Lange's and Lohwasser's testimony is not grounded on sufficient facts or data and is not the product of reliable principles and methods. ........... 10

a.    Lange's arbitrarily chosen group of peer vehicles does not follow a recognized methodology.................................................. 11

b.    The arbitrarily chosen selection of "all 2000 to 2013 model year light duty trucks with NHTSA test reports" do not evince an acceptable expert methodology. .................................. 12

c.    The arbitrarily chosen and distinctively dissimilar vehicles used in the Report's "Motor Vehicle Fire Safety Research" Section do not follow an acceptable methodology. ..................... 13

d.    Using irrelevant "vehicle collision data" cannot be considered an acceptable methodology.......................................................... 14

3.    Lange's and Lohwasser's testimony simply restating facts that are clearly in dispute is not expert testimony and also cannot serve as the basis for an expert report......................................................................... 18

4.    Lange and Lohwasser should not be permitted to discuss or give opinions on a "crash test" that was allegedly conducted by Exponent..... 20

5.    Lange and Lohwasser should not be permitted to discuss or give opinions that are not contained in the Lange-Lohwasser Report............. 22

6.    Lange and Lohwasser should not be permitted to discuss or give opinions on the FE modeling and simulation performed by Keith Friedman and Dr. Stephenson................................................................. 23

7.      Lange and Lohwasser should not be permitted to discuss or give
        opinions on the reports and testimony of Defendants' other experts........ 23

8.      Lange and Lohwasser's testimony is also inadmissible under FED.R.
        EVID. 403................................................................................................... 24

III.    CONCLUSION ............................................................................................. 25

CERTIFICATE OF CONFERENCE.......................................................................... 27

CERTIFICATE OF SERVICE ................................................................................... 28

TABLE OF AUTHORITIES

## Cases

*Ahrens v. Ford Motor Co.*, 340 F.3d 1142 (10th Cir.2003) .......................................................... 14

*Allison v. McGhan Medical Corp.*, 184 F.3d 1300 (11th Cir.1999) ....................................... 3

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir.2002) ........................... 2

*Bammerlin v. Navistar International Transportation Corp.*, 30 F.3d 898 (7th Cir.1994) ............. 5

*Barker v. Deere & Co.*, 60 F.3d 158 (3d Cir.1995) ................................................. 15

*Barnes v. General Motors Corp.*, 547 F.2d 275 (5th Cir.1977) ...................................... 20

*Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir.1994) ............................................ 9

*Buck v. Ford Motor Co.*, 810 F.Supp.2d 815 (N.D.Ohio 2011) ....................................... 15

*Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir.1994) ........................................... 2

*Contini v. Hyundai Motor Co.*, 876 F.Supp. 540 (S.D.N.Y.1995) .................................... 9

*CSX Transp., Inc. v. City of Plymouth*, 92 F.Supp.2d 643 (E.D.Mich.2000) ....................... 5

*Cummins v. Lyle Indus.*, 93 F.3d 362 (7th Cir.1996). .............................................. 3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ......................... passim

*Davis v. Washington*, 547 U.S. 813 (2006) ........................................................ 19

*E.E.O.C. v. U-Haul Co. of Texas*, 2005 WL 2860987 (S.D.Tex. 2005) ............................ 24

*Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623 (Tex. 2002) .................................... 10, 13

*Fort Worth & Denver Ry. Co. v. Williams*, 375 S.W.2d 279 (Tex.1964) .......................... 20

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ................................................... 18

*Greenwell v. Boatwright*, 184 F.3d 492 (6th Cir.1999) ............................................ 17

*Guidroz-Brault v. Mo. Pac. R.R. Co.,* 254 F.3d 825 (9th Cir. 2001) ............................. 17

*Hafstienn v. BMW of N. Am., LLC*, 194 Fed.Appx. 209 (5th Cir.2006) ............................ 20

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir.1994) ................................. 2, 10

*Jaramillo v. Ford Motor Co.*, 116 Fed. Appx. 76 (9th Cir. 2004) ............................... 15

*Kloepfer v. Honda Motor Co.*, 898 F. 2d 1452 (10th Cir. 1990) ................................. 15

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999) ......................................... 3

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797 (6th Cir.2000) .................................. 17

*Morales v. American Honda Motor Co.*, 151 F.3d 500 (6th Cir.1998) ............................ 15

*Muth v. Ford Motor Co.*, 461 F.3d 557 (5th Cir.2006) ........................................... 21

*N. Dallas Diagnostic Ctr. v. Dewberry*, 900 S.W.2d 90 (Tex.App.—Dallas 1995, writ denied)  24

*Nemir v. Mitsubishi Motors Corp.*, 2006 WL 322476 (E.D.Mich. Feb. 10, 2006) ...................... 6

*Pomella v. Regency Coach Lines, Ltd.*, 899 F.Supp. 335 (E.D.Mich.1995)............................... 17

*Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194 (11th Cir.2002) .................................................. 17

*Salamone v. Wal–Mart Stores East, LP*, 2011 WL 2787788 (E.D.Pa. July 15, 2011)................ 10

*Santos v. Chlysler Corp.*, 715 N.E.2d 47 (Mass. 1999)............................................................... 15

*Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940 (7th Cir.1997 .................................................. 2

*Smelser v. Norfolk Southern Railway*, 105 F.3d 299 (6th Cir.1997). ............................................. 2

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir.2010) ......................................................... 17

*U.S. v. Mejia,* 545 F.3d 179 (2d Cir. 2008); ............................................................................... 18

*United States v. Bonds*, 12 F.3d 540 (6th Cir.1993)...................................................................... 3

*United States v. Johnson*, 587 F.3d 625 (4th Cir.2009)............................................................. 19

*United States v. Lombardozzi*, 491 F.3d 61 (2d Cir.2007) ......................................................... 19

*United States v. Posado*, 57 F.3d 428 (5th Cir.1995) ........................................................... 12, 16

*United States v. Williams*, 343 F.3d 423 (5th Cir.2003) ............................................................... 9

*Viterbo v. Dow Chem. Co.*, 826 F.2d 420 (5th Cir. 1987) ....................................................... 11, 16

*Weisgram v. Marley Company*, 169 F.3d 514 (8th Cir.1999) ........................................................ 3

**Rules**

Fed.R.Evid. 403 ....................................................................................................................... passim

Fed.R.Evid. 702 ....................................................................................................................... passim

Fed.R.Evid. 704(a) .......................................................................................................................... 9

**PLAINTIFF'S MOTION TO STRIKE AND/OR EXCLUDE
DEFENDANT'S DESIGNATED EXPERTS AND ACCOMPANYING TESTIMONY**

Ollie Greene, Individually and as parent of Wyndell Greene, Sr., William Greene, as Administrator of the Estate of Wyndell Greene, Sr. and Marilyn Burdette Hardeman, Individually and the parent of LaKeysha Greene (collectively "Plaintiffs") file this motion to strike and/or exclude the testimony of Defendants' designated experts, Robert Lange ("Lange") and Dolph Lohwasser ("Lohwasser"), and in support thereof shows the Court as follows:

## I.      SUMMARY OF ARGUMENT

Lange's and Lohwasser's testimony do not meet the requirements of FED.R.EVID. 702 and *Daubert* because (1) they are not qualified to give expert opinions on certain matters for which they are being offered; (2) much of their testimony attempts to state a legal interpretation or conclusion or answer the ultimate question; (3) it is not based upon scientific, technical or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue; and (4) it is not based on sufficient facts or data and is not the product of reliable principles and methods that they have applied reliably to the facts of the case.  Plaintiffs further contend that the proposed testimony should be excluded pursuant to FED.R.EVID. 403 because consideration of the testimony will result in confusion of the issues and misleading the jury.

## II.      ARGUMENT  AND AUTHORITIES

### A.      Governing Principles Applicable to Defendants' Proffer of This Testimony.

*Daubert* and Federal Rule of Evidence 702 require that trial courts perform a "gate-keeping role" when considering the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 597 (1993).  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in

the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED.R.EVID. 702.

The court's gate-keeping role is two-fold.   First, the court must determine whether the testimony is reliable. See *Daubert*, 509 U .S. at 590. The reliability analysis focuses on whether the reasoning or methodology underlying the testimony is scientifically valid. *Id.*   A district court assessing the admissibility of expert testimony under FED.R.EVID. 702 serves a "gatekeeping" function: "it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir.2002) (quoting Daubert 509 U.S. at 597.  The proponent of the testimony must establish, by a preponderance of the evidence, that the expert's testimony is reliable. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994). In addition, a court may consider "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying" because the former "provides important, objective proof that the research comports with the dictates of good science." *Smelser v. Norfolk Southern Railway*, 105 F.3d 299, 303 (6th Cir.1997).  Another factor that may be considered by the court is "[w]hether the expert has adequately accounted for obvious alternative explanations." FED.R.EVID. 702 advisory committee's note (citing *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir.1994)). Finally, the court may consider "[w]hether the expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting.'" FED.R.EVID. 702 advisory committee's note (quoting *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir.1997)).

The Supreme Court has emphasized that, in assessing the reliability of expert testimony,

whether scientific or otherwise, the trial court may consider one or more of the *Daubert* factors when doing so will help determine that expert's reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

The second prong of the gate-keeping role requires an analysis of whether the expert's reasoning or methodology can be properly applied to the facts at issue, that is, whether the opinion is relevant. See *Daubert*, 509 U.S. at 591-93. This relevance requirement ensures that there is a "fit" between the testimony and the issue to be resolved by the trial. See *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir.1993). Thus, an expert's testimony is admissible under Rule 702 only if it is predicated upon a reliable foundation and is relevant. Furthermore, although a witness may be qualified as an expert in one area of expertise, the expert may be precluded from offering opinions beyond that area of expertise or which are not founded on a reliable methodology. See, e.g., *Kumho Tire*, 526 U.S. at 154-55; *Allison v. McGhan Medical Corp*., 184 F.3d 1300, 1317-19 (11th Cir.1999); *Weisgram v. Marley Company*, 169 F.3d 514, 518 (8th Cir.1999); *Cummins v. Lyle Indus*., 93 F.3d 362, 371 (7th Cir.1996).

### B.     The Nature of The Alleged Testimony Sought to Be Introduced.

On or about December 20, 2013, the Toyota Defendants submitted the jointly authored report of Robert Lange and Dolph Lohwasser (the "Lange-Lohwasser Report"). See APP 001-261. During Lange's deposition, which was taken on February 17, 2014, when asked to provide a summary of his role as a potential expert in this case, the following exchange occurred:

> **Q:**     Okay. So let me get back to my original question because perhaps you misunderstood my original question.  You told me that you had two roles in this case; one was to assess the merit regarding defects in the Toyota 4Runner, is that correct?
>
> **A:**     Yes, sir.
>
> **Q:**     And the second role that you said you were going to comment on observation by Plaintiffs's [sic] experts regarding defects, is that right?

**A:** I think what I said is I don't think I have a role, I have an assignment.

**Q:** Now, my -- the second questions relate to the second part of your assignment, commenting on the observation by Plaintiffs's [sic] expert, and do I hear you to say that you believe that there is additional data that you may have to analyze enable to be able to give a complete and full opinion as to the observations of Plaintiffs's experts?

**A:** I don't think it's a matter of belief so much as it is a matter of observation that Mr. Friedman asserted in his deposition that he had done work that I 17 don't believe at the time had been exchanged with the parties. I have not seen what that work is. If it is exchanged, maybe it will be useful to look at it.

Lange Deposition at 16:15 – 17:3 and 19:6-19 (APP 265-66 and 268).  Similarly, when Lohwasser was asked to describe his role in the case, the following discussion ensued:

**Q:** What do you perceive as your and Robert Lange's purpose and function in this case?

**A:** Well, I can speak to -- to my function. My function was to provide observations and opinions relative to vehicle testing, to structural design and crashworthiness performance and vehicle safety.

Lohwasser Deposition at 15:11-16 (APP 282).

In addition, in its designation of experts, Toyota stated that these experts would "offer opinions and testimony regarding the design, testing and performance of the subject vehicle's structure, occupant protection systems and the design characteristics criticized by Plaintiffs.  [And] may offer other opinions and conclusions to rebut the opinions of Plaintiffs' experts."  See, Dkt Entry No. 295.  For the reasons explained herein, Plaintiffs ask that the Court exclude and/or limit Lange's and Lohwasser's opinions and testimony.

### C.    Grounds Upon Which to Exclude Defendants' Experts.

**1.    Lange and Lohwasser should not be permitted to give opinions on the history, meaning and/or interpretations of NHTSA and the Safety Act or whether Toyota complied with it.**

In the Lange-Lohwasser Report, as well as during their depositions, the experts make comments regarding, and form opinions on, the interpretation and meanings of terms and

requirements in various regulations of the National Highway Traffic Safety Administration ("NHTSA").   The Lange-Lohwasser Report also includes subjective opinions regarding the background of NHTSA, NHTSA's Safety Act, Federal Motor Vehicle Safety Standards ("FMVSS"), as well as their opinion of the history of NHTSA rulemaking.   This testimony should be excluded under FRE 702 because 1) Lange and Lohwasser are not qualified to give opinions in court regarding the history and intent of NHTSA or the Safety Act;  2) allowing these opinions is tantamount to usurping the judge's because Lange's and Lohwasser's testimony is based on their interpretation of the NHTSA rulemaking process and Safety Act, of which they were not a part, and constitute legal opinions; 3) their conclusions are based on inadmissible hearsay; 4) their opinions on whether the 4Runner complied with safety standards or was defective is not proper expert testimony from these experts; and, 5) their testimony is not based on sufficient facts and data, nor is it the product of reliable principles or methods.

In *Bammerlin v. Navistar International Transportation Corp*., 30 F.3d 898 (7th Cir.1994) the court reversed a jury verdict after the district court erroneously permitted experts to interpret FMVSS 208 stating, "[t]he meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." *Id* at 900 (7th Cir.1994). "The interpretation of federal regulations is a matter of law for the court to decide." CSX Transp., Inc. v. City of Plymouth, 92 F.Supp.2d 643, 656 (E.D.Mich.2000) (citing *Bammerlin* 30 F.3d at 900). It is a question of law, to be resolved by the court.")). See *Nemir v. Mitsubishi Motors Corp.*, 2006 WL 322476, at *1 (E.D.Mich. Feb. 10, 2006) ("[I]nterpretation of federal regulations presents a question of law for the Court; not a question of interpretation for experts or a question of fact to be resolved by the jury.").  Accordingly, this court should exclude

Lange's and Lohwasser's opinions or observations regarding the meaning of the safety standards or any federal regulations.

Additionally, Lange and Lohwasser make statements (under the guise of expert testimony) on the purpose of the Safety Act, whether the safety standards are adequate and, more importantly, whether the Toyota 4Runner complied with the safety standards.   Consider a sampling of testimony these men seek to offer regarding the NHTSA, the Safety Act and whether Toyota complied with the regulations:

28 In 1966, the National Traffic and Motor Vehicle Safety Act was adopted. The law established the National Highway Traffic Safety Bureau, now the National Highway Traffic Safety Administration (NHTSA), **to address the need for motor vehicle and roadway safety (ref. A.3). The act required the NHTSA to promulgate motor vehicle rules to protect the public against "unreasonable risk of death or injury" in traffic collisions**.

    A  It is impossible to provide an absolute level of safety with no collisions and no injury due to impact insult in collisions; **Congress wisely recognized this fact** and expressly authorized the NHTSA to promulgate rules that ensure a reasonable level of safety performance in the design of motor vehicle products.

    B  **The NHTSA meets this responsibility through its adoption of Federal Motor Vehicle Safety Standards** (FMVSS) that are imposed as mandatory performance requirements on qualifying motor vehicles that are offered for sale in the U.S. Manufacturers are required to self-certify to FMVSS requirements; annually, <u>the NHTSA requests manufacturers' documentation of the self-certification process and results</u>.

    C  **NHTSA audits certification results and FMVSS compliance through its own enforcement test programs**. Failure or near failure in NHTSA testing can lead to recall by the manufacturer for non-compliance.

    D  **FMVSS by definition are imposed to meet the need for motor vehicle safety and to assure a reasonable level of safety in vehicles that comply with FMVSS requirements**.

29 Toyota records have been produced that demonstrate the 2010 4Runner was certified and complied with FMVSS 201, 208, 214, and 301: the applicable standards that govern occupant safety in front and side collisions and fuel system integrity in front, side and rear collisions. **Compliance with these standards**

**demonstrates that a vehicle is reasonably safe**; the 2010 Toyota 4Runner complied with the applicable FMVSS and is reasonably safe.

30 In many dimensions of safety performance and technology implementation, manufacturers exceed the specifications set by the applicable rules and implement safety technologies that are not mandated by rule or are not necessary to satisfy the performance requirements of a rule. By allowing motor vehicle manufacturers the flexibility to exceed rule-based performance standards and to apply new safety equipment and technologies for which there are no regulations, the NHTSA promotes the advancement of motor vehicle safety and progress in the science of motor vehicle collision injury control.

31 Many safety technologies and requirements have been developed through the application of a public health model for motor vehicle collision injury reduction described below.

****

182 Many groups, organizations, institutions, and individual parties have a shared interest in motor vehicle safety. Safe transport is an essential element for personal mobility and trade in goods and services. Motor vehicle collisions and the associated injuries extract a human and economic toll; it is in society's interest to minimize that toll and reduce those costs by improving roadway safety. Some parties with this shared interest in motor vehicle safety improvement are: roadway users, vehicle manufacturers, safety researchers and practitioners, governmental institutions (legislative, administrative, judicial, law enforcement, transport and health officials), first responders, the medical community, roadway designers and builders, and taxpayers.

183 In the United States, some elements of roadway safety are directed by the U.S. Congress through the Motor Vehicle Safety Act of 1966 as amended and now codified as 49 USC Chapter 301 (ref. A.89).

A   The United States Code for Motor Vehicle Safety (Title 49, Chapter 301) defines motor vehicle safety as "the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle."

B   The Safety Act authorizes the NHTSA to issue vehicle safety standards and to require manufacturers to recall vehicles that have safety-related defects or that do not meet Federal Safety Standards.

184 In the context of the Safety Act, a safety defect is defined as a problem that exists in a motor vehicle or item of motor vehicle equipment that: poses an unreasonable risk to motor vehicle safety, and exists in a group of vehicles of the same design or manufacture, or items of equipment of the same type and manufacture.

    A  Risk can be assessed as a standalone consideration or as an element to be weighed against the benefit provided by the element that presents the risk.

    B  Often a risk-benefit balancing is done in consideration of safety defect issues. **In such a context, if the benefits of a feature outweigh the risks, the risk is acceptable and the product is not defective**.

185 In the U.S., most motor vehicle defect determinations for safety and non-compliance recall actions are initiated by manufacturers; a minority of recall actions is influenced by the NHTSA's investigations. Motor vehicle manufacturers, the NHTSA, and, of course in the context of product liability disputes, a trier of fact, can make a defect determination.

    A  Whether manufacturer-initiated or NHTSA-influenced, each defect determination and resultant recall action results from a process of identification, investigation, and resolution.

    B  The defect investigation process involves the following steps: recognition that a potential safety problem or non-compliance condition may exist; collection of data related to the issue; analysis of relevant data including risk assessments; implementation of some decision making process; resolution; and notification to the involved parties as appropriate.

186 In considering defect issues, the decision making body would consider: regulations and requirements applicable to the design, benchmarking competitive product design and performance features, customer use data, and injury patterns.

187 In considering these elements for the 2010 4Runner one finds:

    A  **The 4Runner meets the requirements of all applicable safety standards with margin**.

    B  The 4Runner VDP applied multiple collision load case conditions that were not required by regulation: IIHS offset frontal crash, high speed lateral impact occupant protection, and low speed frontal impact for air bag sensing performance. **These collision load cases are documented in Toyota test reports for certification and validation of the architectural generation design and performance**.

    C  The 4Runner structural architecture does not negatively differentiate from its peer group. <u>There are no apparent failures in the structural topology of the 4Runner as compared to the peer class</u>.

    D  The 4Runner fuel system packaging, materials selection, shielding, and design does not negatively differentiate it from its peer group. <u>There are no apparent failures in these characteristics of the 4Runner as compared to the peer class</u>.

E The collision event is both rare and severe. Collisions of this type do not occur often on U.S. roadways; no collision in the NASS-CDS analysis matched the subject collision. <u>The collision event that gave rise to this case is very rare and would not have been identified by engineers or by regulators as a collision load case representative of a large class of collisions for inclusion in safety standards or in a vehicle manufacturer's VDP.</u>

F **In evaluating the 2010 Toyota 4Runner against these considerations, one would conclude: the 4Runner provides a high level of occupant and fuel system protection in a wide variety of very severe collision load cases, that it is reasonably safe, and <u>it is not defective</u>.**

In addition to providing "interpretations" of federal regulations, this added testimony, if allowed, clearly expresses legal conclusions, going beyond "stating opinions that suggest the answer to the ultimate issue." Under FED.R.EVID. 704(a) such testimony by an expert is improper. *See United States v. Williams*, 343 F.3d 423, 435 (5th Cir.2003)(explaining that Fed.R.Evid. 704(a) "'does not allow a witness to give legal conclusions'"); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir.1994); *Contini v. Hyundai Motor Co.*, 876 F.Supp. 540, 543 (S.D.N.Y.1995) (an expert is simply not permitted to testify whether the product complied with the standard). Lange and Lohwasser should be precluded from providing any testimony or opinions as to the conclusion to be drawn regarding whether the vehicle at issue was defective, unreasonably dangerous, in compliance with the federal regulations, or whether the Defendants were grossly negligent.

Moreover, allowing Lange and Lohwasser to provide their subjective and disputed thoughts regarding the purpose and history of the Safety Act would be improper and prejudicial since neither has shown to be a legal expert in the meaning and intent of these pronouncements, neither was involved in the rulemaking process behind the Safety Act, neither has shown the relevance and reliability of such testimony, and neither has identified the proper methodology to be employed in providing opinions of the meaning and purpose of NHTSA and the Safety Act.

Thus, statements in the Lange-Lohwasser Report that should be excluded include, but are not limited to those expressed in, and related in any way to paragraphs 28-92 and 182-193 of the Lange-Lohwasser Report.

### 2. Lange's and Lohwasser's testimony is not grounded on sufficient facts or data and is not the product of reliable principles and methods.

An expert's testimony must also "fit" the facts of the case. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742–43 (3d Cir.1994). To assess reliability of expert testimony, courts consider whether the expert opinion is based on methods and procedures of science rather than the expert's subjective belief or unsupported speculation. *In re Paoli*, 35 F.3d at 742. Factors guiding this analysis include: (1) whether the method features a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the technique is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the expert's qualifications to testify based on the methodology; and (8) the method's history of non-judicial uses. Id. at 742 n. 7; *see also Salamone v. Wal–Mart Stores East, LP*, 2011 WL 2787788, at *1 (E.D.Pa. July 15, 2011). Lange's and Lohwasser's testimony fails each of these elements.

Expert opinions are admissible only if they are the product of reliable principles and methods. FED R.EVID. 702 advisory committee's note; *Daubert*, 509 U.S. at 591-95. The Texas Supreme Court has also held "expert testimony is unreliable if it is not grounded 'in the methods and procedures of science' and is no more than 'subjective belief or unsupported speculation.'" *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002) (quoting *Robinson*, 923 S.W.2d at 556 (quoting *Daubert*, 509 U.S. at 590)). The record in this case will demonstrate that the opinions expressed by Lange and Lohwasser fall woefully short of being reliable. The opinions

are simply subjective, prepared strictly for this litigation and are tailored solely to benefit Toyota in this litigation.

>    a.    **Lange's arbitrarily chosen group of peer vehicles does not follow a recognized methodology.**

In the report at page 82, Lange and Lohwasser have arbitrarily chosen six (6) SUVs[1] that they claim are in a so-called "peer vehicle class" for the 2010 Toyota 4Runner.  And using this subjectively chosen peer vehicle classification, Lange and Lohwasser, throughout the report allegedly compare the 4Runner to the other vehicles in their peer class in terms of structural topology, fuel tank location, shielding, frontal and side collision, and fuel tank integrity. However, when questioned about the methodology used to determine this subjective peer selection, Lohwasser admits that the "methodology" he and Lohwasser used to compile this arbitrary peer class cannot be found documented anywhere.  Lohwasser Depo at 68:7 – 69:1 (APP 288-89).  They also reluctantly acknowledge that in various analyses reputable entities such as the Insurance Institute for Highway Safety ("IIHS") and the National Highway Traffic Safety Administration use a completely different methodology for classifying vehicles such as the 2010 4Runner.  Lohwasser Depo at 62:2-17 (APP 285); Lange Depo at 115:25 – 116:11 (APP 270-71).  In fact, the IIHS analysis of comparable vehicle actually lists twenty-two vehicles among their comparison of SUVs, most of which are different from, and/or in addition. See, Insurance Institute for Highway Safety Evaluation Ratings for Midsize SUVs (APP 290-91).

Consequently, Lange and Lohwasser should be prohibited from providing any expert testimony regarding the Toyota 4Runner's performance in relation to any other vehicles including, but not limited to, those randomly selected six vehicles identified by Lange and Lohwasser as "peer" vehicles to the 4Runner.  *See Viterbo v. Dow Chem. Co*., 826 F.2d 420,

---

[1]  The six SUVs chosen were:  Honda Pilot, Nissan Pathfinder, Hyundai Veracruz, Ford Explorer, Chevrolet Equinox, and Jeep Grand Cherokee.

421-22 (5th Cir. 1987) ("it is not so simply because 'an expert says it is so ...; if an expert brings

to the court 'little more than his credentials and a subjective opinion,' his opinion amounts to no

evidence").   Although Rule 702 does not require absolute certainty, it does mandate that the

proffered knowledge be based on "good grounds" and that the testimony is "more than

speculative belief or unsupported speculation." *United States v. Posado*, 57 F.3d 428, 433 (5th

Cir.1995)(citing *Daubert*, 509 U.S. at 589-90).   See also FED.R.EVID. 702 advisory committee's

note ("The trial judge in all cases of proffered expert testimony must find that it is properly

grounded, well-reasoned, and not speculative before it can be admitted.").   Because the

"methodology" used by Lange and Lohwasser consists only of their arbitrary and subjective peer

vehicle classification, and unsupported conclusions drawn from it, it is unreliable, and this expert

testimony should be excluded.   These opinions include, but are not limited to those expressed in,

and related in any way to paragraphs 103-153, 187, 194-214 of the Lange-Lohwasser Report.

>    **b.    The arbitrarily chosen selection of "all 2000 to 2013 model year light
>    duty trucks with NHTSA test reports" do not evince an acceptable
>    expert methodology.**

After arbitrarily limiting to six the number of vehicles in the peer vehicle class for the

comparison discussed above, in Lange-Lohwasser Report at page 126, Lange and Lohwasser

now conveniently expand their vehicle comparisons when they refer to a "survey" of all 2000 to

2013 model year light duty trucks and use this data supposedly to compare fuel tank materials,

shapes, locations, heat shields, skid plates, etc. with the 4Runner.   The report, however, does not

identify the trucks by model or architecture so that dissimilar vehicles could be eliminated.   This

also led to an inability to question Lange and Lohwasser on the specifics of the models used in

this so-called survey.   Lange and Lohwasser also did not identify in the Lange-Lohwasser Report

or during the depositions any methodology that would allow an expert to make this large of a

stretch, comparing undisclosed and dissimilar vehicles to a subject vehicle.  And it is contrary to the law.  In addition, during several motions to compel in this matter when Plaintiffs sought information regarding other vehicles models and designs, Toyota argued that "other Models and Vehicles are not Relevant to this Case," and "Discovery into "Alternative Designs" is not Unlimited."  See, Toyota Defendants' Response to Plaintiffs' Expedited Motion to Compel (APP 292-314).  In Toyota's motion to compel response, which the Court relied on to fashion the scope of discovery in its July 18, 2012, Order in this case, Toyota argues that the comparison models must share "pertinent characteristics" as they relate to the accident at issue and that a "specific factual showing of substantial similarity" is required.  *Id*.  Therefore, Toyota's experts should not be allowed to ignore Toyota's previous position, as well as the law, and present the jury with evidence regarding dissimilar and irrelevant vehicle comparisons designed solely to support Toyota's litigation position.

The Texas Supreme Court has held "expert testimony is unreliable if it is not grounded 'in the methods and procedures of science' and is no more than 'subjective belief or unsupported speculation.'" *Exxon Pipeline* 88 S.W.3d at 629 (quoting *Robinson*, 923 S.W.2d at 556 (quoting *Daubert*, 509 U.S. at 590)).  In this case, these experts have provided several statements that are transparently subjective, unreliable, and tailored just for this litigation.  The opinions that should be excluded from this matter include, but are not limited to, those expressed in, and related in any way to, paragraphs 120-122, 194-212, and 216- 226 of the Lange-Lohwasser Report.

> c.     **The arbitrarily chosen and distinctively dissimilar vehicles used in the Report's "Motor Vehicle Fire Safety Research" Section do not follow an acceptable methodology.**

In the Lange-Lohwasser Report at pages 207 and 219, Lange and Lohwasser have once again chosen an arbitrary and random selection of comparison vehicles, this time with which to

form the opinion that there was allegedly "noting in the GM fire research [that] would cause an engineer to question the design or performance of the 2010 Toyota 4Runner for fire risk, or fuel system integrity."  The problem is that none of the vehicles described in this section come close to the 4Runner or its 2010 design.  The referenced vehicles do not even include a recent model year vehicle that was even remotely close to the 2010 4Runner model year.  In fact, this random study did not include a single SUV and involved a 1998 Honda Accord, a 1997 Chevrolet Camaro, a 1996 Dodge Caravan and a 1997 Ford Explorer.  As a result, none of the vehicles has any similarity to the 4Runner at issue and this test is not reflective of a recognized methodology that would legitimately compare such dissimilar accidents, vehicle types, and distinctive fuel system designs and locations to form an opinion on duty, foreseeability or any relevant issue in this case.  Testing that simulates other sorts of accidents is of limited probative value. See *Ahrens v. Ford Motor Co*., 340 F.3d 1142, 1145–46 (10th Cir.2003).

Therefore, Lange and Lohwasser should be prohibited from providing any testimony regarding the design and placement of the Toyota 4Runner's fuel system and its propensity to lose integrity in relation to any vehicle including, but not limited to, using those comparator vehicles identified in the Lange Lohwasser Report as a basis for opinions.  These excludable opinions or observations include, but are not limited to, those expressed in, and related in any way to, paragraphs 169-181 and 231 of the Lange-Lohwasser Report.

### d.    Using irrelevant "vehicle collision data" cannot be considered an acceptable methodology.

In the Lange-Lohwasser Report beginning at page 207, Lange and Lohwasser refer to alleged statistics from the National Automotive Sampling System ("NASS") Collision Data System ("CDS") in an effort to provide support for an opinion that allegedly "the likelihood of occurrence for a collision such as this does not register in public health records."  However, the

problem again is that this study does not detail statistics for SUVs with a design remotely similar

to the design of the 2010 4Runner and includes thousands of clearly dissimilar vehicles.  This

random selection of vehicles from this database is inappropriate and does not follow a

methodology that requires some similarity between the subject vehicle and those in the statistical

sampling.  *Jaramillo v. Ford Motor Co.*, 116 Fed. Appx. 76 (9th Cir. 2004)(court abused its

discretion in admitting Ford's comparative accident statistics that were not limited to accidents

that occurred under circumstances similar to plaintiff's accident, i.e., rollover on smooth, dry

pavement); *Buck v. Ford Motor Co.*, 810 F.Supp.2d 815 (N.D.Ohio 2011); *Santos v. Chlysler

Corp.*, 715 N.E.2d 47 (Mass. 1999)(the court excluded a defense expert's statistical analysis of

the FARS database because the analysis was not limited to accidents that involved braking,

skidding, or rear wheel lockup, which were the critical circumstances of the Santos accident...);

*see also Morales v. American Honda Motor Co.*, 151 F.3d 500, 511-12 (6th Cir.1998) (in a small

motorcycle case, accident statistics admissible when concerning "minibikes and small vehicles of

the same sort"); *Barker v. Deere & Co.*, 60 F.3d 158, 161, 163 fn. 5 (3d Cir.1995) (holding that

statistical evidence of rollover was not substantially similar to the case at issue, which did not

involve rollover);  *Kloepfer v. Honda Motor Co.*, 898 F. 2d 1452 (10th Cir. 1990)(rejecting ATV

manufacturer's attempt to introduce statistical evidence of injuries caused by ATVs

manufactured by other manufacturers, when offered to show theirs was no worse than anyone

else's).

　　　　Here, Lange and Lohwasser have not identified a recognized methodology that would

allow the use of this overly broad database to determine whether designers should have taken

steps to build a safer SUV.  Indeed, Lange or Lohwasser never state that they read all of these

accident reports and accident reconstructionist reports in an effort to remove dissimilar accidents

and scenarios from these statistics, nor do they discuss the method for arriving at these opinions. Lange's and Lohwasser's failure to eliminate dissimilar accidents from the comparison is a fatal flaw which makes the entire exercise inherently suspect and misleading.  Removing dissimilar vehicles and dissimilar conditions would clearly lead to a much smaller sample with which to examine whether this accident was unforeseeable and whether there was evidence that Toyota was alerted to its duty to design the fuel system "differently."  Therefore, Lange and Lohwasser should be prohibited from providing any testimony regarding the alleged NASS-CDS (or any other) collection of crashes.  The study introduced in the Lange-Lohwasser Report clearly involves dissimilar accidents, dissimilar conditions, dissimilar causes, dissimilar defective components, and dissimilar vehicles including, but not limited to, those comparator vehicles identified by Lange and Lohwasser.  Use of this study is an improper methodology and causes severe unfair prejudice to Plaintiffs.  Accordingly, the opinions using the NASS-CDS information that should be excluded include, but are not limited to, those expressed in, and related in any way to, paragraphs 101, 154-161, 183, 187, 219, 222, and 227 of the Lange-Lohwasser Report.

> **e.**    **The lack of an authoritative or consistent methodology and the arbitrary use of comparable vehicles render the opinions completely inadmissible.**

The record is clear that Lange and Lohwasser have no recognized methodology, scientific or otherwise, to speak of.  Their comparisons of allegedly peer or comparable vehicles and crashes, whether based on their arbitrary selection of the six SUVs, the 200 light-duty trucks, or the millions of crashes, are only their subjective conclusions.  *See Viterbo* 826 F.2d at 421-22 ("it is not so simply because 'an expert says it is so ...; if an expert brings to the court 'little more than his credentials and a subjective opinion,' his opinion amounts to no evidence").  Although Rule 702 does not require absolute certainty, it does mandate that the proffered knowledge be

based on "good grounds" and that the testimony is "more than speculative belief or unsupported speculation." *Posado*, 57 F.3d at 433(citing *Daubert*, 509 U.S. at 589-90).  See also FED.R EVID. 702 advisory committee's note ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted."). Because Lange's and Lohwasser's "methodology" consists only of arbitrary, subjective, and irrelevant vehicle and crash comparisons it is unreliable, and their expert testimony should be excluded.

In addition, Lange's and Lohwasser's comparisons should also be excluded since the report consists of premises that contradict the uncontroverted facts.  *See McLean* 224 F.3d at 800-01 ("[A]n expert's opinion must be supported by more than subjective belief and unsupported speculation and should be supported by good grounds, based on what is known.") (quoting *Pomella v. Regency Coach Lines, Ltd*., 899 F.Supp. 335, 342 (E.D.Mich.1995)).  An expert opinion is properly excluded where it relies on an assumption that is unsupported by evidence in the record and is not sufficiently founded on facts. *See Guidroz-Brault v. Mo. Pac. R.R. Co.,* 254 F.3d 825, 829-31 (9th Cir. 2001); *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir.1999) ("Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony contradict the evidence.").

In addition, Lange testified that experts are required to develop hypotheses and test them. Lange Depo at 18:5-25 (APP 267).  Despite this recognition, Lange did not test, for instance, the accident reconstructions provided to him.   Lange Depo at 123:11 – 124:10 (APP 272-73). Without testing, all Lange and Lohwasser have done is to identify hypotheses.   Untested hypotheses, even if plausible, are insufficient to satisfy Rule 702.  *E.g., Rider v. Sandoz Pharm. Corp*., 295 F.3d 1194, 1202 (11th Cir.2002) ("The courtroom is not the place for scientific

guesswork, even of the inspired sort."); *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670

(6th Cir.2010) (explaining that a "working hypothesis" is not "admissible scientific knowledge").

Lange and Lohwasser provide no explanation for the analytical leap that the general engineering

principles they describe apply to motor vehicles in general and specifically to the expert opinions

in the report that are not the subject of any testing. "Nothing in either *Daubert* or the Federal

Rules of Evidence requires a district court to admit opinion evidence which is connected to

existing data only by the ipse dixit of the expert. A court should conclude that there is simply too

great an analytical gap between the data and the opinion offered." *Gen. Elec. Co. v. Joiner*, 522

U.S. 136, 146 (1997).  Thus, the Court should exclude the Lange-Lohwasser Report as well as

testimony regarding the opinions expressed in it.

> **3.    Lange's and Lohwasser's testimony simply restating facts that are clearly in dispute is not expert testimony and also cannot serve as the basis for an expert report.**

In other statements in the Lange-Lohwasser Report, Lange and Lohwasser clearly assume

the truth of certain alleged facts and adopt those facts, either as their opinions or as the basis for

what they call expert opinions.  For instance, in forming opinions regarding the alleged safety of

the subject 4Runner, the Lange-Lohwasser Report makes the following observation:

> 193 The 2010 4Runner was developed and validated to a complex set of
> regulatory and internal Toyota requirements, including FMVSS 201, 208, 214,
> and 301, and consumer metric tests for front and side collision. It satisfied all
> regulatory requirements with margins, sometimes quite large margins. These test
> results indicate that the 2010 4Runner provides a very high level of occupant
> collision safety; the vehicle provides a reasonable level of safety.

APP 255.  It is clear from Toyota's designation of Lange and Lohwasser however that

they seek to testify as to matters with which they have no personal knowledge, to testify as to

statements that are hearsay, and to give opinions on of issues that go to the heart of the claims

and defenses in this matter.  In other words, considering they have no personal knowledge of

Toyota's actual compliance testing and failure analyses, these experts are being used solely as a "hearsay conduit."  Courts faced with similar issues have cautioned against situations such as this where a witness is used as little more than a conduit for testimonial hearsay, rather than "a true expert whose considered opinion sheds light on some specialized factual situation." *See U.S. v. Mejia,* 545 F.3d 179, 197 (2d Cir. 2008); *U.S. v. Dixon*, 413 F.3d 520, 524-25 (5th Cir. 2005), aff'd 548 U.S. 1 (2006); *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir.2009); *see also Davis v. Washington*, 547 U.S. 813, 826 (2006) (excluding note-taking policeman's testimony since it recites declarant's unsworn testimony from a report).  These experts should not be allowed to testify regarding alleged safety testing that no one from Toyota has discussed with them or proved to them.  Both men admit that they were not present for any of the compliance testing Toyota claims it did.  Lohwasser Depo at 63:21 – 64:9 (APP 286-87); Lange Depo at 142:8 – 143:8 (APP 274-75).

In addition, Toyota, like most manufacturers, uses a process known as Failure Mode and Effects Analysis ("FMEA") in which a manufacturer repeatedly tests and tries to refine its designs to improve and ensure reliability. During the FMEA process, engineers normally run tests to identify risks and do what is necessary to try and fix them.  Here however, Lange and Lohwasser did not see any of Toyota's FMEA documentation or quality control standards.  They also did not speak with any of Toyota's employees about such documentation.  Lohwasser Depo at 28:10 – 29:12 (APP 283-84); Lange Depo at 194:21 – 195:13 (APP 276-77). Instead, Lange and Lohwasser merely recite statements they received from Toyota's counsel and adopt these findings as their expert opinions.  However, cloaking this inadmissible testimonial hearsay as expert opinions does not redeem the character of the evidence.  Indeed, courts agree that "allowing a witness to simply parrot ... out-of-court testimonial statements directly to the jury in

the guise of expert opinion" would provide an end run around Crawford, and this we are loathe to do." *See Mejia,* 545 F.3d at197; *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir.2007).

In this case, Plaintiffs will also be unable to cross Lange and Lohwasser on the testing documentation regarding which they are providing testimony since they did not undertake any type of investigation to determine the accuracy of the statements they are repeating and have no first-hand knowledge of the extent of the testing, if any. Therefore, these hearsay statements parading as expert testimony should be excluded.

**4.     Lange and Lohwasser should not be permitted to discuss or give opinions on a "crash test" that was allegedly conducted by Exponent.**

Paragraph 27 of the Lange-Lohwasser Report makes reference to a "December 17, 2013, "single-moving-vehicle crash test between a stationary 2010 Toyota 4Runner and a moving 2008 Volvo 630/1981 Great Dane flat-bed trailer."   Toyota has indicated that it plans to introduce this video footage and the related testimony of Mickey Marine, who was hired by Toyota to conduct this test.  The problem with this footage and related testimony is that the crash test does not even purport to be substantially similar to, or a replication of, the accident that happened on May 28, 2010, wherein multiple vehicles and multiple impacts of moving vehicles were involved.   In other words, although the video is represented to be a "potential" re-enactment of a single event during the May 28, 2010, crash it is clearly not substantially similar to the underlying accident. Because of the material differences between the crash test and the underlying accident, the video and all testimony related to it must be excluded.  *See e.g. Hafstienn v. BMW of N. Am., LLC*, 194 Fed.Appx. 209, 213 (5th Cir.2006) (evidence of crash tests properly excluded where there are "material differences between the accident and the crash test."); *see also, Barnes v. General Motors Corp.*, 547 F.2d 275 (5th Cir.1977); *Fort Worth & Denver Ry. Co. v. Williams*, 375 S.W.2d 279 (Tex.1964).

In the event Toyota contends that the crash test was not designed to constitute a re-enactment of the May 28, 2010, crash, the Fifth Circuit has already addressed this issue:

> When the demonstrative evidence is offered only as an illustration of general scientific principles, not as a reenactment of disputed events, it need not pass the substantial similarity test. Such demonstrative aids, however, must not be misleading in and of themselves, and one such way that a demonstration might mislead is when ... the demonstration resembles the disputed accident.

*Muth v. Ford Motor Co.*, 461 F.3d 557, 566 (5th Cir.2006). In *Muth*, the district court rejected the proffered demonstration as insufficiently similar, but too closely resembling the disputed accident to effectively present abstract principles without misleading the jury. *Id.* The Fifth Circuit upheld the district court's determination, noting that the similarities between the crash test and the accident at issue heightened the prejudicial effect of the evidence, and this prejudicial effect was sufficient to justify the exclusion of the evidence. *Id.* at 567. This rationale is equally applicable here. Toyota's experts opined that the vehicles in the crash test were identical to the 4Runner and the Volvo tractor and trailer involved in the May 28, 2010, accident. Toyota also notes that both the crash test and the May 28, 2010 accident involved circumstances (e.g. speeds and impact conditions) similar to those proffered by one or more of the experts in this case. Therefore, this Court should conclude, as *Muth* did, that the similarities between the crash test and the accident at issue heightens the prejudicial effect of the evidence, and that this prejudicial effect is sufficient to justify the exclusion of the evidence.

Furthermore, Plaintiffs would note that Toyota's witnesses have also acknowledged that the narrator whose voice is heard on the walk-up portion of the crash test videotape allegedly describing the result of the test is Kurt Kern, who is Toyota's lead trial counsel. Plaintiffs were not provided with the opportunity to have representatives, *i.e.,* a videographer, a photographer, an attorney, and an expert, present at this particular test, or during any crash test or any test

21

involving vehicle-to vehicle collisions conducted by defendants that may pertain to this case. Therefore, the conditions under which this test was performed and the suspect nature of it are additional reasons the tape and accompanying testimony should be excluded.   Moreover, the Court should also exclude this evidence since the danger of unfair prejudice or confusion posed by this subjective evidence substantially outweighs its probative value. FED.R.EVID. 403.  Thus, this video footage, and the accompanying testimony is excludable since it clearly is not reliable or relevant evidence on which any expert should rely to form opinions.

   5.   **Lange and Lohwasser should not be permitted to discuss or give opinions that are not contained in the Lange-Lohwasser Report.**

   During their depositions, Lange and Lohwasser were occasionally asked questions by other defendants regarding matters outlying to the Lange-Lohwasser Report.  For instance, during questioning, Strick's counsel, Donald Dawson, asked Lange whether the report of 68 million dissimilar vehicle accidents in the NASS-CDS study, discussed above, could be used to inform a design opinion as to "a Toyota vehicle, a Volvo vehicle, or a Strick trailer."  The problem: Lange did not include this opinion anywhere in the Lange-Lohwasser Report.  In fact, Lange testified that he did not perform any analysis of the designs of the Volvo truck or the Strick trailer, meaning that he did not employ a methodology to study these designs, assuming he would even be qualified to do so.   In addition, in its designation of experts, Toyota stated that Lange and Lohwasser would "offer opinions and testimony regarding the design, testing and performance of the subject vehicle's [Toyota 4Runner] structure, occupant protection systems and the design characteristics criticized by Plaintiffs.  [And] may offer other opinions and conclusions to rebut the opinions of Plaintiffs' experts."  See, Dkt Entry No. 295.  Accordingly, Lange and Lohwasser should be precluded from giving any opinions regarding the designs, testing, performance, or any

aspects of the other vehicles and/or trailers involved in the accident, as well as from providing

any other opinions not disclosed in the Lange-Lohwasser Report.

6.     **Lange and Lohwasser should not be permitted to discuss or give opinions on the FE modeling and simulation performed by Keith Friedman and Dr. Stephenson.**

During his deposition, Lange testified that prior to his deposition he became aware of FE

modeling and simulation that was performed by Keith Friedman and Dr. Rhodes Stephenson, on

Plaintiffs' behalf.  However, despite that the FE information was produced to Toyota's counsel

not later than January 18, 2014, and given to a copy service and court reporting service retained

by his client Toyota, Lange testified that as of his February 17, 2014, deposition, he had not

reviewed or formed opinions on these items.   Lange Depo at 21:9 – 23:7 (APP 269).

Accordingly, Lange and Lohwasser should not be permitted to give any testimony or opinions on

the FE modeling and simulations or the subject of it.

7.     **Lange and Lohwasser should not be permitted to discuss or give opinions on the reports and testimony of Defendants' other experts.**

In the Lange-Lohwasser Report, as well as during their depositions, Lange and Lohwasser

make reference to the expert reports and out of court statements of Lee Carr and other experts

designated by the Defendants.   However, Lange and Lohwasser have not (1) identified a

recognizable methodology showing that this is the type of information that experts such as

themselves would reasonably rely upon in forming the opinions formed in the Lange-Lohwasser

Report and (2) identified and proven in the Lange-Lohwasser Report that specific findings of

defendants' other experts are critical to their opinions.  Nonetheless, even if they were able to

satisfy these prerequisites, Lange and Lohwasser should be ordered to avoid repeating the

findings and opinions of defendants' other experts, as well as commenting on the merits or

quality of the other experts' work or opinions. The jury must evaluate Lee Carr's and the other experts' testimony without the benefit of bolstering from Lange and Lohwasser.

>   **8.     Lange and Lohwasser's testimony is also inadmissible under FED.R.EVID. 403.**

Any purported expert testimony from Lange and Lohwasser also should be excluded because its probative value, if any, is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.   FED.R.EVID. 403; *Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.   Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."); s*ee also, E.E.O.C. v. U-Haul Co. of Texas*, 2005 WL 2860987 (S.D.Tex. 2005); *N. Dallas Diagnostic Ctr. v. Dewberry*, 900 S.W.2d 90, 94 (Tex.App.—Dallas 1995, writ denied) ("courts should exclude . . . evidence [when] the expert's opinion would be more likely to prejudice or confuse than to assist the trier of fact.").   A review of the Lange-Lohwasser Report shows that it contains legal and subjective conclusions and is not based on any independent evaluations undertaken by Lange and Lohwasser.   Both men have testified that they did not observe any testing of the Toyota vehicles and did not perform any independent testing themselves.   Yet, they seek to tell the jury that Toyota's vehicles are safe; in fact allegedly safer than vehicles in Lange's arbitrary peer group.   Both Lange and Lohwasser have also admitted that in making random statements about the safety of Toyota's vehicles they did not take into account that in just the past few years, Toyota has had to recall millions of vehicles, of just about every type manufactured by Toyota, including the subject model year 4Runner.   Yet, they wish to testify that Toyota supposedly exceeds the industry in safety testing and performance. Consider another selection of "expert opinions" Lange and Lohwasser attempt to offer:

24

188 The science of motor vehicle safety has advanced substantially through the application of the public health model for collision safety improvement: data driven research, innovation, countermeasure development and deployment, and assessments of countermeasure safety improvements.

189 Motor vehicle safety is not an absolute; there is no way to provide absolute safety with no collisions and no collision-related occupant injuries. Motor vehicle safety must achieve a reasonable level.

190 Science-driven motor vehicle safety improvements generate technologies for application or collision load cases that can be incorporated into the VDP. Collision load cases are developed and selected for application to be comprehensive of a broad range of collision circumstances, not specific to a singular collision event. This facilitates maximization of the safety benefit.

191 Most motor vehicle safety improvements have been instituted absent a regulatory mandate.

192 Motor vehicle systems have complex interactions. Revisions to one system can interact with and affect multiple other systems. A feature of a system cannot be changed without considerations of other effects.

Lange's and Lohwasser's subjective conclusions and pronouncements such as these and others should not be anointed with the label of "expert opinions," particularly because such opinions are neither relevant nor reliable, are not based on accepted engineering principles, are biased, and would serve only to confuse and mislead a jury that these are supposedly expert opinions.

## III.        CONCLUSION

Permitting Lange and Lohwasser to testify without them having applied the proper methodology in the analysis and without having considered all of the relevant evidence would cause severe prejudice to Plaintiffs.  It is also clear that Lange and Lohwasser are ether not qualified or simply chose not to utilize a methodology used by other experts in the field. Plaintiffs therefore request that the Court strike the Lange-Lohwasser Report and accompanying

testimony, not consider the same as evidence, and grant Plaintiffs such other and further relief, in law or in equity, to which Plaintiffs may be entitled.

Respectfully Submitted,

/s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

/s/ Daryl K. Washington
DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

26

## CERTIFICATE OF CONFERENCE

The undersigned certifies that a face-to-face conference on this motion was held on March 7, 2014, with counsel for all defendants, during which time defendants' counsel indicated they were opposed to the relief being sought in this motion.  Accordingly, Plaintiffs present this matter to the Court for resolution.

    /s/ Aubrey "Nick" Pittman        
AUBREY "NICK" PITTMAN

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 17, 2014 the foregoing pleading was filed with the clerk of

the court for the U.S. District Court, Northern District of Texas, using the electronic case filing

system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all

attorneys of record who have consented in writing to accept this Notice as service of documents

by electronic means.

   /s/ Aubrey "Nick" Pittman       
AUBREY "NICK" PITTMAN