IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OLLIE GREENE, Individually as the<br>surviving parent of WYNDELL GREENE,<br>SR., WILLIAM GREENE, as the<br>Administrator of the Estate of WYNDELL<br>GREENE, SR., and MARILYN BURDETTE<br>HARDEMAN, Individually and as the<br>surviving parent of LAKEYSHA GREENE,<br><br>     Plaintiffs,<br><br>v.<br><br>TOYOTA MOTOR CORPORATION,<br>TOYOTA MOTOR ENGINEERING &<br>MANUFACTURING NORTH AMERICA,<br>INC.,  TOYOTA MOTOR SALES USA,<br>INC., VOLVO GROUP NORTH<br>AMERICA, LLC., VOLVO TRUCKS<br>NORTH AMERICA, A DIVISION OF<br>VOLVO GROUP NORTH AMERICA,<br>LLC., STRICK TRAILERS, LLC, JOHN<br>FAYARD MOVING & WAREHOUSE,<br>LLC, and DOLPHIN LINE, INC.<br><br>     Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § | CAUSE NUMBER: 3:11-cv-0207-N |

PLAINTIFFS' RESPONSE TO TOYOTA'S
MOTION TO EXCLUDE MATERIALS AND DATA OF
PLAINTIFFS' EXPERTS KEITH FRIEDMAN AND DR. RHOADS STEPHENSON

AUBREY "NICK" PITTMAN
State Bar No. 16049750

THE PITTMAN LAW FIRM, P.C.
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax

ATTORNEYS FOR PLAINTIFFS

DARYL K. WASHINGTON
State Bar No. 24013714

LAW OFFICES OF DARYL K. WASHINGTON P.C.
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214-880-4883
469-718-0380 - fax

TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................ 1

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT AND AUTHORITIES ................................................................................. 1

    A.    There Has Been No Untimely Production of Materials. ......................................... 1

    B.    The Parties Were Unable to Reach an Agreement on The Timing Protocol for Production of Expert Materials, and The Manner of Production Complained of Has Not Been Inconsistent With Disclosures from Defendants. ........................... 5

    C.    The "Size" and Timing of the Friedman Production Was the Direct Result of Toyota's Overly Broad Document Request. ......................................................... 7

    D.    The Discovery Materials from Friedman's and Stephenson's Files is Very Important to Plaintiffs. ......................................................................................... 7

    E.    Defendants Have Not Been Prejudiced By the Timing of the Production. ........... 8

        1.    The bulk of the information provided to Defendants has been in Defendants' possession for years. ............................................................... 9

        2.    Defendants had full access to Friedman's materials beginning on the first day of a 4-day deposition period. ...................................................... 9

        3.    Defendants were never prevented from reviewing and identifying the finite element analysis simulations. ...................................................... 11

        4.    Defendants' counsel had the ability to discuss all of the material with Friedman and Stephenson on January 15, 16 and/or January 17. ............. 12

        5.    The materials were copied on or about January 20, 2014, thus providing Defendants' experts with nearly a month to review and analyze the material prior to their depositions being taken. ..................... 17

    F.    Defendants Have Presented No Valid Grounds For Exclusion of Any "Testing and Simulation" Work ....................................................................... 18

        1.    The November 20, 2013, expert report discloses that Friedman and Stephenson conducted testing and simulation throughout their assignment in order to support and illustrate their opinions. .................... 18

        2.    The testing and simulation are important to Plaintiffs' experts to support their opinions and refute Defendants' affirmative defenses. ....... 20

3.     Defendants will suffer no prejudice from denial of the motion to exclude. ................................................................................................ 22

CONCLUSION ..................................................................................................................... 24

CERTIFICATE OF SERVICE ............................................................................................. 26

TABLE OF AUTHORITIES

**Cases**

*Allen v. Ford Motor Co*., 2010 WL 3791037 (E.D.Tex., Sept. 23, 2010) ................................... 24

*Davis v. U.S. Bancorp*, 383 F.3d 761 (8th Cir.2004).................................................................. 23

*Dunn v. State Farm Mut. Auto. Ins*. Co., 264 F.R.D. 266 (E.D.Mich.2009) ................................ 8

*Farmland Indus., Inc. v. Morrison–Quirk Grain Corp*., 54 F.3d 478 (8th Cir.1995) ................. 23

*Gayle Martz, Inc. v. Sherpa Pet Group, LLC*, 651 F.Supp.2d 72 (S.D.N.Y.2009) ....................... 9

*Graves ex rel. W.A.G. v. Toyota Motor Corp*., 2012 WL 38894 (S.D.Miss. Jan. 9, 2012) .......... 24

*In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products
     Liability Litigation*, 2013 WL 5763178 (C.D.Cal. 2013) ........................................................ 23

*Tex. A & M Research Found. v. Magna Transp., Inc*., 338 F.3d 394 (5th Cir.2003).............. 8, 17

**Rules**

FED.R.CIV.P. 26(a)(2)(B)(ii) ........................................................................................................ 1

FED. R. CIV. P. 26(b)(4)(D) ......................................................................................................... 4

FED. R. CIV. P. 26(e)(2)............................................................................................................... 5

FED.R.CIV.P. 37(c)(1) ............................................................................................................... 24

Ollie Greene, William Greene, as the Administrator of the Estate of Wyndell Greene, Sr. and Marilyn Burdette Hardeman, (collectively referred to as "Plaintiffs") file this Response to Toyota's Motion to Exclude File Materials and Data (the "Motion to Exclude") of Plaintiffs' Experts Keith Friedman and Dr. Rhoads Stephenson and show the Court as follows:

## PRELIMINARY STATEMENT

To begin with, the Motion to Exclude labors under a false premise, applies inapposite legal authorities and relies on an inaccurate and incomplete record. As explained herein, there has been no untimely disclosure of information and Defendants have not been prejudiced by production of materials obviously considered by Plaintiffs' experts in rendering their opinions. The Motion to Exclude amounts to little more than Defendants' disingenuous attempt to manufacture a baseless argument under the discovery rules now that Defendants have realized that Plaintiffs' expert reports clearly establish Plaintiffs' entitlement to relief and refute all of Defendants' affirmative defenses. Once the Court scrutinizes Defendants' misrepresentations in view of the appropriate authorities, Plaintiffs believe the hollowness of the Motion to Exclude will be very obvious.

## ARGUMENT AND AUTHORITIES

### A.      There Has Been No Untimely Production of Materials.

At the outset, Plaintiffs will note that Defendants' Motion to Exclude is vague in the first section as to what material Defendants are seeking to exclude, especially considering that most of the material produced has been in Defendants' possession for years. Nevertheless, there has been no untimely production. FED.R.CIV.P. 26(a)(2)(B)(ii) requires an expert to **disclose**, among other things, the "facts or data considered" by the expert in forming his or her opinion. Friedman and Stephenson made these disclosures timely on November 20, 2013. For instance, the following disclosure is reflected in the Friedman Research Expert Report:

1

## "IV. MATERIALS REVIEWED OR RECEIVED

- Texas Peace Officers Crash Report dated 5/28/2010
- Kaufman County Sheriff's Office CFS Report # 10-37173 dated 5/28/2010
- Elmo Fire Department Report – Incident # 10-0000132 – dated 5/28/2010
- Texas Department of Public Safety Communications Uniform Fatality Report dated 5/28/2010
- Police photos taken at the accident scene on 5/28/2010
- Texas Department of Public Safety photos
- Autopsy Report of Wyndell Greene Sr.
- Autopsy Report of Lakeysha Greene
- Autopsy Report of Wesleigh Greene
- Autopsy Report of Wyndell Greene Jr.
- Dallas County Office of Medical Examiner Affidavit regarding Lakeysha Greene
- Dallas County Office of Medical Examiner Affidavit regarding Wyndell Greene II
- Dallas County Office of Medical Examiner Affidavit regarding Wesleigh Greene
- Affidavit of Jeffrey J. Bernard, MD, Office of Medical Examiner
- Legal briefs
- Various sources of vehicle data including, but not limited to, CARFAX, VinDecoder, DecodeThis.com, equivalencies, Expert Autostats, MVMA/JAMA specifications, Body & Engine Specifications, NCAP testing, Vehicle Crush Stiffness Coefficients, Neptune Crush Stiffness and RepairMate
- Vehicle Year & Model Interchange List (Sisters & Clones List)
- Subject 2010 Toyota 4Runner
- Discovery materials from Toyota received as of November 14, 2013
- Discovery materials from Volvo received as of November 14, 2013
- Discovery materials from Strick received as of November 14, 2013
- Discovery materials from John Fayard Moving & Warehouse received as of November 14, 2013
- Discovery and materials from Dolphin Line received as of November 14, 2013
- 2010 Toyota 4Runner Owner's Manual
- 2010 Toyota 4Runner Service and Repair Manuals
- Toyota 4Runner design drawings produced by Toyota
- 2010 model year Toyota 4Runner (exemplar)
- Written statement of Christopher Wright
- Photos received from client as of November 2013
- Inspection and photos by Will Miller dated 6-23-2010
- DDEC Report by Crash Analysis Testing of Ft. Worth – Detroit Diesel Diagnostic Link dated 6-23-2010
- Inspections and photos by Keith Friedman and Friedman Research Corporation
- 2010 Toyota 4Runner exemplar fuel tank
- 2010 Toyota 4Runner parts drawings
- Exemplar inspection of 2010 Toyota 4Runner on 11-22-2011
- Inspection of Volvo tractor (5-19-2011)
- Deposition of Brian Thompson, Witness
- Deposition of Gary Hatfield, Dolphin Line Service Advisor
- Deposition of Kyle Evans, Tow Truck Driver

2

- Deposition of Christopher Countryman, Trooper
- Deposition of Dexter Barkley, Trooper
- Deposition of Daniel Sprinkle, Fayard/Strick Trailer Truck Driver
- Deposition of Dr. Chester Gwin, Medical Examiner
- Deposition of Dr. Lynn Salzberger, Medical Examiner
- Deposition of Dr. Tracy Dyer, Medical Examiner
- Deposition of Charles Derrick Moody, Driver of Volvo Truck
- Deposition of James Jay Jackson, Corporate Representative of Strick Trailers
- Deposition of Frank Katz, Corporate Representative of Strick Trailers
- Deposition of Charles Gregory Rushing, Firefighter
- Deposition of Roger Crues, Firefighter
- Deposition of Andrew Wilson Adams Jr., Representative of Volvo Group North America LLC
- Deposition of Charles Edwin Bird, Expert Witness –Crash Warning Systems
- Deposition of Gregory Joseph Prinzo, Volvo Expert-Witness Collision Warning
- Deposition of Ichiro Fukumoto, Toyota Project Manager
- Deposition of Ryan Earheart, VP of Operations Dolphin Line
- Deposition of Joe Gibson, Dolphin Line Safety Director
- Deposition of Jerry Talton, John Fayard's Manager
- Biokinetics report, "2010 Toyota 4Runner Fuel Tank Evaluations," Ed Fournier et al, December 2011.
- Vick accident reconstruction report
- Conversations with Dr. Burton, Mr. Vick and Daniel Langston
- Motor vehicle fire research institute website reports
- References
- Bibliography 1-6"

See, Friedman Research Expert Reports.  See, APP 001-233.  As shown by the passage above, the experts disclose very specific documents and categories of things they considered in forming their opinions.  And as Defendants articulated in the motion, these materials wound up amounting to approximately "100 gigabytes of data, and over 10,000 files." Mot. at 8.  In fact, as Toyota has pointed out in previous pleadings, Toyota alone produced approximately 149,500 pages of documents.  See, Dkt Entry No. 201 at PageID 7024.  These 149,500 pages were considered by the experts and are included in the aforementioned 100 gigabytes of data, and over 10,000 files.  Thus there is no dispute that the information submitted to Defendants is disclosed in Friedman's and Stephenson's expert reports as information on which they relied.  Moreover, with few exceptions, virtually all of the 100 gigabytes of data, and over 10,000 files that were

3

recently recopied for Defendants, includes material that were provided to Defendants and/or received from Defendants throughout the course of the lawsuit.  Accordingly, Friedman and Stephenson were not required to spend thousands of dollars scanning, copying, and "reproducing" these same discovery materials in order that they may be sent back to Defendants, "along with" the expert reports, especially taking into account the expert report adequately and completely "discloses" these materials as is required.

Perhaps realizing they have no authority, in the Fifth Circuit or elsewhere, that would require experts to copy hundreds of thousands of pages of documents and electronic data (especially that which has already been exchanged in discovery) for five defendants and re-produce these duplicative documents along with expert reports, Toyota attempts to rely on a June 13, 2011, document production request to support its unfounded argument.  However, as the Court can observe from Plaintiffs' response to that June 2011 request, Plaintiffs timely objected to this request as premature, considering that at the time of this request, testifying experts had not been identified.[1]  The designation of testifying experts did not happen until November 20, 2013. Even then, the experts' file was not near completion and was in use by experts who were working frantically to complete the expert file and were using these materials to prepare for potential rebuttal expert reports.  Thus, contrary to Toyota's suggestion that there was somehow a two year delay in providing responses, the evidence shows that responsive documents could not have been produced prior to the November 20, 2013, identification of the testifying experts who would have discoverable expert files.

With regard to Defendants' next argument that there has been a violation of the duty to supplement under Rule 26(e)(1), this argument is also false.  First, Rule 26(e) simply states that a

---

[1] See FED. R. CIV. P. 26(b)(4)(D) (a party may not generally discover facts known to an expert employed only in anticipation of litigation or for trial preparation who is not expected to testify as a witness at trial).

party must supplement "in a timely manner."  As Defendants concede, Plaintiffs objected to the June 2011, request for production, including on the grounds that "the complete file of all testifying experts" was vague and overly broad.  Defendants did not obtain a ruling on this objection and never narrowed the request.  Indeed, the overly broad nature of Toyota's initial June 2011 request for documents was evidenced by the fact that the production amounts to 100 gigabytes of data, and over 10,000 files.   Nevertheless, as discussed above, the information complained of was provided to Defendants soon after the November 20, 2013, disclosure of the identities of testifying experts and prior to and/or during the deposition of the experts to whom the disclosure relates.   Therefore, the disclosure has been timely.   In addition, for expert witnesses, Rule 26(e) provides the following additional guidance regarding supplementation of information:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

FED. R. CIV. P. 26(e)(2).  The Rule 26(a)(3) pretrial disclosure date is May 23, 2014.  See Dkt. Entry No. 332.  Thus, if the expert files produced to Defendants are governed under Rule 26 supplementation, the production is timely under any reading of the rules.

**B.    The Parties Were Unable to Reach an Agreement on The Timing Protocol for Production of Expert Materials, and The Manner of Production Complained of Has Not Been Inconsistent With Disclosures from Defendants.**

Other than the premature and overly broad June 2011 document request discussed above, none of the Defendants made a formal request for documents from Plaintiffs' experts.  None of the Defendants served a subpoena *duces tecum* on the experts.  In fact, the record shows that, prior to the start of the period for expert depositions, one of Defendants' counsel proposed that expert files be disclosed "two days prior to the depositions."  See, December 30, 2013, email

from Kathleen Clark.  (APP 282-283).  The Defendants never agreed to this proposal, or on a

plan among themselves, as to whether expert files would be produced at the depositions or two

or more days prior to the depositions.  Nonetheless, there was never an understanding, explicit or

implicit, that the parties would produce thousands of pages of underlying discovery "along with"

expert reports.  In fact, the record is absolutely clear that this was not the Defendants' practice.

For instance, although Defendants' expert reports were produced on December 30, 2013,

Plaintiffs were served copies of the files of the following Defendants' experts "after" the experts'

December 30, 2013, written reports were served:

| | | |
|---|---|---|
| 1. | Timothy Cheek | Expert File served on Plaintiffs on January 10, 2014 (APP 284) |
| 2. | David Viano | Expert File served on Plaintiffs on January 16, 2014 (APP 287) |
| 3. | Michelle Vogler | Expert File served on Plaintiffs on January 20, 2014 (APP 288) |
| 4. | Thomas Truss | Expert File served on Plaintiffs on January 29, 2014 (APP 289) |
| 5. | Kenneth Tandy | Expert File served on Plaintiffs on January 30, 2014 (APP 291) |
| 6. | Stephen Werner | Expert File served on Plaintiffs on February 6, 2014 (APP 292) |
| 7. | Helen Reynolds | Expert File served on Plaintiffs on March 4, 2014 (APP 295) |

Thus, the record is clear that the parties had no specific agreement regarding when the

underlying expert files would be provided, and certainly no agreement that thousands of dollars

would be spent by the parties to copy "entire expert files" and attach to expert reports.  As a

result of the inability of the parties to decide on a process for obtaining expert files (that were not

duplicative of materials the parties already had), Plaintiffs implemented a practice of serving a

*duces tecum* along with each of the expert deposition notices to ensure that documents were

produced at the depositions.  Thus, Defendants would be incorrect to contend that there was an

agreement regarding when "entire expert files" would be produced.

**C.     The "Size" and Timing of the Friedman Production Was the Direct Result of Toyota's Overly Broad Document Request.**

In the Motion to Exclude, Toyota appears to complain about the "voluminous seventeen boxes of material" that was produced at Friedman's deposition.  Mot. at 8.  However, as Toyota concedes, it requested that Friedman and Stephenson produce "the <u>complete</u> file of all testifying experts."  As discussed above, this resulted in the production of 100 gigabytes of data, and over 10,000 files.  Therefore, Toyota cannot be heard to complain now about the volume of materials produced, or how it affected its ability to review the materials.  In fact, due to the volume of material requested by Toyota, it took five Friedman Research staff members, from multiple offices, substantial hours over multiple days to arrange this information for inspection and copying.  According to Friedman, the compilation did not get finished until the morning of his deposition.  Friedman Depo at Thus, the volume of materials requested contributed to the timing of the production.

**D.     The Discovery Materials from Friedman's and Stephenson's Files is Very Important to Plaintiffs.**

As discussed above, there has been no untimely production of discovery in this matter.  As also mentioned above, the Motion to Exclude is unclear as to exactly what it seeks to exclude.  Nevertheless, it goes without saying that the information presented to Defendants within the 100 gigabytes of data, and over 10,000 files is extremely important to Plaintiffs.  That is because the experts used this research and discovery to form their opinions.  The production includes all of the discovery that has been exchanged in this matter, including 149,500 pages of Toyota-produced documents, documents produced by the other four defendants, Friedman's research and testing, pleadings in the file, written discovery responses, the depositions of each of the fact and expert witnesses, investigative reports of the troopers, vehicle data, inspection notes, etc.  All of these materials have been reviewed and analyzed by the experts, goes to the heart of Plaintiffs'

case, and refute Defendants' case.  Therefore, even if the Court were to apply the failure to disclose principles, the "importance of the testimony or materials" factor weighs in Plaintiffs' favor since excluding the 100 gigabytes of data, and over 10,000 files of materials produced would amount to an exclusion of virtually all evidence in this case.

In addition, as discussed more fully below, all of the testing and simulation work performed and reviewed by Friedman and Stephenson is of paramount importance to Plaintiffs case-in-chief as well as to their rebuttal of Defendants' contention.

### E.    Defendants Have Not Been Prejudiced By the Timing of the Production.

Without asserting that there has been an untimely disclosure, even in instances where there has been late-disclosed evidence, courts have permitted evidence to be used where the other party has adequate time to prepare and would not suffer prejudice as a result. See *Tex. A & M Research Found. v. Magna Transp., Inc*., 338 F.3d 394, 402 (5th Cir.2003) (weighing the four harmlessness factors and concluding that the district court had not abused its discretion by permitting certain evidence to be used at trial despite failure to disclose under Rule 26(a) because, "[a]lthough [the party seeking to use the evidence] failed to explain its failure to disclose, the prejudice to the adverse parties was negligible because the witness in support of whose testimony the [contested evidence] [was] offered had been designated properly as a witness before trial. Further, any prejudice was cured by the approximately one month during which [the opponent] was allowed to examine and respond to the contested evidence"); *Dunn v. State Farm Mut. Auto. Ins*. Co., 264 F.R.D. 266, 276 (E.D.Mich.2009) (permitting defendant to use evidence despite defendant's failure to timely supplement its responses before discovery cut-off date because delay was harmless given that plaintiff still had months before trial to adequately prepare itself).  Here there simply is no prejudice to Defendants.

**1.    The bulk of the information provided to Defendants has been in Defendants' possession for years.**

As can be observed from the disclosure listing in the Friedman Research Expert Report, most of the information that is contained in the 100 gigabytes of data, and over 10,000 files of materials produced is information such as the 149,500 pages of Toyota-produced documents, documents produced by the other four defendants, public and government research and testing, pleadings in the file, written discovery responses, the depositions of each of the fact and expert witnesses, investigative reports of the troopers, vehicle data, inspection notes, etc.   In other words, the bulk of the information produced is information to which the Defendants have already had full access, in some cases for years.   Therefore, the Court should not exclude any of the information produced.   *See Gayle Martz, Inc. v. Sherpa Pet Group, LLC*, 651 F.Supp.2d 72, 81 (S.D.N.Y.2009) (finding no prejudice to defendants from plaintiff's failure to supplement its discovery because "any such supplements would be derived entirely from discovery materials that Defendants produced to [plaintiff]," and refusing to sanction plaintiff as a result).

**2.    Defendants had full access to Friedman's materials beginning on the first day of a 4-day deposition period.**

At Defendants' request, the Court awarded Defendants a total of fourteen (14) hours, over two days, to take Friedman's deposition and 14 hours to take Stephenson's deposition.[2] January 15, 2014, was the first day of Friedman's two days of deposition testimony.   At approximately 11:10 a.m. on the first day of his deposition, Defendants' counsels were tendered for inspection and/or copying more than sixteen (16) boxes of documents that contained Friedman's "entire expert file."   One of Toyota's counsels contends in the Motion that he was "not allowed to review the file material at all on the first day…."  Mot at 6.  This is completely

---

[2] Plaintiffs note for the Court that despite Defendants' representation to the Court that they needed 14 hours for Stephenson's deposition, they spent only seven (7) hours with him and declined Plaintiffs' attempts to produce Stephenson for the continuation of his deposition. (APP 297-301)

incorrect.   The only request Friedman made at the outset of his deposition was that he be permitted to organize the boxes first, since the boxes had been brought in by couriers.   Toyota's counsel made the decision not to take a few minutes at that point to allow Friedman to organize the seventeen boxes so that other counsel in the room could have access.   Instead, Toyota's counsel asked Friedman to organize the boxes during a lunch break.   See, e.g. Friedman Depo at 100:11-18 (APP 246) and 109:11-17 (APP 248).   Friedman complied with this request during his lunch break.   Following the organization of the boxes over his lunch break, Defendants' counsels had unfettered access to the production of material for the eleven (11) remaining hours of Friedman's deposition and seven (7) hours of Stephenson's deposition, over the span of Wednesday, January 15 – Saturday, January 18.   In fact, in an email dated January 16, 2014, Plaintiffs' counsel corrected counsel for Toyota's misrepresentation that he was somehow prevented access to the boxes:

> Second, contrary to your representation, when Mr. Friedman brought the 15 boxes to his deposition you did not ask him what was specifically in each of the boxes and he certainly did not prevent you from looking at the documents. He asked for just a moment to organize them and you asked him to do so over the lunch break, during which time you could have competed a full review. In addition, you did not arrange to have copied the documents he brought for inspection.

See email dated January 16, 2014.  (APP 302).   In fact, Friedman also reiterated at the start of day two of his deposition that the files had been organized and that counsel had full access to the materials.   Friedman Depo at 265:6-266:1 (APP 258-259).   Therefore, even if Toyota did not believe it had access to the boxes on January 15, 2014, certainly beginning on January 16, 2014, when it was reiterated to Defendants that they had unrestricted access to rummage through the production of materials and copy items at will, Defendants still had approximately 7 hours remaining to depose Friedman and 14 hours in which to depose Stephenson on every item in the production, if they so desired.

**3.      Defendants were never prevented from reviewing and identifying the finite element analysis simulations.**

The Motion to Exclude also alters the conversation between Plaintiffs' counsel and Strick's counsel relating to his identification of finite element analysis simulations.  In particular, the Motion suggests that Strick's counsel was prevented from questioning Friedman on the location or identification of certain finite element DVDs in the boxes.  However, a review of the full conversation demonstrates that it is a flagrant misrepresentation to contend that there was any such obstruction.  See, Friedman Depo at 685:14 – 688:13 (APP 277-280).  Plaintiffs' counsel clarified this to Defendants on other occasions, prior to the filing of the subject motion:

> During the three days of depositions, each attorney had access to all of the boxes, including the boxes that contained the computer files and other information regarding the FE analyses and calculations.  There were multiple opportunities for Defendants' counsel to have marked these disks and output documents as separate exhibits.  I recall that Mr. Dawson examined Mr. Friedman on the FE, asked him to separate the Strick FE, and asked to remove that FE from among the remaining boxes that were an exhibit.  **An objection was made to removing this one portion of FE only because the boxes had been marked as one Exhibit by Toyota**.  We could not destroy the integrity of that exhibit.  **However, Mr. Dawson was never precluded from inspecting the material on the disk during the deposition and marking "all of the FE disks" as a separate exhibit, or even marking the Strick FE separately as a subset of the main exhibit.  That way the FE would have been easier to locate**.

See February 26, 2014 email to Strick's counsel.  (APP 304).  Likewise, during Friedman's deposition, in response to Strick's misrepresentation of directions given to Friedman, Plaintiffs' counsel made clear that Defendants' counsel were not being hindered from conducting a full review and examination of the finite element simulations:

> MR. PITTMAN:  This witness has not refused to do anything.  I have not instructed this witness not to do it.  I have merely told you, as one of the counsel of record in this case admitted in the Northern District, that this exhibit has been marked as an exhibit, as one exhibit, one group exhibit, and we will provide all of the -- the full exhibit to all of counsel, but that I'm not going to separate the exhibit to accommodate you at the risk of not maintaining the integrity of an exhibit that's been marked.

**********

MR. PITTMAN:  Don, you've had four hours to have this witness do what Mr. Kern did, what I believe Volvo's counsel also did.  So you had time where you could have had this witness pull out those documents and you could have identified those.  But you waited until your time was completely up.

MR. DAWSON:  I thought you were worried about the integrity of the file.

MR. PITTMAN:  Well, I am.  No, I said in terms of identifying them.  I mean, the exhibit is going to be one exhibit, but you could have had him identify those.

Friedman Depo at 687:4 – 688:13 (APP 279-228).  Thus, these passages do not support Defendants' misrepresentation that they were somehow hampered from questioning Friedman regarding the finite element simulations.  In fact, the record demonstrates that during the deposition, Friedman expressed a willingness to segregate the finite element DVDs for Strick's counsel:

**Q:**     So could you do that this evening?

**A:**     Potentially.

Friedman Depo at 676:15-17 (APP 276).  The record demonstrates, however, that Friedman was never provided with directions from Strick's counsel as to which items Strick wanted identified and how the process would work.

> **4.      Defendants' counsel had the ability to discuss all of the material with Friedman and Stephenson on January 15, 16 and/or January 17.**

A further review of Friedman's deposition also debunks more of Defendants' misrepresentations.  The Motion to Exclude blatantly states that because of the need for special software "none of the defendants were able to question Friedman or Stephenson about their finite element analysis work."  Again, this is a flagrant untruth.  Indeed, the deposition reflects the following conversation when Friedman was asked if brought everything that was needed to be able to provide full testimony during his deposition as to the simulations:

**Q:**     Do you have a copy of that FE model with you here today?

**A:**    Yes.

**Q:**    Where is it?

**A:**    In one of the boxes.

**Q:**    What format do you have it in?

**A:**    On a CD.

**Q:**    Do you have anything here with you that can play or demonstrate that FE model?  Do you have software here?

**A:**    I did, but -- yeah, I think so.

Friedman Depo at 214:4-14 (APP 257).  In fact, a simple inspection of other portions of Friedman's deposition demonstrates that he was questioned at length regarding some of his finite element simulations, such as this dialogue with Toyota's counsel:

**Q:**    What other bases do you have?

**A:**    Well, there's a whole, you know, set of information that's associated with the crash, with the vehicle itself.  Looking at the deformations that we see on the vehicle, we can see the way the vehicle was deformed.  We can see contact on the road.  We understand how like, for example, the leading arms are fractured on the driver's side, the wheel goes forward into the -- into the C post area and door.  So there's a whole series of resulting -- we can see deformation of the trailing arm bracket indicating that it's highly distorted.

So there's a whole series of physical evidence on the -- both at the scene on the road and on the vehicle itself, which are the basis for what I'm saying.  **I'm saying that the simulation is an illustration of that just illustrating the – the opinion**.  But the basis is the physical evidence, what we see, and studies of the vehicle and how the tank is originally laid out in exemplar vehicles and a whole, you know, myriad of details of -- that we've pursued during the course of the investigation.

**Q:**    So I want you, then, sir, to give me all the bases for your opinion that the Volvo struck the -- when the Volvo struck the 4Runner initially, but the tank was driven into the ground.  And if I understand you now, you've said the photos on Page 35, the leading arms were fractured on the driver's side, there was deformation of a trailing arm bracket that also constitutes physical evidence of the tank being driven into the ground?

**A:**    Well, it's –

**Q:**    **And there was a simulation that was conducted**.  What else do you have to support your opinion that the tank was driven into the ground?

MR. PITTMAN:  Objection, form.

13

**A:**     Well, the initial – you know, the -- the way the tank is put in the vehicle, the orientation of the vehicle and how the frame – how the frame deforms during the crash and -- and the remnants of the tank itself and the bracketry associated with the tank.  Those are other – so there's all the physical evidence about the vehicle itself, of which there are many points.

There's also -- and so fitting that together with the information we see at the scene, we can see that the spare tire is driven down into the ground, we can see that the differential is in the ground, we can see that the trailing arm suspension is deformed, we can see that the rocker -- not the rocker -- the frame is dragging on the ground, and we can see that the wheel drives into the C post area.

So all of that shows us that the penetration was forward into the -- into the tank area  and that as the frame is deforming the tank is deforming as well in terms of it's bending, and then you have these structures moving forward into it, as well as being driven down by the Volvo.  So that's the override.

**Q:**     All right.  So in terms of –

**A:**     So because -- let me just make one comment that because we see the scratches on the -- on the shield and other parts of the frame and because the tank hangs down below the frame and because we can expect that the tank -- that the tires blow, et cetera, that that whole area is now down in the ground.  It can't -- the fuel tank can't help but be on the ground because it's below the frame, and it's below the shield as the vehicle is at an angle.

**Q:**     And have you conducted any crash tests to confirm this hypothesis?

MR. PITTMAN:  Objection, form.

**A:**     Yes.

**Q:**     What crash test did you conduct?

**A:**     **Well, as I said, we ran a simulation of that situation and it shows that that's what is happening**, that the Volvo overrides the 4Runner and pushes it down into the ground deforming the trailing arm suspension. The rear bumper pushes forward on the spare tire, pushes on the differential, which then causes the failure of the suspension arms, which then causes -- and the override then pushes the whole thing down into the ground.  So the tank is on the ground.

Friedman Depo at 90:21 – 94:4 (APP 241-245).   Later in the deposition, another

Defendants' counsel explored more of Friedman's opinions, calculations and illustrations

derived from his use of finite element modeling and simulation:

**Q:** And let's be clear so we're not confusing anybody.  You made a model of the underride guard?

**A:** Yes.

**Q:** So when you say you had it, you're not talking about physically having the underride guard that was involved here?

**A:** No, but we have a physical underride guard.

**Q:** Okay.  I'm talking about in your -- in the finite element analysis that you talked about.  So we're not talking about a real actual physical underride guard?

**A:** Yes, we do have a real physical underride guard, and we then created a model of it.

**Q:** All right.  So that underride guard was obtained from where?

**A:** From a dealer.

**Q:** Okay.

**A:** From a Strick dealer.

**Q:** All right.  And it was one that was the same as –

**A:** From New Life, as I recall.

**Q:** It was the one that was the same as the one that had -- appears to have been on the back of the truck at the time of the accident?  Yes?

**A:** Well, it has a general shape like that, yes.

**Q:** And you took that and you -- did you take measurements off that?

**A:** We took measurements of the underride guard that we received.

**Q:** Okay.  And you inputted those into your model?

**A:** Yes.

**Q:** And then how did you determine -- did you use some standard to determine what -- how much strength the welds would have?  How did you do that?

**A:** No.  What we assumed was that the -- we used the underride guard and attached it to the underpart of the frame so that it wasn't falling off like this -- like the underride guard that was in the accident.

**Q:** Okay.

**A:** So we compared it to the effectively falling off underride guard that essentially was -- was not absorbing energy in the crash.

**Q:** How did you tell the model it was attached?

**A:** We connected the nodes between the underride guard and the trailer.

15

**Q:** And do you have to -- do you have to give it a strength for that attachment?

**A:** No. We just say it's attached.

**Q:** Okay. And in the model, then, what does the model -- how does the model determine how strong that attachment is? Well, let me ask you a better –

**A:** Is it –

**Q:** Let me ask you a better question. Does the model test the strength of the attachment to the trailer or just the guard itself?

**A:** Both.

**Q:** Okay. So how does it determine how much force is transferred from the guard into the trailer through that connection?

**A:** Well, that's what finite element modeling does, is it takes -- it breaks down the structure system into very small pieces, and then using the sort of laws of mathematics and physics it transfers the stresses and strains from one element to the next so that you get an overall effect from an impact on the whole structure.

Friedman Depo at 409:12-15 (APP 272-273). The depositions has multiple other areas where counsel explored Friedman's opinions regarding his use of testing and simulation throughout this case, since long before November 20, 2013. See, e.g. Freidman Depo at 211:18-22 (APP 256); 277:11 – 279:20 (APP 260-262); 282:20 – 285:25 (APP 265-268); 379:17 – 381:12 (APP 269-271); 403:3 – 408:6; and 409:1 – 410:13 (272). Accordingly, it is clear that Defendants had detailed discussions with Friedman about the modeling and simulation his company conducted in formulating his opinions. Friedman even includes drawings and information in his report that is clearly finite element simulation. Thus, the defendants all knew it was being used. Finally, Defendants have presented no showing that they were unable, during twenty-eight (28) potential hours of deposition testimony from Friedman and Stephenson, to discuss any of the materials in the boxes of documents produced to Defendants.

**5.      The materials were copied on or about January 20, 2014, thus providing Defendants' experts with nearly a month to review and analyze the material prior to their depositions being taken.**

The eighteen boxes of information were tendered to Defendants' counsel on January 15, 2014.  Toyota's counsel retained a copy service to copy all of the information, which amounted to 100 gigabytes of data, and over 10,000 files of materials.  Defendants' misrepresent that the volume of materials produced led to a delay in Defendants' receipt of the files.  However, according to information supplied by the court reporting firm retained by Defendants to transcribe Friedman's deposition, these boxes were all copied and returned to Friedman on January 21, 2014.  (APP 306-308).  Therefore, the materials were in the possession of the agent for Toyota's counsel by January 21, 2014.  The experts retained by Defendants to review and rebut Friedman and Stephenson's opinions are Richard Dyer (deposed on February 10), Richard Lange (deposed on February 17), Michelle Vogler (deposed on February 18), David Viano (deposed on February 19), Dolph Lohwasser (deposed on February 20), and Timothy Cheek (deposed on February 27).  Accordingly, considering the materials were fully copied by January 21, these experts conceivably had anywhere between 19-37 days to review the materials produced by Friedman to be prepared to discuss these materials at their depositions[3].  Thus, even if the Court were to conclude that the January 15, 2014, production was produced late, courts have permitted evidence disclosed after the discovery deadline to be used where the other party has adequate time to prepare and would not suffer prejudice as a result. *See Tex. A & M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir.2003) (weighing the four harmlessness factors and concluding that the district court had not abused its discretion by

---

[3] At least one of the Defendants' counsel wrote Plaintiffs' counsel complaining that she did not receive the 100 gigabytes of data, and over 10,000 files of materials in January.  In response, Plaintiffs' counsel reminded counsel that the information was copied by a court reporting firm that was hired by one of her co-defendants and suggested that she contact this firm to get to the bottom of things.  See correspondence at APP 309-310.

permitting certain evidence to be used at trial despite failure to disclose).  In addition, the trial in this matter is not until June 23, 2014, which would mean that Defendants would have more than five months to examine this material.

>    **F.    Defendants Have Presented No Valid Grounds For Exclusion of Any "Testing and Simulation" Work.**

In a continuing effort to gain an unfair advantage, Defendants misrepresent the nature of the testing and simulation as well as the testimony regarding it.  The record demonstrates that the testing and simulation has been a continuing process for Friedman Research Corporation; Defendants have always been aware that testing was being performed; the practice of testing and simulation is disclosed in the expert reports; and Defendants had the opportunity during Friedman's 14 hour deposition to discuss ad nauseam all of his testing and simulation.

>    **1.    The November 20, 2013, expert report discloses that Friedman and Stephenson conducted testing and simulation throughout their assignment in order to support and illustrate their opinions.**

To begin with, it is a misrepresentation for Defendants to contend that any substantial the testing and simulation work was performed "after the expert deadline."  In fact, as shown in the following passage between Friedman and Toyota's counsel, Friedman was very clear that the testing and simulation analyses have been ongoing, since before the November 20, 2013, expert reports were issued:

> **Q:**    All right.  Well, tell me about the finite element analysis simulation work you've done.
>
> **A:**    Well, we've impacted the -- a vehicle representing a 4Runner, we've -- with a vehicle representing the Volvo.  We've impacted the 4Runner into a Strick trailer and -- with and without underride guards under various conditions.
>
> **Q:**    Okay.  Anything else?
>
> **A:**    I think they also looked at -- I think that's the general characteristics.
>
> **Q:**    And then what else were you thinking there?  You said you also looked at --

18

**A:**     Well, I already said Volvo hitting the 4Runner.

**Q:**     <u>All right.  And when did you conduct this work, sir</u>?

**A:**     <u>Well, we've been conducting it</u>.  As I said, we got new information, so we incorporated that.

Friedman Depo at 59:20 – 60:12 (APP 237-238).  As far as the "new information" referenced in the passage above, Freidman testified that they were waiting on information from Volvo.  Friedman Depo at 61:18 – 62:17 (APP 239-240).  This missing Volvo information was the subject of three motions to compel, and on November 8, 2013, the Court ordered that Volvo produce certain information that was needed by Friedman to plug into his finite modeling of the Volvo tractor.  See, Dkt Entry No. 239.  Pursuant to the November 8, 2013, Order, Volvo supplied some of this information to Plaintiffs' counsel on or about November 14, 2013.   (APP 311-322).  With less than a week remaining before expert reports were due, Plaintiffs requested an additional six weeks for Plaintiffs' experts to be able to incorporate this new information into the finite modeling testing being conducted by Friedman.  See, Dkt Entry No. 231.  The Court declined to grant the full extension, providing only ten days additional time.  Nevertheless, as Friedman testified, the finite element modeling was being performed throughout all of his expert analyses:

**Q:**     Okay.  So you did some finite element modeling prior to November 20th?

**A:**     We've done finite element modeling through the whole project.

Friedman Depo at 409:12-15 (APP 272-273). In addition, as discussed in Section E.4. above, contrary to yet another misrepresentation in the Motion to Exclude, Friedman discussed in some detail the finite element work they did in preparation for the expert report.  Furthermore, later in his deposition, when Strick's counsel questioned Friedman, he again directed counsel to passages in his report that identify that finite element testing forms the basis, in part, for his expert opinions:

**Q:**   Did you or did you not say in Exhibit 30 that there was any virtual testing, sir?

**A:**   Yes.

**Q:**   Where?

**A:**   When we described the application of our life subject safety research methodology, which is a computerized methodology.

**Q:**   Then show me where it says, "and we went on to do virtual testing."

**A:**   Well, that's part of the methodology.

**Q:**   I don't care if it's part of the methodology.  You can lay out methodology without doing all of it.  Where does it say, "and we did each of these steps"?

MR. PITTMAN:  Objection, form

**Q:**   You know it doesn't, correct?

MR. PITTMAN:  Objection, form

**A:**   No, I don't know that it doesn't.

**Q:**   Okay.

**A:**   **But I just pointed to a place where it does.  So whether you don't want to agree with that, that's a different issue**.

**Q:**   Okay.  That's fine.

Friedman Depo at 525:11 – 526:8 (APP 274-275).  And as shown above, there are many other passages throughout Friedman's deposition where he engages in discussions regarding the testing and simulation.

> **2.   The testing and simulation are important to Plaintiffs' experts to support their opinions and refute Defendants' affirmative defenses.**

For the outset of this litigation, Plaintiffs made clear that their theory of the case rested on evidence that Defendants had access to safer alternative designs when the Toyota 4Runner and the Volvo Truck were manufactured and that Defendants were aware of the defects in the vehicles when these vehicles were designed, tested, manufactured, and sold.  To establish their claims Plaintiffs requested Computer Aided Design ("CAD"), Computer Aided Engineering ("CAE") and Finite Element modeling (FE) and related information from Defendants Toyota

20

Motor Corporation, Toyota Motor Engineering & Manufacturing North America, Inc., Toyota

Motor Sales USA, Inc., (collectively, "Toyota") and Volvo Group North America, LLC, a/k/a

Volvo Trucks North America ("VGNA").  Plaintiffs first requested CAD, CAE and FE models

from Toyota in discovery requests submitted to Toyota on June 17, 2011.  After VGNA was

added to the lawsuit and appeared on September 16, 2011, Plaintiffs served a similar request for

CAD, CAE and FE models to VGNA on October 4, 2011.  As the Court is aware, in finite

element analysis modeling, a computer representation is created by inputting numeric values

representing the vehicles materials, including geometric dimensions, material properties and

physical properties, into modeling software.  This computer representation of a package is then

subjected to simulated physical and crash conditions to generate an approximation of how the

vehicle will operate in the physical world under crash conditions. This modeling is well accepted

and used throughout the automobile industry for predicting and confirming reliability of vehicles

in crash conditions.   Indeed, through FEM, the crashworthiness characteristics and safety

features of a vehicle's designs are evaluated from computer analysis results.  FEM also allows

the accurate prediction of a vehicle's reaction and deformation in crash simulations by expert

designers, reconstructionists and other experts.  It is undisputed that the input and analyses of

these models are performed by those with substantial knowledge and experience, i.e. experts.

Having access to actual (or the closest available) electronic data such as CAD, CAE, FE,

and CATIA 3–D that is in Toyota's and VGNA's possessions would have been helpful to

Plaintiffs in establishing their claims and defending against Defendants' claims.  As a result of

Defendants failure to provide this clearly discoverable information, Plaintiffs were forced to file

several motions to compel.   The last of the three motions to compel was filed against VGNA on

August 9, 2013. (Dkt. Entry No. 164).   The last of the three motions to compel against the

Toyota Defendants was filed on September 3, 2013. (Dkt. Entry No. 174).   Pursuant to the September 30, 2013 Court Order (Dkt. Entry No. 207), the Court set a hearing on this motion to compel on October 4, 2013.   On October 31, 2013, the Court issued an Order on the motion to compel granting it in part and denying it in part.   Later, Toyota and VGNA were given 14 days to comply with the portions of the motion to compel for which the motion was granted.   Considering that Plaintiffs' experts did not have sufficient time to analyze these new production items, Plaintiffs requested additional time for preparation of expert reports.   The Court denied the full length of the extension requested.

Based principally on Defendants' representations, the Court did not order the production of full model FE and CATIA.   Plaintiffs' experts were therefore forced to perform additional or alternative analyses through alternative testing or attempts to recreate the computer modeling. Much of the alternative testing Plaintiffs' experts were forced to perform was done near in time to the preparation of the initial expert reports.   As discussed above, the nature of this testing has been adequately disclosed in the expert reports.   And the importance of this testing cannot be overstated, as evidenced by Plaintiffs spending 2 ½ years, and three motions to compel trying to obtain the FE models and testing sources from Toyota and Volvo.   Thus, this factor weighs in favor of denying the motion.

### 3.    Defendants will suffer no prejudice from denial of the motion to exclude.

As explained above, Defendants have always been aware that finite element modeling and simulation would be used in this matter.   As the Court may recall, Plaintiffs fought for this information for nearly three years.   Defendants were also informed that Plaintiffs' experts anticipated receiving the information that the Court ultimately chose to exclude from discovery. They were waiting on this information to use to complete their expert reports.   However, once

the experts were been informed that this information is not forthcoming, the experts had to undertake additional "workaround" efforts to try and replicate some of the information that was not provided.  Therefore, it would be disingenuous for Defendants to contend they were unaware of the need for the finite element modeling or that Plaintiffs' experts were using and relying on it.  Indeed, even when the Court denied the production of full vehicle FE materials, the Court ordered Defendants to produce materials that everyone knew would be used by Plaintiffs' experts to conduct simulation and testing.  *See, e.g. Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir.2004) (no abuse of discretion to allow testimony when "district court reasonably found that there was no unfair surprise" about the topic of testimony); *Farmland Indus., Inc. v. Morrison–Quirk Grain Corp.*, 54 F.3d 478, 482 (8th Cir.1995) (district court did not abuse its discretion by allowing testimony when opposing party "was neither surprised nor confused at the substance" of the testimony).

In addition, as discussed herein, during their depositions the experts testified at length about testing and simulation they did as support for and to illustrate their opinions. In a case based on similar facts and involving Toyota the court refused to strike evidence regarding the expert's opinions where the expert had been deposed on those opinions. *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, 2013 WL 5763178, (C.D.Cal. 2013).  Given that Defendants had twenty-eight (28) hours to question Friedman and Stephenson on these opinions, there is no prejudice.  More importantly, the testing and simulation work do not contain any new opinions.  Rather, they are evidence of the basis for opinions that are expressed in the written reports.  Thus, they should not be excluded.  *See McPherson v. Rowe*, 366 Fed.Appx. 43 (11th Cir.2010) (allowing the inclusion of new information not included in an expert report, particularly because the experts were not

testifying to new opinions based on new information); *Graves ex rel. W.A.G. v. Toyota Motor Corp.*, 2012 WL 38894 (S.D.Miss. Jan. 9, 2012) (allowing the inclusion of opinions "clearly articulated" in the report); *Allen v. Ford Motor Co.*, 2010 WL 3791037 (E.D.Tex., Sept. 23, 2010) (allowing an affidavit to clarify an opinion taken out of context in a deposition).

Even if the Court were to determine that Rule 26 has been violated, FED.R.CIV.P. 37(c)(1) provides several remedies to a district judge who is faced with violations of the mandatory-disclosure provisions of Rule 26. The provision on sanctions explicitly states in pertinent part that 'instead of this sanction [of total exclusion], the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.'"). If the Court finds there to be prejudice to Defendants it could be mitigated by having Friedman appear for a continuation of deposition before trial, during which time he could provide additional responses to question regarding his testing and simulation.

## CONCLUSION

Here, it is clear that there has been no untimely production of material.  In addition, none of the Defendants has been prejudiced by Plaintiffs' production of the information that was tendered to Defendants over two months ago.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the Court deny the Motion to Exclude in its entirety and for such other and further relief to which Plaintiffs may be allowed in law or equity.

Respectfully Submitted,


/s/ Aubrey "Nick" Pittman            
AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

/s/ Daryl K. Washington            
DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2014, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.

　/s/ Aubrey "Nick" Pittman　　　
AUBREY "NICK" PITTMAN