IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OLLIE GREENE, Individually as the surviving parent of WYNDELL GREENE, SR., WILLIAM GREENE, as the Administrator of the Estate of WYNDELL GREENE, SR., and MARILYN BURDETTE HARDEMAN, Individually and as the surviving parent of LAKEYSHA GREENE, <br><br>    Plaintiffs, <br><br>v. <br><br>TOYOTA MOTOR CORPORATION, TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., TOYOTA MOTOR SALES USA, INC., VOLVO GROUP NORTH AMERICA, LLC., VOLVO TRUCKS NORTH AMERICA, A DIVISION OF VOLVO GROUP NORTH AMERICA, LLC., STRICK TRAILERS, LLC, JOHN FAYARD MOVING & WAREHOUSE, LLC, and DOLPHIN LINE, INC. <br><br>    Defendants. | § § § § § § § § § § § § § § § § § § § § § § § | CAUSE NUMBER: 3:11-cv-0207-N |

**PLAINTIFFS' RESPONSE TO DOLPHIN'S MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF DR. DARRELL L. HENDERSON AND BRIEF IN SUPPORT**

AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax

**ATTORNEYS FOR PLAINTIFFS**

DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas 75201
214-880-4883
469-718-0380 - fax

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................ ii

TABLE OF AUTHORITIES ......................................................................................................... iii

I. INTRODUCTION ............................................................................................................. 1

II. ARGUMENT AND AUTHORITIES ................................................................................ 2

    A. Dr. Henderson is Imminently Qualified to Provide the Opinions He Provides. ........ 2

        1. Dr. Henderson has substantial education, training, and practical experience in the types of physical issues faced by Wyndell Greene. ......... 3

        2. Dr. Henderson also has substantial education, training, and practical experience in the types of emotional and psychological issues faced by Wyndell Greene. ................................................................................... 5

            a. Dr. Henderson uses a universally accepted methodology and relevant data in his analyses. ............................................................ 6

            b. Dr. Henderson's methodological assessment of Wyndell Greene's pain and suffering is based on substantial facts, third party evidence, and his independent assessment from his education, experience and training. ............................................... 8

    B. Dolphin's Blood Clot Theory Has No Traction. ....................................................... 9

    C. The Extensive Factual Bases For the Opinions Weigh in Favor of Reliability. .... 10

    D. Dolphin's Complaints, If They Were Indeed Legitimate, Are Subjects for Cross Examination at Trial, Rather than a *Daubert* Motion. ............................... 10

    E. Contingent Request for Oral Hearing. ................................................................... 11

III. CONCLUSION ................................................................................................................ 12

CERTIFICATE OF SERVICE ..................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Brown v. Kia Motors Corp.*, 2009 WL 866846 (W.D.Pa. Mar.30, 2009) ....................................... 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).................................. passim

*Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183 (9th Cir. 2005) ................................... 2

*Friendship Heights Associates v. Koubek*, 785 F.2d 1154 (4th Cir.1986)........................................ 2

*Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713 (Tex.1998). ..................................... 11

*In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124 (2d Cir.1995). ......................................... 11

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir.1994) ......................................................... 7

*Kopf v. Skyrm*, 993 F.2d 374 (4th Cir.1993)................................................................................ 11

*LMC Complete Auto., Inc. v. Burke*, 229 S.W.3d 469 (Tex.App.-Houston [1st Dist.] 2007, pet. denied)........................................................................................................................... 11

*Media, L.L.C. v. Google Inc.*, 2010 U.S. Dist. LEXIS 3273 (E.D. Tex. Jan. 15, 2010) ............... 11

*Moore v. Ashland Chemical, Inc.*, 126 F.3d 679 (5th Cir.1997) ..................................................... 2

*N. Dallas Diagnostic Ctr. v. Dewberry*, 900 S.W.2d 90 (Tex.App.-Dallas 1995, writ denied) ... 11

*Rock v. Arkansas*, 483 U.S. 44 (1987) ......................................................................................... 10

*Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791 (4th Cir.1989) ............................................. 3

*United States v Gomez*, 67 F. 3d 1515 (10th Cir. 1995) ................................................................ 2

*United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.*, 80 F.3d 1074 (5th Cir.1996) .............................................................................................. 11

*Verzwyvelt v. St. Paul Fire & Marine Insurance Company*, 175 F.Supp.2d 881 (W.D.La.2001) ...................................................................................................................... 3

*Viterbo v. Dow Chem. Co.*, 826 F.2d 420 (5th Cir.1987) ........................................................ 2, 11

**Rules**

FED.R.EVID. 702 ............................................................................................................................. 2

Ollie Greene, William Greene, as Administrator of the Estate of Wyndell Greene, Sr. and Marilyn Burdette Hardeman, (collectively "Plaintiffs") oppose Defendant Dolphin Line, Inc.'s ("Dolphin") motion to exclude the opinions and testimony of Plaintiffs' expert Dr. Darrell Henderson ("Dr. Henderson") and Brief in Support (hereinafter "Motion."). Dolphin fails to meet the threshold for exclusion of expert opinion established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny.

## I.   INTRODUCTION

There is no issue in the case that Dolphin owned the Strick- manufactured trailer that was being towed by a freightliner tractor driven by Daniel Sprinkle, a Fayard and/or Dolphin employee who was being paid by and controlled by Fayard and/or Dolphin. It is also undisputed that Dolphin was responsible, in whole or in part, for the upkeep and maintenance of the Strick trailer on May 28, 2010, when the Greene's 4Runner collided into the Strick Trailer's underride guard, causing it to fall off, and leading to the 4Runner underriding the Strick Trailer. It is also undisputed that Lakeysha Greene died as a result of her interaction with components on the Strick Trailer and that Wyndell Greene, Sr. died later as a result of the complication of burns caused in the fire that occurred by means of fuel from the 4Runner by way of a leak that ensued in the 4Runner's fuel system, after the 4Runner underrode the Strick Trailer. As will be explained by both fact and expert witnesses at trial, Wyndell Greene suffered extreme pain from the collision and the fire, as well as emotional distress from the time of the accident until his death a few months later. Lakeysha Greene suffered conscious paid and suffering as the 4Runner was underriding the Strick Trailer.

Dolphin's Motion grossly distorts Dr. Henderson's expertise, his methodology, and the facts on which he relies. Dolphin also misinterprets the intent and holding of Daubert and its offspring. A *Daubert* motion cannot rest on a false presentment of the opinions it seeks to

1

challenge. Dr. Henderson's analysis is demonstrably reasonable and well-grounded in fact, law, and generally accepted forensic and medical principles. Dolphin may dispute certain factual premises and assumptions employed by Dr. Henderson, but those disputes do not provide a basis for a *Daubert* challenge.

## II. ARGUMENT AND AUTHORITIES

As Dolphin cannot dispute, expert testimony is admissible under FED.R.EVID. 702 if it "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury should such testimony be excluded. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987). Dr. Henderson's testimony far surpasses this "liberal standard of admissibility." *Brown v. Kia Motors Corp.*, 2009 WL 866846, at *5 (W.D.Pa. Mar.30, 2009); *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005); *Moore v. Ashland Chemical, Inc.*, 126 F.3d 679 (5th Cir.1997); *United States v Gomez*, 67 F. 3d 1515, 1525 (10th Cir. 1995).

### A. Dr. Henderson is Imminently Qualified to Provide the Opinions He Provides.

In the process of misrepresenting his surgical workload and experience, Dolphin contends that if Dr. Henderson's practice is "only" 40% cosmetic and car accidents or if he hasn't published "in the last ten years," he cannot qualify as an expert. This is nonsense. A witness's qualifications to render an expert opinion are liberally judged by Rule 702. Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed: knowledge, skill, experience, training, or education. *Friendship Heights Associates v. Koubek*, 785 F.2d 1154, 1159 (4th Cir.1986). Where the expert's qualifications are challenged, the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, nor skill, nor experience, nor training, nor education on the issue for which the opinion is proffered. In

disingenuously attacking Dr. Henderson's expertise, Dolphin attempts to define requisite expertise narrowly and misrepresents Dr. Henderson's expertise. An expert knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion. *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir.1989).

Relying on the Court's decision in *Verzwyvelt v. St. Paul Fire & Marine Insurance Company*, 175 F.Supp.2d 881 (W.D.La.2001), Dolphin challenges Dr. Henderson's qualifications. However, *Verzwyvelt* presents no challenge. In *Verzwyvelt*, the physician "'conceded' that he is not an expert in either Listeria, listeriosis, or hematologic malignancy.'" *Id*. at 887. Here, however, the record reflects that Dr. Henderson has the pertinent education and training and more than 50 years of expertise in precisely the same subject and field at issue here. Dr. Henderson completed his undergraduate education at the University of Mississippi and Vanderbilt University, and obtained a Doctor of Medicine degree in 1959 from the University of Tennessee Medical School. In 1960, he studied under one of the pioneers of plastic surgery, Dr. Mills, and then went on to spend six years at the Mayo Clinic in Rochester, Minnesota as a fellow in general surgery and plastic surgery. This included a three-month rotation through the Department of Psychiatry. He also spent a one year fellowship with Dr. William Frackleton in Milwaukee, Wisconsin, which is associated with Marquette University studying surgery of the hand. From 1967 to 1964 he served as a plastic surgeon in the United States Navy with the rank of Commander. He worked closely with the psychiatric department as many of the injured Navy and Marine personnel had been in prolonged combat and had sustained many psychological stressors which needed treatment hand in hand with their physical wound and burn reconstruction. (APP 040, ¶ 2).

### 1. Dr. Henderson has substantial education, training, and practical experience in the types of physical issues faced by Wyndell Greene.

Dr. Henderson has been practicing surgery since 1969. In the same year, he became certified by the American Board of Plastic Surgery. His practice includes extensive and complex surgical procedures, congenital and pediatric plastic surgery, maxillofacial surgery, surgery of the head, neck and oral cavity, microvascular surgery, cosmetic surgery, and the treatment of burns. In 1976 he became one of the first surgeons in the United States to start using the carbon dioxide and Argon laser on skin lesions. Internationally renowned, he has lectured on the technique throughout the United States and in Australia, Russia, and Poland. He is a Diplomat of the American Board of Plastic and Reconstructive Surgery, Diplomat of the American College of Forensic Examiners, a Fellow of the American College of Surgeons, as well as being an active member of the American Society of Plastic and Reconstructive Surgeons, the American Society for Aesthetic Plastic Surgery, International Society of Clinical Plastic Surgeons, Association of Military Plastic Surgeons of the United States and many other national and regional societies. He has held teaching positions at Louisiana State University School of Medicine, Tulane University, and George Washington University in Washington, DC. Dr. Henderson has published peer-reviewed medical articles in plastic surgery journals and authored chapters in plastic surgery textbooks. He treated burn patients during his fellowship at the Mayo Clinic and the VA hospital in Milwaukee, Wisconsin and **in his two years of active duty with the United States Navy in Virginia, which included treating pilots who were severely wounded in napalm fires**. (APP 041, ¶¶ 3-7).

Since that time Dr. Henderson has been continually involved in the treatment of burn patients, including many who have sustained life-threatening burns. **Over the years, he has developed a sub-specialty as a long-term reconstructive surgeon who follows burn patients forever.** Every week he sees patients who have had severe thermal burns at some

**time in their lives. Through his education, training, research and active treatment of burn patients he has gained a very comprehensive understanding of the medical and psychological issues with which burn patients have to deal, from first presentment throughout the rehabilitation process, and throughout their lives.** He has consulted, been deposed, and/or testified in many cases in state and federal courts around the country, including many in the State of Texas. On more occasions than he can recall, Dr. Henderson has been asked to provide expert testimony on the reasonableness and necessity of medical expenses, including in plastic surgery and burn cases. **He is very familiar with the types of services and average medical rates for the medical doctors, radiologists, social service personnel, counselors, therapists, mental health professionals, pharmacists, and other medical professionals who would be involved with providing care to a patient such as Mr. Greene. Likewise, he is familiar with the types of medications that are provided to burn patients such as Mr. Greene**. (APP 042, ¶¶ 8-11).

> 2. **Dr. Henderson also has substantial education, training, and practical experience in the types of emotional and psychological issues faced by Wyndell Greene.**

Dr. Henderson **did a rotation through the Department of Psychiatry** while he was at the Mayo Clinic in Rochester, Minnesota as a fellow in general surgery and plastic surgery. He **worked closely with the psychiatric department** as many of the injured Navy and Marine personnel he performed surgery on had been in prolonged combat and had sustained many **psychological stressors which needed treatment hand in hand with their physical wound and burn reconstruction.** (APP 040, ¶ 2). On more occasions than he can recall, Dr. Henderson has been asked to **provide expert testimony regarding the conscious physical and psychological pain and suffering that burn patients suffer during initial treatment, rehabilitation, and throughout their lives if reconstructive surgery is not completely**

5

**restorative**. He is actively practicing medicine, including treating burn patients, helping burn patients with rehabilitation and providing reconstructive surgery. Through his continuing education, knowledge, skill, experience, and training he is fully aware of the accepted standards for the diagnosis, care, and treatment of the condition involved in this matter. (APP 042, ¶ 12-13). **He has had formal training in psychiatry and, as a surgeon, find it necessary to apply his training with just about every patient he see, since the patient's psychological well-being is always a concern** to surgeons, burn doctors, and other similar treating medical personnel. (APP 043, ¶ 14).

          a.    **Dr. Henderson uses a universally accepted methodology and relevant data in his analyses.**

The court's gatekeeping function focuses on the examination of the expert's methodology, not the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis. *Smith*., 215 F.3d at 718. Dolphin's criticisms of Henderson do not trigger any *Daubert* concerns. As Dr. Henderson states in his written opinion, (APP 001-039), and again during his deposition, that he reviewed and analyzed several thousand pages of Wyndell Greene's medical records beginning from the time he was air-lifted from the accident site to the time he passed away a few months later. (APP 043, ¶ 16). In support of his opinions, Dr. Henderson has testified that Wyndell Greene's complete medical file documents all of injuries he suffered in the accident and the treatment that Wyndell Greene received. Dr. Henderson noted that Mr. Greene had acute thermal burns to approximately one-third of his body, including his back, bilateral upper extremities, buttocks, neck, scalp and face. He also observed that considering that Mr. Greene was prescribed "short-acting narcotics and short-acting sedatives," it is clear evidence that Mr. Greene was experiencing pain. He also noticed that Mr. Greene was experiencing unwanted bleeding. Henderson Depo at 38:2-23 (APP047).

Overall, Dr. Henderson was able to get a full picture of what Mr. Greene went though as a patient from the time he arrived at the burn trauma hospital until the time he died from his burn injuries.  Looking at medical records to infer the presence of a condition is not a methodologically unsound "assumption" or "guess"--it is a diagnosis. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir.2000) (noting that patient histories "provide information upon which physicians may, and at times must, rely in their diagnostic work"); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 762 (3d Cir.1994) ("[E]valuation of the patient's medical records ... is a reliable method of concluding that a patient is ill even in the absence of a physical examination").

Dr. Henderson's report and testimony reflects that he followed a standard and sound methodology in rendering his opinions.  For instance, he relied on his experience, his medical training and education, and his (a) review and analysis of Wyndell Greene's complete medical files from the time of the accident until the time of death; (b) analysis of the medications that were prescribed to Wyndell Greene; (c) review and analysis of Mr. Greene's extensive physical and occupational therapy record from the hospital's burn and recovery unit; (d) review and analysis of the early and extensive support Mr. Greene received from the hospital's psychology and psychiatric personnel, as well as the chaplain; (e) review of extensive postings from Wyndell Greene's Caring Bridge diary documenting his daily struggles with recovery; (f) deposition testimony from Wyndell Greene's brother and the first responders discussing Mr. Greene's injuries and emotional state; (g) review and analysis of the autopsy reports for Mr. Greene and his family members to understand the full nature of the accident, injuries suffered, and his mental state; (h) review and analysis of peer-reviewed articles, such as the *American Medical Association's Guides to the Evaluation of Permanent Impairment*, *Posttraumatic Stress Disorder*

*and Pain Impact Functioning* and *Disability After Major Burn Injury*, *The Journal of Trauma*, and others; and (i) review and analysis of the reasonableness and necessity of medical expenses, taking into account the cost for services reflected in the nationally published *Physician's Fee Reference*. (APP 043, ¶ 16).

    **b.** **Dr. Henderson's methodological assessment of Wyndell Greene's pain and suffering is based on substantial facts, third party evidence, and his independent assessment from his education, experience and training.**

To the extent Dolphin would seek to criticize Dr. Henderson for his opinion as to Wyndell Greene's obvious pain and suffering, there are no grounds. As discussed above, Dr. Henderson reviewed and analyzed the actual facts that were contained in Mr. Greene's medical records. For instance, notes dictated by the social services personnel, chaplains, and psychiatric and psychology consults who visited with Mr. Greene describe vividly his emotional state of mind and kept record of the pain medications he was required to take. The notes in the Caring Bridge dairy also indicate the daily struggles Mr. Greene was having, physically and mentally. Dr. Henderson also read testimony from his brother, Bill Greene, who discussed Mr. Greene's daily activities and the first responders who provided details of the severity of his initial pain and suffering. The substantial medical records Dr. Henderson reviewed provide a complete picture of what Mr. Greene was going through in terms of surgery, medication, pain, rehabilitation, etc. (APP 044, ¶ 17). Mr. Greene's medical information, in addition to using his education and many years of experience treating and caring for patients in Mr. Greene's condition, as well as the substantial literature that explains the types of post-traumatic psychological stresses these patients have to deal with, allowed Dr. Henderson to determine, within a reasonable degree of medical certainty, that Mr. Greene suffered severe physical and psychological pain and suffering until he passed away.

8

According to Dr. Henderson, the thousands of pages of medical records he reviewed of Mr. Greene's complete treatment record from these same physicians and psychiatric personnel were more than sufficient to enable him to determine the services that were provided to Mr. Greene, and to understand his daily plight as a recovering burn victim. (APP 045, ¶ 18). Dr. Henderson testified that he also read the deposition of Wyndell Greene's brother William, who was by Wyndell's side daily, and the Caring Bridge diary, which chronicled Mr. Greene's daily struggles to recover from the accident and his considerable burns. This reliable and extensive information confirmed to Dr. Henderson that Wyndell Greene's physical and emotional pain and suffering was real and substantial. In other words, in Dr. Henderson's estimation, based on over 50 years of medical experience treating and counseling burn patients, and his experience as a forensic physician, he had sufficient information to conclude, as a matter of reasonable medical probability, that Wyndell Greene suffered severe physical and emotional pain and suffering.

### B.     Dolphin's Blood Clot Theory Has No Traction.

In a desperate last move to attack Dr. Henderson, Dolphin presents a hypothetical view of Mr. Greene's medical condition and attempts to use it to question Dr. Henderson's conclusion. Dolphin appears to argue that since blood clots '"can' result from severe impacts,"' Wyndell Greene must have suffered his blood clot that way. Br. at 7. The problem with Dolphin's straw man theory is that none of Wyndell Greene's medical records reflect a preexisting blood clot. His autopsy does not reflect a pre-existing blood clot. In fact, as Dr. Henderson notes "those attorneys present absolutely no evidence of any preexisting blood clots and none was noted in Mr. Greene's extensive medical records."  (APP 047, ¶ 21).  In fact, Dr. Henderson has opined that the record is clear as to how Mr. Greene passed away. As indicated in his report and his deposition, within a reasonable degree of medical certainty, Mr. Greene died from a massive pulmonary embolism, which virtually blocked the unoxygenated blood from reaching his lungs.

This caused a suffocation-type death as he was craving for oxygen but did not get it. As a result he passed out and became brain dead. (APP 047, ¶ 21). Thus, Dolphin's opposition to Dr. Henderson's conclusion has no merit.

    **C.    The Extensive Factual Bases For the Opinions Weigh in Favor of Reliability.**

As mentioned above, Dr. Henderson's opinions were formed only after a thorough review of a world of information he had regarding Wyndell Greene's daily life from the time of the May 28, 2010, accident until his death. Dr. Henderson reviewed thousands of pages of Mr. Greene's medical records, his psychiatric and counseling notes, records of Mr. Greene's physical rehabilitation, daily entries in his diary describing his recovery efforts, autopsy findings, depositions of family members, depositions of first responders, and other records to allow him to understand the magnitude of the accident. Using his significant expertise, he relied on an abundance of information regarding Mr. Greene and the May 28, 2010, collision. Clearly, Dr. Henderson bases his opinions on extensive and reliable facts and data and is not giving subjective opinions. Thus, Dolphin's motion must be denied.

    **D.    Dolphin's Complaints, If They Were Indeed Legitimate, Are Subjects for Cross Examination at Trial, Rather than a *Daubert* Motion.**

*Daubert* is about the admissibility of an expert's testimony, not the weight the testimony should carry with the trier of fact. The complaints in Dolphin's *Daubert* motion are nothing more than an outline of a cross examination of Dr. Henderson. As *Daubert* noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)). "'[T]he jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its

10

admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir.1996) (quoting *Viterbo,* 826 F.2d at 422; *Media, L.L.C. v. Google Inc*., No. 2:07-cv-279, 2010 U.S. Dist. LEXIS 3273, at *5 (E.D. Tex. Jan. 15, 2010)  As these authorities reaffirm, "the test for exclusion [of expert opinion] is a strict one." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir.1993).

At most, Dolphin's arguments relate to Dr. Henderson's credibility as an expert, a question of fact that is left to a fact-finder, rather than Dr. Henderson's admissibility. Dolphin's disagreement with Dr. Henderson's opinions goes to the weight the jury will give the expert testimony and not to whether Henderson is himself qualified to give his expert opinion. To the extent defendant's Brief is based on objections to the *factual foundation* of Dr. Henderson's opinions, nothing in *Daubert* or its progeny changed the fundamental rule that the factual basis of an expert opinion "goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion **in cross-examination**." *Hose v. Chicago Northwestern Transp. Co.,* 70 F.3d 968, 974 (8th Cir. 1995). A court's gate-keeping analysis is not a substitute for cross-examination.[1] A court is not permitted to determine reliability based on the weight of the evidence or the credibility of the witnesses.[2] Nor should a district court prejudge the weight of conflicting evidence or substitute the judgment of the court for that of the jury. See *In re Joint E. & S. Dist. Asbestos Litig*., 52 F.3d 1124 (2d Cir.1995).

### E. Contingent Request for Oral Hearing.

---

[1] *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex.1998).

[2] *LMC Complete Auto., Inc. v. Burke*, 229 S.W.3d 469, 478–79 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (finding weakness of facts in support of expert's opinion and credibility of patient history go to weight and not admissibility); *N. Dallas Diagnostic Ctr. v. Dewberry*, 900 S.W.2d 90, 95 (Tex.App.-Dallas 1995, writ denied) (holding only the jury should determine credibility and weight to be attached to expert's testimony).

Plaintiffs believe the record before the Court is sufficient to allow the Court to summarily dismiss Dolphin's Motion to Exclude. However, in the event the Court is inclined to limit or exclude any of Dr. Henderson's testimony, Plaintiffs request they be given the opportunity to present counsel argument and/or testimony from such witnesses at an oral hearing. This would allow Plaintiffs to more develop for the Court the expert's qualifications and testimony, as well as the relevance and reliability of it.

### III. CONCLUSION

For all the aforementioned reasons, Plaintiffs respectfully request that the Court deny Dolphin's *Daubert* Motion and grant Plaintiffs such other and further relief, in law or in equity, to which Plaintiffs may be entitled.

Respectfully Submitted,

| | |
|---|---|
| /s/ Aubrey "Nick" Pittman | /s/ Daryl K. Washington |
| AUBREY "NICK" PITTMAN | DARYL K. WASHINGTON |
| State Bar No. 16049750 | State Bar No. 24013714 |
| | |
| **THE PITTMAN LAW FIRM, P.C.** | **LAW OFFICES OF DARYL K. WASHINGTON P.C.** |
| 100 Crescent Court, Suite 700 | 325 N. St. Paul St., Suite 1975 |
| Dallas, Texas 75201-2112 | Dallas, Texas 75201 |
| 214-459-3454 | 214-880-4883 |
| 214-853-5912 – fax | 469-718-0380 - fax |
| pittman@thepittmanlawfirm.com | dwashington@dwashlawfirm.com |

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2014 the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.

      /s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN