IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

OLLIE GREENE, *et al.*,                    §
                                           §
        **Plaintiffs,**                    §
                                           §
v.                                         §
                                           §
TOYOTA MOTOR CORPORATION, *et al.*,        §        **CAUSE NUMBER: 3:11-cv-0207-N**
                                           §
        **Defendants.**                    §
                                           §

## JOINT PRETRIAL ORDER

Plaintiffs Ollie Greene, Individually and as the surviving parent of Wyndell Greene, Sr.,

William Greene, as the Administrator of the Estate of Wyndell Greene, Sr. and Marilyn Burdette

Hardeman, Individually and as the surviving parent of LaKeysha Greene (collectively hereinafter

referred to as "Plaintiffs"), and Defendants Toyota Motor Corporation, Toyota Motor

Engineering & Manufacturing North America, Inc., Toyota Motor Sales U.S.A, Inc., (the

"Toyota Defendants"), Volvo Group North America, LLC, f/k/a Volvo Trucks North America,

("VGNA"), Strick Trailers, LLC, ("Strick") John Fayard Moving & Warehouse, LLC,

("Fayard") and Dolphin Line, Inc. ("Dolphin") (collectively hereinafter referred to as

"Defendants"), submit this Joint Pretrial Order under Local Rule 16.4, pursuant to the Court's

January 3, 2014, *Order Setting Trial Date*:

### I.       SUMMARY OF THE CLAIMS AND DEFENSES OF EACH PARTY

### A.       Plaintiffs:

On Friday evening, May 28, 2010, traffic was slowing on Interstate Highway 20 in the

eastbound lane.  The driver of a Volvo semi-tractor trailer applied the brakes but impacted a

2010 Toyota 4Runner containing the Greene family. The Toyota 4Runner then impacted a 2006

1

Toyota Corolla in the rear.  The Corolla rotated into the freeway median. The Greene's 4Runner then slid into the rear of Strick trailer, dislodging the trailer's underride guard and causing the 4Runner to travel underneath the Strick trailer, all the way up to the mud flaps and the trailer's axle.  The inadequate structure of the Toyota 4Runner, in combination with the Strick trailer's underside, caused Mrs. Greene to be ejected from the 4Runner and to hit her head underneath the Strick Trailer.  In the accident sequence, the Greene family's Toyota 4Runner caught fire and burned up.  The Greene family children, ages 3 and 5, died in the crash as did Mrs. Greene. Later, after spending several months in the hospital, Mr. Greene eventually died as a result of the medical complications caused by the burns he received as a consequence of the fire that resulted from defects in the Toyota, Volvo, and Strick product and the negligence of the Defendants.

Although Defendants contend that an earlier lawsuit against Charles Moody, the driver of the Volvo truck, and his employer, Forest Products, is somehow relevant to this action, it is clear that the present lawsuit largely contains different legal claims from the earlier lawsuit.  Similarly, even though some Defendants may claim that Moody's plea on a criminal negligence charge is dispositive of liability in this case, the facts and the law demonstrate otherwise.  When the charge of criminal negligence was levied against Moody, the troopers were investigating possible causes of the "accident," not the cause of the "deaths" of the Greene family members.  Thus, Moody's plea is irrelevant to the current lawsuit and its admission is more prejudicial than probative.  In addition, the troopers were also not assigning percentages of negligence to the different parties. Nor were the troopers investigating whether product defects attributed to the accident and/or the causes of death.  This lawsuit, however, focuses on the presence of product defects and the negligence of other parties, as stated below:

1.      **Allegations against the Toyota Defendants**.

Plaintiffs allege that Toyota failed to design and incorporate widely available, safer and feasible, alternative designs into the Toyota 4Runner's fuel system, fire prevention and suppression systems, seat restraints, air bag systems, rear occupant compartment and structural integrity of the Toyota 4Runner that would have prevented or significantly reduced the injuries and deaths to the Greene Family.  Plaintiffs also allege that Toyota breached express warranties that the 4Runner was safe, reliable and that quality was of paramount importance.  In addition, Toyota impliedly warranted that Toyota's vehicles were of merchantable quality but breached the warranty of merchantability by designing, manufacturing, distributing, selling and refusing to adequately repair or replace their vehicles after it became apparent they were defective. Furthermore, Plaintiffs allege that in commercials, internet postings, periodicals, press releases, etc., Toyota represented that the safety of their customers is paramount and that the Greene family relied on these representations when they purchased the 4Runner for their family.

2.      **Allegations against Volvo Group North America**.

Plaintiffs allege Volvo failed to design and incorporate widely available, safer and feasible, alternative designs into the Volvo Heavy Truck.  First, Plaintiffs allege that the Volvo truck was an incompatible mismatch, in a crash, with other vehicles on the road and designed in such a manner as to inflict, upon impact, its entire mass and stiffness upon passenger vehicles such as the Greene Family's Toyota 4Runner, without any consideration to installing more energy-absorbing components, less rigid materials or technology that would have reduced the Volvo truck's aggressivity towards the Greene SUV and other vehicles.  Second, Plaintiffs' alleged that Volvo should have included readily available technology used by Volvo in Europe that is referred to as front underride protection systems.  Third, Plaintiffs also allege that VGNA failed to incorporate into the truck an available collision mitigation system, including collision

warning radar, the interrelated adaptive cruise control, and an advanced electronic Braking System.  In addition, Volvo and Volvo Group North America breached its duty in failing to provide information to the U.S. Government regarding the need for readily available collision avoidance and mitigation technologies, such as radar-based collision warning systems, adaptive or automatic cruise control and electronic disc brakes

### 3.     Allegations against Strick Trailers.

Plaintiffs allege that Strick is liable in strict liability for failing to provide a safely designed and manufactured trailer, complete with adequate underride guards.  Strick also had a duty under the federal and state regulations to provide installation and repair instructions to its aftermarket distributor.  In addition, Strick had a duty to warn consumers of the dangerous nature of the inadequate underride guards.  Also, Strick had a duty to ensure that end-users who repaired or installed Strick underride guards were provided with sufficient installation and/or repair instructions to ensure that the underride guards would comply with all applicable federal and state regulations and be reasonably safe, even without regard to the compliance with any federal regulation.  Strict was negligent, even grossly negligent, when it failed to fulfill these duties, the result of which caused the deaths of the Greene Family from contact with, and failure of, the Strick Trailer's rear impact guard.  Moreover, Strick breached its duty by failing to provide information to the U.S. Government regarding the inadequacy of Strick's underride guards and Strick's ability to feasibly and economically install safer underride guards.

### 4.     Allegations against Fayard and Dolphin

Plaintiffs' allege that as a lessor of the Strick trailer, Dolphin and Fayard had a duty to operate a safely designed and manufactured trailer on the highways.  Dolphin and Fayard also had a duty to train their employees on how to inspect a motor vehicle and trailer to ensure that an

unsafe tractor-trailer would not be placed on the road and to maintain the trailer in accordance with traffic and safety regulations. Dolphin and Fayard also had a general duty to operate a safe trailer on the highways where the Strick Trailer was towed and to ensure that the companies hired a driver who would comply with all applicable federal and state regulations and rules of the road. In addition, on the day of the accident, the record demonstrates that (a) Sprinkle stopped suddenly or too rapidly; (b) there was a shoulder and another lane where Sprinkle could have instead driven to avoid the collision; (c) Sprinkle could have noticed the Volvo truck approaching if he had been keeping a lookout to his rear; (d) Sprinkle could have moved to the shoulder if he had seen the approaching truck and avoided the accident; and (e) Sprinkle took no such evasive action.

Plaintiffs also allege that in picking up the Fayard/Dolphin shipment and equipment, as well as while he operated the Freightliner tractor and Dolphin's Strick Trailer, Sprinkle was acting in the course and scope of his employment as an agent for Fayard and Dolphin, as he had done many times in the past. Both Fayard and Dolphin are vicariously liable for the negligent inspection and negligent operation of the tractor and trailer since this negligence occurred in the course of Sprinkle's employment with Fayard and Dolphin as well as while the trailer was under informal lease from Dolphin to Fayard. Sprinkle was acting (operating the tractor and trailer) within the general authority given to him by Fayard and Dolphin, in furtherance of their business and for the accomplishment of the joint objective for which he was employed. Both Fayard and Dolphin had the right to control Sprinkle. Dolphin and Fayard were grossly negligent when they failed to fulfill these duties to the Greene Family, causing death to the Greene Family and damages to Plaintiffs.

## B.   <u>Toyota Defendants</u>:

Defendants Toyota Motor Corporation, Toyota Motor Engineering & Manufacturing North America, Inc., and Toyota Motor Sales, U.S.A., Inc.'s (collectively the "Toyota Defendants") allege that the accident and Plaintiffs' injuries were caused by the negligence of Charles Moody, who was inattentive and failed to control his speed, causing the accident and Plaintiffs' injuries.

The Toyota Defendants further contend that the 2010 Toyota 4Runner was not defectively designed, manufactured, or marketed and that the deaths of the Greene Family were not caused by any alleged defect in the 4Runner's design, manufacture or marketing. The Toyota Defendants deny any warranties accompanied the 2010 4Runner other than the express written warranty that came with the vehicle, and further deny that they breached any warranty, express or implied.  The Toyota Defendants further deny that they made any material misrepresentations regarding the 2010 Toyota 4Runner, and further deny that Wyndell Greene, Sr. or Lakeysha Greene relied upon on any alleged material misrepresentations. The 4Runner was reasonably safe, defect free, and exceeded all applicable Federal Motor Vehicle Safety Standards. The Toyota Defendants deny that Plaintiffs have proffered any admissible expert testimony in support of their defect theories, and further deny that Plaintiffs experts have offered any testimony, admissible or not, to support any claim that the deaths of Lakeysha. Greene, Wesleigh Greene, or Wyndell Greene, II were the result of any defect in the 2010 4Runner. Moreover, Plaintiffs' experts provided no testimony whatsoever in support of any defect claims with respect to "seat restraints" and "air bag systems." Accordingly, the Toyota Defendants contend they are not liable to Plaintiffs.

6

### C.    VGNA f/k/a Volvo Trucks North America, Inc:

This case arises from a multiple-vehicle collision on I-20 near Terrell, Texas, on May 28, 2010.  The Greene family – Wyndell Sr., LaKeysha and their two young children, Wesleigh and Wyndell II – were riding in a Toyota 4Runner that had slowed or stopped because the traffic in front of them had stopped.  The Greenes' 4Runner was struck from behind by a tractor-trailer driven by Charles Moody and owned and operated by Moody's employer, Forest Products Tranports, LLC, that was traveling at highway speed.  The 4Runner was first pushed into a Toyota Corolla, and then collided with the rear of another tractor-trailer.  Five-year-old Wesleigh and two-year old Wyndell II died in the course of the collision.  LaKeysha was ejected from the passenger seat and died during the collision as well.  Wyndell Sr., who was driving, suffered burns and other injuries.  He died about 3½ months later.

The plaintiffs in this case are two relatives of the Greene family (Wyndell Sr.'s mother, Ollie Greene, and LaKeysha's mother, Marilyn Burdette-Hardeman) and the administrator of Wyndell Sr.'s estate (Wyndell Sr.'s brother William Greene).  Each of these three plaintiffs asserted a variety of claims and causes of action – primarily product liability and negligence claims – against five defendants in connection with the deaths of the members of the Greene family.  These five defendants are:  *(1)* Toyota, which made the 4Runner; *(2)* Volvo (VGNA f/k/a Volvo Trucks North America, Inc.) which made the tractor that struck the Greene vehicle; *(3)* Strick, which made the trailer that the Greene vehicle struck; *(4)* Dolphin, the owner of the trailer that the Greene vehicle struck; and *(5)* Fayard, the operator of the tractor-trailer that the Greene vehicle struck.

The plaintiffs have pleaded three theories of "design, manufacturing and/or marketing defects" in the Volvo tractor:  *(1)* "absent or defective collision warning system"; *(2)* "ineffective

energy-absorption capabilities"; and *(3)* "the Tractor was defectively designed because it was incompatible, in a crash, with other vehicles on the road…".  Plaintiffs have not (and have never) pleaded any allegations of defect regarding the Volvo tractor's brakes or braking system.  They also have never alleged any defect regarding "adaptive cruise control."  Also, no causes or claims have been made on behalf of the estates of LaKeysha Greene or the Greene children – by a court-appointed personal representative of those estates or otherwise.

VGNA contends that Charles Moody, the driver of the Volvo tractor, and his employer Forest Products are both responsible third parties and "settling persons" under Chapter 33 of the Texas Civil Practice and Remedies Code.  Moody's and Forest Products' fault will be submitted in this case.  VGNA will show that Moody was indicted by the grand jury in Kaufman County, Texas, in October 2010 on three counts of criminal negligent homicide (for the deaths of LaKeysha, Wesleigh and Wyndell II).  The indictment alleged that Moody committed felony **criminal negligence** causing the deaths by "failing to watch the road and traffic, by driving at too great a rate of speed for the traffic conditions, and by using a cell phone when he should have been attentive to traffic."  *See* VGNA Trial Exhibit V001. On April 29, 2013, Moody *stipulated and judicially confessed* that on May 28, 2010 he "committed the offenses(s) as alleged in the above referenced cause number."  The stipulation of evidence was signed by Moody's lawyer. *See* VGNA Trial Exhibit 2.  On that same date, Moody pled guilty to the felony charges.  *See* VGNA Trial Exhibit V003.

Texas Penal Code §19.05(a) ("Criminally Negligent Homicide") provides that a person commits an offense if he causes the death of an individual by *criminal negligence.*  Texas Penal Code §6.03(d) provides that  "A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought

to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."  *Britain v. State*, 412 S.W.3d 518, 520 (Tex.Crim.App. 2013)

By entering his plea of guilty, Moody admitted all elements of the charge contained in the counts of the indictment.  *United States v. Trevino*, 131 F.3d 1140, 1141 (5th Cir. Tex. 1997), citing *McCarthy v. United States*, 394 U.S. 459, 22 L. Ed. 2d 418, 89 S. Ct. 1166 (1969); *accord United States v. Arclese*, 2002 U.S. App. LEXIS 28426 (5th Cir. Tex. June 13, 2002).

Plaintiffs also contended – and judicially admitted – that Moody and Forest Products were negligent and grossly negligent in another lawsuit (Case No. 3:10-cv-01085-G; N.D. Texas) that based on the same accident and facts.

VGNA further contends that subject Volvo tractor was not defectively (or negligently) designed, manufactured, or marketed, and that the deaths of the Greene family members were not caused by any alleged defect (or negligence) in the Volvo tractor's design, manufacture or marketing.  The Volvo tractor was reasonably safe, free of defects, and exceeded all applicable Federal Motor Vehicle Safety Standards (FMVSS).  Accordingly, VGNA contends it is not liable to Plaintiffs.

VGNA contends that it did not make any representations to the Greene family or to any of these Plaintiffs regarding the Volvo tractor.  It also contends that there is no cause of action under Texas for "representations," as Plaintiffs have pleaded.

VGNA has also asserted additional various defenses and affirmative defenses in the case, including (but not limited to):  *(1)* the incident was caused by the negligence of third parties over

whom VGNA had no right of control or exercised any right to control; *(2)* the doctrines of contribution and comparative causation under Chapter 33 of the Texas Civil Practices and Remedies Code apply in this case; *(3)* Charles Moody and Forest Products are "responsible third parties" under the provisions of Chapter 33; *(4)* the Volvo tractor met or exceeded all applicable FMVSS standards and the rebuttable presumption under the product liability provisions of Chapter 82 of the Texas Civil Practices and Remedies Code apply; *(5)* the Plaintiffs may only recover for medical expenses and fees that were "paid and incurred" under Section 41.1050 of the Texas Civil Practices and Remedies Code; *(6)* there is no basis for awarding exemplary damages against VGNA in this case, and the limitations, burdens, standards and instructions contained in Chapter 41 of the Texas Civil Practices and Remedies Code apply in this case; *(7)* any award of exemplary damages against VGNA under the facts and circumstances would violate VGNA's due process rights and violate various constitutional protections afforded under the Texas and U.S. Constitutions; and *(8)* a negligent design, marketing or manufacturing claim against VGNA is subsumed by a strict products liability claim and cannot and should not be separately submitted to the jury (see *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 665-66 (Tex. 1999)).

VGNA (and any other non-settling defendant in this case) is and would also be entitled to settlement credits under Texas law in connection with and based upon *(i)* the settlements made by Moody and Forest Products in the lawsuit filed by Plaintiffs against Moody and Forest Products; and *(ii)* any settlements between the Plaintiffs and any defendant in this lawsuit.

**D.     Strick:**

Strick Corporation, Inc. designed and manufactured a Smoothside Dry Van trailer, MY 2004, equipping it with a Strick-designed and manufactured, FMVSS 223/224-compliant, rear

underride guard.  On February 6, 2003, Strick sold the trailer to its dealer, RC Trailer Sales & Service.  Strick supplied, in electronic form, a Trailer Care and Maintenance Manual, for distribution to RC Trailer's buyer, Dolphin Lines.  Thereafter, Strick had no contact with the trailer.

When the Greene family's accident occurred 7 years later, the underride guard on the Strick trailer was not the original equipment Strick underride guard.  The guard's characteristics, as seen in post-accident photographs, are definitively different from the original equipment underride guard on the subject trailer and from other underride guards manufactured and sold by Strick.  Although Dolphin Line has repair orders for a replacement of the horizontal bar and upright(s) in 2008, it has no records showing the source of the replacement guard components.  If any original components remained on the guard, which Strick disputes, the condition of the guard was substantially altered.  At the time of the accident, John Fayard Moving & Warehouse, LLC was towing the trailer behind a Freightliner tractor.

The accident commenced when a 63,500 pound Forest Products tractor-trailer rear-ended the Greene family's Toyota 4Runner.  The impact was extremely severe, imposing forces and accelerations exceeding known human tolerances for small children.  The Volvo tractor crushed the entire rear of the 4Runner, shoving the second row seat, where the Greene children were seated, forward and upward, crushing both into the front seats occupied by their parents.  This crush caused fatal blunt force head trauma to the heads of the children.  Death was instantaneous.  There was no conscious pain and suffering.

The Volvo tractor-trailer them rammed the 4Runner into the rear of a Corolla.  The 4Runner rotated sideways and slid, passenger side leading, into the rear of the Strick trailer which was being towed by a Freightliner tractor and was stopped in traffic.  The Volvo Tractor

trailer slammed into the left side of 4Runner, crushing the 4Runner between the two tractor trailers. Despite the colossal forces of the impact, the underride guard remained intact long enough to leave its imprint on the passenger side front door and cause 10 inches of intrusion of passenger side structures from the rocker panel to the roof.  During this side impact, before any underride, Lakeysha Greene's head struck the trailer body.  She sustained fatal head injuries.

These massive impact forces fractured the right side of the underride guard, shoved the 4Runner beneath the Strick trailer and twisted off the left side of the guard.  The impact was so violent that it lifted the Strick trailer's rear end off the ground and accelerated the entire Fayard rig forward.  Mrs. Greene's body was ejected onto the vehicle's hood and sustained additional post-mortem trauma beneath the trailer and/or when the 4Runner spun and its front end twice hit the passing Volvo trailer as it veered to the right.

The initial rear impact of the Volvo Tractor Trailer into the 4Runner's rear-end had breached the 4Runner's fuel system.  At some point during the accident sequence, the exact timing of which is a matter of speculation, mechanical sparks ignited the leaking fuel at the left rear of the vehicle.  Flames erupted when the 4Runner stopped as it impacted the rear of the Strick trailer.  Fire consumed the 4Runner and inflicted severe post-mortem burns upon the childrens' bodies.  Bystanders rescued Mr. Greene from the 4Runner.  He, unfortunately, succumbed to complications of burn injuries three and a half months later.  The failure of the underride guard did not cause the fire.

Texas DPS Troopers who inspected the trailer and the accident underride guard observed no deficiencies in the accident guard or its attachment welds.  There is no alternative rear underride guard design which could have withstood the extremely severe forces of the subject

impact.  There is no alternative design rear underride guard which would have eliminated or reduced the risk of death or serious injuries to Greene family members in this severe accident.

Strick contends:

1.      Strick did not design, manufacture or sell the accident underride guard.  If any original equipment component was still on the accident underride guard, the guard was substantially modified in condition.  Strick is not liable for alleged design, assembly or installation defects of the accident guard.  Tex. Civ. Prac. & Rem. Code §§82.001, 82.003.

2.      The Strick original equipment underride guard was reasonably safe in design and was not the producing cause of death or injury to any member of the Greene family.  Tex. Civ. Prac. & Rem. Code §82.005(a)(2); *Toshiba Intl Corp v. Henry*, 152 SW3d 774 (Tex. App. 2005).

3.      Strick exercised ordinary care in the design of the Strick trailer, including its underride guard and supplied adequate warnings and instructions.  Strick is not liable for a marketing defect.  *Garza v. Ford*, V-10-05, 2012 WL 293189 p. 3(S.D. Jan. 30, 2012).

4.       Absence of adequate warnings and instructions about the underride guard was not the producing cause of the failure of the accident underride guard or of the death or injury to any member of the Greene family.

5.      Strick is entitled to a statutory presumption of no liability because the original equipment rear underride guard complied with F.M.V.S.S. 223 and 224.  Tex. Civ. Prac. & Rem. Code §82.008(a).

6.      There was no safer alternative underride guard design which would have prevented or significantly reduced the risk of fatal personal injuries to the decedents, or any of them, in this accident.  Tex. Civ. Prac. & Rem. Code, §82.005(a) and (b).

7.      The sole proximate cause of the deaths of Plaintiffs' decedents is the criminally negligent driving of Charles Moody for which his employer,  Forest Products Transports LLC. is liable.

8.      Plaintiffs' damages may have been caused or contributed to by the comparative negligence of other defendants, over whom Strick has no right of control and Strick asserts the right to contribution and comparative fault underChapter 33 of the Texas Civil Practice and Remedies Code

9.      Lakeysha Greene's death was caused by the lateral (side) impact with the trailer body and preceded the failure of the accident underride guard.  An underride guard which remained intact would not have prevented her death.

10.     To the extent the trial court deems Plaintiff William Greene to have pleaded, and to have standing to pursue a survival action for the death of the Greene children (which Strick disputes), both children died in the initial rear end impact, unrelated to the later crash with the rear of the Strick trailer.

11.     Even if the children were still alive at the time of impact with the Strick trailer, an underride guard which remained intact would not have prevented their deaths.

12.     Lakeysha Greene's death was instantaneous and she suffered no conscious pain and suffering.

13.     Wyndell Greene II's death was instantaneous and he suffered no conscious pain and suffering.

14.     Wesleigh Greene's death was instantenous or nearly and she suffered no conscious pain and suffering and her death was instantaneous or nearly so.

14

15.     The injuries and death of Plaintiff William Greene's decedent, Wyndell Greene, Sr.,  was not caused by failure of the accident underride guard and Strick has no liability for Mr. Greene's death.

16. Strick o  was not grossy negligence of Strick, and  Strick is not liable for exemplary damages (which are not available on the wrongful death claims of Plaintiffs Ollie Greene and Marilyn Hardeman, at any rate).  Tex. Civ. Prac & Rem. Code §§71.009, 71.021; Texas Constitution, Article XVI §26; DOC 156.  Constitutional due process of law precludes an award of exemplary damages for conduct which did not cause the harm at issue.  [Tex. Const. Art. 1, §19; U.S. Const. Amend. V & XIV, §1; *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 1520 (2003);

16.     If  Plaintiff William Greene is deemed by the court to have adequately pleaded a survival action for the death of the Greene children and to have standing to pursue it (which Strick disputes), the deaths of the children were not caused by Strick or by any gross negligence of Strick.

17.      Exemplary damages may not be awarded in excess of the amounts in Tex Civ. Prac & Rem Code § 41.008, or in an excessive amount or manner constituting a constitutionally arbitrary deprivation of property or due process of law.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 1520 (2003); *Honda Motor Company Ltd v. Oberg*, 512 U.S. 415, 432 (1990); *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 18 (1991); *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 (1996).

18.     As a matter of Constitutional law, exemplary damages may not be awarded for extrerrirtorial conduct, including sales of trailers outside the State of Texas.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 1522-3 (2003); *White v. Ford Motor*

*Co.*, 312 F.3d 998, 1014 n. 62 (9th Cir. 2002) (allowing the jury "to measure damages by [the alleged] harm to the whole country" was "a substantive error...of federal constitutional law." "[A] state may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other states"].

19.     Strick and any other non-settling defendant, is entitled to settlement credits under Texas law in connection with and based upon the settlement Plaintiffs reached with Moody and Forest Products Transports, LLC, and any other defendant in this matter.

**E.     Dolphin:**

This is a negligence and strict liability case arising out of a motor vehicle accident occurring on, or about, May 28, 2010 (the "accident"). (Plaintiffs' Second Amended Complaint and Jury Demand ¶1, Document No. 113 ("Second Amended Complaint")). Wyndell Greene, Sr., LaKeysha Greene, Wyndell Greene, II and Wesleigh Greene (collectively referred to as the "Greenes") all passed away as a result of the accident. (Second Amended Complaint ¶1&2). Plaintiffs seek to recover both economic and non-economic damages. (Second Amended Complaint ¶126&127). With respect to Dolphin, Plaintiffs assert claims based on theories of: negligence, gross negligence, strict liability, wrongful death, and survival actions.

2.     The Court partially granted Dolphin's Motion for Summary Judgment on May 05, 2014. (ECF #614). As a result of the Court's Order, only Wyndell Greene, Sr.'s wrongful death claim, Ollie Greene's survival claim as to Wyndell Greene, Sr., and Marilyn Burdette-Hardeman's survival claim as to LaKesha Greene are pending against Dolphin. In addition, only the estate of Wyndell Greene, Sr.'s exemplary damage claims survived the Court's summary judgment ruling.

16

3.     With respect to the live claims against it, Dolphin denies that it is liable in any respect.  Dolphin denies that it is strictly liable, that it acted negligently, or that its actions constitute gross negligence.  Dolphin did not breach any legal duty owed to Plaintiffs.  Dolphin is not responsible for the actions Fayard's driver, Daniel Sprinkle ("Sprinkle"), or the driver of the vehicle which caused the accident Charles Moody ("Moody").   Moody acknowledged that the subject accident was his fault alone. Dolphin disputes that its trailer and/or equipment was a proximate cause of any injuries or damages claimed by Plaintiffs.  No act, or omission, on the part of Dolphin was a proximate cause of any of the damages alleged in this matter.

4.     Plaintiffs, other Defendants and/or third parties, or other circumstances, over whom/which Dolphin had no control, failed to use that degree of care and caution as would have been used by a reasonably prudent person under the same or similar circumstances, thereby producing or proximately causing or contributing to Plaintiffs' damages or injuries, if any. Such acts or omissions of Plaintiffs and/or third parties or other then-existing circumstances were the proximate cause, producing cause, sole proximate cause, or sole producing cause of the accident in question and any alleged resulting injuries or damages. This includes, but is not limited to, Dolphin's assertion that Plaintiffs' alleged damages, if any, resulted from the independent actions of Forest Products Transports, LLC and Moody and are not reasonably attributable to Dolphin. Forest Products Transports, LLC and Moody's actions were the sole, immediate and proximate cause of Plaintiffs' claimed damages. Accordingly, any alleged action or alleged omission on the part of Dolphin was not the proximate cause, or cause in fact of Plaintiffs' alleged damages, if any.

5.     On May 28, 2010, Moody stipulated and judicially confessed that he committed the criminally negligent homicide of LaKesha Greene, Wesleigh Greene, and Wyndell Greene,

Jr. By entering his plea of guilty, Moody admitted all of the elements of the charges contained in the indictment. *United States v. Trevino*, 131 F.3d 1140, 1141 (5th Cir. Tex. 1997).

6.      Plaintiffs originally filed suit against Moody and his employer, Forest Products Transports, LLC, in Case No. 3-10-cv-01085-G in the United States District Court – Northern District of Texas – Dallas Division. In this suit, Plaintiffs judicially admitted that Moody and Forest Products Transports, LLC were negligent and grossly negligent in relation to the same underlying accident. Such admissions establish that both of these entities were the proximate cause of the plaintiffs' injuries and damages.

7.      Dolphin also asserts that the doctrines of contribution and comparative fault under Chapter 33 of the Texas Civil Practice and Remedies Code apply in this case.

8.      That Moody and Forest Products Transports, LLC are responsible third parties in accordance with this Court's order and the provisions of Chapter 33 of the Texas Civil Practice and Remedies Code.

9.      That §41.1050 of the Texas Civil Practice and Remedies Code mandates that Plaintiffs only recover "paid or incurred" medical expenses and fees in relation to this case.

10.      That there is no basis for awarding exemplary damages against Dolphin in this case. Dolphin further asserts that any award of punitive or exemplary damages would constitute the imposition of a criminal penalty without the safeguards guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitution of the United States, and similar provisions of the Texas Constitution. Furthermore, the imposition of such punitive or exemplary damages constitutes an excessive fine under the Eighth Amendment, denies Dolphin equal protection of the law under the Fourteenth Amendment, and violates the due process clause of the Fifth and Fourteenth Amendments. Dolphin pleads that any claim by Plaintiffs for punitive or exemplary

damages should be stricken as unconstitutional and that any award of punitive or exemplary damages should be set aside for the reasons stated above. Dolphin further pleads that some or all of Plaintiffs' claim for punitive damage are barred by the Texas Constitution.

11.     Dolphin, and any other non-settling defendant, is entitled to settlement credits under Texas law in connection with and based upon the settlement Plaintiffs reached with Moody and Forest Products Transports, LLC, and any other defendant in this matter.

12.     To the extent exemplary damages are awarded, by virtue of section 41.008 of the Texas Civil Practice & Remedies Code, any award of punitive damages is subject to the caps specified in that section and any award in excess of that cap must be reduced accordingly.

**F.     <u>Fayard</u>:**

This lawsuit arises from an automobile accident that occurred at approximately 6:25pm on May 28, 2010, near Mile Marker 509 on eastbound Interstate 20, in Kaufman County, Texas. Responsible third party and settling party Charles Moody ("Moody"), operating a tractor and loaded flatbed trailer owned and entrusted to him by responsible third party and settling party Forest Products Transport, LLC, ("Forest Products Transport") violently and forcefully rear-ended a Toyota 4Runner SUV containing decedents Wyndell Greene, Sr., LaKeysha Greene, Wesleigh Greene, and Wyndell Greene, Jr.

2.     Moody's and Forest Products Transport's tractor and loaded flatbed trailer not only violently and forcefully rear-ended the Greene family's SUV, but also drove the SUV forward, causing it to collide first with a Toyota Corolla sedan and second with the rear of a dry-van trailer that was being pulled by a tractor owned by Fayard Moving and operated by its employee, Daniel Sprinkle, who had previously stopped his tractor-trailer because of traffic stopped in front of him on eastbound I-20.

3. As a result of this accident, Plaintiffs initially sued Moody and Forest Products Transport, alleging negligence and gross negligence. That lawsuit resulted in a settlement of Plaintiffs' claims against Moody and Forest Products Transport.

4. Thereafter, Plaintiffs filed this lawsuit, against five Defendants, including Fayard Moving, against whom Plaintiffs have alleged strict products liability, with respect to the rear underride guard (or "DOT bumper") on the rear of the dry-van trailer, and negligence and gross negligence, with respect to Sprinkle's pre-trip inspections of the DOT bumper and operation of the tractor-trailer.

5. The Court granted summary judgment in favor of Fayard Moving on Plaintiffs' strict products liability claim, such that Plaintiffs' only remaining claims against Fayard Moving are their negligence and gross negligence claims pertaining to Sprinkle's pre-trip inspections of the DOT bumper and operation of the tractor-trailer.

6. Fayard Moving generally denies Plaintiffs' claims of negligence and gross negligence. Fayard Moving specifically denies that Sprinkle was negligent, either in the performance of his pre-trip inspections or his operation of the tractor-trailer. Fayard Moving likewise denies that any of Sprinkle's actions was a proximate cause of the accident in question or the deaths of the decedents.

7. Fayard Moving contends that, prior to the accident in question, Sprinkle performed his pre-trip inspections of the trailer as would a reasonably prudent commercial driver under the same or similar circumstances and in compliance with the Federal Motor Carrier Safety Regulations (FMSCR). Fayard Moving contends that Sprinkle visually inspected the DOT bumper during his pre-trip inspections, observed that it appeared to be sufficiently attached to the rear of the trailer, and noted no apparent defects.

8.     Fayard Moving contends that, at the time of the accident in question, Sprinkle was attentive to the roadway; observed that traffic ahead of him on eastbound Interstate 20 was slowing and coming to a stop; and therefore brought his tractor-trailer to a gradual and controlled stop, a reasonable distance behind the tractor-trailer directly in front of him.

9.     Fayard Moving invokes the applicable law of proportionate responsibility, pursuant to Chapter 33 of the Texas Civil Practice & Remedies Code, and pleads that the legal responsibility for any alleged injuries and/or damages resulting from the accident made the basis of this lawsuit lies in whole or in part with responsible third parties and settling parties Moody and Forest Products Transport, which responsibility has been admitted by Moody when he pled guilty to three counts of criminally negligent homicide, as charged by the Kaufman County District Attorney's office, arising from the accident in question.

10.     Fayard Moving invokes the applicable law of damages, pursuant to Chapter 41 of the Texas Civil Practice & Remedies Code, and pleads that Plaintiffs' gross negligence cause of action and claims for recovery of medical expenses and exemplary damages are defined by, and subject to the definitions and limitations set forth in, that Chapter and related Texas jurisprudence.

## II.     STATEMENT OF STIPULATED FACTS

1.     Ollie Greene is the natural mother of Wyndell Greene, Sr.

2.     Marilyn Hardeman is the natural mother of Lakeysha Greene.

3.     William Greene is the representative of the Estate of Wyndell Greene, Sr.

4.     Marilyn Hardeman is the representative of the Estate of Lakeysha Greene.

5.     Lakeysha and Wyndell Greene, Sr. purchased the 2010 Toyota SR5 4Runner, VIN #JTEZU5JR9A5000911 from Toyota of Plano on January 6, 2010.

6. Toyota Motor Corporation ("TMC"), located in Japan, is responsible for the overall design, development and testing of Toyota, Lexus and Scion motor vehicles. TMC was responsible for the design, development, and manufacture of the 2010 Toyota SR5 4Runner, VIN #JTEZU5JR9A5000911, which was purchased by Lakeysha and Wyndell Greene, Sr.

7. Toyota Motor Sales, Inc. ("TMS") is the authorized importer and a distributor of Toyota, Lexus and scion motor vehicles in certain geographic areas of the continental United States.

8. TMS was responsible for distributing the 2010 Toyota SR5 4Runner, VIN #JTEZU5JR9A5000911, that was purchased by Lakeysha and Wyndell Greene, Sr.

9. The 2010 Toyota SR5 4Runner, VIN #JTEZU5JR9A5000911, that was purchased by Lakeysha and Wyndell Greene, Sr. was a 4x2 sports utility vehicle that was sold with a half-cover type fuel tank protector sub-assembly.

10. Toyota Motor Manufacturing North America, Inc. ("TEMA") integrates Toyota's research and development and manufacturing operations in North America. TEMA conducts engineering design, development, and testing for certain Toyota vehicles in North America, works with North American Suppliers to evaluate parts and materials and conducts powertrain design, tuning, evaluation, environmental safety and emissions certification. TEMA also engages in prototype development and materials and technical research.

11. Volvo Group North America, LLC (formerly known as Volvo Trucks North America, Inc.) designed and manufactured the 2008 Volvo VNL64T truck, VIN #4V4NC9GH88N483933.

12. Strick Trailers LLC is a company that is engaged in the business of selling trailers.

13.     A multiple-vehicle accident occurred on Friday, May 28, 2010, on Interstate 20 ("IH 20") in Kaufman County, Texas.

14.     IH 20 is a four-lane divided highway with improved shoulders and a grass median at and near the site of the accident.

15.     In the days prior to the May 28, 2010, incident, Daniel Sprinkle ("Sprinkle"), drove the Freightliner owned by Fayard Moving & Warehouse to Loxley, Alabama to pick up a load that was on the Dolphin-owned, Strick-manufactured Trailer.  The load was to be delivered to a number of home improvement stores in Oklahoma City, OK and Dallas, TX.

16.     At the time of the collision, the 2010 4Runner was being driven by Wyndell Greene, Sr.

17.     At some point in the accident sequence on May 28, 2010, a fire occurred in the Toyota 4Runner.

18.     Lakeysha Greene, their son Wyndell, II (a/k/a Kyle), and daughter Wesleigh, died at the scene of the crash on May 28, 2010.

19.     Wyndell Greene, Sr. died three and a half (3½) months later from complications of the injuries he sustained in the accident on May 28, 2010.

## III.    LIST OF CONTESTED ISSUES OF FACT

**A.    <u>Plaintiffs</u>:**

1.     Whether it was foreseeable to the Toyota defendants that rear end collisions between trucks and passenger vehicles would on occasion take place in the ordinary use of the vehicles such as those Toyota designed and sold.

2.      Whether it was foreseeable to the Toyota defendants that accidents and incidents such as what occurred herein would on occasion take place in the ordinary use of the vehicles such as those Toyota designed and sold.

3.      Whether Toyota specifically marketed the Toyota 4Runner to families with children.

4.      Whether Toyota specifically marketed the Toyota 4Runner to minority families, including those with children.

5.      Whether Toyota specifically marketed the Toyota 4Runner to the Greene family.

6.      Whether the 2010 Toyota 4Runner was defective in the design of the 4Runner's fuel system, fire prevention and suppression systems, seat restraints, air bag systems, rear occupant compartment and structural integrity.

7.      Whether Toyota breached its duty to exercise reasonable care in the design, testing, and distribution and/or marketing of the Toyota 4Runner to ensure that it was not unreasonably dangerous for its foreseeable uses.

8.      Whether, if there was a safer alternative design to any defective design in the Toyota 4Runner, it would have prevented or significantly reduced the risk of the Plaintiffs' damages without substantially impairing the product's utility.

9.      Whether, if there was a safer alternative design to any defective design in the 2010 4Runner, it was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

10.     Whether there was a causal connection between the design of the 2010 Toyota 4Runner and Plaintiffs' or the decedents' personal injury, property damage, or death.

11.     Whether Toyota's negligence was a proximate cause of the injury and/or death of one or more members of the Greene Family.

12.     Whether Toyota breached its duty and was negligent in not installing a different and full cover fuel tank protective shield.

13.     Whether Toyota breached its duty and was negligent in failing to warn of known dangers regarding the fuel system and fuel tank protective shield.

14.     Whether Toyota breached its duty and was negligent in failing to warn of known dangers regarding the seat restraints and air bag systems.

15.     Whether the 2010 Toyota 4Runner was unfit for the ordinary purposes for which it was used because of a lack of something necessary for adequacy.

16.     Whether Toyota knowingly made false or misleading statements of fact concerning Toyota products.

17.     Whether Toyota, by and through the sale of the vehicle in question, represented that the vehicle was reasonably safe in heavy volume highway traffic.

18.     Whether Toyota, by and through the sale of the vehicle in question, represented that the vehicle was reasonably safe for transporting children in the rear seats in long distance highway traffic.

19.     Whether Toyota failed to exercise reasonable care or competence in obtaining or communicating information about its products.

20.     Whether the Greene family and Plaintiffs suffered pecuniary loss by justifiably relying on Toyota's representations about its products.

21.     Whether Toyota failed to disclose information concerning the Toyota 4Runner that was known at the time of the transaction where such failure to disclose such information was

intended to induce the Greene Family into a transaction into which the family would not have entered had the information been disclosed.

22.     Whether Toyota failed to instruct consumers as to the safe use of its product and to warn consumers of dangers associated with its product of which Toyota either knew or should have known at the time the product was sold.

23.     Whether the absence of the warning and/or instructions from Toyota rendered the product unreasonably dangerous to the ultimate user or consumer of the product.

24.     Whether Toyota's failure to warn and/or instruct constituted a causative nexus in the death of one or more members of the Greene Family.

25.     Whether Toyota's refusal to maintain computer aided engineering and finite element modeling information for the 2010 4Runner, as well as the 2003-2009 model, and discarding it during the period surrounding this lawsuit and/or Toyota's other highly publicized legal troubles, and in contradiction to its records retention policy, evinces bad faith spoliation of evidence.

26.     Whether it was foreseeable to Strick that rear end collisions between trucks and passenger vehicles would on occasion take place in the ordinary use of the trailers such as the those Strick designed and sold.

27.     Whether it was foreseeable to Strick that accidents and incidents such as what occurred herein would on occasion take place in the ordinary use of the trailers such as those Strick designed and sold.

28.     Whether the Strick Trailer was defective in the design of the trailer's ICC bumper/underride guard.

29.     Whether Strick breached their duty to exercise reasonable care in the design, testing, distribution and/or marketing of the Strick Trailer to ensure that it was not unreasonably dangerous for its foreseeable uses.

30.     Whether, if there was a safer alternative design to any defective design on the Strick Trailer, it would have prevented or significantly reduced the risk of the Plaintiffs' damages without substantially impairing the product's utility.

31.     Whether, if there was a safer alternative design to any defective design on the Strick trailer, it was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

32.     Whether the design of the Strick Trailer was a producing cause of the death of one or more members of the Greene Family.

33.     Whether the design of the Strick Trailer helped create the mechanical sparks that ignited the fire in the 4Runner that led to the deaths of one or more members of the Greene Family.

34.     Whether Strick's underride guard complied with the labeling requirements under the Federal Safety Standard.

35.     Whether Strick's underride guard complied with the strength requirements under the Federal Safety Standard.

36.     Whether the safety requirements for underride guards under the federal and state requirements are inadequate.

37.     Whether it was foreseeable to Strick that Strick's trailer customers would have to maintain, repair and/or replace the underride guard during the life of the trailer.

38. Whether, if Dolphin or Fayard replaced or repaired components of the Strick underride guard, it was foreseeable to Strick that lack of instructions could lead to an inadequate underride guard.

39. Whether Strick's decision to continue to sell underride guards and components that had inferior performance and capabilities, even though it had an improved design, constitutes negligence.

40. Whether Strick's failure to retrofit trailers with adequate, non-defective safety devices so as to prevent injury, where it undertook to modify the product to correct a defect, constitutes negligence.

41. Whether Strick's failure to retrofit the subject trailer constitutes negligence.

42. Whether Strick's failure to recall trailers that (a) were not sufficiently energy-absorbing; (b) did not contain FMVSS 223 underride installation instructions; and (c) were not properly labeled under the FMVSS regulations, constitutes negligence.

43. Whether Strick failed to provide sufficient warnings and instructions on use and maintenance of the Strick trailer and its underride guard.

44. Whether Strick failed to exercise reasonable care to prevent the trailer from creating an unreasonable risk of harm to person or property while the trailer was being used in the manner Strick should reasonably have expected.

45. Whether Strick failed to provide underride guard repair and installation instructions to its parts' dealers.

46. Whether Strick failed to provide underride guard repair, maintenance and installation instructions to end users such as purchasers of the trailers.

28

47.     Whether Strick's failure to provide underride guard repair and installation instructions to its parts dealers created an unreasonable risk of harm to person or property while the trailer was being used in the manner Strick should reasonably have expected.

48.     Whether Strick's failure to provide underride guard repair and installation instructions could have led to the inability of a user to install the underride guard properly.

49.     Whether Strick's failure to provide underride guard repair and installation instructions was a producing cause of the death of one or more members of the Greene Family.

50.     Whether Strick breached its duty in failing to provide information to the U.S. Government regarding the inadequacy of Strick's underride guards and Strick's ability to feasibly and economically install safer underride guards.

51.     Whether Strick's negligence was a proximate cause of the death of one or more members of the Greene Family.

52.     Whether, if Strick was aware that others were petitioning the National Highway Traffic Safety Administration for more stringent standards for underride guards, considering the current standards allow underride guard designs that fail catastrophically when struck by passenger vehicles at speeds that frequently produce minimal intrusion and injury risk in regulatory and consumer information frontal crash test programs, such conduct demonstrates foreseeable negligence.

53.     Whether Fayard was a lessor/distributor of the Strick trailer.

54.     Whether Dolphin was a lessor/distributor of the Strick trailer.

55.     Whether Dolphin exercised reasonable care to discover the dangerous condition or character of the Strick trailer before allowing the trailer to be used by Sprinkle on the roadways.

56.     Whether Fayard exercised reasonable care to discover the dangerous condition or character of the Strick trailer before allowing the trailer to be used by Sprinkle on the roadways.

57.     Whether the Fayard/Dolphin truck driver exercised reasonable care to discover the dangerous condition or character of the Strick trailer before allowing the trailer to be used on the roadways.

58.     Whether it was foreseeable to Dolphin that rear end collisions between semi-trucks and passenger vehicles would on occasion take place in the ordinary use of the trailers such as those that Dolphin leased or loaned.

59.     Whether it was foreseeable to Fayard that rear end collisions between semi-trucks and passenger vehicles would on occasion take place in the ordinary use of the trailers such as those that Dolphin and/or Fayard leased or loaned.

60.     Whether it was foreseeable to Dolphin and/or Fayard that accidents and incidents such as what occurred herein would on occasion take place in the ordinary use of the trailers such as those that Dolphin and/or Fayard leased or loaned.

61.     Whether the design of the Strick Trailer's ICC bumper/underride guard was defective.

62.     Whether Dolphin and/or Fayard breached their duty to exercise reasonable care in the testing, distribution, marketing, or leasing of the Strick Trailer to ensure that it was not unreasonably dangerous for its foreseeable uses.

63.     Whether, if there was a safer alternative design to any defective design on the Strick Trailer, it would have prevented or significantly reduced the risk of the Plaintiffs' damages without substantially impairing the product's utility.

64.     Whether, if there was a safer alternative design to any defective design on the Strick trailer, it was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

65.     Whether the design of the Strick Trailer was a producing cause of the death of one or more members of the Greene Family.

66.     Whether Dolphin and/or Fayard failed to ensure that the rear impact bumper guard was installed "and maintained" in compliance with the requirements of 49 CFR §393.86.

67.     Whether Dolphin and/or Fayard failed to attach the rear impact bumper guard in accordance with the installation instructions or procedures provided by Strick, if any, pursuant to S5.5 of 49 CFR §571.223, Rear impact bumper guard.

68.     Whether Dolphin ignored the requirements of FMCSR 396.11 by failing to ensure that the records required to document the required daily inspections of equipment occurred were available to be reviewed by the next driver.

69.     Whether Dolphin and/or Fayard failed to provide installation instructions or procedures for installation of the rear impact guard pursuant to S5.5 of 49 CFR §571.223.

70.     Whether Dolphin and/or Fayard failed to ensure that the rear impact bumper guard complied with the strength requirements of S5.2.1 of 49 CFR §571.223 at each test location and the energy absorption requirements of S5.2.2.

71.     Whether Dolphin and/or Fayard failed to ensure that the trailer had been properly and timely inspected as required by 49 CFR §396.17 and §396.21.

72.     Whether Dolphin and/or Fayard violated the general duty under 49 CFR §396.3, and Texas law, of a trucking company to maintain its vehicles and trailers in good working order,

to maintain repair records and inspection reports, and to make periodic inspections of each vehicle and trailer.

73.     Whether Dolphin and/or Fayard failed to properly inspect the Strick/Dolphin trailer before placing the two objects on the highway, as required by CFR §396.13, and Texas law.

74.     Whether Dolphin and/or Fayard failed properly to maintain and service the Strick/Dolphin trailer

75.     Whether Dolphin's and/or Fayard's failure properly to service, repair, install and/or maintain the rear impact bumper guard on the trailer involved in the collision constitutes negligence.

76.     Whether Dolphin and/or Fayard failed to adequately inform Sprinkle as to how to test for a weak rear impact bumper guard and failed to warn Sprinkle of the dangers of operating the trailer without ensuring the adequacy of the rear impact bumper guard.

77.     Whether Dolphin and/or Fayard failed to warn consumers of the unreasonably dangerous nature of the rear impact guard, which industry experts have identified as presenting a threat of harm that would elude the common perception of the product.

78.     Whether Dolphin and/or Fayard entrusted the Strick/Dolphin trailer to Daniel Sprinkle, an incompetent or reckless driver whose negligence on the day of the collision was one of the proximate causes of the collision.

79.     Whether the Dolphin/Fayard driver failed to exercise that degree of care that other drivers would have exercised in maintaining an assured clear distance between vehicles, keeping a proper lookout, stopping safely and/or operating a dangerous instrumentality on the roadways.

80.     Whether Fayard's negligence was a proximate cause of the death of one or more members of the Greene Family.

81.     Whether Dolphin's negligence was a proximate cause of the death of one or more members of the Greene Family.

82.     Whether Sprinkle's negligence was a proximate cause of the death of one or more members of the Greene Family.

83.     Whether, when picking up the Fayard/Dolphin shipment and equipment, as well as while he operated the Freightliner tractor and Dolphin's Strick Trailer, Sprinkle was acting in the course and scope of his employment as an agent for both Fayard and Dolphin.

84.     Whether the Fayard/Dolphin truck driver inappropriately divided his attention between looking ahead and looking to the rear of his trailer for rear clearance.

85.     Whether, if the Fayard/Dolphin truck driver failed to keep a proper lookout, such constituted negligence.

86.     Whether, if the Fayard/Dolphin truck driver failed to maintain an assured clear distance between vehicles, such constituted negligence.

87.     Whether the Fayard/Dolphin Driver's failure to observe the speed of approaching traffic led to his inability to attempt to veer off to the shoulder, thus potentially preventing the 4Runner from striking the trailer's underride guard.

88.     Whether, if the Fayard/Dolphin truck driver failed to stop the truck and trailer safely and/or slowed too suddenly, such constituted negligence.

89.     Whether, if the Fayard/Dolphin truck driver came to a complete stop on an active highway, such constituted negligence.

90.     Whether Sprinkle's sudden stop caused a sudden impediment to traffic on the interstate.

91.     Whether, if the Fayard/Dolphin truck driver failed timely to activate his hazard lights, such constituted negligence.

92.     Whether it was foreseeable to Fayard and Dolphin that a complete stop on the middle of the freeway, under the circumstances, might cause a collision from traffic approaching from the rear.

93.     Whether, if the Fayard/Dolphin truck driver failed to take other evasive action such as moving to another lane, moving further ahead in his lane, or moving to the shoulder, such constituted negligence.

94.     Whether the omissions and commissions of Fayard, Dolphin and Sprinkle were precipitating factors leading directly to the cause of the collisions between the Toyota 4Runner and the Fayard/Dolphin trailer and/or the Volvo Tractor-Trailer and the Toyota 4Runner.

95.     Whether the omissions and commissions of Fayard, Dolphin and Sprinkle were precipitating factors leading directly to the cause of the deaths of one or more members of the Greene family.

96.     Whether it was a bad faith spoliation of evidence for Fayard to (a) fail to maintain the actual ICC bumper guard as a key piece of evidence after Fayard's driver, and later its agents, had clear access to the damaged bumper guard; (b) fail to maintain the mud flap and the panel from the Strick Trailer that would have demonstrated that Lakeysha Greene's body struck portions of the Strick Trailer and left her blood and hair follicles on the Strick Trailer; and (c) go against established protocol and repair a Dolphin-owned trailer that was clearly the subject of fatalities-centered litigation.

97.    Whether Dolphin's failure to instruct Fayard to maintain during the on-going investigation the integrity of the damaged trailer and its component parts; failure to keep records; and turning its head on preserving evidence evinces bad faith spoliation of evidence.

98.    Whether it was foreseeable to Volvo Group North America that rear end collisions between semi-trailer trucks and passenger vehicles would on occasion take place in the ordinary use of the vehicles such as those Volvo Group North America designed and sold.

99.    Whether it was foreseeable to Volvo Group North America that accidents and incidents such as what occurred herein would on occasion take place in the ordinary use of the vehicles such as the those Volvo Group North America designed and sold.

100.    Whether Volvo Group North America specifically marketed the Volvo Group North America VNL 630 to truckers who would use them in interstate deliveries.

101.    Whether Volvo marketed to the public that trucks such as the VNL 630 were safe to ride alongside.

102.    Whether the Volvo VNL 630 was defective in the manufacture or design of the VNL 630's front end.

103.    Whether the Volvo VNL 630 was defective in the manufacture or design of the VNL 630 where Volvo failed to include with the truck readily available collision avoidance and mitigation technologies, such as radar-based collision warning systems, adaptive or automatic cruise control and electronic disc brakes.

104.    Whether Volvo Group North America breached its duty to exercise reasonable care in the design, testing, and distribution and/or marketing of the Volvo Group North America VNL 630 to ensure that it was not unreasonably dangerous for its foreseeable uses.

105.    Whether, if there was a safer alternative design to any defective or deficient manufacture or design in the VNL 630, it would have prevented or significantly reduced the risk of the Plaintiffs' damages without substantially impairing the product's utility.

106.    Whether, if there was a safer alternative design to any defective design in the VNL 630, it was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

107.    Whether the design of the Volvo Group North America VNL 630 was a producing cause of the death of one or more members of the Greene Family.

108.    Whether Volvo Group North America's negligence was a proximate cause of the death of one or more members of the Greene Family.

109.    Whether Volvo Group North America breached its duty and was negligent in not installing a different front end to the VNL 630.

110.    Whether Volvo Group North America breached its duty and was negligent in not installing a version of front underrun protection on its truck.

111.    Whether Volvo Group North America breached its duty and was negligent in failing to warn of known dangers regarding the absence of readily available collision avoidance and mitigation technologies, such as radar-based collision warning systems, adaptive or automatic cruise control and electronic disc brakes.

112.    Whether the Volvo Group North America VNL 630 was unfit for the ordinary purposes for which it was used because of a lack of something necessary for adequacy.

113.    Whether Volvo Group North America or its agent Volvo knowingly made false or misleading statements of fact concerning Volvo's products.

114. Whether Volvo Group North America, by and through the sale of the truck in question, represented that the Volvo product was reasonably safe to other drivers in heavy volume highway traffic.

115. Whether Volvo Group North America failed to exercise reasonable care or competence in obtaining or communicating information about its products.

116. Whether the Greene family and Plaintiffs suffered pecuniary loss by justifiably relying on Volvo Group North America's representations about its products.

117. Whether Volvo Group North America failed to disclose information concerning the Volvo Group North America VNL 630 that was known at the time of the transaction where such failure to disclose such information was intended to induce the Greene Family to engage in conduct into which the family would not have engaged had the information been disclosed.

118. Whether Volvo Group North America failed to instruct consumers as to the safe use of its product and to warn consumers of dangers associated with its product of which Volvo Group North America either knew or should have known at the time the product was sold.

119. Whether the absence or lack of the warning and/or instructions from Volvo Group North America rendered the product unreasonably dangerous.

120. Whether Volvo Group North America's failure to warn and/or instruct constituted a causative nexus in the death of one or more members of the Greene Family.

121. Whether Volvo Group North America's failure to retrofit the subject truck with readily available collision avoidance and mitigation technologies, such as radar-based collision warning systems, adaptive or automatic cruise control and electronic disc brakes constitutes negligence.

122.    Whether Volvo Group North America's failure to retrofit the subject truck with readily available front underrun protection constitutes negligence.

123.    Whether Volvo Group North America's failure to retrofit the subject truck constituted a causative nexus in the death of one or more members of the Greene Family.

124.    Whether Volvo Group North America breached its duty in failing to provide information to the U.S. Government regarding the inadequacy of the Volvo truck's front end in reducing the injuries to occupants in other cars during rear end collision.

125.    Whether Volvo Group North America breached its duty in failing to provide information to the U.S. Government regarding the need for, and safety of, readily available collision avoidance and mitigation technologies, such as radar-based collision warning systems, adaptive or automatic cruise control and electronic disc brakes.

126.    Whether Plaintiffs have suffered a total loss of love, companionship, and society which already existed between Plaintiffs and their respective child and which would have continued to grow for the remainder of Plaintiffs' lives.

127.    Whether Ollie Greene and Marilyn Hardeman have lost the tender benefits of nurture, guidance, and care they would have received from Wyndell and Lakeysha, respectively, in their elder years.

128.    Whether Lakeysha Greene experienced pain and suffering before her death.

129.    Whether Wesleigh Greene experienced pain and suffering before her death.

130.    Whether Wyndell Kyle Greene, II experienced pain and suffering before his death.

131.   Whether Wyndell Greene, Sr. contemporaneously witnessed (saw and heard) the horrific and gruesome death of his wife and two children and suffered extreme mental anguish and emotional suffering as a result.

132.   What recoverable damages have been suffered by Plaintiffs.

133.   The amount recoverable by Wyndell Greene, Sr.'s estate as a result of him being a bystander to the deaths of Lakeysha, Wesleigh and/or Wyndell Greene, II.

134.   The amount recoverable for Wyndell Greene, Sr.'s loss of companionship and society between May 28, 2010 and September 10, 2010.

135.   The amount recoverable for the pain and suffering experienced by Wyndell Greene, Sr. prior to his death.

136.   The amount recoverable for the pain and suffering experienced by Lakeysha Greene prior to her death.

137.   The amount recoverable for the pain and suffering experienced by Wesleigh Greene prior to her death.

138.   The amount recoverable for the pain and suffering experienced by Wyndell Greene, II prior to his death.

139.   The amount recoverable for Plaintiffs' loss of companionship and society in the past and in the future.

140.   The amount recoverable by Ollie Greene for the extreme mental anguish and emotional suffering in the past and in the future.

141.   The amount recoverable by Marilyn Hardeman for the extreme mental anguish and emotional suffering in the past and in the future.

142.     The amount of reasonable and necessary attorneys' fees that are payable to Plaintiffs.

143.     Whether Defendants had actual awareness of the risks involved in their conduct but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of persons who might be in the vicinity of their vehicles.

144.     The amount of exemplary damages recoverable by the estates of Lakeysha Greene and Wyndell Greene, Sr.

145.     Plaintiffs should be awarded the damages to which they are entitled and awarded interest thereon in the form of both prejudgment and post-judgment interest.

146.     Any contention above that has been improperly designated as a disputed issue of fact when it should be considered a disputed issue of law should be re-designated as such.

**B.**     **Defendants:**

1.     Was there a design defect in the 4Runner that caused Lakeysha Greene and/or Wyndell Greene, Sr.'s injuries and death?

2.     Was there a manufacturing or marketing defect in the 4Runner that caused Lakeysha Greene and/or Wyndell Greene, Sr.'s injuries and death?

3.     Did the Toyota Defendants make a material misrepresentation to Lakeysha Greene or Wyndell Greene, Sr?

4.     Did Toyota make any express warranties other than the express written warranty that came with 2010 Toyota 4Runner?

5.     Whether Strick designed, manufactured or sold the rear underride guard which was involved in the accident.

6.      Alternatively, whether, even if one or more of the original equipment underride guard components remained on the underride guard at the time of the accident, the underride guard originally on the trailer, had been substantially modified in condition.

7.      Whether Strick's original equipment underride guard was reasonably safe in design.

8.      Whether Strick's warnings and instructions regarding the rear underride guard were adequate.

9.      Whether Strick exercised reasonable care in the design of the original equipment rear underrride guard and in providing adequate warnings and instructions concerning it.

10.      Whether a design defect in the original equipment underride guard design or an inadequacy in Strick's warning and instructions caused the death(s) of Plaintiffs' decedent(s) (or any of them).

11.      Whether at the time of manufacture, there was a safer, feasible alternative design which would have prevented or significantly reduced the risk of fatal personal injuries to the decedents.

12.      Subject to the court's ruling on whether Plaintiff William Greene has adequately pled a survival action for, and has standing to pursue a survival action for, the deaths of the Greene children, whether Wesleigh Greene and Wyndell Greene, II's deaths were caused by the rear impact of the Volvo Tractor Trailer into the rear of the Toyota 4Runner and not from the failure of the rear underride guard which was on the trailer at the time of the accident.

13.      Whether Lakeysha Greene's death was caused by the side impact with the body of the Strick Trailer and not from the failure of the rear underride guard which was on the trailer at the time of the accident.

41

14.     Whether Wyndell Greene, Sr.'s burn injuries and death were caused or contributed to by the failure of the underride guard which was on the trailer at the time of the accident.

15.     Whether Strick's original equipment rear bumper guard complied with FMVSS 223 and FMVSS 224.

16.     Whether the sole proximate cause of the deaths of Plaintiffs' decedents was the criminal negligence of Charles Moody and the negligence of his employer Forest Products.

17.     Whether the deaths and injuries of Plaintiffs' decedents, or any of them, were caused or contributed to by product defect(s) in the Toyota 4Runner and/or negligence of the Toyota defendants.

18.     Whether the deaths and injuries of Plaintiffs' decedents, or any of them, were caused or contributed to by product defects in the Volvo Tractor-Trailer and/or negligence of the Volvo defendants.

19.     The amount of damages, as permitted by the wrongful death statute, Tex. Civ. Prac. & Rem. Code §71.009, which Plaintiff Ollie Greene sustained in relation to the death of Wyndell Greene Sr.

20.     The amount of damages, as permitted by the wrongful death statute, Tex. Civ. Prac. & Rem. Code §71.009, which Plaintiff Marilyn Hardeman sustained in relation to the death of Lakeysha Greene.

21.     The amount of damages which Plaintiff William Greene as representative of the estate of Wyndell Greene, Sr. may recover, as permitted by the survival statute Tex. Civ. Prac. & Rem. Code §71.021, for the death of Wyndell Greene, Sr.

22.     Whether Plaintiff Ollie Greene's decedent, Lakeysha Greene, suffered conscious pain and suffering after the failure of the accident underride guard and prior to death.

23.     Subject to the Court's ruling on whether Plaintiff William Greene has properly plead, and has standing to pursue, a survival action for the deaths of children Wesleigh Greene and Wyndell Greene, II, whether either child suffered conscious pain and suffering after the failure of the accident underride guard and before death.

24.     There was no Federal Motor Vehicle Safety Standard ("FMVSS") or other U.S. federal or state governmental standard or regulation that required heavy trucks to have a collision warning system ("CWS") in 2007 when the subject Volvo tractor was built, delivered and left VGNA's possession (and there is no such standard today).

25.     No North American heavy truck manufacturer offered the Eaton VORAD EVT-300 or any other collision warning system ("CWS") as a standard feature on its heavy trucks in or before 2007.

26.     VGNA offered the EVT-300 as a factory-installed customer option at the time the subject Volvo tractor was built in January 2007.

27.     The EVT-300 was designed and made by Eaton Corporation, a third-party manufacturer.

28.     Forest Products, the purchaser of the subject Volvo tractor, did not order or purchase the EVT-300 or any other CWS at the time it ordered or purchased the subject tractor.

29.     Forest Products did not retrofit the subject Volvo tractor with a CWS after it was purchased and delivered in 2007.

30.     The subject Volvo tractor did not have a CWS at the time of the accident.

43

31.     The 2005 Freightliner tractor driven by Fayard driver Daniel Sprinkle did not have a CWS at the time of the accident.

32.     There was no FMVSS or other U.S. federal or state governmental standard or regulation that required heavy trucks to have any front-end "energy absorption capabilities" in a crash with other motor vehicles in 2007 when the subject Volvo tractor was built and delivered (and there is no such standard today).

33.     There was no FMVSS or other U.S. federal or state governmental standard or regulation that required heavy trucks to have any front-end "crash compatibility capabilities" in a crash with other motor vehicles in 2007 when the subject Volvo tractor was built (and there is no such standard today).

34.     There was no FMVSS or other U.S. federal or state governmental standard or regulation that required heavy trucks to have any frontal underride protection device or system ("FUPD") in 2007 when the subject Volvo tractor was built (and there is no such standard today).

35.     No North American heavy truck manufacturer offered a FUPD as a standard or optional feature on its heavy trucks in or before 2007.

36.     The subject Volvo tractor did not have a FUPD at the time of the accident.

37.     The 2005 Freightliner tractor driven by Fayard driver Daniel Sprinkle did not have a FUPD at the time of the accident.

38.     VGNA had set the speed-limiter (governor) on the tractor at 68 mph at the time of manufacture in January 2007 per the specifications of the purchaser.  At the time of the accident, the speed-limiter had subsequently been adjusted up to 74 mph by someone other than VGNA.

39.     Charles Moody had turned off the cruise control in the tractor prior to the collision.

40.     The Forest Products (Volvo) tractor did not override the 4Runner in the collision. (Similarly, the 4Runner did not underrun the Volvo tractor in the collision.)

41.     A CWS on the Forest Products (Volvo) tractor would not have made any difference in the accident or its outcome in light of the speeds, distances, vehicle models, vehicle masses, paths/trajectories, forces (energy), and collision sequences involved.

42.     A FUPD on the Forest Products (Volvo) tractor would not have made any difference in the accident in the accident or its outcome in light of the speeds, distances, vehicle models, vehicle masses, vehicle heights, forces (energy), and paths/trajectories involved.

43.     The absence of a CWS on the subject Volvo tractor was not a defective design.

44.     The subject Volvo tractor was not unreasonably dangerous, as designed, due to the absence of a CWS, taking into consideration the utility of the product and the risk involved in its use.

45.     With respect to the Plaintiffs' absence-of-a-CWS claim, there was no safer alternative design at the time the subject Volvo tractor was built and delivered that, in reasonable probability:  *(a)* would have prevented or significantly reduced the risk of the deaths in question without substantially impairing the tractor's utility; and *(b)* was both economically and technologically feasible at the time the tractor left VGNA's control by the application of existing or reasonably achievable scientific knowledge.

46.     The absence of a CWS on the subject Volvo tractor was not a producing cause of the deaths in question.

47.     The subject Volvo tractor was not marketed defectively by VGNA with respect to CWS's or the absence thereof.

48.     The subject Volvo tractor did not have a manufacturing defect with respect to CWS's or the absence thereof.

49.     The absence of a FUPD (or other front-end energy-absorption or crash compatibility feature or device) on the subject Volvo tractor was not a defective design.

50.     The subject Volvo tractor was not unreasonably dangerous, as designed, due to the absence of a FUPD (or other front-end energy-absorption or crash compatibility feature or device), taking into consideration the utility of the product and the risk involved in its use.

51.     With respect to the Plaintiffs' energy-absorption and crash compatibility claims, there was no safer alternative design at the time the subject Volvo tractor was built and delivered that, in reasonable probability:  *(a)* would have prevented or significantly reduced the risk of the deaths in question without substantially impairing the tractor's utility; and *(b)* was both economically and technologically feasible at the time the tractor left VGNA's control by the application of existing or reasonably achievable scientific knowledge.

52.     The absence of a FUPD (or other front-end energy-absorption or crash compatibility feature or device) on the subject Volvo tractor was not a producing cause of the deaths in question.

53.     The subject Volvo tractor was not marketed defectively by VGNA with respect to FUPD's (or other front-end energy-absorption or crash compatibility feature or device) or the absence thereof.

54. The subject Volvo tractor did not have a manufacturing defect with respect to FUPD's (or other front-end energy-absorption or crash compatibility feature or device) or the absence thereof.

55. VGNA did not negligently design, manufacture, market or test the subject Volvo tractor.

56. VGNA did not negligently fail to warn Wyndell Greene, Sr., LaKeysha Greene, or any of the Plaintiffs regarding the subject Volvo tractor.

57. VGNA did not make any representations at all to Wyndell Greene, Sr., LaKeysha Greene, or any of the Plaintiffs.

58. VGNA did not make any misrepresentations to Wyndell Greene, Sr., LaKeysha Greene, or any of the Plaintiffs.

59. VGNA was not responsible for the death or injuries of Wyndell Greene, Sr.

60. VGNA was not responsible for the death of LaKeysha Greene.

61. Charles Moody was responsible for the injuries and death of Wyndell Greene, Sr.

62. Forest Products was responsible for the injuries and death of Wyndell Greene, Sr.

63. Charles Moody was responsible for the death of LaKeysha Greene.

64. Forest Products was responsible for the death of LaKeysha Greene.

65. Charles' Moody's negligence was a proximate cause of the injuries and death of Wyndell Greene, Sr.

66. Charles' Moody's gross neglect was a proximate cause of the injuries and death of Wyndell Greene, Sr.

67. Forest Products' negligence was a proximate cause of the injuries and death of Wyndell Greene, Sr.

68.     Forest Products' gross neglect was a proximate cause of the injuries and death of Wyndell Greene, Sr.

69.     Charles' Moody's negligence was a proximate cause of the injuries and death of LaKeysha Greene.

70.     Charles' Moody's gross neglect was a proximate cause of the injuries and death of LaKeysha Greene.

71.     Forest Products' negligence was a proximate cause of the injuries and death of LaKeysha Greene.

72.     Forest Products' gross neglect was a proximate cause of the injuries and death of LaKeysha Greene.

73.     Was Daniel Sprinkle Dolphin's driver?

74.     Who manufactured the rear bumper on Dolphin's trailer at the time of the accident?

75.     Was Dolphin's trailer properly inspected prior to the accident?

76.     Was Dolphin's trailer's inspection current at the time of the accident?

77.     Was the rear bumper of Dolphin's trailer properly attached?

78.     Did the rear bumper of Dolphin's trailer cause, or contribute to the cause, of any of the  injuries sustain by any of the Greenes?

79.     Would any alternative rear bumper on Dolphin's trailer resulted in any different outcome       for the subject accident and resulting suit?

80.     Did Dolphin's trailer comply with all applicable government and industry standards?

81.     Did Sprinkle improperly stop in the road immediately prior to the accident?

82.     Did Sprinkle's actions cause, or contribute to the cause, of the accident?

83.     Did Dolphin properly maintain its trailer?

84.     Was traffic stopped in front of Sprinkle immediately prior to the accident?

85.     When did the deaths of LaKesha Greene, Wesleigh Greene, and Wyndell Greene, Jr. happen during the course of the accident?

86.     Did LaKesha Greene, Wesleigh Greene, or Wyndell Greene, Jr experience any conscious     pain and suffering as a result of the accident?

87.     Can Plaintiffs' experts provide relevant and reliable testimony as to Plaintiffs' claims against Dolphin?

88.     To what extent have Plaintiffs suffered damages?

89.     What percentage of responsibility is attributable to Forest Products Transports, LLC and Charles Moody for the injuries and death of Wyndell Greene, Sr.?

90.     What percentage of responsibility is attributable to Forest Products Transports, LLC and Charles Moody for the death of Lakeysha Greene?

91.     What percentage of responsibility, if any, is attributable to each defendant for the death of Wyndell Greene, Sr.?

92.     What percentage of responsibility, if any, is attributable to each defendant for the death of Lakeysha Greene?

93.     Was the Strick/Dolphin Line trailer out of inspection at the time of the accident?

94.     Was the DOT bumper sufficiently attached to the rear of the Strick/Dolphin Line trailer?

95.     Was the DOT bumper in compliance with the Federal Motor Carrier Safety Regulations (FMSCR) and the Federal Motor Vehicle Safety Standards (FMVSS)?

96.     Did Sprinkle have any reason to believe that the DOT bumper was not sufficiently attached to the rear of the Strick/Dolphin Line trailer?

97.     Did Sprinkle have any reason to believe that the DOT bumper was not in compliance with the FMSCR and the FMVSS?

98.     Did Fayard Moving have any reason to believe that the DOT bumper was not sufficiently attached to the rear of the Strick/Dolphin Line trailer?

99.     Did Fayard Moving have any reason to believe that the DOT bumper was not in compliance with the FMSCR and the FMVSS?

100.    Should the DOT bumper have been able to withstand the impact(s) and force(s) exerted on it during the accident?

101.    Was the detachment of the DOT bumper during the accident in question a proximate cause of the death of decedents Wyndell Greene, Sr. or LaKeysha Greene?

102.    When, during the accident sequence, did decedents Wyndell Greene, Sr. and LaKeysha Greene sustain the fatal injuries that proximately caused their deaths?

103.    What events during the accident sequence proximately caused the deaths of decedents Wyndell Greene, Sr. and LaKeysha Greene?

104.    At approximately 6:25pm on the evening of May 28, 2010, Fayard Moving driver Daniel Sprinkle ("Sprinkle") was driving a white 2005 Freightliner tractor, owned by Fayard Moving, and pulling a white 2004 Strick trailer, designed and manufactured by Strick Trailers, LLC ("Strick") and owned by Dolphin Line, Inc. ("Dolphin Line"), eastbound on Interstate 20.

50

105.     Traveling behind Sprinkle was a black 2006 Toyota Corolla, being operated by Daniel Langston and containing as passengers his teenage daughters, Alanna and Zoe Langston (collectively, "the Langstons").

106.     Traveling behind the Langstons was a silver 2010 Toyota 4-Runner, being operated by decedent Wyndell Greene, Sr. and containing as passengers decedents Lakeysha Greene, Wesleigh Greene, and Wyndell Greene, Jr. (collectively, "the Greene family").

107.     Traveling some distance behind the Greene family was a 2008 Volvo tractor, owned by responsible third party and settling party Forest Products Transport, LLC ("Forest Products Transport"), being operated by responsible third party and settling party Charles Moody ("Moody") and pulling a 2008 black Utility trailer loaded with cargo.

108.     Traffic on eastbound Interstate 20 was extremely heavy and had slowed to a stop near Mile Marker 509.

109.     Sprinkle was paying attention to the roadway and traffic ahead of him and observed that the traffic ahead of him was stopped.   Sprinkle therefore brought his tractor-trailer to a controlled and gradual stop, at a distance of about a truck-length behind another tractor-trailer that was stopped directly in front of him.

110.     Sprinkle did not brake hard, lock his brakes, or otherwise stop abruptly.

111.     The Langstons slowed as they approached Sprinkle's tractor-trailer.

112.     The Greene family likewise slowed as they approached the Langstons' car.

113.       However, Moody, operating the Forest Products Transport tractor-trailer, was not paying attention to the traffic in front of him.  Moody failed to control his speed and violently rear-ended the Greene family's SUV at high speed.

114.       Trooper Dexter Barkley, the Texas Department of Public Safety's (DPS) lead investigator for the accident in question, ultimately concluded that a contributing factor to the accident was Moody's failure to control the speed of the Forest Products Transport tractor-trailer. Trooper Barkley also concluded that a factor which may have contributed to the accident was mobile or cell phone usage by Moody.

115.       Conversely, Trooper Barkley determined that none of the other drivers or vehicles involved in the accident caused or contributed to the accident.  He specifically determined that Fayard Moving driver Sprinkle did nothing that caused or contributed to the accident.  Trooper Barkley likewise determined that there were no mechanical defects in the Fayard Moving tractor or the Strick/Dolphin Line trailer that caused or contributed to the accident.

116.       Trooper Christopher Countryman was one of the specially trained troopers who conducted the DPS's official reconstruction of the accident in question.  Based on his reconstruction of the accident, Trooper Countryman did not formulate any opinions critical of the actions of Fayard Moving driver Sprinkle.

117.       Troopers Clint Baughman and Al Cummins were specially trained troopers who performed post-accident Level One inspections ("DOT inspections") of all the commercial motor vehicles involved in the accident in question, including the Fayard Moving tractor and the Strick/Dolphin Lines trailer.  Based on their inspections of the vehicles, Trooper Baughman and Trooper Countryman determined that there were no

mechanical defects of the Fayard Moving tractor or the Strick/Dolphin Line trailer that caused or contributed to the accident.

118.    Trooper Barkley, Trooper Baughman, and Trooper Cummins inspected the DOT bumper, which was detached from the Strick/Dolphin Line trailer as a result of the accident, at the scene of the accident in question.  The troopers all agreed that the DOT bumper appeared to have been properly welded to the rear of the Strick/Dolphin Line trailer prior to the accident.

119.    The Kaufman County District Attorney's office charged Moody with three counts of criminally negligent homicide as a result of the accident in question.  Moody ultimately pled guilty to all charges.

120.    At the time of the accident, Sprinkle was an employee of Fayard Moving.

121.    At the time of the accident, the trailer was owned by Dolphin Line.  As such, Dolphin Line was responsible for performing maintenance and repairs on the trailer, including any maintenance or repairs on the DOT bumper.

122.    While Sprinkle was pulling the trailer, he was responsible for performing daily pre-trip inspections of the trailer.  As such, he was responsible for making a visual inspection of the DOT bumper, to confirm that it was attached to the trailer.

123.    Sprinkle was not responsible for testing the DOT bumper or for performing any inspection, maintenance, or repair of the DOT bumper other than making a visual inspection of the DOT bumper, to confirm that it was attached to the trailer.

124.    Moody was traveling at an excessive rate of speeding and his speeding was a factor in the accident.

125.     The brutal impact of Moody's collision with the Greenes' 4Runner caused the 4Runner to collide with at least two other vehicles and burst into flames.

126.     Moody accepts sole responsibility for the accident.

127.     Moody failed to take proper evasive action to avoid the collision with the Greenes' 4Runner.

128.     Moody failed to apply his brakes in a timely manner to avoid the collision with the Greenes' 4Runner.

129.     Moody failed to take maintain proper distance from the Greene's 4Runner to avoid the collision.

130.     Moody was an incompetent and/or reckless driver.

131.     Forest Products Transports, L.L.C. negligently entrusted Moody with its tractor.

132.     Plaintiffs sued Moody and Forest Products Transports, LLC in Civil Action No.: 3:10-CV-1085-G.

133.     Plaintiffs allegations in their petition against Charles Moody and Forest Products Transports, LLC constitue a judicial admission and/or stipulation

134.     After the accident, Dolphin's trailer was inspected by troopers from the Department of Public Safety.

135.     No citation was issued to Sprinkle relating to the accident.

136.     As a result of their investigation, the troopers from the Texas Department of Public Safety only attributed fault to Charles Moody for the accident

137.     Moody was charged with negligent homicide by the Kaufman County District Attorney for the deaths of LaKesha, Wesleigh, and Wyndell Jr.

138.     Moody pled guilty to those charges.

139.     In the course of his plea, Moody admitted that he was negligent in relation to the accident.

140.     Moody also admitted that he was on his cell phone at the time of the accident.

141.     Dolphin did not spoil evidence.

142.     Plaintiffs were afforded the opportunity to inspect the rear bumper guard as it was transported from the scene and stored at a local wrecker yard

### IV.     LIST OF CONTESTED ISSUES OF LAW

**A.     <u>Plaintiffs' Contention</u>:**

1.     Whether, as a matter of law, Defendants were negligent *per se* for their violations of various statutory standards, legislative regulations, administrative regulations adopted by a court, or municipal ordinances.

2.     Whether Strick, as a matter of law, had a duty to retrofit the subject trailer.

3.     Whether Strick, as a matter of law, was required to recall trailers that (a) were not sufficiently energy-absorbing; (b) did not contain FMVSS 223 underride installation instructions; and (c) were not properly labeled under the FMVSS regulations.

4.     Whether Volvo Group North America, as a matter of law, had a duty to retrofit the VNL 630 truck.

5.     Whether the testimony of the highway patrol investigators and lay witnesses regarding the "cause of the accident" and the "causes of death" is relevant, non-prejudicial and admissible evidence.

6.     Whether Defendants' affirmative defenses fail as a matter of law.

7.     Whether Defendants can establish their defenses, if any, through admissible evidence and expert testimony.

8.      Whether any of Defendants' experts lack the qualifications to give expert opinions on the matters for which they are offered.

9.      Whether the testimony of any of Defendants' experts is not based upon scientific, technical or other specialized knowledge which will assist the trier of fact to understand the evidence or to determine a fact in issue.

10.     Whether the testimony of any of Defendants' experts is not based on sufficient facts or data or the product of reliable principles and methods which the expert has applied reliably to the facts of the case

11.     Whether the testimony of any of Defendants' experts should be excluded pursuant to FED.R.EVID. 403 because consideration of it will result in confusion of the issues and misleading the jury.

12.     Whether the pleadings and testimony in the precious lawsuit involving Forest Products and Charles Moody's plea are relevant, non-prejudicial and admissible evidence.

13.     Whether Charles Moody's plea is relevant, non-prejudicial and admissible evidence.

14.     Whether Daniel Sprinkle was an agent of both Fayard and Dolphin at the time of the accident on May 28, 2010.

15.     Whether the Court should find that the referenced missing documents and things are clearly critical to Plaintiffs' claims, and impose sanctions against Defendants for spoliation because Defendants acted in bad faith in concealing, destroying, or failing to maintain relevant evidence. Alternatively, whether the jury should be instructed that it can infer that destroyed or concealed evidence would have been unfavorable to the Defendants.

16.     Any contention above that has been improperly designated as a disputed issue of law when it should be considered a disputed issue of fact should be re-designated as such.

**B.     Defendants' Contention:**

1.     Whether there is legally sufficient evidence to support  any design defect claim as to the 4Runner that caused Lakeysha Greene and/or Wyndell Greene, Sr.'s injuries and death?

2.     Whether there is legally sufficient evidence to support any marketing or manufacturing defect claim as to the 4Runner that caused Lakeysha Greene and/or Wyndell Greene, Sr.'s injuries and death?

3.     Whether any defect in the 4Runner was a producing cause of the injuries and death of Wyndell Greene, Sr.?

4.     Whether as a matter of law there is legally sufficient evidence to support Plaintiffs' warranty claims?

5.     Whether as a matter of law there is legally sufficient evidence to support Plaintiffs' misrepresentation claims?Whether as a matter of law there is legally sufficient evidence to support Plaintiffs' exemplary damages claim?

6.     Whether any of Plaintiffs' experts have a basis, with a sufficient foundation and a sufficiently reliable methodology, to express admissible opinions concerning alleged defects in the of the 4Runner?

7.     Whether any of Plaintiffs' experts have a basis, with a sufficient foundation and a sufficiently reliable methodology, to express admissible opinions concerning alleged defects in the fuel system and/or structure of the 4Runner?

8.      Whether any of Plaintiffs' experts have a basis, with a sufficient foundation and a sufficiently reliable methodology, to express admissible opinions that Lakeysha Greene and/or Wyndell Greene, Sr.'s injuries and death were caused by any alleged defects in  the 4Runner?

9.      Whether any of Plaintiffs' experts have a basis, with a sufficient foundation and a sufficiently reliable methodology, to express admissible opinions that Lakeysha Greene and/or Wyndell Greene, Sr.'s injuries and death were caused by alleged defects in the structure and/or fuel system of the 4Runner?

10.      Whether any of Plaintiffs' experts have a basis, with a sufficient foundation and a sufficiently reliable methodology, to express admissible opinions about the nature and extent of Plaintiffs' damages for the injuries and death of Wyndell Greene, Sr.?

11.      Whether any of Plaintiffs' experts have a basis, with a sufficient foundation and a sufficiently reliable methodology, to express admissible opinions about the nature and extent of Plaintiffs' damages for the death of Lakeysha Greene?

11.      Whether FMVSS 223 and 224 require a trailer manufacturer which sold its trailer equipped with an underride guard to a dealer to provide installation instructions for replacement rear guards, or only imposes the requirement to provide installation instructions upon guard manufacturers who sell to trailer manufacturers.   {See Strick's Motion to Exclude Mr. Friedman's Opinion on FMVSS 223 and 224 Compliance of OEM Strick Trailer (DOC. 397)}.

12.      Whether Strick is entitled to a statutory presumption of no liability because the OEM underride guard complied with the requirements of FMVSS 223 and 224.  Tex. Civ. Prac. & Rem. Code §82.008(a).

13.      Whether Strick will be entitled to judgment as a matter of law on all claims because since it did not design, manufacture or sell the underride guard which was on the trailer

at the time of the accident, or alternatively because the original equipment rear underride guard had been substantially modified after it left the possession and control of Strick.  {See Strick's Motion to Exclude Mr. Friedman's Opinion That the ICC Rear Bumper Guard was Manufactured by Strick (DOC. 401)}.

14.     Whether Strick will be entitled to judgment as a matter of law on Plaintiff's William Greene's survival action claim, Count Twelve, for the death of Wyndell Greene, Sr., because there is no admissible evidence, or insufficient evidence to establish beyond speculation and conjecture that failure of the underride guard on the trailer at the time of the accident caused or contributed to the fire in the 4Runner. {See Strick's Motion for Leave to File Motion for Partial Summary Judgment and Brief in Support (DOC. 385), denied by the Court's Order Denying Strick's Motion (DOC. 613);  Strick's Motion to Exclude Mr. Friedman's Opinions that (1) The Failure of the ICC Rear Impact Guard Caused or Contributed to the Breach of the 4Runner's Fuel System and (2) The Failure of the ICC Rear Impact Guard is the Most Likely Cause of the Sparks That Ignited The Fuel Leaking From the 4Runner (DOC. 393).

15.     Whether Plaintiff William Greene has adequately pled, or has standing to pursue, a survival action claim under Tex. Civ. Prac. & Rem. Code §71.021 under for the deaths of the Greene children.

16.     Whether Strick will be entitled to judgment as a matter of law on all of Plaintiffs' claims because the evidence will be insufficient to establish that Strick's underride guard was defective, that Strick was negligent as to its design or that Strick's warnings and instructions were inadequate and/or that inadequate warnings or instructions were the producing cause of Plaintiffs' harm, or of the harm of any of them.

17.     Whether Strick will be entitled to judgment as a matter of law on Plaintiff Marilyn Burdette Hardeman's claims of damage due to conscious pain and suffering of decedent Lakeysha between the failure of the accident underride guard and her death because (i) when unconsciousness was immediate, the estate cannot recover for the decedent's conscious pain and suffering and (ii) the immediacy of the events between failure of the underride guard and death (assuming death occurred after the failure, which Strick disputes render a conclusion of conscious pain and suffering speculative as a matter of law. {See Argument and Case law cited at page 9 of Strick's Motion to Exclude Dr. Burton's Opinions on Lakeysha Greene's Cause of Death and Conscious Pain and Suffering. Doc. 387, page ID 18154.

18.     Whether (assuming Plaintiff William Greene adequately pleaded and as standing to pursue a survival action for the deaths of the Greene children, which Strick disputes), Strick will be entitled to judgment as a matter of law on his claims that Wesleigh Greene and/or Wyndell Greene, II sustained conscious pain and suffering between the failure of the accident underride guard and their deaths because (i) there is no admissible evidence of conscious pain and suffering; (ii) when unconsciousness was immediate, the estate cannot recover for the decedent's conscious pain and suffering and (iii) the immediacy of the circumstances render a conclusion of conscious pain and suffering speculative. {See Argument and Case Law cited in Strick's Motion to Exclude Dr. Burton's Opinion that the Greene Children Experienced any Conscious Pain and Suffering (Doc. 389 page ID 18186)

19.     Whether Strick will be entitled to judgment as a matter of law on Plaintiff William Greene's survival action because there is insufficient evidence to establish by clear and convincing evidence that Strick was grossly negligent in design of the trailer's original equipment underride guard or warnings and instructions.

20.     Are any of the defendants negligent?

21.     Are any of the defendants grossly negligent?

22.     Are any of the defendants strictly liable?

23.     Were Dolphin and Fayard engaged in a joint venture?

24.     Are Dolphin and Fayard vicariously liable for the actions of each other?

25.     Are Dolphin and Fayard viacariously liable for the actions of Sprinkle?

26.     Are Plaintiffs entitled to damages from any defendant?

27.     Are Plaintiffs entitled to exemplary damages from any defendant?

28.     Are Plaintiffs' experts opinions' admissible?

29.     Are Plaintiffs' experts opinions relevant and reliable to this trial?

30.     Whether trial on exemplary damages should be bifurcated.

31.     Pleadings by These Plaintiffs in the "Original" Action Against Moody and Forest Products.

VGNA has marked two documents as exhibits that VGNA intends to offer in the case which are the pleadings filed by these plaintiffs in their suit in the Northern District of Texas against the driver of the Volvo tractor, Charles Moody, and his employer, Forest Products Transports, LLC. (Case No. 3-10-cv-1085-G)  These are marked as VGNA Exhibits V006 and V007. These exhibits are admissible. While they are not parties to *this* litigation, the fault and responsibility of Moody and his employer for this accident and the deaths of the Greene family will be submitted to the jury as both:  *(1)* "settling person(s)" under Chapter 33 of Texas Civil Practice and Remedies Code; and *(2)* "responsible third parties" under Chapter 33 (*see* Docket #374).  In these complaints, Plaintiffs pled many acts of negligence of the driver Moody. Further, they sued for the same damages sought herein, alleged that Moody and his employer were grossly negligent, and asked for punitive damages.  Among other things, they alleged that Moody admitted to the officers in question that he was not paying attention at the time of the collision.  *See* VGNA Trial Exhibit V007 at p. 4, ¶16.  There are also key allegations against Moody in paragraphs 22 and 25 of these complaints. And, in paragraph 28 they claimed that Moody was an incompetent and reckless driver.  Plaintiffs further alleged that Moody's conduct amounted to a wilful act or omission or gross neglect in paragraph 48.

As a general rule, the pleading of a party ***made in another action,*** as well as pleadings in the same action which have been superseded by amendment, withdrawn or dismissed, are admissible as admissions of the pleading party to the facts alleged therein, assuming of course that the usual tests of relevancy are met. *Continental Ins. Co. v. Sherman*, 439 F.2d 1294, 1298

(5th Cir. Fla. 1971); *Parker v. MSB Energy, Inc.* (*In re MSB Energy, Inc.*), 438 B.R. 571, 596 (Bankr. S.D. Tex. 2010); *Sanford v. Johns-Manville Sales Corp.*, 923 F.2d 1142, 1148 (5th Cir. 1991) (noting that statements within pleadings are generally admissible as party admissions, assuming they are relevant to the dispute); *Maggette v. BL Dev. Corp.*, 2011 U.S. Dist. LEXIS 58077, 25-26 (N.D. Miss. May 27, 2011) ("The Fifth Circuit has stated that 'there is a well-established rule that factual allegations in the trial court pleadings of a party in one case may be admissible *in a different case* as evidentiary admissions of that party.'")(emphasis added).

VGNA Trial Exhibits V006 and V007 are admissible.

32.   Matters Pleaded (and Not Pleaded).

Plaintiffs are and should be limited to what they have pleaded.

Since this lawsuit was filed, they have alleged three defects in the Volvo tractor:  *(1)* "absent or defective collision warnings system"; *(2)* "ineffective energy-absorption capabilities"; and *(3)* "the Tractor … was incompatible, in a crash, with other vehicles on the road."  *See* PLAINTIFFS' SEC. AM. COMPLAINT (Docket #113) at ¶58.  They have not – and have *never* – alleged any defect in or with the Volvo tractor's brakes or braking system (including but not limited to the type of brake used – drum versus disc – or to "Advanced Electronic Braking" (AdvBS)).  Nor have they ever alleged that the tractor was defective due to the absence of "Adaptive Cruise Control" (ACC).  (ACC is not a "collision warning system.")  And, they have never pleaded any survivorship claims by on or behalf of the estates of LaKeysha Greene or the Greene children (Wesleigh and Wyndell II).  *See* PLAINTIFFS' ORIG. COMPLAINT (Docket #1); PLAINTIFFS' FIRST AM. COMPLAINT (Docket #24-1); PLAINTIFFS' SEC. AM. COMPLAINT (Docket #113).

Plaintiffs last amended their complaint on July 23, 2012 – almost two years ago.  *See* Docket #113.  They recognized at that time that they could not amend their pleadings after August 24, 2011 absent a showing of "good cause" under Federal Rule 16(b).  *See* PLAINTIFFS' MOTION TO VACATE OLD SCHEDULING ORDER (Docket #74).  The "good cause" standard requires the party seeking relief to show that the scheduling deadlines, including any pleadings deadlines, cannot reasonably be met despite the diligence of the party needing the extension.  FRCP 16(b)(4).

Here, Plaintiffs knew or should have known of any facts upon which any pleadings of any alleged brake defect, any defect based on the absence of "ACC" in the subject tractor, or any survivorship claims by or on behalf of the estates of LaKeysha Greene or the Greene children could be made long before now – for example, the expert report of Plaintiffs' liability expert Keith Friedman dated November 14, 2013 (six months ago) criticizes the brakes and braking system of the Volvo tractor and (briefly) refers to the absence of ACC on the subject tractor.

33.   Contested Legal Issues Raised in VGNA's Summary Judgment Motions.

VGNA refers to and incorporates several contested legal issues that have been previously raised and addressed in summary judgment motions and briefing:

a)    Plaintiffs' "Misrepresentation" Claim.  Plaintiffs have asserted a "misrepresentation" claim against VGNA.  *See* Plaintiffs' Sec. Am. Complaint (Docket #113) at ¶¶61-64.  VGNA has addressed this claim in a motion for partial summary judgment (Docket #250), brief in support of its motion for partial summary judgment (Docket #251), and reply brief (Docket #311).  Among other things, there is no cause of action for "misrepresentation" under Texas law. Moreover, there is no evidence whatsoever in this case that VGNA ever made a representation – much less a <u>mis</u>representation – regarding its products to the Greene family (or any of these Plaintiffs).

b)    Plaintiffs' Manufacturing & Marketing Defect Claims.  Plaintiffs have alleged defects under design, marketing and manufacturing defect theories.  *See* Plaintiffs' Sec. Am. Complaint (Docket #113) at ¶¶61-64.  VGNA addressed the marketing and manufacturing defect claims in its motion for summary judgment (Docket #267), brief in support of that motion (Docket #268), and reply brief (Docket #353).  Plaintiffs have no evidence of any alleged design or marketing defect pertaining to the Volvo tractor, and did not even contest this in their summary judgment briefing.  Indeed, there is no lay witness testimony or evidence <u>or</u> any expert witness testimony or evidence regarding these marketing and manufacturing defect claims.

c)    Plaintiffs' "Negligent Design" Claims.  Plaintiffs have also asserted negligent design claims against VGNA in connection with the Volvo tractor.  *See* Plaintiffs' Sec. Am. Complaint (Docket #113) at ¶¶59-60.  Without making any admission that Plaintiffs' claims are valid, as a matter of law the only theory of liability that the Court should consider as even possibly sufficient to go to the jury as to VGNA is Plaintiffs' claim of a "design defect" under Texas law; a negligence theory should not be submitted.  The proof for recovery required on a design defect claim is the same for a negligence theory.  The Texas Supreme Court has held that a trial court is not required to – and, indeed, should not submit – separate questions to the jury when the elements are functionally identical. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 665-66 (Tex. 1999).  Under the Texas Products Liability Act, the elements prescribed in §82.005 of the Civil Practice and Remedies Code are the uniform elements that must be proved in <u>any</u> design defect case involving a covered product, regardless of whether pleaded in strict liability, negligence or other theory.  *Id.* at 664, n.14.

d)    Gross Negligence and Exemplary Damages.  Plaintiffs have also alleged that VGNA was "grossly negligence" and have pleaded for an award of exemplary damages.  *See* Plaintiffs' Sec. Am. Complaint (Docket #113) at ¶¶60 & 128. As discussed in VGNA's motion for summary judgment on Plaintiffs' strict liability, negligence and gross negligence claims, there is no evidence in this case of gross negligence or any willful act or omission by VGNA that supports any claim for exemplary damages as a matter of law.  *See* VGNA's motion for summary judgment (Docket #267), supporting brief (Docket #268), and reply brief (Dcoument #353); *see generally* Tex. Civ. Prac. & Rem. Code §§41.001 *et*

*seq.* & §71.009 (setting forth the standards regarding the availability, burdens, limitations and other considerations for awards of exemplary damages in wrongful death actions in Texas).

34.   Inadmissible Expert Testimony.

VGNA refers to and incorporates several legal issues that have been previously raised and addressed in the parties' "Daubert" motions and briefing.  VGNA contends that many of Plaintiffs' testifying experts, their reports, and their evidence should be excluded/limited under applicable law – for several reasons.

a)   <u>Untimeliness/Insufficiency of Disclosures</u>.  The testimony, reports and evidence of several of Plaintiffs' experts should be excluded because Plaintiffs' disclosures were untimely and insufficient under FRCP 26 and applicable law.  This includes Plaintiffs' experts Jeff Vick (accident reconstruction) (*see* Docket #'s 377, 378 & 466); Keith Friedman (*see* Docket #'s 380, 381 & 466); and Rhoads Stephenson (*see* Docket #s 380, 381 & 466).

b)   <u>Lack of Qualifications</u>.  The testimony, reports and evidence of several of Plaintiffs' experts should also be excluded because these individuals are not qualified under Federal Rules of Evidence 702 and 703 and applicable law to offer expert testimony in subject areas for which they have been designated.  This includes Mr. Friedman's lack of qualifications to offer expert testimony regarding heavy truck design (including front-end design); collision warning systems and "radar systems"; and heavy truck brakes and braking systems.  (*See* Docket #'s 463, 464 & 598).  It also includes Dr. Stephenson's lack of qualifications to offer testimony regarding any alleged theory of defect regarding the Volvo tractor. (See Docket #'s 460, 461 & 599).  And, it includes Dr. Darrell Henderson's lack of qualifications to testify about certain matters pertaining to medical treatment and medical bills and fees.  (*See* Docket #'s 418, 419, 422, 425, 466 & 588)

c)   <u>Unreliability and/or Irrelevance</u>.  The testimony, reports and evidence of several of Plaintiffs' experts should also be excluded because it fails to satisfy the reliability and relevance requirements of FRE 702 & 703 and *Daubert*.  *See Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-91 (1993) This includes testimony, reports and evidence of the following individuals designated as testifying experts by Plaintiffs:

   i.   Jeff Vick (reconstruction) (*see* Docket #'s 409, 436, 438, 466 & 595);
   ii.   Keith Friedman (liability/design) (*see* Docket #'s 463, 464 & 598);
   iii.   Rhoads Stephenson (liability/design) (*see* Docket #'s 443, 444, 460, 461, 466 & 599);
   iv.   Darrell Henderson (damages/medical fees) (*see* Docket #'s 418, 419, 422, 425, 466 & 588);
   v.   Trudi Zaplac (mental anguish) (*see* Docket #'s 429, 430, 435, 466 & 589); and

vi.  Stan Smith (economic damages) (*see* Docket #'s 421, 423, 424, 426, 559, 450, 458, 466 & 596).

This also includes any testimony, reports and evidence from any party's designated biomechanics expert (whether Joseph Burton, Catherine Corrigan or David Viano) regarding the injuries or mechanisms of death of the Greene children on relevance grounds.  (*See* Docket #'s 446 & 448)

35.  Exemplary Damages/Bifurcation.

As discussed above, Plaintiffs have alleged that VGNA was "grossly negligent" and is seeking punitive damages against VGNA (and its co-defendants). *See* PLAINTIFFS' SECOND AM. COMPLAINT (Docket #113) at ¶¶60, 122 & 128.  The only potential claim for exemplary damages arises from the claims of the estate of Wyndell Greene, Sr.  As the Court noted in its summary judgment order of December 19, 2012, Texas law does not allow parents of decedents to recover exemplary damages for wrongful death claims.  *See* Docket #130 at p. 6.

VGNA denies that under any state of facts in this case it would be liable to plaintiff William Greene (*i.e.,* Wyndell Greene Sr.'s estate) for gross negligence or any other theory which could form the basis of an exemplary damage award in this case.   However, pursuant to Federal Rule of Civil Procedure 42, this Court should bifurcate and/or separate the trial (same jury) of the issue of any award of exemplary damages – including matters pertaining to VGNA's net worth.  (VGNA is concurrently filing a motion to bifurcate the trial.)  The purpose of bifurcation is to prevent or avoid prejudice to VGNA if the estate were allowed to introduce net worth evidence in its case in chief or otherwise offer any evidence bearing on the net worth of VGNA or any other defendant.  While the bifurcation of punitive damages is a matter of right in Texas state court and a matter of discretion in federal court, it has been recognized as a legitimate and proper remedy in federal court under Rule 42 to accomplish the same result. There is no harm to the plaintiffs by this bifurcation.  *See Jenkins v. Raymark Ind., Inc.*, 782 F.2d 468, 474-75 (5th Cir. 1986), (approving bifurcation of punitive and compensatory damages); *Sanford v. Johns-Manville Sales Corp.*, 923 F.2d 1142, 1146 (5th Cir. Tex. 1991); *State Farm Fire & Cas. Co. v. Woods*, 896 F. Supp. 658, 660 (E.D. Tex. 1995).

36.  Past Medical Expenses (Actually Paid and Incurred).

Under Texas law, a wrongful death plaintiff may only "the amount [of past medical expenses] actually paid or incurred by or on behalf of" the decedent.  *See* TEX. CIV. PRAC. & REM. CODE §41.0105; *see Haygood v. De Escabedo*, 356 S.W.3d 391, 398 (Tex.2011).  In this case, Plaintiffs did not disclose – and have never disclosed – the amount of or computation for the amount of past medical expenses allegedly paid and incurred by or on behalf of decedent Wyndell Greene, Sr.  Moreover, their designated medical expense expert, Dr. Darrell Henderson, failed to address this "actually paid and incurred on behalf of the decedent" standard in his report and deposition.  Evidence of medical bills or expenses invoiced, as opposed to actually paid and incurred, should be inadmissible in this case under the relevant standard and case law.

37.  The "Substantial Similarity" Requirement Regarding Evidence of Other Accidents.

Under the Federal Rules of Evidence, evidence of other accidents or incidents is not relevant unless a foundation of substantial similarity is laid. FED. R. EVID. 402. Evidence of dissimilar accidents is more prejudicial than probative because it creates a risk of jury confusion and decisions based on different designs or circumstances. In a product liability case, evidence of other accidents is relevant only under certain carefully defined circumstances: *(1)* the earlier failure occurred under conditions substantially similar to those existing during the failure in the accident central to the litigation; and *(2)* the earlier failure occurred at a time not too remote from the time of the failure in the accident central to the litigation. *Edwards v, Permobil, Inc*, No. CIV. A. 11-1900, 2013 WL 4508063 (E.D. La. August 22, 2013) (citing *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338–39 (5th Cir.1980)); *Johnson v. Ford Motor Co.*, 988 F.2d 573, 579 (5th Cir.1993) (proponent must establish "that the facts and circumstances of other accidents or occurrences are 'closely similar' to the facts and circumstances at issue").

The substantial similarity rule "rests on the concern that evidence of dissimilar accidents lacks the relevance required for admissibility under Federal Rules of Evidence 401 and 402." *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir. 1991). This is of particular importance in cases where the evidence is proffered to show the existence of a defective condition or causation. In *Barker v. Deere & Co.*, 60 F.3d 158, 162-63 (3d Cir. 1995), the Third Circuit described the importance of the rule when allegations of product defect are at issue:

> We note that every court of appeals to have considered this issue agrees that when a plaintiff attempts to introduce evidence of other accidents as direct proof of a design defect, the evidence is admissible only if the proponent demonstrates that the accident occurred under circumstances substantially similar to those at issue in the case at bar.

> The foundational requirement of establishing substantial similarity is especially important in cases where the evidence is proffered to show the existence of a design defect. In such cases, the jury is invited to infer from the presence of other accidents that a design defect existed, which contributed to the plaintiffs' injuries. (Citations omitted).

Federal courts have interpreted "similarity of conditions" to mean that the occurrence or accidents must have involved the identical model or design of product, or, at the least, one which is substantially or virtually similar. *See Anderson v. Whitaker Corp*., 894 F.2d 804, 813 (6th Cir. 1990); *Brock v. Caterpiller, Inc*., 94 F.3d 220, 225-26 (6th Cir. 1990). Further, Plaintiffs also must prove that the accident circumstances of the other claims and lawsuits are substantially similar to those at issue in this case. *See Barker*, 60 F.3d at 162 ("The almost universal requirement, however, is that the prior occurrence must involve facts and circumstances which are substantially similar to those involved in the case under consideration or they will be excluded"). Should this Court decide the some of the incidents are substantially similar, they may still be excluded from trial. As the Fifth Circuit held, "even when a substantial similarity of circumstances is established, the District Court has broad discretion to exclude some or all of the proffered evidence under Rule 403 of the Federal Rules of Evidence." *Johnson*, *supra*, at 579.

38.     Length of Trial (Due Process Considerations).

VGNA recognizes that this Court may set various limitations, directives, or guidelines – including time limits – on the trial presentations of this case.  VGNA recognizes that the Court is vested with discretion in this regard.  However, since the Court has not yet announced what kind of limits, if any, may be placed on the number of witnesses and/or time limits which may be used, VGNA notes as a possible contested point of law that when and if the Court makes any such decision(s) to set limitations, that VGNA may raise due process or other concerns in light the complexity of the case, the number of the parties, the various factual and legal contentions made, and the serious nature of the claims being asserted.  *See Labor v. DeSisto*, 929 F.2d 789, 795-96 (1st Cir. 1991); *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 115 (7th Cir. 1990); *United States v. Hildebrand*, 928 F.Supp. 841, 848–49 (N.D. Iowa 1996).

VGNA has contended and asserted that gross negligence and exemplary damages should not be submitted in this case.  VGNA has moved for separate trial and/or bifurcation on that issue. However, the event that the jury were somehow to reach exemplary damages in phase II of the trial, then, in that event, VGNA would contend and does contend that there a number of important principles relating to constitutional based evidentiary matters which will then come into play and which must be adhered to so that the due process rights of VGNA are not transgressed.

Under *State Farm Mut. Auto Ins. Co. v. Campbell*,  538 U.S. 408, 421-22 (2003), any conduct alleged committed by VGNA in other states other than Texas would not be admissible unless it could be established that the harm in this case was the result of such conduct. Otherwise, per Campbell, such evidence is not admissible, and the jury must be instructed not to use that evidence if it does come in.

Adjudication and/or punishment of alleged VGNA conduct that occurred outside Texas to other persons is not the legitimate concern of the State of Texas. See id. at 422. A state cannot punish a defendant for conduct that may have been lawful where it occurred.  *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 569 (1996).  The jury must be instructed that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred.  *Campbell*, at 422 (citing Gore, 517 U.S. at 572-73).  A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business.  *Campbell*, 538 U.S. at 423.

39.     Settlement Credits.

It is unknown whether this issue will ever arise or whether it will be contested if it does arise. Out of an abundance of caution, VGNA brings this issue to the attention of the Court. In this case, Plaintiffs sued the driver of the Volvo tractor, Charles Moody, and his employer Forest Products in another case.  *See* VGNA Exhibits V006 and V007.  As a result of that case, Plaintiffs settled for a total of **[CONFIDENTIAL]** dollars – gross for all three plaintiffs.  Each plaintiff (both parents and the estate of Wyndell Greene, Sr.) were allocated a gross amount of **[CONFIDENTIAL]** dollars. Under Chapter 33 of the Texas Civil Practice and Remedies Code, the defendants in this case – including VGNA – may be entitled to a credit under Texas

substantive law.  The methodology of applying the Chapter 33 settlement credit on these facts was set out in *Roberts v. Williamson*, 111 S.W.3d 113, 123 (Tex. 2003).  In this case, the only credit is a dollar-for-dollar credit.  *See also Duff v. Spearman*, 322 S.W.3d 869, 886 (Tex.App.– Beaumont 2010, pet. denied) for an explanation of the credit issue.  *See also Battaglia v. Alexander*, 177 S.W.3d 893, 900 (Tex. 2005) bearing on a potential calculation of the judgment. In this case, VGNA will prove in its case-in-chief before VGNA rests – outside of the presence of the jury – the settlement credit and will offer the above-noted exhibits in that regard.  The amounts paid in settlement in the other case were for the same damages sued for as Plaintiffs are seeking from VGNA in this case.  This issue will not arise until post-verdict (and maybe never).

40.    Are the opinions of Plaintiffs' expert witnesses Keith Friedman, Jeff Vick, and Stan Smith, Ph.D., admissible, pursuant to Rule 702 of the Federal Rules of Evidence and the federal *Daubert* jurisprudence?

41.    Did Sprinkle act as would have a reasonably prudent commercial driver, under the same or similar circumstances, in his pre-trip inspections of the DOT bumper?

42.    Did Sprinkle act as would have a reasonably prudent commercial driver, under the same or similar circumstances, in his operation of his tractor-trailer at the time of the accident?

43.    Were Sprinkle's actions a proximate cause of the accident in question?

43.    Did any actions of Fayard Moving constitute gross negligence, as that term is defined by Section 41.001(11) of the Texas Civil Practice & Remedies Code?

44.    Can Fayard Moving be liable for gross negligence based on the acts of its employee Sprinkle?

45.    Can Plaintiffs introduce evidence the past medical expenses allegedly incurred by or on behalf of decedent Wyndell Greene, Sr., pursuant to Section 41.0105 of the Texas Civil Practice & Remedies Code and the Texas Supreme Court's *De Escabedo* decision?

**46.    Whether any defendant or plaintiff spoiled evidence.**

## Objections to Defendants' Contentions:

Plaintiffs object to Defendants' contentions since Plaintiffs maintain that many of the

68

contentions (e.g. those that reference case authorities, summary judgment motions (which should all be summarily denied), *Daubert* motions, and other specific pleading) are inappropriate for a joint pretrial submission.  In addition, Plaintiffs object to many of Defendants' contentions since there is no evidence or law that supports such contentions.  Consequently, Plaintiffs object to any consideration of including in the pretrial order items such as Defendants' alleged contested issues of fact No. 24-142 since most contain gross misrepresentations of fact and/or law. Plaintiffs and their counsel also do not concede, by signing this pretrial order, that these are proper issues for the pretrial order or fact issues for trial.

Furthermore, to the extent the Court considers the referenced Defendants' improper contentions in fashioning a final pretrial order, Plaintiffs ask that the Court provide Plaintiffs with an opportunity to offer briefing on the disputed contentions since Plaintiffs were unaware of the nature of Defendants' contention until the evening before the Joint Pretrial Order was to be filed.

## V.      ESTIMATED LENGTH OF TRIAL & JURY TRIAL

1.      Plaintiffs believe that the trial will last thirty (30) business days, based on approximately six hours of testimony each day.  Jury selection and opening statements will likely take a day and a half.  Plaintiffs ask that a half-day should be reserved for closing arguments.

2.      Defendants believe that trial will last twenty-five days, exclusive of hearings on expert challenges and motions in limine.

3.      This case is set for a jury trial.

## VI.      ADDITIONAL MATTERS

A.      **Plaintiffs' Additions:**

1.      **Use of Jury Questionnaire.**

Plaintiffs wish to submit a questionnaire to the jury panel, to be completed by each juror upon arrival at the courthouse, prior to voir dire.  Plaintiffs request that the clerk of the court collect the completed questionnaires and deliver copies to counsel prior to voir dire and that counsel be given sixty (60) minutes to review the questionnaires prior to the voir dire.  Plaintiffs have submitted a copy of the proposed questionnaire along with their voir dire questions.

**2.      Use of Defendants' Depositions.**

Pursuant to Federal Rule of Civil Procedure 32(a)(3), "[a]n adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's…designee under Rule 30(b)(6)."  Plaintiffs intend to use deposition testimony from each of the defendants' designees in Plaintiffs' case in chief and rule 32(a)(3) does not require that Plaintiffs designate portions of Defendants' depositions to be filed along with this joint pretrial order.

**3.      Rulings on Spoliation Motions.**

As the Court is aware, Plaintiffs have filed the following motions for spoliation of evidence and request that the Court consider these motions so that Plaintiffs can determine how to proceed with the presentation of evidence as related to the issues in these motions.

      a.      Motion for Sanctions against Fayard Moving & Warehouse, LLC and Dolphin Lines, Inc. for Destruction and Concealment of Evidence (Dkt. No. 86); and

      b.      Motion for Sanctions against Toyota Defendants for Spoliation of Evidence (Dkt. No. 269).

**4.      Ruling on Plaintiffs' Motion *in Limine*.**

In accordance with the Court's Scheduling Order, Plaintiffs filed a Motion *in limine* asking that the Court instruct Defendants' counsels not to mention or bring before the jury either directly or indirectly upon voir dire and examination, opening statement, interrogation of witnesses, in argument, objections before jury, or by any other means or in any other manner,

inform the jury or bring to the jury's attention, any of the matters set forth in the motion in limine.  Plaintiffs believe a ruling on this motion will expedite the presentation of evidence.

### 5.     Rulings on Plaintiffs' *Daubert* Motions.

Plaintiffs filed the following *Daubert*-related and believe that a ruling on these motions will shorten the length of the trial and allow the parties to streamline the evidence.

| Dkt. Entry Nos. for Motion and Reply | Witness's Testimony sought to be excluded in whole or in part |
|---|---|
| 489, 600 | Stephen Werner |
| 493, 601 | Timothy Cheek |
| 476, 602 | Kenneth Tandy |
| 483, 603 | Mickey Marine |
| 487, 604 | Robert Lange |
| 487, 604 | Dolph Lohwasser |
| 485, 605 | Richard Dyer |
| 495, 606 | William Van Arsdell |
| 478, 607 | Lee Carr |
| 470, 608 | Catherine Corrigan |
| 472, 609 | David Viano |
| 480, 610 | Michelle Vogler |
| 474, 611 | Helen Reynolds |
| 491, 612 | Thomas Truss |

## B.     <u>Defendants' Addition</u>:

### 1.     The Toyota Defendants.

a.   The Toyota Defendants object to the use of jury questionnaires. Jury

questionnaires will not facilitate jury selection. Rather, they will unnecessarily

complicate and delay the jury selection process.

b.   The Toyota Defendants object to the use of deposition of its witnesses that

have not been properly designated pursuant to the Court's prior orders.

c. There are multiple matters that may aid in the disposition of the case.

Additionally, a court order on the following motions would aid in the disposition

of this case:

| DOCUMENT NUMBER | MOTION |
|---|---|
| 179, 180 | Toyota's Motion and Brief for Partial Summary Judgment (marketing and misrepresentation) |
| 253, 254 | Toyota's Motion and Brief for Partial Summary Judgment |
| 256, 257 | Toyota Motor Engineering & Manufacturing North America, Inc.'s Motion and Brief for Summary Judgment |
| 377, 378 | Toyota's Motion and Brief to Exclude Untimely Disclosed File Materials and Data of Plaintiffs' Expert Jeff G. Vick |
| 380, 381 | Toyota's Motion and Brief to Exclude Untimely Disclosed File Materials and Data of Plaintiffs' Experts Keith Friedman and Dr. Rhoads Stephenson |
| 422, 425 | Toyota's Motion and Brief to Exclude the Testimony of Plaintiffs' Expert Darrell Lane Henderson, M.D. |
| 429, 430 | Toyota's Motion and Brief to Exclude the Testimony of Plaintiffs' Expert Trudi Zaplac |
| 432, 433 | Toyota's Motion and Brief to Exclude the Testimony of Plaintiffs' Expert Keith Friedman |
| 436, 438 | Toyota's Motion and Brief to Exclude the Testimony of Plaintiffs' Expert Jeff G. Vick |
| 443, 444 | Toyota's Motion and Brief to Exclude the Testimony of Plaintiffs' Expert Dr. Rhoads Stephenson |
| 449, 450 | Toyota's Motion and Brief to Exclude the Testimony of Plaintiffs' Expert Stan Smith |

**2.   Strick**

Strick anticipates the following evidentiary issues will need to be resolved at trial:

**1.   Admissibility of Expert Opinions.**

72

Strick has filed the following motions challenging the admissibility of certain opinions of Plaintiffs' experts, Dr. Joseph Burton, Keith Friedman and Dr. R. Rhoads Stephenson, as follows:

a) Motion to Limit Plaintiffs' Experts' Opinions and Preclude Plaintiffs From Offering Rebuttal Expert Testimony (DOC. 405).

b) Motion to Exclude Dr. Burton's Opinion that the Greene Children Experienced any Conscious Pain and Suffering (DOC. 389).

c) Motion to Exclude Dr. Burton's Opinions on Lakeysha Greene's Cause of Death and Conscious Pain and Suffering (DOC. 487).

d) Motion to Exclude Keith Friedman's Opinions Regarding OEM Strick Trailer's Non-Compliance with FMVSS 223 (DOC. 399).  (Erroneously filed as: Motion to Exclude Any Reference to OEM Strick Trailer Compliance with FMVSS 223 Labeling Requirements).

e) Motion to Exclude Expert Keith Friedman's Untimely Disclosed Computer Simulations and Opinions Based Thereupon (DOC. 391).

f) Motion to Exclude Friedman/Stephenson Opinions on Failure to Recall, Retrofit or Give Post-Sale Warnings (DOC. 407).

g) Motion to Exclude Mr. Friedman's Opinions that (1) The Failure of the ICC Rear Impact Guard Caused or Contributed to the Breach of the 4Runner's Fuel System and (2) The Failure of the ICC Rear Impact Guard is the Most Likely Cause of the Sparks that Ignited the Fuel Leaking from the 4Runner (DOC. 393).

h) Motion to Exclude Keith Friedman's Causation Opinion(s) re Alternative Design Bumper Guards (DOC. 403).

i)   Motion to Exclude Mr. Friedman's Opinion That the Rear Bumper Guard was Manufactured by Strick (DOC. 401).

j)   Motion to Exclude Mr. Friedman's Opinion on FMVSS 223 and 224 Compliance of OEM Strick Trailer (DOC. 397).

k)   Motion to Exclude Keith Friedman's Opinions on Other Accidents, Incidents, Claims, Lawsuits, Judgments, Verdicts or Settlements (DOC. 411).

l)   Motion to Exclude Expert Testimony of Dr. Stan Smith (DOC. 423).

m)  Motion to Exclude Calculations and Opinions Based Thereon of Plaintiffs' Expert Jeff G. Vick (DOC. 436).

### 2.     Admissibility of Other Evidence

Strick has filed the following Motions in Limine to exclude evidence:

a)   Motion in Limine Re  Heavy Truck/trailer Death and Injury Data and Rates from All Causes Other than Rear Underride.

b)   Motion in Limine Failure to Train Trailer Purchasers, Owners and Dealers on Maintenance and Repair.

c)   Motion in Limine  Re Gruesome Evidence.

d)   Motion in Limine Re Grief and Anguish over Childrens' Deaths or Loss of Entire Family.

e)   Motion in Limine  Re  Allegations of Misrepresentation and Concealment

f)   Motion in Limine re Inapplicable Standards and Regulations.

g)   Motion in Limine re Alleged Failure to Petition NHTSA to Change The Federal Motor Vehicle Safety Standards.

h) MotioninLimineRe Other   Accidents,   Claims,   Lawsuits   Judgments,   Verdicts   or Settlements.

i) Motion in Limine Re  All Evidence or Testimony Related to (1) Irrelevant Certification Label "Bad Acts" and (2) Failure to Retain Testing Reports for Scrapped Designs.

j) Motion in Limine Re  Other Irrelevant and Unduly Prejudicial Topics.

k) Motion in Limine Re  Post-manufacture Design Changes, and Failure to Recall, Retrofit or Give Post-sale Warnings.

l) Motion  to Bifurcate Exemplary Damages, to Exclude Financial Information During the Liability Phase and to Exclude Extraterritorial Sales and Revenues in Any Phase

### 3. Joinder of Motions in Limine

Strick reserves the right to join any or all of Motions in Limine filed by any of the joint Defendants in this case.

### 4. In Addition to the Evidentiary Issues Raised by Motions in Limine, Strick Anticipates Evidentiary Issues May Arise as to the Following:

a) Evidence of loss of future wages and/or earning capacity of Lakeysha Greene and of Wyndell Greene, Sr.  In a wrongful death action, the proper measure of damages is loss of support and loss of inheritance Tex. Civ. Prac. & Rem. Code Ann. § 71.010 (West)

b) Evidence of loss of future earning capacity of Wesleigh Greene or Wyndell Greene, II. Even if the Court rules Plaintiff William Greene had pleaded a survival cause of action and has standing to pursue a survival action for the childrens' death, future lost earnings and loss of earning capacity are not recoverable damages under the Tex. Survival Act. V.T.C.A., Civil Practice & Remedies Code §§ 71.001, 71,021.

c) Admissibility of expert opinions on non-economic damages categories such as loss of society, companionship, relationship and other non-economic matters.

   **3.**     Admissibility of evidence, including but not limited to expert opinion, on the loss of value of life (hedonic) damages for any of the decedents.  FRE 702.

   **3.**     **Dolphin Line, Inc. and Strick Trailers.**

Dolphin and Strick believes a hearing and ruling on the numerous expert challenges it has filed, or joined, and the anticipated motions in limine that it will file, or join, will aid in the disposition of the case.

   **4.**     **VGNA**

VGNA believes that are multiple matters that may aid in the disposition of the case, at least with respect to VGNA and the claims asserted against it.  Among other things, court orders on the following motions would aid in the disposition of this case:

### Summary Judgment Motions

1. VGNA's Motion for Partial Summary Judgment on Plaintiffs' "Misrepresentation" Claim and Brief in Support Thereof (Docket #'s 250 & 251);
2. VGNA's Motion for Summary Judgment on Plaintiffs' Strict Liability, Negligence and Gross Negligence Claims and Brief in Support Thereof (Docket #'s 267 & 268);

### Motions to Exclude Experts

3. VGNA's Motion to Exclude Expert Testimony of Biomechanic Experts Joseph Burton, Catherine Corrigan and David Viano regarding the Injuries and Deaths of the Greene Children and Brief in Support Thereof (Docket #'s 446 & 448);
4. VGNA's Motion to Exclude the Testimony and Evidence of Plaintiffs' Expert Keith Friedman and Brief in Support Thereof (Docket #'s 463 & 464);
5. VGNA's Motion to Exclude Expert Testimony of Plaintiff's Economist Stan Smith and Brief in Support Thereof (Docket #'s 421 & 426);

6.      VGNA's Motion to Exclude Expert Testimony of Plaintiffs' Expert Rhoades Stephenson and Brief in Support Thereof (Docket #'s 461 & 462);

7.      VGNA's Motion to Join (Joinder) Various Motions to Exclude Filed by Other Defendants (Docket #466) (related to Docket #'s 418, 435, 454, 458, 422, 429, 436, 443, 377, 380, 449, 409 and 423); and

## Motions in Limine

8.      Various Motions in Limine (including Defendants' joint motion in limine and VGNA's separate motion in limine) (Docket #'s TBD).

**5.      John Fayard Moving & Warehouse, LLC**

Fayard Moving respectfully contends that pretrial hearings and rulings on the outstanding *Daubert* Motions, motions *in limine*, and other pretrial matters will streamline the issues remaining for trial and aid the Court and the parties in the disposition of the case.

Signed_____, 2014.


_____
DAVID C. GODBEY
UNITED STATES DISTRICT JUDGE

**DATED**:  May 23, 2014.

/s/ Aubrey "Nick " Pittman
AUBREY "NICK" PITTMAN
State Bar No. 16049750
PAUL STAFFORD
State Bar No. 00791716

100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

/s/ Daryl K. Washington
DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON, P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

**ATTORNEYS FOR PLAINTIFFS**

/s/ Kurt C. Kern
KURT C. KERN
State Bar No. 11334600
kurt.kern@bowmanandbrooke.com
DAVID P. STONE
State Bar No. 19289060
david.stone@bowmanandbrooke.com
JUDE T. HICKLAND
State Bar No. 24065416
jude.hickland@bowmanandbrooke.com

**BOWMAN AND BROOKE, LLP**
2501 N. Harwood Street, Suite 1700
Dallas, Texas  75201
(972) 616-1700
(972) 616-1701 (fax)

**ATTORNEYS FOR TOYOTA MOTOR CORPORATION, TOYOTA MOTOR ENGINEERING & MANUFACTURING**

**NORTH AMERICA, INC., AND TOYOTA MOTOR SALES USA, INC.**

/s/ Randy Howry
RANDY HOWRY
Texas State Bar No. 10121690
JOHN E. CARLSON
Texas State Bar No. 00790426

**HOWRY BREEN & HERMAN, L.L.P.**
1900 Pearl Street
Austin, Texas 78705-5408
512-474-7300
512-474-8557 – Fax
rhowry@howrybreen.com
pfitzgerald@howrybreen.com
jcarlson@howrybreen.com

**ATTORNEYS FOR VOLVO GROUP
NORTH AMERICA, LLC a/k/a VOLVO
TRUCKS NORTH AMERICA**

/s/ S. Todd Parks
S. TODD PARKS
Texas State Bar No. 15526520
JASON L. WREN
Texas State Bar No. 24028144
ASHLEY DE LA CERDA
Texas State Bar No. 24045760

**WALTERS, BALIDO & CRAIN, L.L.P.**
900 Jackson Street, Suite 600
Dallas, Texas 75202
214-749-4805
214-760-1670 – Fax
todd.parks@wbclawfirm.com

**ATTORNEYS FOR STRICK
TRAILERS, LLC**

/s/ Donald Dawson
DONALD DAWSON
Bar No. 05606500
KATHLEEN CLARK
Bar No. 00788830

**DAWSON & CLARK, P.C.**
243 W. Congress
600 Marquette Building
Detroit, MI 48226

313-256-8900
313-256-8913 – Fax
ddawson@dawson-clark.com

**ATTORNEYS FOR STRICK
TRAILERS, LLC**

/s/ Scott W. Self
MICHAEL P. SHARP
State Bar No. 00788857
SCOTT W. SELF
State Bar No. 24033176

**FEE, SMITH, SHARP & VITULLO, LLP**
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 752440
972-934-9100 phone
972-934-9200 fax
sself@feesmith.com

**ATTORNEYS FOR
JOHN FAYARD MOVING &
WAREHOUSE, LLC**

/s/ Joseph F. Henderson
JOHN S. KENEFICK
Texas State Bar No. 24006294
JOSEPH F. HENDERSON
Texas State Bar No. 24036751

**MACDONALD DEVIN, P.C.**
3800 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270

214-744-3300
214-747-0942 – Fax
jkenefick@macdonalddevin.com

**ATTORNEYS FOR DOLPHIN LINE,
INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2014, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.

    /s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN