## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **OLLIE GREENE, Individually as the surviving parent of WYNDELL GREENE, SR., WILLIAM GREENE, as the Administrator of the Estate of WYNDELL GREENE, SR., and MARILYN BURDETTE HARDEMAN, Individually and as the surviving parent of LAKEYSHA GREENE,** | § § § § § § § § | |
| **Plaintiffs,** | § | |
| **v.** | § § | **CAUSE NUMBER: 3:11-cv-0207-N** |
| **TOYOTA MOTOR CORPORATION, TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., TOYOTA MOTOR SALES USA, INC., VOLVO GROUP NORTH AMERICA, LLC., VOLVO TRUCKS NORTH AMERICA, A DIVISION OF VOLVO GROUP NORTH AMERICA, LLC., STRICK TRAILERS, LLC, JOHN FAYARD MOVING & WAREHOUSE, LLC, and DOLPHIN LINE, INC.** | § § § § § § § § § § § § § § | |
| **Defendants.** | § | |

---

### PLAINTIFFS' RESPONSE TO TOYOTA'S
### MOTION TO EXCLUDE KEITH FRIEDMAN'S
### COMPUTER SIMULATIONS AND OPINIONS BASED THEREUPON

---

AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax


DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas 75201
214-880-4883
469-718-0380 - fax

**ATTORNEYS FOR PLAINTIFFS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ ii

TABLE OF AUTHORITIES.......................................................................................................... iv

INTRODUCTION .......................................................................................................................... 1

ARGUMENT AND AUTHORITIES ............................................................................................. 2

A.    There Has Been No Untimely Production of Materials That Form The Basis
of Friedman's Opinions. ........................................................................................... 2

B.    The "Size" and Timing of the Friedman Production Was the Direct Result of
Toyota's Overly Broad Document Request. .............................................................. 4

C.    Toyota and the other Defendants had the Opportunity and the Ability to
Examine Friedman in January Regarding the Computer Simulation is Very
Important to Plaintiffs. ............................................................................................... 5

        1.    Contrary to its misrepresentation, Toyota had full access to Friedman's
materials, including the simulations, beginning on the first day of a
4-day deposition period.................................................................................. 5

        2.    Defendants were never prevented from reviewing and identifying the
finite element analysis simulations. ............................................................. 6

        3.    Defendants' counsel had the ability fully to discuss the FE and
simulations with the deponents on January 15, 16 and/or 17. .................... 8

        a.    Friedman had all of the simulation files present, as well as the
accompanying software, to be able to answer all questions and make
demonstrations for defendants. ................................................................ 8

        b.    The November 20, 2013, expert report discloses that Friedman
and Stephenson conducted testing and simulation throughout their
assignment in order to support and illustrate their opinions. ...................... 9

        c.    Defendants were able to, and did, ask detailed questions about the
FE and simulations that Friedman performed.......................................... 11

D.    The pre-January 15, 2014 Computer Simulation Previously Made Available
to Defendants is Very Important to Plaintiffs. ....................................................... 15

E.    Defendants Have Not Been Prejudiced By the Timing of the
pre-January 15, 2014 FEM Production. ................................................................... 17

        1.    Defendants have had the opportunity to fully explore the
pre-January 15, 2014 FEM Production with Friedman. ............................. 17

2.      Defendants' Experts Have Had Five Months to Dissect the pre-January 15, 2014 FEM Production. ............................................................................... 19

F.      Defendants Are Not Prejudiced By the Timing of any post-January 15, 2014 FEM Production. ............................................................................................. 20

1.      Plaintiffs had no strategic plan to hide FEA. ............................................ 20

2.      Friedman testified that the post-January 15, 2014 FEM is merely refinements of early FEM and was performed in some cases to test Defendants' experts' theory. ..................................................................... 22

3.      Toyota is unable to argue that the post-January 15, 2014 FEM work forms new opinions and/or that all of it is discoverable. .......................... 23

4.      Plaintiffs made several overtures to address what Toyota claims has prejudiced it but neither effort was accepted. ........................................... 24

CONCLUSION ....................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................ 27

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Ford Motor Co*., 2010 WL 3791037 (E.D.Tex., Sept. 23, 2010) .................................... 19

*Davis v. U.S. Bancorp*, 383 F.3d 761 (8th Cir.2004) ................................................................... 18

*Dunn v. State Farm Mut. Auto. Ins*. Co., 264 F.R.D. 266 (E.D.Mich.2009) ............................... 17

*Farmland Indus., Inc. v. Morrison–Quirk Grain Corp*., 54 F.3d 478 (8th Cir.1995) ................. 18

*Graves ex rel. W.A.G. v. Toyota Motor Corp*., 2012 WL 38894 (S.D.Miss. Jan. 9, 2012) ......... 19

*In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products
    Liability Litigation*, 2013 WL 5763178 (C.D.Cal. 2013) ........................................................ 18

*McPherson v. Rowe*, 366 Fed.Appx. 43 (11th Cir.2010)............................................................. 23

*Tex. A & M Research Found. v. Magna Transp., Inc*., 338 F.3d 394 (5th Cir.2003)............. 17, 20

**Rules**

FED. R. CIV. P. 26(b)(4)(D) ........................................................................................................... 4

FED.R.CIV.P. 26(a)(2)(B)(ii) ......................................................................................................... 2

Ollie Greene, William Greene, as the Administrator of the Estate of Wyndell Greene, Sr. and Marilyn Burdette Hardeman, (collectively referred to as "Plaintiffs") file this Response to Toyota Defendants' Motion to Exclude, (the "Motion") and show the Court as follows:

## INTRODUCTION

The Motion contains a host of false accusations and material misrepresentations. Toyota's hyperbole regarding the production or circumstances of Friedman's simulation is no reason to exclude Friedman or any of his simulations.  There is no nefarious motive surrounding Friedman's finite element modeling ("FEM"). Nor has there been any "conscious, strategic decision" by Plaintiffs or Friedman to withhold relevant or discoverable FEM.  Plaintiffs note that much of Toyota's recent brief is simply a cut-and-paste of previous argument it made in motions filed months ago, on which the Court has already made rulings.[1]  In addition, Toyota refuses to take any blame for Friedman's delayed FEM work, which was caused largely by Toyota's refusal to produce the actual FEM that is used at Toyota on the subject 4Runner and/or other relevant Toyota vehicles.  As the Court is well aware, Plaintiffs were forced to file three (3) motions to compel and a motion for spoliation of evidence regarding Toyota's strategic decision to conceal its FEM and prevent Plaintiffs from using Toyota's own FEM to prove Plaintiffs case and address Toyota's defenses. It was only after Plaintiffs received a final wave of relevant information from Toyota and Volvo, albeit it very limited, that Friedman could perform his analysis. Nevertheless, Plaintiffs will address herein the factual misrepresentations made by Toyota in the Motion.

Herein, Plaintiffs will address what is referred to as the "pre-January 15, 2014 FEM" and the "post-January 15, 2014 FEM").

---

[1] On June 6, 2014, the Court issued an Order (Dkt. No. 711) denying Toyota's Motion to Exclude Friedman's simulations.

1

## ARGUMENT AND AUTHORITIES

A.     **There Has Been No Untimely Production of Materials That Form The Basis of Friedman's Opinions.[2]**

FED.R.CIV.P. 26(a)(2)(B)(ii) requires an expert to **disclose**, among other things, the "facts

or data considered" by the expert in forming his or her opinion.  The following disclosures were

timely on November 20, 2013, as reflected in the Friedman Research Expert Report:

**"IV. MATERIALS REVIEWED OR RECEIVED**

- Texas Peace Officers Crash Report dated 5/28/2010
- Kaufman County Sheriff's Office CFS Report # 10-37173 dated 5/28/2010
- Elmo Fire Department Report – Incident # 10-0000132 – dated 5/28/2010
- Texas Department of Public Safety Communications Uniform Fatality Report dated 5/28/2010
- Police photos taken at the accident scene on 5/28/2010
- Texas Department of Public Safety photos
- Autopsy Report of Wyndell Greene Sr.
- Autopsy Report of Lakeysha Greene
- Autopsy Report of Wesleigh Greene
- Autopsy Report of Wyndell Greene Jr.
- Dallas County Office of Medical Examiner Affidavit regarding Lakeysha Greene
- Dallas County Office of Medical Examiner Affidavit regarding Wyndell Greene II
- Dallas County Office of Medical Examiner Affidavit regarding Wesleigh Greene
- Affidavit of Jeffrey J. Bernard, MD, Office of Medical Examiner
- Legal briefs
- Various sources of vehicle data including, but not limited to, CARFAX, VinDecoder, DecodeThis.com, equivalencies, Expert Autostats, MVMA/JAMA specifications, Body & Engine Specifications, NCAP testing, Vehicle Crush Stiffness Coefficients, Neptune Crush Stiffness and RepairMate
- Vehicle Year & Model Interchange List (Sisters & Clones List)
- Subject 2010 Toyota 4Runner
- Discovery materials from Toyota received as of November 14, 2013
- Discovery materials from Volvo received as of November 14, 2013
- Discovery materials from Strick received as of November 14, 2013
- Discovery materials from John Fayard Moving & Warehouse received as of November 14, 2013
- Discovery and materials from Dolphin Line received as of November 14, 2013
- 2010 Toyota 4Runner Owner's Manual
- 2010 Toyota 4Runner Service and Repair Manuals
- Toyota 4Runner design drawings produced by Toyota
- 2010 model year Toyota 4Runner (exemplar)
- Written statement of Christopher Wright

---

[2] The arguments made by Toyota on this issue in its Brief is simply rehashing the same argument Toyota and/or Strick made in previous filings, e.g. Dkt. Nos. 380, 391, and 432.  The Court's June 6, 2014 resolved these issues.

- Photos received from client as of November 2013
- Inspection and photos by Will Miller dated 6-23-2010
- DDEC Report by Crash Analysis Testing of Ft. Worth – Detroit Diesel Diagnostic Link dated 6-23-2010
- Inspections and photos by Keith Friedman and Friedman Research Corporation
- 2010 Toyota 4Runner exemplar fuel tank
- 2010 Toyota 4Runner parts drawings
- Exemplar inspection of 2010 Toyota 4Runner on 11-22-2011
- Inspection of Volvo tractor (5-19-2011)
- Deposition of Brian Thompson, Witness
- Deposition of Gary Hatfield, Dolphin Line Service Advisor
- Deposition of Kyle Evans, Tow Truck Driver
- Deposition of Christopher Countryman, Trooper
- Deposition of Dexter Barkley, Trooper
- Deposition of Daniel Sprinkle, Fayard/Strick Trailer Truck Driver
- Deposition of Dr. Chester Gwin, Medical Examiner
- Deposition of Dr. Lynn Salzberger, Medical Examiner
- Deposition of Dr. Tracy Dyer, Medical Examiner
- Deposition of Charles Derrick Moody, Driver of Volvo Truck
- Deposition of James Jay Jackson, Corporate Representative of Strick Trailers
- Deposition of Frank Katz, Corporate Representative of Strick Trailers
- Deposition of Charles Gregory Rushing, Firefighter
- Deposition of Roger Crues, Firefighter
- Deposition of Andrew Wilson Adams Jr., Representative of Volvo Group North America LLC
- Deposition of Charles Edwin Bird, Expert Witness –Crash Warning Systems
- Deposition of Gregory Joseph Prinzo, Volvo Expert-Witness Collision Warning
- Deposition of Ichiro Fukumoto, Toyota Project Manager
- Deposition of Ryan Earheart, VP of Operations Dolphin Line
- Deposition of Joe Gibson, Dolphin Line Safety Director
- Deposition of Jerry Talton, John Fayard's Manager
- Biokinetics report, "2010 Toyota 4Runner Fuel Tank Evaluations," Ed Fournier et al, December 2011.
- Vick accident reconstruction report
- Conversations with Dr. Burton, Mr. Vick and Daniel Langston
- Motor vehicle fire research institute website reports
- References
- Bibliography 1-6"

See, Friedman Research Expert Reports.  See, APP 001-233.  As shown by the passage above, Friedman and Stephenson disclosed very specific documents and categories of things they considered in forming their opinions.  And as stated in a Toyota pleading, these materials include "100 gigabytes of data, and over 10,000 files."  Dkt. Entry No. 381 at PageID 17965.  Thus, there is no dispute that the information submitted to Defendants is properly disclosed in

3

Friedman Research's expert reports as information on which he and Stephenson relied. Moreover, with few exceptions, virtually all of the 100 gigabytes of data, and over 10,000 files that were recopied for Defendants, includes material that were provided to, and/or received from, Defendants throughout the lawsuit. Accordingly, the experts were not required to spend thousands of dollars scanning, copying, and "reproducing" these same discovery materials in order that they may be sent back to Defendants, "along with" the expert reports, especially taking into account the expert report adequately and completely "discloses" these materials as is required.

To the extent Toyota argues at footnote 1 of its brief, the Plaintiffs violated a "formal request for production" this argument cannot pass muster.[3]  Indeed, the information relative to Friedman's expert report was produced "prior" to the completion of Friedman's and Stephenson's January 2014 depositions and prior to the March 17, 2014 close of expert discovery.  Again, this is the same argument Toyota and/or Strick made in previous filings, e.g. Dkt. Nos. 380, 391, and 432.

**B.     The "Size" and Timing of the Friedman Production Was the Direct Result of Toyota's Overly Broad Document Request.**

In an effort to support its conspiracy theory, Toyota complains that "approximately eighteen banker's boxes" of file materials were produced at Friedman's deposition.  Br. at 6. However, Toyota's document production request asked for "the <u>complete</u> file of all testifying

---

[3] Plaintiffs timely objected to Toyota's June 2011 request as premature, considering that at the time of this request, testifying experts had not been identified.  See FED. R. CIV. P. 26(b)(4)(D) (a party may not generally discover facts known to an expert employed only in anticipation of litigation or for trial preparation who is not expected to testify as a witness at trial).  The designation of testifying experts did not happen until November 20, 2013.  Thus, contrary to Defendants' suggestion that there was somehow a two year delay in providing responses, the evidence shows that responsive documents could not have been produced prior to the November 20, 2013, identification of the testifying experts who would have discoverable expert files.  With regard to supplementation under Rule 26(e), the production was "timely" as required.  In addition, for expert witnesses, Rule 26(e) provides that supplementation can occur up to the time the party's pretrial disclosures under Rule 26(a)(3) are due, which is May 23, 2014.  See Dkt. Entry No. 332.  Thus, if the expert files produced to Defendants are governed under Rule 26 supplementation, the production is timely under any reading of the rules.

experts." As discussed above, this resulted in the production of 100 gigabytes of data, and over 10,000 files, which justifies the additional time it took to produce these files. Therefore, Toyota cannot be heard to complain now about the volume of materials produced, or how it affected its ability to review the materials. In fact, due to the volume of material requested by Toyota, it took five Friedman Research staff members, from multiple offices, substantial hours over multiple days to arrange this information for inspection and copying. According to Friedman, the compilation did not get finished until the morning of his deposition on January 15, 2014. Friedman Depo at 86:15 – 87:5 (APP 311-312). Nevertheless, the record demonstrates that Toyota and the other defendants had from January 15-18 to review the materials during the depositions, up until March 17 before expert discovery closed, and up until the June 23, 2014 trial date. Again, this argument rehashes the same argument Toyota and/or Strick made in previous filings, e.g. Dkt. Nos. 380, 391, and 432. The Court's June 6, 2014 resolved this issue.

C.   **Toyota and the other Defendants had the Opportunity and the Ability to Examine Friedman in January Regarding the Computer Simulation is Very Important to Plaintiffs.**

   1.   **Contrary to its misrepresentation, Toyota had full access to Friedman's materials, including the simulations, beginning on the first day of a 4-day deposition period.**

At the request of Toyota and the other defendants, the Court awarded defendants a total of fourteen (14) hours, over two days, to take Friedman's deposition and 14 hours to take Stephenson's deposition.[4] January 15, 2014, was the first day of Friedman's two days of deposition testimony. At approximately 11:10 a.m. on the first day of his deposition, Toyota and the other defendants' counsels were tendered for inspection and/or copying approximately 17 boxes of documents containing Friedman's expert. Following the organization of the boxes over

---

[4] Plaintiffs note for the Court that despite Defendants' representation to the Court that they needed 14 hours for Stephenson's deposition, they spent only seven (7) hours with him and declined Plaintiffs' attempts to produce Stephenson for the continuation of his deposition. (APP 297-301)

his lunch break, Toyota and the other defendants' counsels had unfettered access to the production of material for the eleven (11) remaining hours of Friedman's deposition and seven (7) hours of Stephenson's deposition, over the span of Wednesday, January 15 – Saturday, January 18. In fact, in a January 16, 2014, email Plaintiffs' counsel responded to a misrepresentation that Toyota and the other defendants were prevented access to the boxes:

> Second, contrary to your representation, when Mr. Friedman brought the 15 boxes to his deposition you did not ask him what was specifically in each of the boxes and he certainly did not prevent you from looking at the documents. He asked for just a moment to organize them and you asked him to do so over the lunch break, during which time you could have competed a full review. In addition, you did not arrange to have copied the documents he brought for inspection.

See January 16, 2014, email.  (APP 302).  Friedman also reiterated at the start of day-two of his deposition that the files were suitably organized and that defendants' counsels had full access to the materials.  Friedman Depo at 265:6-266:1 (APP 258-259).  Therefore, even if Toyota's counsel did not believe he had access to the boxes on January 15, 2014, certainly on January 16, 2014, when it was reiterated to defendants that defendants had unrestricted access to delve through and copy items at will, defendants still had 7 hours remaining to depose Friedman and 14 hours in which to depose Stephenson on every item in the production, if they so desired. Again, however, Toyota's argument on this issue rehashes the same argument Toyota and/or Strick made in previous filings, e.g. Dkt. Nos. 380, 391, and 432.  The Court's June 6, 2014 resolved this issue.

### 2.   Defendants were never prevented from reviewing and identifying the finite element analysis simulations.[5]

The Motion also fabricates when it suggests that "Plaintiffs refused the defendants' request to segregate the FE disks."  In fact, a review of the record demonstrates that it is a

---

[5] Again, however, Toyota's argument on this issue rehashes the same argument Toyota and/or Strick made in previous filings, e.g. Dkt. Nos. 380, 391, and 432.  The Court's June 6, 2014 resolved this issue.

flagrant misrepresentation to contend that there was any such obstruction.  See, Friedman Depo at 685:14 – 688:13 (APP 277-280).  Plaintiffs' counsel clarified this position on other occasions, prior to the filing of the subject motion:

> During the three days of depositions, each attorney had access to all of the boxes, including the boxes that contained the computer files and other information regarding the FE analyses and calculations.  There were multiple opportunities for Defendants' counsel to have marked these disks and output documents as separate exhibits.  I recall that Mr. Dawson examined Mr. Friedman on the FE, asked him to separate the Strick FE, and asked to remove that FE from among the remaining boxes that were an exhibit.  **An objection was made to removing this one portion of FE only because the boxes had been marked as one Exhibit by Toyota**.  We could not destroy the integrity of that exhibit.  **However, Mr. Dawson was never precluded from inspecting the material on the disk during the deposition and marking "all of the FE disks" as a separate exhibit, or even marking the Strick FE separately as a subset of the main exhibit.  That way the FE would have been easier to locate**.

See February 26, 2014 email to Strick's counsel. (APP 304).  Likewise, during Friedman's deposition, in response to Strick counsel's misrepresentation of directions given to Friedman, Plaintiffs' counsel made clear that Strick's counsel was not being hindered from conducting a full review and examination of the finite element simulations:

> MR. PITTMAN:  This witness has not refused to do anything.  I have not instructed this witness not to do it.  I have merely told you, as one of counsel of record in this case admitted in the Northern District, that this exhibit has been marked as an exhibit, as one exhibit, one group exhibit, and we will provide all of the -- the full exhibit to all of counsel, but that I'm not going to separate the exhibit to accommodate you at the risk of not maintaining the integrity of an exhibit that's been marked.
>
> **********
>
> MR. PITTMAN:  Don, you've had four hours to have this witness do what Mr. Kern did, what I believe Volvo's counsel also did.  So you had time where you could have had this witness pull out those documents and you could have identified those.  But you waited until your time was completely up.
>
> MR. DAWSON:  I thought you were worried about the integrity of the file.
>
> MR. PITTMAN:  Well, I am.  No, I said in terms of identifying them.  I mean, the exhibit is going to be one exhibit, but you could have had him identify those.

Friedman Depo at 687:4 – 688:13 (APP 279-228).  Thus, these passages do not support Toyota's misrepresentation that defendants' counsels were hampered from questioning Friedman regarding the finite element simulations.  In fact, the record demonstrates that during the deposition, Friedman expressed a willingness to segregate the finite element DVDs for Strick's counsel:

> **Q:**  So could you do that this evening?
>
> **A:**  Potentially.

Friedman Depo at 676:15-17 (APP 276).  The record demonstrates, however, that Strick's counsel never provided Friedman with directions as to which items Strick wanted identified and how the process would work.

### 3.   Defendants' counsel had the ability fully to discuss the FE and simulations with the deponents on January 15, 16 and/or 17.

A further review of Friedman's deposition debunks more of Toyota's misrepresentations.  The Motion suggests that Friedman was not able to answer questions regarding the FEM he had performed.  Another flagrant untruth.  Once again, Toyota's argument on this issue rehashes the same argument Toyota and/or Strick made in previous filings, e.g. Dkt. Nos. 380, 391, and 432.  The Court's June 6, 2014 resolved this issue.

### a.   Friedman had all of the simulation files present, as well as the accompanying software, to be able to answer all questions and make demonstrations for defendants.

Friedman's deposition testimony reflects that he had everything present at the first day of his deposition to be able to provide full testimony during his deposition as to the simulations:

> **Q:**  Do you have a copy of that FE model with you here today?
>
> **A:**  Yes.
>
> **Q:**  Where is it?
>
> **A:**  In one of the boxes.
>
> **Q:**  What format do you have it in?

A:     On a CD.

**Q:**     **Do you have anything here with you that can play or demonstrate that FE model?  Do you have software here?**

A:     I did, but -- **yeah, I think so**.

Friedman Depo at 214:4-14 (APP 257).   Therefore, any of the attorneys, including Toyota's experienced product liability counsel, could have discussed the testing fully with Friedman, complete with demonstrations.  That Toyota's counsel made a strategic decision not to question Friedman more fully of the simulation so that Toyota could later bring a motion to exclude is not a sufficient reason to reward Toyota for its gamesmanship.

       **b.**     **The November 20, 2013, expert report discloses that Friedman and Stephenson conducted testing and simulation throughout their assignment in order to support and illustrate their opinions.**

Friedman has been clear that the testing and simulation analyses have been ongoing, since before the November 20, 2013, expert reports were issued:

**Q:**     All right.  Well, tell me about the finite element analysis simulation work you've done.

A:     Well, we've impacted the -- a vehicle representing a 4Runner, we've -- with a vehicle representing the Volvo.  We've impacted the 4Runner into a Strick trailer and -- with and without underride guards under various conditions.

**Q:**     Okay.  Anything else?

A:     I think they also looked at -- I think that's the general characteristics.

**Q:**     And then what else were you thinking there?  You said you also looked at –

A:     Well, I already said Volvo hitting the 4Runner.

**Q:**     <u>All right.  And when did you conduct this work, sir</u>?

A:     <u>Well, we've been conducting it</u>.  As I said, we got new information, so we incorporated that.

Friedman Depo at 59:20 – 60:12 (APP 237-238).  Freidman testified that at some point they were waiting on information from Volvo.  Friedman Depo at 61:18 – 62:17 (APP 239-240).

This missing Volvo information was the subject of three motions to compel, and on November 8, 2013, the Court ordered that Volvo produce certain information that was needed by Friedman to plug into his finite modeling of the Volvo tractor.  See, Dkt Entry No. 239.  Pursuant to the November 8, 2013, Order, Volvo supplied some of this information to Plaintiffs' counsel on or about November 14, 2013. With less than a week remaining before expert reports were due, Plaintiffs requested an additional six weeks for Plaintiffs' experts to be able to incorporate this new information into the finite modeling testing being conducted by Friedman.  See, Dkt Entry No. 231.  The Court declined to grant the full extension, providing only ten days additional time. Nevertheless, as Friedman testified, the finite element modeling was being performed throughout all of his expert analyses:

> **Q:**    Okay.  So you did some finite element modeling prior to November 20th?
>
> **A:**    We've done finite element modeling through the whole project.

Friedman Depo at 409:12-15 (APP 272). In addition, as discussed herein, contrary to yet another misrepresentation in the Motion, Friedman discussed in great detail the finite element work they did in preparation for the expert report.  Furthermore, later in his deposition, when questioned, Friedman again directed counsel to passages in his report that identify that finite element testing forms the basis, in part, for his expert opinions:

> **Q:**    Did you or did you not say in Exhibit 30 that there was any virtual testing, sir?
>
> **A:**    Yes.
>
> **Q:**    Where?
>
> **A:**    When we described the application of our life subject safety research methodology, which is a computerized methodology.
>
> **Q:**    Then show me where it says, "and we went on to do virtual testing."
>
> **A:**    Well, that's part of the methodology.

**Q:**      I don't care if it's part of the methodology.  You can lay out methodology without doing all of it.  Where does it say, "and we did each of these steps"?

MR. PITTMAN:  Objection, form

**Q:**      You know it doesn't, correct?

MR. PITTMAN:  Objection, form

**A:**      No, I don't know that it doesn't.

**Q:**      Okay.

**A:**      **But I just pointed to a place where it does.  So whether you don't want to agree with that, that's a different issue**.

**Q:**      Okay.  That's fine.

Friedman Depo at 525:11 – 526:8 (APP 274-275).   There are also many passages throughout Friedman's deposition where he engages in discussions of the testing and simulation.

### c.      Defendants were able to, and did, ask detailed questions about the FE and simulations that Friedman performed.

In its Brief at pp. 7-8, Toyota misrepresents that it could not ask Friedman about his FEM at his January 2014.  This is false and rehashes the same argument Toyota and/or Strick made in previous filings, e.g. Dkt. Nos. 380, 391, and 432.  The Court's June 6, 2014 resolved this issue. Nevertheless, an inspection of other portions of Friedman's deposition demonstrates that he was questioned at length regarding his finite element simulations, such as this dialogue:

**Q:**      What other bases do you have?

**A:**      Well, there's a whole, you know, set of information that's associated with the crash, with the vehicle itself.  Looking at the deformations that we see on the vehicle, we can see the way the vehicle was deformed.  We can see contact on the road.  We understand how like, for example, the leading arms are fractured on the driver's side, the wheel goes forward into the -- into the C post area and door.  So there's a whole series of resulting -- we can see deformation of the trailing arm bracket indicating that it's highly distorted.

So there's a whole series of physical evidence on the -- both at the scene on the road and on the vehicle itself, which are the basis for what I'm saying.  **I'm saying that the simulation is an illustration of that just illustrating the – the opinion**.  But the basis is the physical evidence, what we see, and studies of the vehicle and how the tank is originally laid

out in exemplar vehicles and a whole, you know, myriad of details of -- that we've pursued during the course of the investigation.

**Q:**   So I want you, then, sir, to give me all the bases for your opinion that the Volvo struck the -- when the Volvo struck the 4Runner initially, but the tank was driven into the ground.  And if I understand you now, you've said the photos on Page 35, the leading arms were fractured on the driver's side, there was deformation of a trailing arm bracket that also constitutes physical evidence of the tank being driven into the ground?

**A:**   Well, it's –

**Q:**   **And there was a simulation that was conducted**.  What else do you have to support your opinion that the tank was driven into the ground?

MR. PITTMAN:  Objection, form.

**A:**   Well, the initial – you know, the -- the way the tank is put in the vehicle, the orientation of the vehicle and how the frame – how the frame deforms during the crash and -- and the remnants of the tank itself and the bracketry associated with the tank.  Those are other – so there's all the physical evidence about the vehicle itself, of which there are many points.

There's also -- and so fitting that together with the information we see at the scene, we can see that the spare tire is driven down into the ground, we can see that the differential is in the ground, we can see that the trailing arm suspension is deformed, we can see that the rocker -- not the rocker -- the frame is dragging on the ground, and we can see that the wheel drives into the C post area.

So all of that shows us that the penetration was forward into the -- into the tank area  and that as the frame is deforming the tank is deforming as well in terms of its bending, and then you have these structures moving forward into it, as well as being driven down by the Volvo.  So that's the override.

**Q:**   All right.  So in terms of –

**A:**   So because -- let me just make one comment that because we see the scratches on the -- on the shield and other parts of the frame and because the tank hangs down below the frame and because we can expect that the tank -- that the tires blow, et cetera, that that whole area is now down in the ground.  It can't -- the fuel tank can't help but be on the ground because it's below the frame, and it's below the shield as the vehicle is at an angle.

**Q:**   And have you conducted any crash tests to confirm this hypothesis?

MR. PITTMAN:  Objection, form.

**A:**   Yes.

**Q:**   What crash test did you conduct?

12

**A:**     **Well, as I said, we ran a simulation of that situation and it shows that that's what is happening**, that the Volvo overrides the 4Runner and pushes it down into the ground deforming the trailing arm suspension. The rear bumper pushes forward on the spare tire, pushes on the differential, which then causes the failure of the suspension arms, which then causes -- and the override then pushes the whole thing down into the ground.  So the tank is on the ground.

Friedman Depo at 90:21 – 94:4 (APP 241-245). Later in the deposition, another one of

defendants' counsels explored more of Friedman's opinions, calculations and illustrations

derived from his use of finite element modeling and simulation:

**Q:**     And let's be clear so we're not confusing anybody.  You made a model of the underride guard?

**A:**     Yes.

**Q:**     So when you say you had it, you're not talking about physically having the underride guard that was involved here?

**A:**     No, but we have a physical underride guard.

**Q:**     Okay.  I'm talking about in your -- in the finite element analysis that you talked about.  So we're not talking about a real actual physical underride guard?

**A:**     Yes, we do have a real physical underride guard, and we then created a model of it.

**Q:**     All right.  So that underride guard was obtained from where?

**A:**     From a dealer.

**Q:**     Okay.

**A:**     From a Strick dealer.

**Q:**     All right.  And it was one that was the same as –

**A:**     From New Life, as I recall.

**Q:**     It was the one that was the same as the one that had -- appears to have been on the back of the truck at the time of the accident?  Yes?

**A:**     Well, it has a general shape like that, yes.

**Q:**     And you took that and you -- did you take measurements off that?

**A:**     We took measurements of the underride guard that we received.

**Q:**     Okay.  And you inputted those into your model?

**A:**     Yes.

**Q:** And then how did you determine -- did you use some standard to determine what -- how much strength the welds would have?  How did you do that?

**A:** No.  What we assumed was that the -- we used the underride guard and attached it to the underpart of the frame so that it wasn't falling off like this -- like the underride guard that was in the accident.

**Q:** Okay.

**A:** So we compared it to the effectively falling off underride guard that essentially was -- was not absorbing energy in the crash.

**Q:** How did you tell the model it was attached?

**A:** We connected the nodes between the underride guard and the trailer.

**Q:** And do you have to -- do you have to give it a strength for that attachment?

**A:** No.  We just say it's attached.

**Q:** Okay.  And in the model, then, what does the model -- how does the model determine how strong that attachment is?  Well, let me ask you a better –

**A:** Is it –

**Q:** Let me ask you a better question.  Does the model test the strength of the attachment to the trailer or just the guard itself?

**A:** Both.

**Q:** Okay.  So how does it determine how much force is transferred from the guard into the trailer through that connection?

**A:** Well, that's what finite element modeling does, is it takes -- it breaks down the structure system into very small pieces, and then using the sort of laws of mathematics and physics it transfers the stresses and strains from one element to the next so that you get an overall effect from an impact on the whole structure.

Friedman Depo at 409:12-15 (APP 272-273).  The deposition has multiple other areas where counsel explored Friedman's opinions regarding testing and simulation throughout this case, since long before November 20, 2013. See, e.g. Friedman Depo at 211:18-22 (APP 256); 277:11 – 279:20 (APP 260-262); 282:20 – 285:25 (APP 265-268); 379:17 – 381:12 (APP 269-271); 403:3 – 408:6 (APP 313-318); and 409:1 – 410:13 (APP 319-320).  Accordingly, it is clear that defendants had detailed discussions with Friedman about the modeling and simulation his

14

company conducted in formulating his opinions. Friedman even includes drawings and information in his report that are clearly finite element simulation. Thus, the defendants all knew it was being used. Finally, defendants have presented no showing that they were unable, during twenty-eight (28) potential hours of deposition testimony from Friedman and Stephenson, to discuss any of the materials in the boxes of documents produced to defendants.

### D. The pre-January 15, 2014 Computer Simulation Previously Made Available to Defendants is Very Important to Plaintiffs.

From the outset of this litigation, Plaintiffs made clear that their theory of the case rested on evidence that defendants had access to safer alternative designs when the Toyota 4Runner, the Volvo Truck, and the Strick trailer were manufactured. To establish their claims Plaintiffs requested Computer Aided Design ("CAD"), Computer Aided Engineering ("CAE") and Finite Element modeling (FE) and related information from Defendants Toyota Motor Corporation, Toyota Motor Engineering & Manufacturing North America, Inc., Toyota Motor Sales USA, Inc., (collectively, "Toyota") and Volvo Group North America, LLC, a/k/a Volvo Trucks North America ("VGNA"). Plaintiffs first requested CAD, CAE and FE models from Toyota in discovery requests submitted to Toyota on June 17, 2011. After VGNA was added to the lawsuit and appeared on September 16, 2011, Plaintiffs served a similar request for CAD, CAE and FE models to VGNA on October 4, 2011. As the Court is aware, in finite element analysis modeling, a computer representation is created by inputting numeric values representing the vehicles materials, including geometric dimensions, material properties and physical properties, into modeling software. This computer representation of a package is then subjected to simulated physical and crash conditions to generate an approximation of how the vehicle will operate in the physical world under crash conditions. This modeling is well accepted and used throughout the automobile industry for predicting and confirming reliability of vehicles in crash conditions.

15

Indeed, through FEM, the crashworthiness characteristics and safety features of a vehicle's designs are evaluated from computer analysis results. FEM also allows the accurate prediction of a vehicle's reaction and deformation in crash simulations by expert designers, reconstructionists and other experts. It is undisputed that the input and analyses of these models are performed by those with substantial knowledge and experience, i.e. experts.

Having access to actual (or the closest available) electronic data such as CAD, CAE, FE, and CATIA 3–D that is in Toyota's and VGNA's possessions would have been helpful to Plaintiffs in establishing their claims and defending against Defendants' claims. As a result of Defendants failure to provide this clearly discoverable information, Plaintiffs were forced to file several motions to compel. The last of the three motions to compel was filed against VGNA on August 9, 2013. (Dkt. Entry No. 164). The last of the three motions to compel against the Toyota Defendants was filed on September 3, 2013. (Dkt. Entry No. 174). Pursuant to the September 30, 2013 Court Order (Dkt. Entry No. 207), the Court set a hearing on this motion to compel on October 4, 2013. On October 31, 2013, the Court issued an Order on the motion to compel granting it in part and denying it in part. Later, Toyota and VGNA were given 14 days to comply with the portions of the motion to compel for which the motion was granted. Considering that Plaintiffs' experts did not have sufficient time to analyze these new production items, Plaintiffs requested additional time for preparation of expert reports. The Court denied the full length of the extension requested.

Based principally on defendants' representations, the Court did not order the production of full model FE and CATIA. Plaintiffs' experts were therefore forced to perform additional or alternative analyses through alternative testing or attempts to recreate the computer modeling. Much of the alternative testing Plaintiffs' experts were forced to perform was done near in time

to the preparation of the initial expert reports.  As discussed herein, the nature of this testing has been adequately disclosed in the expert reports.  And the importance of this testing cannot be overstated, as evidenced by Plaintiffs spending 2 ½ years, and three motions to compel, fighting to obtain the FE models and testing sources from Toyota and Volvo.  As a result of the delays in obtaining discovery, Plaintiffs requested numerous extensions to expert disclosure dates.  Thus, this factor weighs in favor of denying Toyota's motion.

      **E.**    **Defendants Have Not Been Prejudiced By the Timing of the pre-January 15, 2014 FEM Production.**

           **1.**    **Defendants have had the opportunity to fully explore the pre-January 15, 2014 FEM Production with Friedman.**

Without asserting that there were any untimely disclosures, even in instances where there has been late-disclosed evidence, courts have permitted evidence to be used where the other party has adequate time to prepare and would not suffer prejudice as a result. See *Tex. A & M Research Found. v. Magna Transp., Inc*., 338 F.3d 394, 402 (5th Cir.2003) (weighing the four harmlessness factors and concluding that the district court had not abused its discretion by permitting certain evidence to be used at trial despite failure to disclose under Rule 26(a) because, "[a]lthough [the party seeking to use the evidence] failed to explain its failure to disclose, the prejudice to the adverse parties was negligible because the witness in support of whose testimony the [contested evidence] [was] offered had been designated properly as a witness before trial. Further, any prejudice was cured by the approximately one month during which [the opponent] was allowed to examine and respond to the contested evidence"); *Dunn v. State Farm Mut. Auto. Ins*. Co., 264 F.R.D. 266, 276 (E.D.Mich.2009) (permitting defendant to use evidence despite defendant's failure to timely supplement its responses before discovery cut-off date because delay was harmless given that plaintiff still had months before trial to adequately prepare itself).  Here there simply has been no prejudice to defendants.

As explained above, Toyota and the other defendants have always been aware that finite element modeling and simulation would be used in this matter. Plaintiffs fought for this information for nearly three years. Defendants were also informed in pleadings that Plaintiffs' experts anticipated receiving the information that the Court ultimately chose to exclude from discovery. Friedman and the other experts were waiting on this information to use to complete their expert reports. However, once the experts were informed that this information was not forthcoming, the experts had to undertake additional "workaround" efforts to try and replicate some of the information that was not provided. Therefore, it would be disingenuous for Toyota and the other defendants to contend they were unaware of the need for the finite element modeling or that Plaintiffs' experts were using and relying on it. Indeed, even when the Court denied the production of full vehicle FE materials, the Court ordered defendants to produce materials that everyone knew would be used by Plaintiffs' experts to conduct simulation and testing. *See, e.g. Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir.2004) (no abuse of discretion to allow testimony when "district court reasonably found that there was no unfair surprise" about the topic of testimony); *Farmland Indus., Inc. v. Morrison–Quirk Grain Corp*., 54 F.3d 478, 482 (8th Cir.1995) (district court did not abuse its discretion by allowing testimony when opposing party "was neither surprised nor confused at the substance" of the testimony).

In addition, as discussed herein, during their depositions, the experts testified at length about testing and simulation they did as support for and to illustrate their opinions. In a case based on similar facts and involving the Toyota defendants the court refused to strike evidence regarding the expert's opinions where the expert had been deposed on those opinions. *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, 2013 WL 5763178, (C.D.Cal. 2013). Given that defendants had twenty-eight (28)

hours to examine Friedman and Stephenson on their opinions, there is no prejudice.  More importantly, the testing and simulation work do not contain any new opinions.  Rather, they are evidence of the basis for opinions that are expressed in the written reports.  Thus, they should not be excluded.  *Graves ex rel. W.A.G. v. Toyota Motor Corp*., 2012 WL 38894 (S.D.Miss. Jan. 9, 2012) (allowing the inclusion of opinions "clearly articulated" in the report); *Allen v. Ford Motor Co*., 2010 WL 3791037 (E.D.Tex., Sept. 23, 2010) (allowing an affidavit to clarify an opinion taken out of context in a deposition).

Finally, the Court already provided defendants with two (2) additional hours to take Friedman's deposition on the pre-January 15, 2014 FEM. In the spirit of cooperation, Plaintiffs' counsel allowed an additional hour of deposition testimony.  Friedman has fully responded regarding all of the FEM that serves as the basis of Toyota's Motion.

### 2.   Defendants' Experts Have Had Five Months to Dissect the pre-January 15, 2014 FEM Production.

Friedman's pre-January 15, 2014, FEM was tendered to defendants' counsel on January 15, 2014.  According to information supplied by both the copying service and the court reporting firm retained by defendants to copy the documents from Friedman's deposition, these boxes were all copied and returned to Friedman on January 22, 2014.  (APP 306-308).  Therefore, the materials were in the possession of the defendants' court reporter by January 22, 2014.  The experts retained by defendants to review and rebut Friedman and Stephenson's opinions are Richard Dyer (deposed on February 10), Richard Lange (deposed on February 17), Michelle Vogler (deposed on February 18), David Viano (deposed on February 19), Dolph Lohwasser (deposed on February 20), and Timothy Cheek (deposed on February 27).  Accordingly, considering the materials were fully copied by January 21, these experts conceivably had anywhere between 18-36 days to review the materials produced by Friedman to be prepared to

discuss these materials at their depositions.  In addition, since the materials were copied by January 22, 2014, Strick and the other defendants had forty-eight (48) days to issue supplemental expert reports, serve written expert discovery, or take other depositions, if needed, before the expert discovery period closed on March 10, 2014.  Finally, Defendants' experts have now have nearly five (5) months to review Friedman's pre-January 15, 2014 FEM.  In fact, it was clear from multiple technical questions asked by defense counsel at Friedman's June 15, 2014 deposition that defendants have had their experts reviewing Friedman's FEM.

Therefore, even if the Court were to conclude that the January 15, 2014, production was late (which Plaintiffs zealously dispute), courts have permitted evidence disclosed after the discovery deadline to be used where the other party has adequate time to prepare and would not suffer prejudice as a result. *See Tex. A & M Research Found. v. Magna Transp., Inc*., 338 F.3d 394, 402 (5th Cir.2003) (weighing the four harmlessness factors and concluding that the district court had not abused its discretion by permitting certain evidence to be used at trial despite failure to disclose).  In addition, the June 13, 2014, deposition ordered by the Court was meant to alleviate the harm, in any, that Defendants claim to have suffered from the timing of Friedman's FEM production. With five months to prepare questions regarding Friedman's FEM, there is simply no prejudice and no good cause for a continuance.

**F.      Defendants Are Not Prejudiced By the Timing of any post-January 15, 2014 FEM Production.**

**1.      Plaintiffs had no strategic plan to hide FEA.**

To begin with, Toyota claims that Plaintiffs' "Notice of Service of Plaintiffs' Rule 26(e)(2) Expert Supplementation" is false. Br. at 9.  Without agreeing that this notice contained an erroneous statement, it is clear that this statement was based on information Plaintiffs' counsel held at the time.  And besides, the alleged "missing" supplementation was actually

provided to all defendants at the deposition.  In another attempt to paint Plaintiffs in a bad light,

Toyota claims that Plaintiffs' counsel obstructed Toyota from discovering when Friedman's

FEM had been produced to Plaintiffs.  However, upon review of the full transcript, it is clear that

the instruction was given only because the question exceeded the scope of the Court's June 6,

Order.  Otherwise, Toyota was free to ask questions regarding the timing of the post-January 15,

2014, production:

> **Q:**   And when did you first provide the input files or the content of Exhibit 31
> to Mr. Pittman?
>
> MR. PITTMAN:  Objection, form.  I'm going to instruct you not to answer the
> question.
>
> **Q:**   Are you going to follow your attorney's instructions?
>
> **A:**   I believe so.
>
> **Q:**   When were all the input files completed that are found on Exhibit 31?
>
> MR. PITTMAN:  Objection, form.  I'm going to instruct you not to answer the
> question.
>
> MR. STONE:  Counsel, I'm entitled to answer -- ask him questions about --
>
> MR. PITTMAN:  If you want to ask him about the -- Kurt -- I'm sorry -- David,
> there are files on here that precede November 20th and ones that -- that are after
> November 20th.  So you're asking him about everything on here and expecting one
> answer?
>
> MR. STONE:  Well, he can tell me that.
>
> MR. PITTMAN:  Well --
>
> MR. STONE:  Let him answer.
>
> MR. PITTMAN:  But -- but the scope is after November 20th.
>
> MR. STONE:  Well --
>
> MR. PITTMAN:  **So if you want to ask him about after November 20th, feel
> free**.

MR. STONE:  All right.  May I see that, please?

MR. PITTMAN:  Yes.

Friedman Depo at 710:25 – 712:6 (APP 325-327).  Thus, contrary to Toyota's misrepresentation, there was no plan to conceal any information.  It was simply an attempt by Plaintiffs' counsel, early in the deposition, to ensure that the parameters of the limited scope deposition ordered by the Court were followed. In fact, throughout the deposition, Toyota eventually asked Friedman on multiple occasions about the full details of the FEM production and reasons for preparation of the FEM.  Accordingly, there has been no prejudice.

> **2.      Friedman testified that the post-January 15, 2014 FEM is merely refinements of early FEM and was performed in some cases to test Defendants' experts' theory.**

The USB drive that Friedman provided in response to Toyota's and Strick's deposition subpoena contained input data for Friedman's FE Runs 1, 2, 2A, 3, 3A, 4, 4A, 5, 6, 7, 7A, 7B, 8, 9 and 9A. As Friedman testified fully during his deposition, each of the Runs with an "A" designation is simply an iterations or enhancements of earlier Runs.  These Runs do not change any of Friedman's opinions:

Q:     Have there been any changes -- substantive changes or refinements to Run 2 since your deposition?

A:     No, I don't -- I mean, I -- if I understand your question, no, it's still the same as it was. There's a Run 2A.

Q:     Okay.  And what -- when was Run 2A done?

A:     Sometime after the deposition.  But it uses the materials that were there at the time of the deposition.  So the information that's in Run 3 --

Q:     Hold on.  Let me stop you right there, please, sir.  Does Run 2A have its own set of input files.

A:     Yes.

Q:     And were there any substantive changes in the input files for 2A as opposed to Run 2?

A:     Run 2A uses the information like what was the SUV in Run 3 in the impact configuration of Run 2, but there's no substantive changes in terms of opinion.

Q:     So you -- so you -- you used the 4Runner model from Run 3 in the impact scenario in Run 2?

A:     Correct, just substituted the vehicle.

******

Q:     Were there any substantive refinements in Run 3 input files from your deposition, January 15th, until now.

A:     I don't believe so.  I mean, basically there's some refinements, but they're not substantive in the sense that they don't change my opinions or anything like that.

As for the timing of Friedman's FEM enhancements, it is not unusual that an expert will continue to test his/her hypotheses if the expert comes into possession of new discovery following the issuance of his opinion.  Indeed, the rules contemplate that an expert is required to supplement his or her opinion if they learn it is incorrect.[6]  Here, it is obvious from Friedman's testimony that periodically following his deposition he tested various theories advocated by Defendants' experts.  He was not forming new opinions based on his own work.  In those cases, Friedman may have created one or more iterations to examine or test Defendants' theories to himself. Thus, the Court should not exclude any supplemental iteration that Friedman conducted to examine the veracity of the theories being advance by Defendants' experts.  *See McPherson v. Rowe*, 366 Fed.Appx. 43 (11th Cir.2010) (allowing the inclusion of new information not included in an expert report, particularly because the experts were not testifying to new opinions based on new information).

### 3.     Toyota is unable to argue that the post-January 15, 2104 FEM work forms new opinions and/or that all of it is discoverable.

In its Motion, Toyota misrepresents the nature of Friedman's post-January 15, 2014 FEM work.  A portion of Mr. Friedman's post-January work was done merely to further illustrate the opinions he had already provided in his initial report and during the fourteen hours of his deposition testimony.  Nothing was done to change or modify his opinions.  Nor did the other

---

[6] To the extent the additional Runs are supplemental expert work, the deadline for Friedman's supplementation was May 23, 2014.  Thus, Plaintiffs ask that the Court find that 3 weeks did not work a hardship to Defendants.

Run iterations alter his opinion.  In other words, a portion of his post-January work is creating demonstrative trial exhibits to further illustrate his opinions. It would be one thing if the post-January work changed or modified his opinions. Then, and only then, would there be an issue of timeliness. Timeliness should not be an issue when an expert is merely creating additional trial exhibits.  As discussed above, the other portion of Mr. Friedman's post-January work was looking at the Defense experts' opinions.  Friedman conducted FE modeling using the defense expert opinions to get a feel for whether their opinions had any validity. It is not uncommon for experts to review and analyze the other side's experts' work not only for rebuttal purposes, but also to test their opinions, especially when those opinions are different than theirs. That work did not change or modify  Friedman's opinions. On the contrary, if anything, Mr. Friedman's work was further supported. Some of that work was "back of the envelope" type work, was not relied upon by Mr. Friedman, was not going to be used at trial, and therefore was not produced. Some of that work was produced, and that work essentially represented the same Runs as done previously by Mr. Friedman but using some of the defense expert parameters. Obviously, that work could not be done until after the defense experts' reports had been produced and the experts had been deposed.  Thus, there is nothing mistrustful about Friedman's post-January work.

### 4.    Plaintiffs made several overtures to address what Toyota claims has prejudiced it but neither effort was accepted.

Once Plaintiffs' counsels were made aware that Friedman had fashioned demonstrative trial aids that were created from one or more of the "A" Runs, Plaintiffs' counsel offered to make an early exchange of potential trial exhibits with Toyota and the other defendants, including all of the AVIs that form the basis of Toyota's Motion. The offer was made on May 31, 2014 (APP 329-330).  If this offer to exchange exhibits had been accepted, Defendants' counsel would have had two weeks to review the relatively few post-January 15, 2014, FEM to question Friedman

about it on June 13, 2014, during his third deposition.  Toyota declined this offer.  In addition, Plaintiffs' counsel also offered to withdraw the post-January 15, 2014, demonstrative exhibits, i.e., those that were not clearly provided at Mr. Friedman's January deposition, specifically, those runs other than 1,2,3,4,5,6,7 and 9[7].  Toyota's counsel indicated that it would not accept this overture, thus making it clear that Toyota is using the Motion, not to argue for the exclusion of the post-January 15, 2014, demonstrative exhibits, but as a fourth attempt to exclude all of Friedman's FEM.  Thus, the Motion must be denied.

## CONCLUSION

Here, it is clear that there has been no untimely production of material.  In addition, none of the defendants has been prejudiced by Plaintiffs' production of the FEM information. Finally, Toyota has not met its burden to demonstrating why a continuance should be granted.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the Court deny the Motion in its entirety, deny the request for continuance and for such other and further relief to which Plaintiffs may be allowed in law or equity.

Respectfully Submitted,

---

[7] Friedman testified that these Runs were, or should have been, available to be copied at his January deposition. Friedman Depo at 713:4-20 (APP 328).

/s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com

/s/ Daryl K. Washington
DARYL K. WASHINGTON
State Bar No. 24013714

**LAW OFFICES OF DARYL K. WASHINGTON
P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214-880-4883
469-718-0380 - fax
dwashington@dwashlawfirm.com

26

**CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2014, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.

  /s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN